**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
steve_sady@fd.org
**Steven T. Wax**
**Federal Public Defender**
steve_wax@fd.org
**Ruben L. Iñiguez**
**Assistant Federal Public Defender**
ruben_iniguez@fd.org
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**503-326-2123 Telephone**
**503-326-5524 Facsimile**

**Attorneys for Defendant**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 10-475-KI |
| Plaintiff, | REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S FIRST MOTION TO COMPEL DISCOVERY AND DEFENDANT'S REQUEST FOR DISCOVERY |
| v. | |
| MOHAMED OSMAN MOHAMUD, | |
| Defendant. | |

The government's response mischaracterizes the discovery issues: the defense seeks information required under Rule 16 and *Brady v. Maryland*, 373 U.S. 83 (1963), not "open file" discovery; and the defense does not assert that potential entrapment involves different rules of

discovery, but asserts that the unique facts of this particular case, and the constitutional right to present a defense, require production of a broad range of potentially exculpatory material relevant to entrapment. The necessity for the orders to compel requested by the defense are apparent from the government's arguments. Given the government's claim that it does not understand the exculpatory significance of the Bill Smith emails, this Court can have no confidence that the government has an adequate sense of what might be exculpatory in this case. Beyond the Bill Smith emails, the government questions whether there has been a showing regarding predisposition, inducement, and vulnerability sufficient to trigger any concerns. Again, the government demonstrates that it cannot accurately assess what constitutes exculpatory evidence in the context of this case. The *ex parte* statement regarding the potential defense answers the claim that the defense has asserted only "speculative and ambiguous theories that do not meet the threshold of materiality" (Resp. at 10). Under the unique circumstances of this case, each of the requested areas of discovery should be ordered produced.

A.     **The Bill Smith Discovery Violation And The Government's Narrow View Of What Constitutes Exculpatory Material Demonstrate The Need For An Order To Compel The Government To Meet Its Discovery Obligations.**

In the motion to compel, the defense asserted that the government had failed to reveal contact by a government agent – Bill Smith – that began in November 2009. Mem. Mot. to Compel at 7-8. In response, the government claims that its agent's email contact with Mohamed is not "related to the case." Resp. at 20. On the contrary, the correspondence between Bill Smith and Mohamed demonstrates that Smith was acting as an agent provocateur, attempting to encourage Mohamed to engage in violent activity in this country. Just as in *Jacobson v. United States*, 503 U.S. 540 (1992), where the activities of the postal service in sending emails encouraging trafficking in illegal

pornography led to a finding of entrapment, the activities of the government agents here reveal an early and coordinated effort to encourage violence in the United States. The Bill Smith email exchange is relevant and exculpatory based on three principles of entrapment law: predisposition is measured from the first contact with the government agent, which we now know to be at least November 9, 2009, not the June 25, 2010, date previously disclosed by the government; the government agent initiated discussions regarding violent activity in the United States; and Mohamed did not take any action based on the provocative initiatives of the government agent.

The failure to produce evidence that Bill Smith is a government agent violated this Court's discovery order. The government recognizes that it has an obligation under *Brady* to provide discovery, Resp. at 3, and the discovery deadline was February 15. The discovery provided up to that date and after included no indication that Bill Smith was a government agent. The government must possess the paperwork and reports that are necessarily generated by a government agent who contacts a citizen for such investigative purposes. If not for fortunate defense work, this exculpatory fact would have continued to be suppressed. It was only by backtracking through voluminous emails, and clearing out hundreds of lines of distracting code, that the defense was able to understand Bill Smith's apparent connection to the government. Once confronted with the defense conclusions, the government admitted Bill Smith acted as a government agent. However, the conscious determination by the agency that Bill Smith should not be disclosed to the defense as an agent, purportedly because the government does not believe the information is helpful to the defense, establishes that the government alone should not be permitted to determine what is exculpatory without this Court's supervision and instruction. As in *Alderman v. United States*, 394 U.S. 165, 182 (1969), the defense perspective is necessary to determine what constitutes exculpatory evidence. The

government still has provided no information regarding Bill Smith and his training, instructions, and activities regarding his email exchange with Mohamed.

