Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
Steven T. Wax
Federal Public Defender
steve_wax@fd.org
Ellen C. Pitcher
Assistant Federal Public Defender
ellen_pitcher@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
503-326-2123 Telephone
503-326-5524 Facsimile

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 10-475-KI |
| Plaintiff, | MEMORANDUM IN SUPPORT OF SECOND MOTION TO COMPEL DISCOVERY |
| v. | |
| MOHAMED OSMAN MOHAMUD, | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

Table of Authorities......................................................... iv

Introduction................................................................. 1

A.    The Court Should Order The Production Of Discovery Regarding Matters Either Deferred Or Otherwise Unresolved After The June 1, 2011, Hearing................. 3

    1.    All Statements In The Government's Possession By, Or Reasonably Attributed To, Mr. Mohamud, Including, But Not Limited To, Recorded Face-To-Face Conversations, Telephone Calls, Text Messages, E-mail Correspondence, Notes, Or Other Accounts Of Recorded Verbal Or Written Interactions (CR 25 at 3; CR 27 at 10)..................................... 3

    2.    Removal Of All Non-Classified Redactions Within The Provided Discovery (CR 27 at 11)................................................. 4

    3.    Existing Logs Or Summaries Of Phone Calls (CR 27 at 11).................. 4

    4.    All Materials Related To Government Monitoring Of Statements, Electronic Or Otherwise, By Mr. Mohamud As Well As His Computer Activity (CR 25 at 8; CR 27 at 11-12)................................................. 5

    5.    All Materials Related To Any Contact With Mr. Mohamud By UCE1, UCE2, And Any Other Person Acting On Behalf Of The Government (CR 27 at 12) ..................................................... 6

    6.    Background Information Regarding Any Agent In Contact With Mr. Mohamud, Including Name, Governmental Affiliation, And Curriculum Vitae (CR 27 at 12).................................................. 6

    7.    Reports Or Information Generated Or Distributed To Government Actors Regarding Mr. Mohamud (CR 27 at 12)................................ 6

    8.    All Materials Relative To The Training Or Experience Of Any Government Agent Who Contacted Mr. Mohamud, Including The Past Experience Of Agents In Conducting Similar Undercover Operations (CR 25 at 4; CR 27 at 13)..................................................... 6

i

9.    All Audio, Video, Or Other Recordings Of The Undercover Agents Before, During, And After Meetings With Mr. Mohamud (CR 27 at 14). . . . . . . . . . . . . 7

10.    Allow Defense To Inspect Recorder And Any Transmission Device (CR 27 at 14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

11.    Service And Repair History For The Devices Used On July 30, 2010 (CR 27 at 14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

12.    All Materials Relating To Any Behavioral Or Social Science Expert Consulted For This Case, Including, But Not Limited To, Any Psychiatrist, Psychologist, Social Scientist, Cultural Or Religious Expert, And Any Military Or Civilian Psychological Operations Or Interrogation Expert (CR 25 at 7; CR 27 at 15). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

13.    All Materials Relative To The Search And Seizure Of Computers, Cell Phones, Or Other Electronic Media (CR 25 at 5; CR 27 at 15). . . . . . . . . . . . . . . 8

14.    All Materials From Any Agency Regarding Interagency Cooperation During The 2009 Oregon State Police Investigation (CR 27 at 26-27; CR 58 at 64). . . . . 8

15.    All Materials Related To UA1 And UA2 (CR 27 at 17). . . . . . . . . . . . . . . . . . . . 9

16.    All Materials Related To Any Investigation Into The Yemeni School Referenced In Emails From UA1 (CR 27 at 17). . . . . . . . . . . . . . . . . . . . . . . . . 10

B.    The Court Should Order Production Of Material Regarding The Existence Of Federal Bureau Of Investigation And Other Investigative Agencies' Policies And Practices Regarding Recording The Initial Face-to-Face Contact With Undercover Agents And All Internal Communications Material Regarding Their Application In Mr. Mohamud's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C.    The Court Should Order Production Of Material Regarding Surveillance Of Mr. Mohamud And His Family Generated From Undercover And Informant Activities At Their Mosque. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D.    The Court Should Order The Production Of All Government Material Related To The Investigation Of Mr. Mohamud And Portland's Participation In The Joint Terrorism Task Force And Any Other Collateral Purpose For The Tactics Applied By The Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

E.   The Court Should Order Production Of Material Related To The Pre-Meeting Plans, Post-Meeting Debriefings, And Tactical Decisions Regarding Interaction With Mr. Mohamud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

F.   The Court Should Order Production Of Material Relative To The Placement Of Mr. Mohamud On The No-Fly List. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

G.   The Court Should Order Production Of Materials Related To The Amount Of Money Spent By The Government Leading To Mr. Mohamud's Arrest, Including But Not Limited To Surveillance, Consultations, And Personnel. . . . . . . . . . . . . . . . . . . . . . . . 20

H.   The Court Should Order Production Of Material Related To Governmental Determinations Or Concerns That Investigated Activity By Mr. Mohamud Was Protected By The First Amendment Or Did Not Constitute A Completed Crime.. . . . . . 20

I.   The Court Should Order Production Of Material Related To Investigations Of Any Of Mr. Mohamud's Associates. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

J.   The Court Should Order Disclosure Of All Experts The Government May Use At Trial And Intended Trial Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

