Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
Steven T. Wax
Federal Public Defender
steve_wax@fd.org
Ellen C. Pitcher
Assistant Federal Public Defender
ellen_pitcher@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
503-326-2123 Telephone
503-326-5524 Facsimile

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:10-cr-00475-KI-1 |
| Plaintiff, | CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL DISCOVERY |
| v. | |
| MOHAMED OSMAN MOHAMUD, | |
| Defendant. | |

**Introduction**

This reply addresses those areas contested in the government's response to the second motion

to compel discovery for which additional argument is appropriate. This Court must initially resolve

PAGE 1    CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL DISCOVERY

whether the government errs in using the appellate standard – rather than the pretrial standard – for its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The Court should unequivocally instruct the government that its *Brady* obligation is not qualified by any government assessment of materiality. Where the government has asserted that it has no responsive material, the defense seeks a ruling by the Court in order to clarify discovery obligations and limitations. Moreover, with respect to the claim of "no responsive material," the defense seeks clarification about whether the claim is based on the lack of material for a particular request after inquiring of all appropriate agencies, or whether potential material is classified and therefore not a subject of the government's response. Mere classification of material does not insulate it from constitutionally required discovery. *See United States v. Mejia*, 448 F.3d 436, 454-55 & n.15 (D.C. Cir. 2006). The government's claims regarding several of the discovery requests open new areas in which the Court should compel the production of exculpatory material.

A.    **The Government Continues To Conflate The Pretrial And Post-Trial *Brady* Standards, Resulting In An Overly Narrow View Of the Government's Discovery Obligations.**

The government continues to take the position that material is discoverable under *Brady* only if its "suppression undermines confidence in the outcome of trial" or "is of sufficient significance to result in the denial of the defendant's right to a fair trial." CR 91 at 6; CR 28 at 16-17 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985), and *United States v. Agurs*, 427 U.S. 97, 109-110 (1976)). This is a clear misstatement of law, conflating the first and third prongs of the *Brady* appellate test. This misconception is particularly dangerous because it allows the United States Attorney's office to withhold important and helpful evidence for the defense based on subjective and irrelevant prosecutorial speculation regarding its effect on the jury. In fact, this error was identified

as one of the reasons for the government's *Brady* violations during the Senator Ted Stevens trial, which resulted in dismissal of the case.

In the court-ordered report on the prosecution's *Brady* violations in the *Stevens* case, the first and primary finding was that the government concealed favorable evidence. *In re Special Proceedings*, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order, dated April 7, 2009, Misc. No. 09-0198 (EGS), at 497 (filed November 14, 2011).[1] The court in the *Stevens* prosecution "rejected the use by trial prosecutors of the appellate standard for determining whether *Brady* had been violated because it gave them too much discretion." *Report* at 498-500 (citing *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005)). The *Stevens* court agreed with *Safavian* "that the government is required to produce any evidence 'favorable' to the accused, regardless of whether it would affect the outcome at trial." *Report* at 500. Under the proper pretrial *Brady* standard, the government's claim that it need only provide "material" evidence, not all favorable evidence, misconstrues its constitutional obligation.

As previously briefed by the defense, the position of the *Stevens* court and *Safavian* constitutes the governing Ninth Circuit rule. In *United States v. Price*, 566 F.3d 900 (9th Cir. 2009), the court noted that there are "three components of a *Brady* violation: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Id.* at 907 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). The first prong, is the standard for pretrial discovery: "the proper test for pretrial disclosure of exculpatory

---

[1] Available at http://www.dcd.uscourts.gov/dcd/sites/www.dcd.uscourts.gov.dcd/files/Misc09-198.pdf.

evidence should be an evaluation of whether the evidence is favorable to the defense, i.e., whether it is evidence that helps bolster the defense case or impeach the prosecutor's witness." *Id.* at 913 n.14 (quoting *United States v. Acosta*, 357 F. Supp. 2d 1228, 1239-40 (D. Nev. 2005)). The third prong only comes into play after trial: prejudice exists where there is a reasonable probability that the suppressed evidence would have affected the outcome of the trial – in other words, "'a probability sufficient to undermine confidence in the outcome' of the trial." *Id.* at 911 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The *Price* court noted that in *Brady* appellate cases, the terms "material" and "prejudice" are used interchangeably. *Id.* at 911 n.12.