To this date, the government continues to claim the Bill Smith information is not useful to the defense. The government has not explained why the exculpatory value to the defense, as explained in the motion to compel, does not apply, simply relying on a conclusory claim of irrelevance. *Compare* Mem. Mot. to Compel at 7-8 *with* Resp. at 20. Rather than a simple oversight, the failure to provide exculpatory material is a product of the government's restrictive view of its obligation to provide information that may be helpful to an entrapment defense. Moreover, this restrictive view is not limited to the Bill Smith emails, but rather affects much of the government's analysis of specific discovery requests. While conceding that "entrapment may alter the Court's assessment regarding what constitutes relevant evidence," and correctly citing the predisposition factors and standard for inducement, Resp. at 11-13, the government wholly fails to apply that law to the facts of this case and the current discovery issues.

Even in its section entitled "Entrapment and Discovery," the government ignores its own discussion of entrapment law when responding to Mohamed's discovery request, instead relying on inapplicable non-entrapment cases. In arguing that the defense is not entitled to material in the government's possession regarding Mohamed's behavior that is inconsistent with predisposition to commit the crime charged, the government fails to mention any of the entrapment factors it cites in the previous paragraph, such as the relevance of the "character and reputation of the defendant" or the "nature of the government's inducement." Resp. at 12-13. This is despite its earlier citation to *United States v. Poehlman*, in which the government used its knowledge of the defendant's character and non-criminal interests to induce him to commit a crime. 217 F.3d 692, 702-05 (9th Cir. 2000).

**PAGE 4    REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S FIRST MOTION TO COMPEL DISCOVERY AND DEFENDANT'S REQUEST FOR DISCOVERY**

Instead, the government sets up the straw man claim that Mohamed's discovery request presupposes that "criminals must do evil every waking moment of the day." Resp. at 13. Then, the government proceeds to argue against that straw man with a lengthy discussion of two cases that do not involve entrapment: *United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990) (rejecting discovery of government surveillance of defendant's innocuous activities on relevancy grounds in a non-entrapment case); and *United States v. Hedgcorth*, 873 F.2d 1307 (9th Cir. 1989) (defendant barred from offering evidence of his legitimate work for the government where offered as character evidence in a non-entrapment case). The government's response consistently ignores applicable entrapment law in its specific discovery responses. The following discussion briefly expands on some of Mohamed's specific requests.

   1.   *Statements Of Defendant*

The government argues that Mohamed is not entitled to all written or recorded statements of the defendant in its possession. Resp. at 17. Instead, the government claims that it will decide the relevance of material in its possession and that it has already provided significant irrelevant material to the defense. Resp. at 17. It further states that, as a "courtesy," it has provided material from an "unrelated matter" in November 2009 that resulted in the creation of a mirror image of Mohamed's computer, a search of his cell phone, and a police interview. Resp. at 17-18. These arguments further highlight the deficiency in the government's understanding of relevance in this case.

From the defense's perspective, very little of the discovery provided to date has been irrelevant to assessing such entrapment factors as the defendant's characteristics and the government's conduct. Further, what the government knew about Mohamed – and how it eventually

**PAGE 5    REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S FIRST MOTION TO COMPEL DISCOVERY AND DEFENDANT'S REQUEST FOR DISCOVERY**

used that knowledge – is highly relevant to inducement. *See, e.g., Poehlman*, 217 F.3d at 702. The government's view that it can properly assess the relevance of certain material is belied by its incorrect claim that "much" of the material provided has been irrelevant.