K.   The Court Should Order The Disclosure Of All Grand Jury Proceedings Underlying The Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

**Page**

*Ake v. Oklahoma,*
    470 U.S. 68 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Ibrahim v. Dep't of Homeland Security,*
    No. 10-15873, 2012 WL 390126 (9th Cir. Feb. 8, 2012). . . . . . . . . . . . . . . . . . . . . . . .  18

*Islamic Shura Council of S. Cal. v. FBI,*
    779 F. Supp. 2d 1114 (C.D. Cal. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Jacobson v. United States,*
    503 U.S. 540 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Reynolds v. United States,*
    345 U.S. 1 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*United States v. Bailleaux,*
    685 F.2d 1105 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*United States v. Barrett,*
    703 F.2d 1076 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*United States v. Barton,*
    995 F.2d 931 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*United States v. Edwardo-Franco,*
    885 F.2d 1002 (2d Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*United States v. McClelland,*
    72 F.3d 717 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*United States v. Poehlman,*
    217 F.3d 692 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*United States v. Richmond*,
        153 F.R.D. 7 (D. Mass. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*United States v. W.R. Grace*,
        526 F.3d 499 (9th Cir. 2008) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

**Introduction**

This motion addresses matters deferred or unresolved from the initial discovery motion as well as ten additional areas.  The legal principles previously briefed apply:

- The facts of this case support broad discovery regarding issues supporting an entrapment defense (CR 27 at 3-8);

- The discovery obligations include the duty to make inquiry to relevant agencies, a broad definition of the materials sought, and a different standard for pretrial production than in post-trial proceedings (CR 27 at 8-10; CR 42 at 9-11);

- Discovery obligations include material helpful to the defense regarding trial, motions, and potential sentencing (CR 27 at 5-7).[1]

In a recent argument, the Supreme Court indirectly provided additional guidance regarding the parties' dispute regarding the *Brady* obligation.  Mr. Mohamud's defense has expressed concern that the government is measuring *Brady* by the appellate standard, rather than the pretrial obligation to provide any potentially useful information to the defense.  *Compare* CR 28 at 9-10 *with* CR 42 at 9-11.  Justice Kennedy's statement at page 48 of the transcript of oral argument in *Smith v. Cain*, No. 10-8145, supports the defense view:  "You don't determine your *Brady* obligation by the test of a *Brady* violation.  You are transposing two very different things."

These discovery principles should be applied to the areas covered by this second motion to compel:

---

[1] In addition to the matters previously briefed, the Court would also potentially review dismissal for entrapment as a matter of law or outrageous government conduct at the close of the government's case. *See United States v. Poehlman*, 217 F.3d 692, 703-04 (9th Cir. 2000) (entrapment as a matter of law); *United States v. McClelland*, 72 F.3d 717, 721 & n.1 (9th Cir. 1995) (regardless of predisposition, complete fabrication of a crime or excessive mental coercion violates due process.).

A.    Materials that were raised in the initial discovery motion and left to be revisited, deferred, or ruled upon in the first instance;

B.    Material relating to any FBI policy or practice of not recording initial undercover meetings and the implementation of any such policy in the present case;

C.    Material regarding surveillance of Mr. Mohamud and his family generated from undercover and informant activities related to their mosque;

D.    Material regarding any communications addressing Portland's participation in the Joint Terrorism Task Force and any other political interests related to the investigation of Mr. Mohamud;

E.    Material related to the pre-meeting plans, post-meeting debriefings, and tactical decisions regarding interaction with Mr. Mohamud;

F.    Material relative to the placement of Mr. Mohamud on the no-fly list;

G.    Material reflecting the amount of money spent by the government investigating Mr. Mohamud from the time he was a juvenile until his arrest;

H.    Material related to governmental determinations or concerns that investigated activity by Mr. Mohamud was protected by the First Amendment or did not constitute a completed crime;

I.    Material related to investigations of any of Mr. Mohamud's associates;

J.    Disclosure of all experts the government may use at trial and trial exhibits;

K.    Disclosure of all grand jury proceedings underlying the indictment.

The parties have conferred to resolve or to defer a number of potential discovery disputes. On the issues raised in this memorandum, the defense requests that the Court order the production of the materials upon which discovery is granted to assure the relevant government actors provide the underlying documents to the prosecution. In national security cases, government actors may be motivated to be less than forthcoming in producing discoverable material. For example, in this case, an FBI agent destroyed notes that should have been preserved "because he believed that notes could

**PAGE 2    MEMORANDUM IN SUPPORT OF SECOND MOTION TO COMPEL DISCOVERY**

be destroyed for National Security investigations," even though he preserves them in "criminal investigations." *See also Islamic Shura Council of S. Cal. v. FBI*, 779 F.Supp.2d 1114, 1123-24 (C.D. Cal. 2011) (government misinterpreted executive privilege and misled the court in the name of national security).

In addition, the defense remains concerned about the narrow view the government has asserted regarding the temporal range of this case. According to previous pleadings, the government apparently views "this case" to encompass only the interactions between Mr. Mohamud and the undercover agents. CR 28 at 27. Such a narrow view is not supported by the case law on entrapment. *Jacobson v. United States*, 503 U.S. 540, 549 (1992) ("[T]he prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents."). In *Jacobson*, the initial approach was through email just as – on November 9, 2009 – government agent Bill Smith approached Mr. Mohamud by email.