As shown by *Price*, the government continues to improperly use the "prejudice" and "material" appellate standard to measure its pretrial discovery obligations in this case. CR 91 at 6, 16. On the contrary, the "'materiality' standard usually associated with *Brady* . . . should not be applied to pretrial discovery of exculpatory materials. . . . [J]ust because a prosecutor's failure to disclose evidence does not violate a defendant's due process rights does not mean that the failure to disclose is proper." *Id.* at 913 n.14 (quoting *Acosta*, 357 F.Supp.2d at 1239-40). By using the appellate "prejudice" standard to evaluate its discovery obligations, the government necessarily implements an overly narrow view of what material should be produced. Moreover, it essentially usurps a judicial function – *i.e.*, determining whether prejudice occurred by assessing the impact of non-disclosure on the outcome of a trial – and makes it a pretrial evaluation, with no trial record, performed by a party to the litigation. That is not the law under *Brady* or under controlling Ninth Circuit authority.

**B.    The Court Should Rule In Mr. Mohamud's Favor With Regard To The Outstanding Discovery Requests.**

The following section addresses discovery requests that were specifically contested in the government's response. Where the government has asserted that it has no responsive material, Mr. Mohamud seeks a ruling by the Court in order to clarify discovery obligations and limitations. The defense also believes the Court should direct the government to specify whether the lack of responsive material for a particular request results from an inquiry to all appropriate agencies, or whether the material is classified and, therefore, not a subject of the government's response (*see* CR 91 at 4).

The government's possession of relevant material, despite its claim of "no responsive material," is apparent on the face of several requests. For example, the government claims "it does not have any material related to" the Yemeni school referenced in emails from UA1. CR 91 at 14. However, in the very next sentence, the government admits that it does in fact have material about the school's alleged founder. *Id.* Similarly, the government states it "does not have any information responsive to" Mr. Mohamud's request about his placement on the no-fly list. CR 91 at 17. Again, because the government obviously put Mr. Mohamud on the list, it is inconceivable that it has no responsive information about the placement – instead, it is choosing not to provide it. These areas and others may well be covered by the government's caveat that the pleading does not address classified material, but that is entirely different from stating that the government has no such material.

Finally, with respect to the requests that the government agrees the defense is entitled to but is putting off until trial or just before trial, the material should be ordered produced immediately.

PAGE 5    CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL DISCOVERY

The Court anticipated completion of standard discovery by March 7, 2011. CR 23 at 15. The *Brady* material should have all been produced by that date. Further, for discovery requests based on the complexity and fact-intensive nature of this case, the Court should order production forthwith given the relatively short time until trial.

### 1.     Existing Logs Or Summaries Of Phone Calls (CR 27 at 11; CR 78 at 10).

Before ruling on this request, it is important that the Court fully understand the defense's predicament with respect to what the government has produced to date and what it claims is adequate in terms of its discovery obligations. The government electronically intercepted Mr. Mohamud's phone calls for over a year. As it must under Rule 16(a)(1)(B) and this Court's order (CR 58 at 14), the government produced almost a thousand audio files to the defense – one file for each call. The audio files have zero identifying information other than a seven-digit file name created by the government and useful only to it. The first two calls, for example, are named 3655712.wav and 3657292.wav. The majority of the audio files appear on a "call summary" sheet which provides a date and start time.[2] No other identifying information, such as phone number or participants involved – let alone transcripts of the calls – has been provided.

For well over 100 calls, no information other than the seven-digit file name has been provided. The defense has no way of knowing – or establishing in court – whether the call was made in October 2009 or November 2010 or any time in between. The government has this information

---

[2] As previously briefed (CR 78 at 10-11), even the minimal information provided on the call summary contains numerous errors.

and much more but for undisclosed reasons has refused to provide it in this case.[3]  The defense is

not asking the government to create anything or produce anything it does not already have.  The basic

facts of the calls such as the parties, times, originator of the call, and general content are factual

material needed for preparation of the defense.  Fairness and efficiency dictate that the existing

material be produced.