With respect to the November 2009 incident, the government again misses the relevancy mark by describing it as an "unrelated matter." Resp. 17. Because the FBI was involved from the outset, what the agents learned and how they used that knowledge are relevant to analyzing predisposition and inducement. Further, the search and seizure activity is directly relevant – and essential – to litigating motions to suppress based on the police intrusions into zones of privacy. Based on the discovery provided to date, it appears that the FBI became involved within one day of the incident, observed and potentially assisted in a police interview, received significant data from Mohamed's cell phone, and received a mirror copy of his computer. Then, within a week, the first known government agent—Bill Smith—contacted Mohamed attempting to engage him in violent acts.

    2.    *Material Related To Government Monitoring*

Although the defense does not know the precise date, the FBI apparently was already physically monitoring Mohamed at least a month prior to the November 2009 incident discussed above. Well before that, agents were monitoring Mohamed's online activities. The defense's discovery request for material related to such monitoring is specific, and not "broad, vague and unclear." Resp. at 19. Further, it is highly relevant to assessing government conduct in terms of predisposition and inducement because the undercover agents clearly used information from surveillance activities in approaching Mohamed. One obvious example is that agent Bill Smith attempted to ingratiate himself with Mohamed by recommending an online publication based on the

PAGE 6    REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S FIRST MOTION TO COMPEL DISCOVERY AND DEFENDANT'S REQUEST FOR DISCOVERY

government's belief that Mohamed had connections to the publication. In addition to potential trial evidence, disclosure of information related to monitoring is the necessary predicate to this Court's pretrial determinations regarding the legality and fruits of surveillance.

   3.   *Material Related To Government Contact With Defendant*

The defense requests material related to any government contact with Mohamed, which is clearly related to any analysis of entrapment factors. The government responds that it will withhold material "to the extent such contact has nothing to do with the case or defendant's predisposition." Resp. at 19. Immediately thereafter, however, the government again reveals that it cannot be relied upon to accurately assess relevance, because it claims that it has already, "[a]s a courtesy," provided material related to two government agents who contacted Mohamed while at the same time claiming that the government contact did not "relate to the case or defendant's predisposition." Resp. at 20. Those two contacts were Bill Smith, who actively attempted to engage Mohamed in violent activities in the United States, and another unnamed agent who attempted to engage Mohamed on an online forum. Given that predisposition is measured from the first governmental contact (*Jacobson*, 503 U.S. at 549 n.2; *Poehlman*, 217 F.3d at 698), and given that the undercover agents were not the first attempt on the part of the government to engage Mohamed in unlawful activities, it is flatly incorrect for the government to claim these earlier contacts are irrelevant to an entrapment defense.

   4.   *Training And Background Information Of The Undercover Agents*

In order to assess the predisposition and inducement, it is critical to understand the training and background of the undercover agents. The discovery provided to date reveals that the agents were well versed in certain psychological techniques aimed at ensuring compliance. The greater training, experience, and expertise of the agents, the stronger the case for government inducement,

especially where the target is a vulnerable and immature teenager. The government has not asserted that it has searched for and determined the existence of training and background information. However, the existence and availability of such information is obvious. For example, in recent litigation in Los Angeles, a former undercover operative who was hired to infiltrate the Muslim community described extensive government training and instruction that, if similar training and instruction are present in this case, would be highly relevant to the assessment of government inducement activities. *See Monteilh v. FBI*, SA CV 10-00102-JVS, Civil Complaint, at 5-8 (C.D. Cal. filed Jan. 22, 2010).

    5.    *Pre And Post-Meeting Recordings, Access To Recording Device, And Notes Of Meetings Of The Undercover Agents*

The transcripts of the meetings between government agents and Mohamed show that the agents had a specific approach to Mohamed and planned what issues they wanted to discuss with him. Recorded information before and after the meetings would allow the defense to analyze the nature of the government's inducement and the manner in which agents deliberately targeted certain of the defendant's vulnerabilities. The government's assurances that the recordings do not contain exculpatory material cannot be relied upon, especially given its narrow understanding of relevance under applicable entrapment law.