**A.      The Court Should Order The Production Of Discovery Regarding Matters Either Deferred Or Otherwise Unresolved After The June 1, 2011, Hearing.**

The following identifies the defense request by reference to the initial discovery motions and a short characterization of the request, a statement of the current status, and either additional argument or reference to the *ex parte* submission:

> *1.      All Statements In The Government's Possession By, Or Reasonably Attributed To, Mr. Mohamud, Including, But Not Limited To, Recorded Face-To-Face Conversations, Telephone Calls, Text Messages, E-mail Correspondence, Notes, Or Other Accounts Of Recorded Verbal Or Written Interactions (CR 25 at 3; CR 27 at 10).*

The Court previously ruled that all of Mr. Mohamud's statements to agents or any third party should be produced, subject to any limitations due to classified status. CR 58 at 14, 17-20. Some intercepted phone calls, text messages, and emails have been produced. However, as elaborated *ex*

*parte*, what has been produced demonstrates that more such evidence exists and should be produced, regardless of whether classified or not, under *Brady* as well as Rule 16 as construed in *United States v. Bailleaux*, 685 F.2d 1105, 1112-16 (9th Cir. 1982). CR 27 at 10-11; CR 42 at 5-6. In addition, as noted in the electronic monitoring section below, discovery reports suggest the government monitored statements Mr. Mohamud made on internet forums. The defense has not received any reports of that monitoring or any copies of statements Mr. Mohamud made while this type of internet activity was being surveilled. For any statements that are classified, the Court should order classification review forthwith because Mr. Mohamud's communications with family, friends, and associates do not implicate any reasonable national security interest.

2.    *Removal Of All Non-Classified Redactions Within The Provided Discovery (CR 27 at 11).*

The Court deferred ruling because the government stated it would furnish to the defense the information previously redacted. CR 58 at 32-34. While the government has done so with respect to some discovery documents, other documents in the discovery are subject to the defense's continuing request for any non-classified information redacted from reports. The parties continue to confer on this issue and will bring specific issues to the Court's attention if not resolved prior to the hearing.

3.    *Existing Logs Or Summaries Of Phone Calls (CR 27 at 11).*

This defense request sought any existing logs or summaries related to the hundreds of telephone calls the government provided in discovery. The "Call Summary" produced with the first series of recorded calls – 791 calls in total – failed to identify the participants, the phone numbers involved, and in numerous cases, misstated the time and date of the call. The Court deferred ruling on this request based on the government's agreement to correct inaccuracies in the initial phone log

and to work with the defense to enable a more efficient review.  CR 58 at 34-37.  To date, the

defense has not received any additional information about the calls.  Moreover, the government has

provided an additional 137 recorded calls without providing any log or index showing dates,

participants, or phone numbers involved.  Where the government actively intercepts telephone calls,

and is, therefore, aware of and tracking such information as the time of the call and the telephone

numbers or participants involved, the defense should receive at least that basic identifying

information.  As indicated in previous briefing, the Court has the authority, in the interests of fairness

and efficiency, to order the government to provide logs with the call details and summaries of

content, which would avoid redundancy and waste of resources.  CR 42 at 13-14.

> 4.      *All Materials Related To Government Monitoring Of Statements, Electronic Or Otherwise, By Mr. Mohamud As Well As His Computer Activity (CR 25 at 8; CR 27 at 11-12).*

The defense requested materials related to five specific areas of potential government

monitoring of defendant's statements and computer activity: (1) any translations from any language

other than English; (2) material related to monitoring of defendant's accessing, posting, or

moderating web sites; (3) material related to any surveillance tool or software put on defendant's

computer; (4) material related to any Internet Protocol (IP) tracing; and (5) material related to any

monitoring of defendant's financial accounts.  The government stated it had turned over all material

responsive to this request.  CR 58 at 44.  The Court deferred a final ruling pending the further

showing regarding specific monitoring and associated discoverable material that have not yet been

provided.  CR 58 at 44.  That specificity is provided in the defense *ex parte* filing.

5.  *All Materials Related To Any Contact With Mr. Mohamud By UCE1, UCE2, And Any Other Person Acting On Behalf Of The Government (CR 27 at 12).*

The Court granted this defense discovery request. CR 58 at 14, 48-49. However, the defense still has not received reports or documents related to the activities of government agent Bill Smith. As the Court is aware, the defense received numerous emails between Mr. Smith and Mr. Mohamud commingled with various other emails produced in discovery. The government has indicated that it intends to produce all material ordered produced regarding Bill Smith. CR 58 at 22-23, 48-49. As elaborated in the *ex parte* filing, the defense also has reason to believe that other government agents and contractors have been in contact with Mr. Mohamud.

6.  *Background Information Regarding Any Agent In Contact With Mr. Mohamud, Including Name, Governmental Affiliation, And Curriculum Vitae (CR 27 at 12).*

The Court has not ruled on this request, which overlaps with other discovery requests and will be addressed *ex parte*.

7.  *Reports Or Information Generated Or Distributed To Government Actors Regarding Mr. Mohamud (CR 27 at 12).*

The Court has not ruled on this request, which overlaps with other discovery requests and will be addressed *ex parte*.