> **2.      All Materials Related To Any Contact With Mr. Mohamud By UCE1, UCE2,
>         And Any Other Person Acting On Behalf Of The Government (CR 27 at 12; CR
>         78 at 12).**

The government has provided minimal information – not even the real name – regarding Bill

Smith.  The Bill Smith "reports" provided by the government are no more than copies of the emails

between Smith and Mr. Mohamud – which the defense already had – coupled with a few sentences

stating that a particular email chain was provided by a "source" to a named FBI agent on a particular

date.  The government continues to shield virtually all substantive information about the Smith

contacts from the defense.

At the same time, the government continues to characterize the Bill Smith contacts to claim

that there was no inducement in those interactions.  CR 91 at 10.  Previously, in a slightly different

approach, the government argued simply that Smith and another undercover agent's actions were not

"related to the case."  CR 28 at 27.  Both approaches are misguided – inducement is not such a

temporally rigid concept that the government can send forth agent after agent to induce a targeted

individual and then claim that only the final contact should be relevant to an entrapment case.

---

[3] From the experience of the defense, it is quite common in Title III cases to receive full log
sheets in discovery, which provide the names of both callers, the phone numbers involved, the time
and date of the call, and a full transcript of the contents.

PAGE 7    CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND
         MOTION TO COMPEL DISCOVERY

Instead, inducement is measure by the entire course of the government's conduct in targeting a defendant. *See United States v. Poehlman*, 217 F.3d 692, 701-02 (9th Cir. 2000).

The Bill Smith information, including his name and experience as a government operative, should be ordered produced. The defense is not aware of any evidence that Mr. Mohamud considered, let alone advocated or acted upon, violent action in the United States prior to being contacted, and encouraged to do so, by government agents. The government's claims that Smith's contacts were innocuous rest on misleading selective quotations from Smith's emails. CR 91 at 8-10. The government omitted passages sent to Mr. Mohamud that are clearly aimed at provoking violence in the United States:

- "I want to find other brothers that think like i do. I want to help bring about our Ummah here in the west. I see in the news that other brothers are trying to fight, i want to as well. what can i do, do you know who i can talk to, can you help. I want to get more involved."

- "It is frustrating, i want to fullfill my purpose, and help with what is to come. Any help you could give me would be appreciated. I envision joining others who have the same desire. If we can get the west preoccupied with problems, and struggles here, then they will be less involved in Palestine."

- "I know that if we bring the fight here to the west and bring the focus here, the efforts of our brothers in Palestine will have more success as the west will be focusing here instead of there."

- "I cant tell you how easy it should be to bring any community here in the west to its knees."

- "this is all i think about, if more of us talked, and thought about these things Palestine might not be occupied. What am I supposed to do? just sit around and do nothing? who can I talk to? there is nobody here that wants to do, say, or think about what matters. we arent going to win by sitting, and letting incompetence run the show. I am not afraid."

**PAGE 8    CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL DISCOVERY**

These are clearly exculpatory statements relevant to government inducement. Broad discovery regarding Bill Smith and his government-sponsored activities are necessary to the determination of how best to utilize the exculpatory material at trial. The lack of meaningful discovery in this area deprives Mr. Mohamud of core fair trial rights.

The importance of the Bill Smith material is accentuated by its context. Even after the government initiatives regarding violence in America were rebuffed, the government stepped up its efforts by sending in two trained and sophisticated undercover agents armed with insider knowledge about Mr. Mohamud to contact him in person. The second team of agents were the beneficiaries of the knowledge gained from the Smith interactions. They also had the benefit of a surreptitious interrogation of Mr. Mohamud and access to every aspect of Mr. Mohamud's young life through pervasive electronic surveillance, physical tailing, and the unwarranted search of Mr. Mohamud's computer. The government then further manipulated the situation by putting Mr. Mohamud on the no-fly list, staking out the airport awaiting his efforts to fly to Alaska for gainful employment, and interrogating him under the guise of discussing the no-fly designation. Only when that interview had ended, and Mr. Mohamud was left humiliated and without a job, did the government send in their premier team of agents – in person – to continue to induce Mr. Mohamud.