With regard to analyzing the recording device that allegedly failed to engage in the critical first meeting, the defense cannot be expected to rely simply on the government's assurance that the batteries in the device failed. Elementary defense work involves obtaining an expert to guide cross-examination and to provide potential rebuttal evidence. *See Ake v. Oklahoma*, 470 U.S. 68, 80-82 & n.7 (1985). Specific forensic analysis must be conducted to test the relevant devices and to obtain

expert assistance for cross-examination and affirmative evidence regarding the failure to record the critical July 30th meeting.

Finally, with regard to agents' notes of the July 30th meeting, the defense has serious concerns about the reliability of documentation regarding this critical event, as reflected in the separate motion to sequester witnesses and to preserve evidence. The defense has good faith reasons to believe the actual words of this conversation are useful to the defense.

**B.     The Specific Facts Of This Case Establish That The Government Possesses And Has Not Disclosed Exculpatory Material.**

The government's claims that the defense seeks a special discovery rule for generic entrapment entirely misses the point. As illustrated by the early protestations by government officials, even prior to the first appearance, entrapment has been and will be a major issue in the case. The specific facts, even from the skewed account in the complaint, show a teenager with no prior criminal convictions being contacted by seasoned government agents pretending to belong to an organization that has specially chosen him. As set out in the sealed and *ex parte* information provided to the Court, the discovery already provided, as well as defense investigation, has established facts more than sufficient to require full discovery of all issues that support an entrapment defense.

The government makes several arguments that ignore the different standards for ordering pre-trial discovery and for reversal of a conviction after trial. The government misreads *United States v. Bagley*, 473 U.S. 667 (1985), and *United States v. Agurs*, 427 U.S. 97 (1976), as standing for the proposition that it must only disclose evidence if "its suppression undermines confidence in the outcome of the trial" or if it "is of sufficient significance to result in the denial of the defendant's

right to a fair trial." Resp. at 9-10. Thus, the government argues, the "mere possibility that an item of information might help the defense or might affect the outcome of the trial" does not meet the standard for pre-trial discovery. *Id*. However, the government's claim has been rejected by the Ninth Circuit as confusing the standard for reversal with the standard for discovery. In *United States v. Price*, the court explicitly noted the prosecution's error in relying on the standard for appellate review of *Brady* issues rather than the pretrial discovery standard:

> [T]he 'materiality' standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials . . . [J]ust because a prosecutor's failure to disclose evidence does not violate a defendant's due process rights does not mean that the failure to disclose is proper . . . [T]he absence of prejudice to the defendant does not *condone* the prosecutor's suppression of exculpatory evidence [*ex ante*] . . . [Rather,] the proper test for pretrial disclosure of exculpatory evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witnesses . . . [I]f doubt exists, it should be resolved in favor of the defendant and full disclosure made . . . [T]he government [should therefore] disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case, even if the evidence is not admissible so long as it is reasonably likely to lead to admissible evidence.

566 F.3d 900, 913 n.14 (9th Cir. 2009) (alterations in original) (quoting *United States v. Acosta*, 357 F. Supp. 2d 1228, 1239-40 (D. Nev. 2005)).

The government also appears to hold an inappropriately narrow view of its duty to inquire about *Brady* material from other agencies. Resp. at 5 (generally limiting inquiry to agencies comprising "the prosecution team"). As highlighted earlier with the Bill Smith emails, this Court should order the government to affirmatively seek out exculpatory information – as broadly defined – to be produced by all agencies having any involvement with this case. *See* Def. Mem. Mot. to Compel at 8-9. To date, reports regarding Bill Smith have still not been produced. The Court's supervision in this area is critical because some government agencies have not been forthcoming in

providing material necessary to comply with disclosure obligations. *See*, *e.g.*, *Islamic Shura Council of S. Cal. v. FBI*, ___ F. Supp. 2d ___, 2011 WL 1576476, *1 (C.D. Cal. Apr. 27, 2011) (the government "provided false and misleading information" to the court regarding the existence of documents, then asserted the "untenable" position that misleading the court was permissible "to avoid compromising national security"); Stuart Tomlinson, *Federal Judge Michael Mosman Calls U.S. Bureau of Prisons' Actions In Assault Trial "Abysmal," "Sloppy," And "Unjustifiable,"* The Oregonian, Mar. 18, 2011; Mark Freeman, *Seda's Prosecutors Failed To Disclose FBI Payments To Key Witness' Husband*, Ashland Tidings, Jan. 12, 2011.