8.  *All Materials Relative To The Training Or Experience Of Any Government Agent Who Contacted Mr. Mohamud, Including The Past Experience Of Agents In Conducting Similar Undercover Operations (CR 25 at 4; CR 27 at 13).*

The Court allowed for the defense to re-raise this request once the government has provided all material related to contacts between the defendant and government agents. CR 58 at 53. Although the defense has yet to receive any reports related to Bill Smith, to the extent the argument in favor of this request overlaps with other requests for information about the undercover agents, it will be addressed in the defense's *ex parte* filing.

9.   *All Audio, Video, Or Other Recordings Of The Undercover Agents Before, During, And After Meetings With Mr. Mohamud (CR 27 at 14).*

The Court ordered the government to produce material from when Mr. Mohamud was not present for an *in camera* review.  CR 58 at 57.  The defense will address this issue in its *ex parte* filing.

10.   *Allow Defense To Inspect Recorder And Any Transmission Device (CR 27 at 14).*

The Court granted this request.  CR 58 at 60.  The parties are arranging for inspection by a qualified defense expert.  The government has also stated that it will produce the recordings downloaded from the device after the July 30th meeting.

11.   *Service And Repair History For The Devices Used On July 30, 2010 (CR 27 at 14).*

The Court did not rule on this request.  CR 58 at 59.  As with the recording device itself, the defense needs the service and repair history of the recording device for the defense expert to do a thorough analysis.  The request also encompasses any other electronic surveillance devices deployed but not utilized for the July 30th meeting.

12.   *All Materials Relating To Any Behavioral Or Social Science Expert Consulted For This Case, Including, But Not Limited To, Any Psychiatrist, Psychologist, Social Scientist, Cultural Or Religious Expert, And Any Military Or Civilian Psychological Operations Or Interrogation Expert (CR 25 at 7; CR 27 at 15).*

The defense asked for information related to any government expertise utilized to further its activities: "The request for mental examination includes any review of information relating to Mr. Mohamud by any cultural, religious, psychological, behavior sciences or other such expert, including but not limited to consultations prior to and after attempted or completed contact with Mr. Mohamud through electronic media and face-to-face." CR 25 at 7.  The government stated that no such experts were consulted or used in this case, so the Court did not rule on this request.  CR 58 at 53.  As

elaborated in the *ex parte* filing, the defense request the production of any such experts utilized historically, including experts who consulted with or trained persons who were in contact with Mr. Mohamud.

> 13.    *All Materials Relative To The Search And Seizure Of Computers, Cell Phones, Or Other Electronic Media (CR 25 at 5; CR 27 at 15).*

The Court deferred a final ruling on this request pending further discovery and discussions between the government and Mr. Mohamud. CR 58 at 61-63. The government has provided a forensic report on one of its computer searches and has stated that such a report will be provided regarding two other searches. The defense understands the government to represent that no other searches and seizures of electronic media occurred. To the extent such activity occurred, the defense requests that the Court order its production.

> 14.    *All Materials From Any Agency Regarding Interagency Cooperation During The 2009 Oregon State Police Investigation (CR 27 at 26-27; CR 58 at 64).*

The Court deferred ruling on this request pending an *in camera* review of any material the government has not provided to Mr. Mohamud. CR 58 at 64-65. The defense is unaware of whether the Court has received any such material. As noted during the motions hearing, the defense is concerned about the lack of documentation clarifying the interactions between state and federal actors with respect to the November 2009 activities at issue in the pending non-FISA motion. For example, the government has not provided any indication of how or when the FBI first began cooperating with state officers, even though FBI physical surveillance on campus preceded the November 2009 state investigation. While state officers were investigating – and eventually exonerating – Mr. Mohamud on a potential violation of state law, federal officials somehow involved themselves to the extent that they were able to witness interrogation and to seize and image Mr.

Mohamud's computer unbeknownst to him. In fact, Mr. Mohamud's attempts to cooperate with state officials resulted in him unwittingly providing significant amounts of private information about himself and others to the FBI. Moreover, despite the state officials having couched their request to inspect Mr. Mohamud's cell phone and computer as necessary to further their own investigation – which resulted in Mr. Mohamud providing a limited consent to search – there is no evidence that state officers did anything other than immediately turn over the electronic devices to the FBI. The defense continues to seek any material, such as state or federal law enforcement email communications, messages, and reports, that document the unexplained gaps in the current discovery regarding the interagency cooperation that surrounded the warrantless searches and seizures.

15.    *All Materials Related To UA1 And UA2 (CR 27 at 17).*

The government stated it provided all unclassified material related to the communications between Mr. Mohamud and UA1 and UA2. CR 58 at 66. The Court recognized the possible existence of CIPA material and did not order any further production at the time of the motions hearing. CR 58 at 67. While the requested material may need to be resolved through CIPA procedures, it is important to note that the defense discovery request encompassed far more than merely the communications between these individuals. Rather, the defense seeks the results of any government investigation of UA1 and UA2. As the Criminal Complaint reveals, UA1 appears to play an important role in the government's case – the first heading under the "Probable Cause" section, for example, is entitled "Contact With UA1." CR 1 at 8. It is UA1's email about UA2 – allegedly sent from Pakistan – that provides an email address eventually mimicked by UCE1 when he first contacted Mr. Mohamud. According to an FBI report, in that initial email from UCE1, he attempted to assume the identity of either UA1, UA2, or an associate of theirs. Further, UCE1's story

about why he decided to contact Mr. Mohamud was based on UA1 allegedly giving Mr. Mohamud's name to an unnamed Islamic council.