> **3.**     **All Materials Relating To Any Behavioral Or Social Science Expert Consulted For This Case, Including, But Not Limited To, Any Psychiatrist, Psychologist, Social Scientist, Cultural Or Religious Expert, And Any Military Or Civilian Psychological Operations Or Interrogation Expert (CR 25 at 7; CR 27 at 15; CR 78 at 13).**

Contrary to the government's claim, this request is supported by authority and is not overbroad. The material sought is clearly delineated and, based on the transcripts of the UCEs meetings with Mr. Mohamud. For example, the UCEs quoted from the Qur'an, invoked God and

PAGE 9    CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL DISCOVERY

God's will frequently, and used other well-documented techniques of persuasion and reinforcement against Mr. Mohamud. The FBI made a video that the UCEs showed Mr. Mohamud that included invocations of the Shahada, provocative Qur'anic verses, and the modeling of war-like activities. The UCEs were trained in these techniques at some point, and the material should be produced under *Brady* because it will be helpful to the defense in providing the jury with a full understanding of the inducement tactics used in this case.

The interactions between the UCEs and Mr. Mohamud were not random. The extent to which they were planned, orchestrated, and/or based on training approaches is directly relevant to inducement. The FBI blueprint for sting operations have common characteristics, which are inappropriate when applied to someone like Mr. Mohamud who was not attempting to initiate violent action. *See* Trevor Aaronson, *The Informants*, Mother Jones, Sept.-Oct. 2011.

**4.    All Materials Related To UA1 And UA2 (CR 27 at 17;CR 78 at 15).**

The government has proffered UA1 as a major figure in this case. His name appears in dozens of FBI reports, although almost all information about him is redacted. The only unredacted portions baldly allege that Mr. Mohamud and UA1 have "significant ties." UA1 is portrayed as part of the genesis of the investigation into Mr. Mohamud and as part of the story under which UCE1 approached Mr. Mohamud. The government has characterized UA1's emails as written in code. The claim that the government has no information "responsive to this request," is simply not reasonable unless the prosecution is avoiding having information by failing to make necessary inquiries. CR 91 at 14. Even where the defense pointed out a clear example of non-classified immigration information the government has, and has included in the Criminal Complaint, the government has balked at disclosure. Information about UA1 will be a part of the case at trial, and the defense has

**PAGE 10    CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL DISCOVERY**

a right to helpful material under *Brady*.  To the extent that any material exists that calls into question the government's portrayal of UA1 or otherwise casts doubt on the conclusory allegations made, that material should be produced under *Brady* immediately.  Further bases for an order regarding UA1 will be submitted *ex parte* and under seal.

> **5.    All Material Regarding The Existence Of Federal Bureau Of Investigation And Other Investigative Agencies' Policies And Practices Regarding Recording The Initial Face-to-Face Contact With Undercover Agents And All Internal Communications Material Regarding Their Application In Mr. Mohamud's Case (CR 78 at 16).**

The government asserts that there is no policy regarding when to record meetings between agents and targets of sting operations.  It is unclear whether the government's lack of responsive material is due to a lack of any official guidance on the matter, whether it is due to classification status, or whether the government simply considers it undiscoverable.  The government should be ordered to produce any material regarding FBI policies and practices relative to the recording of undercover meetings.

The government's dismissal of the *Ferdaus* agent's testimony regarding the "FBI's common practice" as jurisdictionally based is suspect.  The quoted testimony is not so limited.  The undercover agents in Mr. Mohamud's case do not appear to be Oregon based and, whether or not the same agents were involved in other cases nationwide, the FBI clearly has developed a standard blueprint for sting operations aimed at Muslims living in the United States.  Given the national scope of sting operations, the FBI does not appear to leave general polices such as the decision when to record meetings, entirely to the whim of each local jurisdiction.

**PAGE 11    CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL DISCOVERY**

6.    **All Material Regarding Surveillance Of Mr. Mohamud And His Family Generated From Undercover And Informant Activities At Their Mosque (CR 78 at 18).**

Any contacts between Mr. Mohamud and government agents is relevant in an entrapment analysis. This is even more so in cases where the government is actively surveilling and infiltrating a discreet religious or ethnic group and has repeatedly been accused of unleashing agent provocateurs into that community. In numerous cases, the agents have been found to engage in questionable tactics. One former FBI confidential informant, who had been tasked with infiltrating mosques in California, recently stated: "The way the FBI conducts their operations, it is all about entrapment . . . I know the game, I know the dynamics of it. It's such a joke, a real joke. There is no real hunt. It's fixed." Paul Harris, *The Ex-FBI Informant With A Change Of Heart: 'There Is No Real Hunt. It's Fixed,'* The Guardian, Mar. 20, 2012; *see also,* Kari Huus, *ACLU: FBI 'mosque outreach' program used to spy on Muslims,* MSNBC.com, Mar. 29, 2012.