Finally, the Court should reject the repeated government mantra that it will provide *Brady* information in a timely manner prior to trial. Resp. at 32 (witness interviews and impeachment material); 33 (physical evidence exculpating Mohamed or impeaching government witnesses); 34 (mitigation evidence); 34 (witness identification). Rule 16 and constitutionally-required discovery was due on February 15th. Contrary to its claims of compliance, the government has not met its obligation under *Brady*, has indicated little notion of what is exculpatory on the facts of this case, and should be ordered to comply immediately with its obligations under *Brady*, which should have been fulfilled over two months ago.

C.  **The Court Should Order Discovery Of Classified And Unclassified Material Both For Trial Purposes And To Assess The Lawfulness Of Electronic And Other Surveillance By Pretrial Motions.**

The government opposes providing some of the material Mohamed seeks on the ground that it is classified, going so far as to argue that the fact of classification, in itself, can limit a defendant's right to discovery. Resp. at 2. We disagree. The fact that some of the information sought through discovery is classified in no manner limits the government's obligations under the Due Process

Clause and Federal Rules of Criminal Procedure. Mohamed is entitled to all the material he needs for his defense. As stated in *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991), "Although the classified nature of many of the documents affects this court's assessment of defendant's request, the basic rule governing discovery of documents in the hands of the prosecution by a defendant is Federal Rule of Criminal Procedure 16(a)(1)(C). . . ." *See also United States v. Pickard*, 236 F.Supp. 2d 1204, 1209 (D. Kan. 2002); *United States v. Spanjol*, 720 F. Supp. 55, 57 (E.D. Pa. 1989). The same applies to constitutionally-required discovery under *Brady* pursuant to the relevant statutes. The defense should receive discovery, regardless of classification, because the material sought is essential to a fair trial and because disclosure of the underlying Foreign Intelligence Surveillance Act applications, orders, and investigative activities is necessary for pretrial review of the governmental activity.

With respect to Mohamed's specific request for FISA-related discovery, the defense seeks two categories of information: (1) material related to the application for, and acquisition of, any FISA warrants; and (2) material derived from any surveillance conducted under FISA. The defense agrees with the government that the former category can appropriately be addressed in the forthcoming defense motion to suppress, as contemplated by the applicable statute. 50 U.S.C. § 1806(f) & (g). However, with respect to any material derived from FISA warrants, the government is obligated to produce it "to the extent that due process requires." 50 U.S.C. § 1806(g). As discussed above, the government's narrow view of what constitutes exculpatory evidence in the context of the entrapment issues in this case suggests that significant discoverable material has yet to be produced. To the extent that the government provides any such material to the Court for

review, the defense should have an opportunity not only to inspect it, but also to brief the Court about whether it is exculpatory based on the defense theory of the case.

The Court can fashion appropriate protective orders and other procedures to ensure no harm to national security ensues from the disclosure of classified information, as has already been done regarding the discovery to date. Fed. R. Crim. P. 16(d). In addition to the authority set out in the Federal Rules of Criminal Procedure, Congress has provided guidance in the Classified Information Procedures Act. 18 U.S.C. App. 3. The Act provides guidance on discovery of classified information. When a defendant should be in possession of classified information, the defense is entitled to full access to the material and to its use under appropriate protective orders. *See Armstrong v. Exec. Office of the President*, 830 F. Supp. 19, 22 (D.D.C. 1993) (the purpose of CIPA is "to harmonize a criminal defendant's right to exculpatory material with the Government's right to protect classified information").