Given the emphasis the government has placed on UA1 and UA2, the lack of discovery regarding these individuals prevents the defense from addressing and putting forth a full presentation of its case. While the defense has received some communications between UA1 and Mr. Mohamud, FBI reports suggest that more exist that have not been provided. The government also has substantive information about UA1 that is not classified but which has been withheld. For example, the Complaint states that UA1 was a student in the United States from August 2007 until July 2008, but nothing in discovery confirms that or provides any similar type of information. CR 1 at 8. The government has immigration records and other such governmental knowledge of him and his activities that should be produced.

16.    *All Materials Related To Any Investigation Into The Yemeni School Referenced In Emails From UA1 (CR 27 at 17).*

As a subset of the previous request regarding discovery of materials related to UA1, the defense also moved for any material related to the Yemeni school referenced in UA1's emails. The school is also included in the Complaint (CR 1 at 8) and is relevant to Mr. Mohamud's interest in attending a religious school and learning Arabic.

**B.    The Court Should Order Production Of Material Regarding The Existence Of Federal Bureau Of Investigation And Other Investigative Agencies' Policies And Practices Regarding Recording The Initial Face-to-Face Contact With Undercover Agents And All Internal Communications Material Regarding Their Application In Mr. Mohamud's Case.**

Both orally and in writing, the government has asserted that the investigating officers' failure to record the first face-to-face meeting occurred as the result of human error and a dead battery:

> Put simply, it was human error: the device was accidently turned on hours before the meeting time and therefore ran out of battery power as the meeting began.

CR 28 at 30.  While the prosecutor undoubtedly conveyed what he heard from the relevant agency, the investigating agency has indicated in an unrelated case in a different jurisdiction that the information provided to the prosecutor may be incomplete.  In a sting case in Boston, the supervising agent for the FBI stated on direct examination that it was common practice not to record a first meeting:

> Q.    Was th[e first] meeting [with the cooperating witness] recorded?
> A.    It was not recorded.
> Q.    Why wasn't it recorded?
> A.    The FBI's common practice is to use the least intrusive methods as they develop an investigation and in addition trying to get an introduction between a cooperating witness and a subject isn't guaranteed so on a first meeting like that they're often not recorded.

*United States v. Ferdaus*, No. 11-10331, CR 24 at 17-18 (D. Mass. Nov. 4, 2011).  On cross-examination, the FBI agent stated that not recording initial meetings was a standard practice:

> Q.    And you told us that that meeting was not recorded, right?
> A.    That's correct.
> Q.    It could've been recorded?
> A.    It could have been.
> Q.    But it wasn't?
> A.    It was not.
> Q.    And that was a decision that the FBI made not to record that meeting, right?
> A.    Yes.  It's standard.
> Q.    I'm sorry?
> A.    It's standard for their practice.

*Id*. at 55.  The government has provided no discovery regarding any policy related to recording first meetings and the application of that policy in this case.  In light of sworn testimony indicating that an FBI policy or standard practice exists regarding the recording of initial face-to-face meetings, the Court should order production of all material related to such policies or practices as well as any

material bearing on the application of the policies or practices in this case.  The existence and application of policies and practices regarding recordation are *Brady* material in the context of this case.

**C.      The Court Should Order Production Of Material Regarding Surveillance Of Mr. Mohamud And His Family Generated From Undercover And Informant Activities At Their Mosque.**

Before and after the government's first contact by Bill Smith on November 9, 2009, the government engaged in court authorized and other physical surveillance of Mr. Mohamud both before and after he became an adult.  During this same period, the FBI nationally engaged in extensive surveillance of mosques using undercover agents and informants.  As evidenced by the declaration of Craig Monteilh in an unrelated federal case in Los Angeles, informants receive extensive training regarding methods of infiltrating mosques and were required to keep extensive and detailed notes regarding all individuals.  *Fazaga v. FBI*, No. 11-301-CJC, CR 66 (Declaration of Craig Monteilh) at 7-22 (C.D. Cal. Dec. 23, 2011).  The general practice in the California mosques warrants this Court's order to provide any material generated by a similar operation in Portland, especially given the history of FBI attention to Mr. Mohamud's home mosque (as elaborated in the *ex parte* submission).  Mr. Monteilh claims his supervising FBI agent stated "that the FBI had every mosque – the ones I went to and the ones I didn't go to – under surveillance." *Id*. at 14.

Any material relating to Mr. Mohamud and his family should be produced under *Brady* because it relates to lack of predisposition and to potential influence of agents provocateurs.  The government has already acknowledged the use of Bill Smith, who directly contacted Mr. Mohamud by email encouraging extremist activity in this country.  The identity, activity, and recorded

observations of agents and informants at Mr. Mohamud's mosque, its summer camps, and sponsored trips, including any contact or purported statements, should be produced as potentially exculpatory, demonstrating law-abiding and appropriate religious activity. To the extent the government asserts material demonstrates any contrary predisposition, the material should be produced to permit the defense to investigate and to develop potential arguments related to inducement.