To the extent that any such agents surveilled, infiltrated, or attempted to infiltrate Mr. Mohamud's local mosque and came into contact with him or generated information about him, that material will be helpful to the defense in terms of predisposition and inducement. Further, the government appears to equate caution in the Bill Smith email correspondence with surreptitious activity. Given the scope and extent of infiltration and surveillance, known and assumed, the requested discovery demonstrates privacy concerns that contradict the government's interpretation. The government's response regarding lack of such material does not end the matter – there may well be classified or otherwise protected material that the government seeks to prevent the public from knowing. If so, the Court should review the material *in camera* and order it produced under the protective order.

7.    **All Government Material Related To The Investigation Of Mr. Mohamud And Portland's Participation In The Joint Terrorism Task Force (JTTF) And Any Other Collateral Purpose For The Tactics Applied By The Government (CR 78 at 19).**

The government provides a sound-bite instead of a response on the request for Joint Terrorism Task Force (JTTF) discovery. The government never says whether responsive material exists within the United States Attorney's office and other relevant agencies, nor does the government assert it has made appropriate inquiries. Instead, the government attacks the defense request as "untethered from reality" and lacking "common sense" because an investigation would never be manipulated to "secure the reassignment of two Portland police officers." CR 91 at 16. There are three fundamental problems with the government's response: the unrebutted evidence from the initial motion and additional facts demonstrate the association is real; the government's claim that Portland's JTTF membership did not matter is belied by the facts; and the government minimizes its role in creating the incident.

First, the defense provided strong bases for a political gloss on the government's decision-making. CR 78 at 19-21. Nevertheless, the government never says that it made reasonable inquiry or that it conducted a review and found no such evidence. The government utterly ignores the evidence at page 15 of the defendant's brief (CR 78 at 21), which provides a powerful inference that on the day of the incident, an Oregonian employee discussed the case with a government attorney or agent and drew political significance from the exchange. The government's response does not deny that such a governmental contact occurred, nor does it offer any explanation for the content. This alone warrants the Court's order for production of discovery regarding this contact and any other efforts to take political advantage of the situation.

Second, the media coverage and common sense contradict the government's claim that Portland's membership in the JTTF was about the "reassignment of two Portland police officers." The federal government wanted Portland to rejoin the JTTF, not because of staffing but because Portland was a lone hold-out from the JTTF nationwide system. As illustrated in the initial pleading, the connection between this investigation and Portland's decision to stay apart from the JTTF was immediately drawn by journalists. Further, FBI Special Agent in Charge Balizan provided some of the most alarmist sound-bites to the media on the day of the arrest, including "The threat was very real." Bryan Denson, *FBI Thwarts Terrorist Bombing Attempt At Portland Holiday Tree Lighting*, The Oregonian, Nov. 26, 2010. According to former Portland Police Chief Rosie Sizer, the same SAC Balizan "expressed interest in Portland rejoining the JTTF." Attachment A. Further, if Portland's participation in the JTTF was insignificant, there would be no reason for the former United States Attorney to post on his campaign web site: "**Joint Terrorism Task Force**: Worked closely with community leaders to have Portland Police Bureau officers resume working with the FBI on terrorism cases to keep the community safer" (bold in original).[4]

Third, despite the government's repeated claim that the "investigation and timing of this case" was based on Mr. Mohamud allegedly selecting a target, the facts suggests otherwise. The investigation and surreptitious surveillance had been ongoing for at least ten months before any mention of Pioneer Square. The timing of numerous governmental tactics, whether the search of Mr. Mohamud's computer in 2009, the approach of Bill Smith in 2009, the approach of UCE1 in June of 2010, all preceded any mention of Pioneer Square. Moreover, the suggestion that Mr. Mohamud