**D.    The Remaining Specific Discovery Issues Should Generate Orders For Immediate Production Of The Requested Material.**

With respect to the specific discovery disputes, Mohamed has either responded above or intends to rely on the authority cited and arguments made in his previous filings. In the interest of fully apprising the Court of the current discovery situation, however, several more clarifications are necessary.

   *1.    Phone Logs And Summaries*

Mohamed has requested any logs and summaries of the voluminous phone calls intercepted and recorded by the government to mitigate the arduous task of finding a relevant needle in the proverbial haystack of almost 800 calls. Such an index has been produced in other cases. *See, e.g.,*

*United States v. Orozco*, 108 F.R.D. 313, 318 (S.D. Cal. 1985) (bill of particulars denied where FBI produced "summaries of all phone calls"); *United States v. White*, No. CR 109-073, 2009 WL 3486057, at *1 (S.D. Ga. Oct. 27, 2009) (defendant's discovery request moot where government provided summaries of phone calls). The government notes that it has "produced a chart of all the phone calls" with "call identification number and the date and start time for each of the calls." Resp. at 18. However, the two pieces of information in that index either provide little useful information or are fraught with inaccuracies.

The "call identification number" represents nothing more than the computer file name for a given phone call. It does not, for example, identify the participants of the phone call or signify whether the call is relevant. The "date and start time," which theoretically would provide some useful guidance, appear to be almost entirely incorrect in terms of the starting times of the phone calls. Where the defense has been able to establish the true time of a call based on other documentation, the index is consistently wrong by four, seven, or eight hours. For example, when the Oregon State Police contacted Mohamed to confirm a 1:00 p.m. meeting on November 2, 2009, the government's index claims the call happened at 5:51 p.m. on November 2nd. Depending on the time of day, the effect of such errors cause a call to be mistakenly attributed to the wrong date.

    2.    *Materials Related To Search And Seizure Of Computer, Redactions, And Polygraph Exam*

As noted above, the government seeks to characterize a November 2009 interaction with Mohamed as "an unrelated matter." Resp. at 17. While the direct contact with Mohamed appeared to involve only the Oregon State Police (OSP), the FBI was clearly involved behind the scene. As the government has only provided minimal discovery related to the FBI's involvement, with much

of it redacted, Mohamed cannot assess the extent of the information the FBI gathered and subsequently used in crafting its sting operation.

What the discovery does show is that the OSP immediately notified the FBI upon receiving a complaint about Mohamed, despite the fact that the substance of the report would ordinarily not result in FBI involvement. Although the redactions in the FBI report prevent the defense from understanding the full scope of the FBI's role, it appears that agents met with OSP officers prior to contact with Mohamed and were involved with the subsequent interview. OSP then requested consent to image Mohamed's computer, which was provided to an FBI analyst within hours. Seven days later, agent Bill Smith began contacting Mohamed and soliciting his participation in violence against the West. A short time later, the FBI analyst copied specific information from Mohamed's computer and provided it to a fellow agent. The analyst did not write a report of his actions until a year later.

As the above discussion shows, the FBI was intimately involved in the November 2009 incident. The FBI used the opportunity to generate specific information about Mohamed, searched his computer and phone, and took part in the preparation of – and then observed – investigation and interview activities. Given entrapment law and the factors relevant to predisposition and inducement, this information is critical to mounting an effective defense, both at trial and for pretrial motions, and should be produced under *Brady*.

**Conclusion**

For each of the foregoing reasons, as well as the grounds stated in the Request For Discovery and Memorandum In Support Of First Motion To Compel Discovery, the defense respectfully requests the Court to order the production of the requested material.

Dated this 6th day of May, 2011.

                                           */s/ Stephen R. Sady*
                                           Stephen R. Sady
                                           Chief Deputy Federal Public Defender

                                           */s/ Steven T. Wax*
                                           Steven T. Wax
                                           Federal Public Defender

                                           */s/ Ruben Iñiguez*
                                           Ruben Iñiguez
                                           Assistant Federal Public Defender