**D.    The Court Should Order The Production Of All Government Material Related To The Investigation Of Mr. Mohamud And Portland's Participation In The Joint Terrorism Task Force And Any Other Collateral Purpose For The Tactics Applied By The Government.**

This case involves tactics and discretionary decisions by government actors related to an investigation of an American teenager. These decisions produced significant political sequella. To the extent such political consequences were contemplated prior to the arrest, any material reflecting political considerations would reveal potential bias favoring successful inducement that is discoverable under *Brady*.

The government tactics appear to be unprecedented. The government monitored email and other communications by a 17-year-old boy with skilled Islamist propagandists on the internet and chose not to advise the parents and not to intervene to protect him. Shortly after Mr. Mohamud turned 18, the government began email communication through the agent Bill Smith, who encouraged thoughts of violence in this country. When Mr. Mohamud agreed with his father to complete his undergraduate degree, putting off Bill Smith, and declining when a second agent asked if he could help the "brothers," the FBI continued the inducement by pursuing a face-to-face meeting, invoking God's will, claiming He "I'm sure has good reason for you to stay where you are." Then, for four months the government engaged in repeated efforts to keep Mr. Mohamud involved by asking him to find a target, changing the plan from suicide to surviving and traveling abroad,

committing him to action on videotape, and pervasively encouraging bad acts by invocations of faith accompanied by flattery and isolation.

In the aftermath of the arrest, potential political reasons for the government's tactical choices became apparent. Even though high profile arrests and publicity elevate minor actors and intimidate the Muslim community, the government engaged in heavy pre-first appearance publicity and, after the arraignment, continued to engage in pretrial publicity at the highest levels, as documented in the pleadings leading to this Court's order of February 23, 2011. CR 24; *see* CR 14 at 2-4. The criminal complaint, which the government provided to the media as a virtual press release immediately after the arrest, and which was only effective between its 10:33 a.m. filing on Monday, November 29, 2009, and being superseded at 11:34 a.m. by the filing of the indictment, pointedly referred on page 2 to the affiant having "spoken with agents assigned to the Joint Terrorism Task Force (JTTF) in Portland, Oregon regarding this and other investigations."

The JTTF in Portland has been a significant political issue since the Portland City Council voted in 2005 to withdraw due to civil liberties concerns. After withdrawal, Portland police continued cooperation with federal authorities. At the same time, federal actors were motivated to bring Portland back into participation in the JTTF. The media began covering discussions of Portland's return to the JTTF almost immediately after the arrest. *E.g.*, Maxine Bernstein, *Portland Mayor Sam Adams, Police Chief Mike Reese Discuss Return To Joint Terrorism Task Force*, The Oregonian, Nov. 27, 2010. The investigation of Mr. Mohamud, in which the Mayor and other city officials were kept in the dark, made Portland's continued non-participation in the JTTF politically untenable. *See* Byron York, *Politically Correct Portland Rejects Feds Who Saved City From Terrorist Attack*, Washington Examiner, Nov. 28, 2010. At the same time, the government did not

inform the Mayor of the undercover operation, apparently because there was not a real "threat" nor did the activity constitute an "incident" sufficient to trigger notification under the post-withdrawal JTTF agreement with Portland's local government.  Portland City Council Resolution No. 36315 (April 28, 2005).  In a political column immediately following the arrest, an Oregonian commentator stated:

> Given these stunning events, is this really the time to replace interim U.S. Attorney Dwight Holton – and his extensive background on criminal cases – with Amanda Marshall, a child-advocacy lawyer with Oregon's Department of Justice?
>
> Even when considering the 9th U.S. Circuit Court of Appeals' restrictive interpretation of what defines an "attempted crime," was it absolutely necessary for the FBI to allow Mohamud to drive downtown and go through the facade of detonating his explosive device?
>
> And would events of recent weeks have played out any differently if the city was still part of the Joint Terrorism Task Force?

Steve Duin, *Mohamed Mohamud 'Planned Violent Jihad On A Spectacular Scale' In Downtown Portland*, The Oregonian, November 27, 2010.  The reference to Ninth Circuit law reflects the possibility of direct contact between the United States Attorney's office and the media on the subject. As a direct consequence of the publicity surrounding Mr. Mohamud's case, the Portland City Council passed a resolution on April 28, 2011, rejoining the JTTF.

The materials likely to provide insights and evidence regarding potential bias include internal emails regarding the JTTF, communications with media, and any writing regarding potential effect of the investigation on political questions.  The Court should order broad production of such material because the scope of *Brady* clearly encompasses bias and other purposes for and served by the investigation.

**PAGE 15    MEMORANDUM IN SUPPORT OF SECOND MOTION TO COMPEL DISCOVERY**

E.     **The Court Should Order Production Of Material Related To The Pre-Meeting Plans, Post-Meeting Debriefings, And Tactical Decisions Regarding Interaction With Mr. Mohamud.**

The government has asserted that no psychological experts were accessed before and during the interactions between government agents and Mr. Mohamud.  CR 58 at 63.  However, the discovery includes facts that support the unmistakable inference that, at a number of key times during the pendency of this matter, tactical choices were made that encouraged Mr. Mohamud to engage in violent activity in the United States, despite lack of previous statements or conduct aimed at such activity.  Contrary to the government's claim that Mr. Mohamud was "frankly discouraged by the undercover officers," April Baer, *Agents Tried To Discourage Suspect, But He Insisted On Carrying Out Plot*, OPB News, Nov. 29, 2010, the discovery indicates deliberate tactics aimed at maximizing the likelihood that he would engage in the fake plot.  In order to provide effective confrontation of witnesses and to present substantive evidence in favor of the defense, the Court should order the production of all material regarding meeting plans, assessments, debriefings, and tactical considerations for all decisions regarding interaction with Mr. Mohamud.