---

[4] Available at: http://www.holtonfororegon.com/about/

PAGE 14    CORRECTED REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SECOND MOTION TO COMPEL DISCOVERY

suddenly came forth with the idea for violent action in Portland, which then drove the "investigation and timing," is incorrect. Instead, it was the undercover agent who initiated the idea of taking action in Portland during the July 30, 2010, meeting. As inaccurate and incomplete as the FBI report of the unrecorded meeting is, the undercover agent does acknowledge that he "asked MOHAMUD to do some research about possible targets and get back to him." The Complaint similarly notes that Mr. Mohamud had not thought about an attack at Pioneer Square until after meeting with UCE1. CR 1 at 19.[5] Moreover, it is not simply the date of the arrest of Mr. Mohamud that raises questions about ulterior governmental motivations, but the very nature of the scale of the sting and the publicity surrounding the arrest that make apparent a motive for the incident to be as sensational as possible.

On top of providing no serious response to the defense need for favorable information, the government reiterates its use of the incorrect *Brady* standard specifically on this request. CR 91 at 16. Any indication that persons involved in this investigation – prosecutors, agents, or other governmental actors – had political incentives or otherwise benefitted from actions that were largely orchestrated by skilled and experienced undercover agents regarding the scale and completion of the sting are exculpatory.

**8.    All Material Related To The Pre-Meeting Plans, Post-Meeting Debriefings, And Tactical Decisions Regarding Interaction With Mr. Mohamud (CR 78 at 22).**

---

[5] The Complaint is apparently referring to the following exchange between UCE1 and Mr. Mohamud:

> UCE-1:  I mean (UI) then, the pioneer square.  How long have you been thinking about this?
> MOHAMUD:  Uh, since I seen you and, and you know we had a talk before
> UCE-1:  Okay
> MOHAMUD:  So I looked around.

Contrary to the government's assertion about lack of controlling legal authority, to the extent that any requested material is favorable to the defense, it must be disclosed under *Brady*. Importantly, the defense does not ask the "government to retrospectively document" anything (CR 91 at 17). To the contrary, the answers to the example questions the defense set forth in its initial motion (CR 78 at 22-23) are likely to be found in existing material.

The government has repeatedly characterized the subjective intentions of the agents in this case and continues to make statements about the nature of the case and how it progressed. For example, the government publicly proclaimed that the undercover agents "frankly discouraged" Mr. Mohamud from acting. April Baer, *Agents Tried To Discourage Suspect, But He Insisted On Carrying Out Plot*, OPB News, Nov. 29, 2010. In its Response, the government claims the "investigation and timing of this case" were driven entirely by the defendant. CR 91 at 16. Based on an analysis of the discovery, the defense believes the requested documents will show that both the government's assertions are incorrect. The material will be favorable to the defense at trial in showing inducement and to counter the government's portrayal of its actions as driven by the defendant rather than its own agenda. By making repeated and public statements characterizing its own strategy, the government cannot now complain about the defense seeking material it believes will disprove those statements.

### 9. All Material Relative To The Placement Of Mr. Mohamud On The No-Fly List (CR 78 at 24).

The government's claim that it "does not have any information responsive to this request" (CR 91 at 17) can only mean that it is, in fact, simply choosing not to provide material because of supposed policy, classification, or amorphous concerns about national security. None of these

factors overcome a criminal defendant's right to discoverable material. Although the government apparently has a policy of neither confirming nor denying the placement of individuals on the no-fly list, that concern is moot here – the government claims that it did place Mr. Mohamud on the list. For the reasons stated in the defense's initial memorandum in support of its motion (CR 78 at 24-26), and because the no-fly incident appears to be a carefully orchestrated triggering event that would leave Mr. Mohamud traumatized and therefore more receptive to UCE1's overtures a week later, the material sought is discoverable under *Brady* and should be produced.

**Conclusion**

For the foregoing reasons and those stated in the Memorandum In Support Of Second Motion To Compel Discovery, we respectfully request that the Court order the production of the requested discovery.

Dated this 30th day of March, 2012.

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Ellen C. Pitcher
Ellen C. Pitcher
Assistant Federal Public Defender