The decision nodes evident from the chronology demonstrate the need for defense review of the requested material.  For example, the government must have generated evidence of how it conducted itself over the year of governmental contacts with Mr. Mohamud that address:

•      What policies and considerations applied to the government decisions that resulted in the failure to notify parents or otherwise intervene when the government detected internet contact between an American juvenile and extremist propagandists?

- What planning and direction led to undercover agent Bill Smith's emails to Mr. Mohamud suggesting action in the United States, which began within ten days of the warrantless imaging of Mr. Mohamud's computer?

- What planning and direction led to the FBI email to Mr. Mohamud asking if he can help "the brothers," which was sent within ten days of the FBI's thwarting of Mr. Mohamud's trip to work in the Alaska fishery?

- What planning and direction led to the FBI email to Mr. Mohamud that God "I'm sure has good reason for you to stay where you are," which was sent three days after Mr. Mohamud emailed that he could not help "the brothers"?

- What planning and direction led the FBI to abruptly change its tactics to present Mr. Mohamud with the option of staying alive and traveling abroad after recruiting Mr. Mohamud and treating the ruse as a suicide mission?

- What planning and direction led the FBI to provide $2,700 in cash and urge Mr. Mohamud to live alone, isolating himself from his friends, when the FBI knew he had almost no money in his bank account and had roommates for his return to college?

- What planning and direction led to the FBI's repeated efforts to persuade Mr. Mohamud to make a video committing himself to the planned course of conduct weeks before the arrest date?

- What planning and direction led the agents to each of the assignments of minor tasks, followed by approbation for performance, that occurred throughout the meetings with the agents?

**PAGE 17   MEMORANDUM IN SUPPORT OF SECOND MOTION TO COMPEL DISCOVERY**

The government inducement, both broad and subtle, clearly involved tactical decisions that would be material to presenting the defense.  The Court should order the production of all material as within the scope of *Brady*.

**F.    The Court Should Order Production Of Material Relative To The Placement Of Mr. Mohamud On The No-Fly List.**

After Mr. Mohamud fell out of contact with Bill Smith, the government next emailed Mr. Mohamud through an undercover agent pretending to be a friend of a friend.  This contact occurred within ten days of an interview between FBI agents and Mr. Mohamud at the Portland airport.  As the government likely knew from surveillance, Mr. Mohamud had a completely legitimate plan to join a close friend in Alaska where they both intended to spend the summer earning money in Alaska laboring in a cannery and, with some luck, on a fishing boat.  The plan was thwarted when Mr. Mohamud arrived at the airport and was not permitted to board the plane.  The facts surrounding this incident are critical to the defense, both in the formulation of potential motions regarding the interview as the product of unlawful governmental action and as governmental action forming a link in the chain of causation to the charged offense.

The no-fly list is generated by a massive and secretive constellation of agencies:  "[T]he federal government has assembled a vast, multi-agency, counterterrorism bureaucracy that tracks hundreds of thousands of individuals."  *Ibrahim v. Dep't of Homeland Security*, No. 10-1587, 2012 WL 390126, at *3 (9th Cir. Feb. 8, 2012).  The FBI administers the organizations that implement the list and nominates persons to be watched.  *Id*. at *3-4.  In *Ibrahim*, the Ninth Circuit held that even an alien no longer living in the United States had sufficient constitutional interests to require production of discovery.  By analogy to the civil discovery in *Ibrahim*, the Court should order production of all material relative to Mr. Mohamud's grounding at the airport such as FBI phone

logs, Transportation Security Administration employee logs from the airport and the Transportation Security Operations Center, the no-fly list entries and other documents directed at Mr. Mohamud, documents considered in placing him on the no-fly list and in the Terrorist Screening Database, documents discussing the events at the airport on the day in question, documents relating to instructions to law enforcement or airport security personnel regarding Mr. Mohamud, documents between federal actors and other persons involved in interactions with the traveler about the incident or any instructions, and any audio or video recordings of any interactions with Mr. Mohamud. *Id.* at *12. The Ninth Circuit noted the precedent that recognizes the higher degree of constitutional protections due to United States citizens and specifically noted the "uncontested proposition" that even an alien, if still in the country, would be able to assert claims under the First and Fifth Amendments to challenge placement on the government's watchlists. *Id.* at *8.

In the context of an American citizen facing a criminal charge, the discovery interests are greater and more appropriate for full enforcement than in civil cases. *See Reynolds v. United States*, 345 U.S. 1, 12 (1953) ("The rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense. Such rationale has no application in a civil forum where the Government is not the moving party, but is a defendant only on terms to which it has consented."). The *Brady* obligation applies to pretrial motions as well as to trial rights. *United States v. Barton*, 995 F.2d 931, 934-36 (9th Cir. 1993). The government's coordinated activity toward Mr. Mohamud on the travel day – including FBI agents waiting for him at the airport – requires full exploration in order to apply relevant principles of constitutional law (First Amendment rights of speech and

association, Fourth Amendment protections against unreasonable detentions, Fifth Amendment

rights to due process and equal protection) against the governmental actions that resulted in

statements obtained from Mr. Mohamud.  Even more important, these facts are relevant to the

government's targeting of Mr. Mohamud since at least November 9, 2009, and derailing him from

legitimate employment with a fellow student, instead leaving him broke and disheartened and prey

to the next undercover contact a mere ten days later.

**G.      The Court Should Order Production Of Materials Related To The Amount Of Money Spent By The Government Leading To Mr. Mohamud's Arrest, Including But Not Limited To Surveillance, Consultations, And Personnel.**

The power imbalance between this American teenager and the full force of the law

enforcement mechanisms employed against him supports the defense in this case.  The government

took extraordinary measures to learn everything about him, then applied what was learned in

sophisticated activity that led to the offense.  One way of quantifying the power imbalance is simply

the break-out of costs of the surveillance, contractors, agents, and monitoring that led to the

November 26th arrest.

**H.      The Court Should Order Production Of Material Related To Governmental Determinations Or Concerns That Investigated Activity By Mr. Mohamud Was Protected By The First Amendment Or Did Not Constitute A Completed Crime.**

The government included in the Complaint activity that appears to be protected by the First

Amendment, including publication of articles, association with others, and speech.  Further, the

Oregonian article indicates that the government voluntarily disclosed, for its benefit, that it extended

the investigation and interactions with Mr. Mohamud due to its belief that, under Ninth Circuit law,

a crime had not been attempted until the time of arrest on November 26, 2010. *Supra* at 16.  The

government's assessments – manifested in emails, internal reports, or other writings – are

exculpatory, especially in the context of protected conduct that the government may argue in support of predisposition.

## I.    The Court Should Order Production Of Material Related To Investigations Of Any Of Mr. Mohamud's Associates.

The government has significant information about some of Mr. Mohamud's associates that is being withheld from the defense. Based on the discovery provided, open source research, and independent investigation, the defense reasonably believes that the government has investigated many other individuals who have associated with Mr. Mohamud. The requested material is relevant both to negating predisposition as well as potential motions based on government conduct. More specificity is provided in the defense's *ex parte* filing.

## J.    The Court Should Order Disclosure Of All Experts The Government May Use At Trial And Intended Trial Exhibits.

In the initial discovery request, the defense requested full disclosure of potential experts in order to prepare for trial:

> A written summary of all expert-witness testimony the government intends to offer in its case-in-chief, whether or not the expert has prepared a written report, describing "the witnesses' opinions, the bases and reasons therefor, and the witnesses' qualifications." Rule 16(a)(1)(G); *United States v. Barrett*, 703 F.2d 1076, 1081 (9th Cir. 1983) ("fairness requires that adequate notice be given to the defense to check the findings and conclusions of the government's experts"); *see United States v. Edwardo-Franco*, 885 F.2d 1002, 1009 (2d Cir. 1989) (defendants could not hire their own expert "until they were informed of the adverse report of the government expert"); *United States v. Richmond*, 153 F.R.D. 7, 8 (D. Mass. 1994) (disclosure of existing summaries of experts must occur "forthwith").

This information is necessary to prepare for meaningful cross-examination and potential rebuttal experts. *See Ake v. Oklahoma*, 470 U.S. 68 (1985) (due process requires defense ability to respond to expert testimony). Disclosure is especially necessary because, in addition to the need to prepare for trial, issues may arise regarding the qualification and appropriateness of potential expert

testimony under the Supreme Court authority on the admissibility of expert testimony.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  The Court should order production of government expert discovery forthwith.

On trial exhibits, the defense understands that the government has not yet decided which items of discovery are intended as trial exhibits.  Given the voluminous material, the Court should order an exhibit list earlier than usual.  The Court has discretion to order production of government exhibits and witnesses well before trial.  *See United States v. W.R. Grace*, 526 F.3d 499, 512-13 (9th Cir. 2008) (en banc) (district court has discretionary authority to order discovery including requiring the government to produce a final witness list a year before trial).  The parties will continue to confer on whether the issues require a ruling from the Court.

**K.    The Court Should Order The Disclosure Of All Grand Jury Proceedings Underlying The Indictment.**

Based on the discovery provided to date, grand jury subpoenas appear to have been issued as early as three months prior to Mr. Mohamud's indictment.  The defense is unaware of how long the grand jury was seated, how many witnesses testified, what evidence was presented, what potential charges were at issue, and whether the grand jury was made aware of the bar to criminal liability created by entrapment law.  Further, given the complex legal issues implicated by the investigation, the Court should require production of transcripts of all proceedings, including but not limited to witness testimony (including any witness notes relied upon by witnesses), questions raised by grand jurors and responses provided by the government, and information provided by the grand jurors regarding applicable legal standards.  Production of this information is necessary both for trial preparation as well as to assess potential pretrial motions.

**Conclusion**

For the foregoing reasons, we respectfully request that the Court order the production of the requested discovery.

Dated this 21st day of February, 2012.

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Ellen C. Pitcher
Ellen C. Pitcher
Assistant Federal Public Defender