**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
steve_sady@fd.org
**Steven T. Wax**
**Federal Public Defender**
steve_wax@fd.org
**Ellen C. Pitcher**
**Assistant Federal Public Defender**
ellen_pitcher@fd.org
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**503-326-2123 Telephone**
**503-326-5524 Facsimile**

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:10-cr-00475-KI-1 |
| Plaintiff, | MOTION FOR RECONSIDERATION OF DISCOVERY ORDER |
| v. | REGARDING DISCLOSURE OF GOVERNMENT AGENT BILL |
| MOHAMED OSMAN MOHAMUD, | SMITH'S TRUE IDENTITY |
| Defendant. | |

On April 17, 2012, this Court ordered the government to disclose the true identity and other information regarding the government's agent "Bill Smith." On May 8, 2012, the Court changed its initial ruling and denied Mr. Mohamud's motion to compel the identity of Bill Smith based on the

**PAGE 1    MOTION FOR RECONSIDERATION OF DISCOVERY ORDER REGARDING DISCLOSURE OF GOVERNMENT AGENT BILL SMITH'S TRUE IDENTITY**

government's "limited privilege to withhold the identity of a confidential informant." CR 127 at 2. The government did not raise the "informer's privilege" in any public pleading related to Mr. Mohamud's motions to compel, and therefore, the defense has not had an opportunity to brief and to be heard on the issue. This motion sets forth the reasons why 1) the informant privilege does not apply based on the facts of the case; and 2) even if the privilege is applicable, the balance of interests favors disclosure. At a minimum, the Court should hold an *in camera* adversarial hearing for full development of the facts related to Bill Smith.

I.  **The Informer's Privilege Should Not Be Applied To Bill Smith Because His Actions In This Case Do Not Fit Those Of A Traditional Informant.**

The seminal case establishing the informer's privilege is *Roviaro v. United States*, 353 U.S. 53 (1957). In *Roviaro*, the Supreme Court held that the government has a limited privilege to "withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." 353 U.S. at 59. The Court reasoned that the "privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id*. However, the privilege is limited by "fundamental requirements of fairness," and the government's interest in nondisclosure must be balanced against a defendant's right to prepare a defense. *Id*. at 60-62.

In *Roviaro*, as in subsequent informant cases, the informant in question actually "furnished information of violations of law" to law enforcement officers. Because those informants, to differing degrees, "communicate[d] their knowledge of the commission of crimes," there was little question that the *Roviaro* privilege and balancing test applied. Indeed, in both cases cited in this Court's

opinion, the informant in question fit squarely within *Roviaro*'s understanding of who should be protected by the "informer's privilege." CR 127 at 2-3. In *United States v. Henderson*, 241 F.3d 638, 642 (9th Cir. 2001), a confidential informant came forward and told the FBI the identity of a wanted bank robber. In *United States v. Gil*, 58 F.3d 1414, 1417 (9th Cir. 1995), the investigation into the defendants began when a confidential informant provided police with information about an ongoing drug distribution conspiracy. Both informants approached police with information about crimes of which they were already personally aware.

In contrast, Bill Smith's actions in Mr. Mohamud's case are inconsistent with the traditional role of an informant. The rationale for *Roviaro*'s "informer's privilege" is absent. Bill Smith was not reporting any crime that he was aware of and was not using any personal connections he had to connect undercover agents with a targeted individual. Instead, he was directed to contact Mr. Mohamud by the FBI, was given Mr. Mohamud's email by the FBI, apparently had no prior relationship with Mr. Mohamud that facilitated the contact, and had no knowledge that a particular crime was afoot. To the extent crime was discussed, Bill Smith was encouraging violent action by Mr. Mohamud.

In short, Bill Smith was not an "informant," so there is no need to provide anonymity or other judicial protections for informants. Bill Smith was well paid to contact Mr. Mohamud through email. Because there is nothing about Bill Smith's actions in this case that need be protected or encouraged by resort to infringement on Mr. Mohamud's constitutional rights to due process, confrontation, and compulsory process, the *Roviaro* informer's privilege is simply not applicable to Bill Smith on the facts of this case.

**II.     Even Assuming That The Informer's Privilege Applies, The Balance Of Interests Favors The Defense And Disclosure Should Be Required.**

Even if the informer's privilege is expanded to incorporate those acting outside the role of a traditional informant, disclosure should be ordered because the weighing of competing interests favors Mr. Mohamud.  The Supreme Court recognized that the informer's privilege is limited and that disclosure is required where "the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60-61.  The Court dictated that "no fixed rule with respect to disclosure is justifiable" and that the "problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id*. at 62.  The balance overwhelmingly supports disclosure in this case because at the heart of an entrapment defense is a temporal line, established by the first governmental contact with a defendant, that serves as a starting point from which predisposition and inducement are measured. *United States v. LaRizza*, 72 F.3d 775, 778 (9th Cir. 1995) (where a "defendant relies on the defense of entrapment, 'the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents'") (quoting *Jacobson v. United States*, 503 U.S. 540, 549 (1992)).  Where entrapment has been properly raised, the importance of an informant's identity – especially a percipient witness – is generally recognized and disclosure is common.  *See, e.g.*, *United States v. Pesaturo*, 519 F.Supp.2d 177, 183-86 (D. Mass. 2007) (disclosure ordered where defendant claimed identity "necessary to support or explore the viability of the defense of entrapment"); *United States v. Williams*, No. C 10-00230 SI, 2010 WL 3447704, at *4 (N.D. Cal. Aug. 30, 2010) (granting disclosure of informant identity and

impeachment material to allow defendant to "prepare an entrapment defense"); *United States v. Huerta*, No. C 06-669 SI, 2006 WL 3491145, at *1-2 (N.D. Cal. Dec 1, 2006) (disclosure ordered to "allow defendant to gather information relevant to an entrapment defense"); *see also LaRizza*, 72 F.3d at 776 (in entrapment case, government disclosed informant's identity and last known location after an informal defense request); *United States v. Cutler*, 806 F.2d 933, 935 (9th Cir. 1986) (in entrapment case, government disclosed informant's name and offered to subpoena him for trial).

> A. **Disclosure Should Be Ordered Because Bill Smith Is Highly Relevant To Mr. Mohamud's Proffered Defense Because He Is A Percipient Witness To The First Six Months Of Government Contact.**

In *Roviaro*, the Court stated that "[w]hether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S. at 62. The need for production focuses on "1) whether the testimony would be 'relevant and helpful' to the defendants' case, especially in terms of the relationship between the asserted defenses and the likely testimony of the informant, which in turn will often depend on the degree of involvement by the informant in the charged crime, and 2) the government's interest in protecting the safety of an informant." *United States v. Wong*, 886 F.2d 252, 255-56 (9th Cir. 1989) (internal citations omitted).[1] "The informer in *Roviaro* was a percipient witness to the crime and was essential to the development of [the] defense." *United States v. Kiser*, 716 F.2d 1268,

---

[1] As this Court noted, the consideration of an informant's involvement in the charged crime is sometimes delineated as a separate factor. CR127 at 2-3. Regardless of whether a particular opinion lists it separately or as a facet of the first factor, it is consistently analyzed as relating to the question of whether disclosure of information about an informant would be helpful and relevant to a proffered defense. *E.g.*, *Gil*, 58 F.3d at 1421 (informant's role as a "mere tipster" made him of "limited usefulness" to defense).

1270 (9th Cir. 1983). The Court reversed in *Roviaro* and ordered disclosure because the informer's "possible testimony was highly relevant" for reasons including that he "might have disclosed an entrapment." *McCray v. Illinois*, 386 U.S. 300, 310-11 (1967) (quoting *Roviaro*, 353 U.S. at 63-65).

Bill Smith's identity and role as a government actor will be "relevant and helpful" under *Roviaro*. As a percipient witness and the first known government agent in contact with Mr. Mohamud, the defense may well call Bill Smith because he represents the demarcation line by which predisposition and inducement are measured. While the predisposition inquiry ends at the first government contact, the inducement question begins there, and Bill Smith represents early government action that steered Mr. Mohamud toward violent action in the United States. Bill Smith's solicitations to help "get the west preoccupied with problems, and struggles here" by "bring[ing] the fight here to the west and bring[ing] the focus here," mark the initial stages of inducement.

The Supreme Court decision in *Jacobson* is particularly instructive in terms of understanding Bill Smith's relevance and favorability to Mr. Mohamud's defense. In *Jacobson*, the Court held that – as a matter of law – the defendant was not predisposed to commit the crime charged. 503 U.S. at 542. Jacobson was arrested after ordering and receiving a pornographic magazine involving minors from a fictitious organization created by the government. *Id*. at 546-47. When first contacted by the fictitious group, Jacobson immediately responded and was sent a catalog. *Id*. However, the Court focused on the fact that "[b]y the time [Jacobson] finally placed his order, he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations." *Id*. at 550. Although "he had become predisposed to break the law by May 1987 . . . the Government did not prove that this predisposition was independent and not the product

of the attention that the Government had directed at [Jacobson] since January 1985." *Id*. That "attention" consisted of several mailings from different covert agents in different agencies that essentially groomed Jacobson for the eventual crime by normalizing his interest in the pornographic material and rationalizing why it should be available based on ideological and political grounds. *Id*. at 543-46.

Here, Bill Smith provided communications that eventually culminated with the sting operation that are analogous to the early mailings sent to Jacobson. Bill Smith invoked political, social, and religious themes that support violent action within the United States. Using feigned friendship, sympathy, need for companionship, allusions to political and social injustice, Bill Smith began the process of normalizing the idea of domestic violence by a young American living in the West. *See United States v. Poehlman*, 217 F.3d 692, 701-02 (9th Cir. 2000) (noting "that even very subtle governmental pressure, if skillfully applied, can amount to inducement"). Bill Smith is a witness who can testify regarding the communications he sent and his status as a government agent. With the information the Court originally ordered produced, the defense would likely expand his testimony to encompass factual questions related to his interactions with Mr. Mohamud, use of insider information about Mr. Mohamud, and how the varied inducement tactics shifted over time as the government refined its approach. This factual testimony is directly relevant to proving both government inducement and lack of predisposition and, therefore, weigh in favor of production under the *Roviaro* balancing test. Under the facts of this case, production is necessary for a fair trial under the due process, confrontation, and compulsory process provisions of the Constitution.[2]

---

[2] Mr. Mohamud's constitutional interests are broader than his rights "under the Confrontation Clause." CR 127 at 2. While the case cited by this Court, *United States v. Gil*, 58 F.3d 1414 (9th

Hearsay testimony by an FBI agent, or other proxy evidence, is no substitute for Bill Smith's testimony regarding the content of his emails. The accused has the right to compulsory process, confrontation of witnesses, and a due process right to present his defense. Second-hand information is especially inappropriate because there can be no assurance that such testimony will be accurate or complete. An agent's testimony will necessarily be limited to what Bill Smith has supposedly reported and, therefore, may not be a complete picture of his conduct. For example, Bill Smith may be a confidential source within the local community. The defense is unaware whether Bill Smith is in a position to personally know or have interacted with Mr. Mohamud without disclosure of Bill Smith's identity. Depending on the incentives or biases that motivated Bill Smith to work for the FBI, Bill Smith may have had reason to go beyond the instructions purportedly given to him by the FBI without reporting such actions to his handlers. Only Bill Smith would be able to provide information about such matters, and the defense has a right to investigate and to test his credibility with respect to such testimony.

Moreover, the government has already shown that its agents do not have full knowledge, recollection, or documentation of the circumstances surrounding Bill Smith's contacts with Mr. Mohamud. There are apparently no contemporaneous, detailed reports regarding the FBI's payments to, tasking, and interactions with Bill Smith. SA Jason Dodd, who debriefed Bill Smith, has no

---

Cir. 1995), did focus on the Confrontation Clause, that was due to the specific issue in dispute – namely, whether the district court's limitations on the defendant's ability to cross-examine government witnesses infringed on the right to confrontation. The case did not purport to establish confrontation as the only right at issue when considering disclosure. Indeed, the Due Process Clause and the Compulsory Process Clause also guarantee a criminal defendant the right to present a complete defense, *Robinson v. Gipson*, No. 1:10-cv-00133, 2012 WL 1551677, at *13 (E.D. Cal. May 1, 2012), and are implicated here. *See generally Holmes v. South Carolina*, 547 U.S. 319, 324-25 (2006); *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).

**PAGE 8    MOTION FOR RECONSIDERATION OF DISCOVERY ORDER REGARDING DISCLOSURE OF GOVERNMENT AGENT BILL SMITH'S TRUE IDENTITY**

significant reports and is unable to recall when exactly Bill Smith was assigned to contact Mr. Mohamud or when Bill Smith was told to cease the interactions. The assertion that Bill Smith was in fact told to cease communications in the spring of 2010 is also in question, because his final email suggests that he was more than willing to continue a dialogue. Further, SA Dodd's reports do not include the final seven communications between Bill Smith and Mr. Mohamud, nor do the reports indicate that SA Dodd was ever given those emails. The defense should be able to compel Bill Smith as a witness and obtain information necessary for reasonable investigation because his testimony is the best direct evidence relating to government contacts with Mr. Mohamud from November 2009 through May 2010.

This Court ordered that "[i]f the government intends to call 'Bill Smith' as a witness, it must disclose his identity before trial." CR 127 at 3. To date, however, the government has given no indication that it intends to rely on Bill Smith at trial and, in fact, has consistently attempted to distance Bill Smith from the case. *E.g.*, CR 28 at 27 ("nor is the [Bill Smith] contact related to the case or defendant's predisposition."). As the defense has repeatedly argued, the government's position is entirely at odds with the law of entrapment. *E.g.*, CR 42 at 2-4; CR 99 at 7-9. The reality is that one side, the defense, considers Bill Smith a critical witness and intends to call him at trial, which it cannot do without the government disclosing Bill Smith's identity. "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. This right would be rendered illusory if the government is given the unilateral power to call a witness if it likes his testimony but can prevent the defense from calling that same witness if it does not like his testimony. *See Wardius v. Oregon*, 412 U.S. 470, 472 (1973) (due process violated where government benefitted from one-sided

**PAGE 9    MOTION FOR RECONSIDERATION OF DISCOVERY ORDER REGARDING DISCLOSURE OF GOVERNMENT AGENT BILL SMITH'S TRUE IDENTITY**

discovery process). Fundamental fairness and a panoply of constitutional rights require immediate disclosure of Bill Smith's identity on the facts of this case.

This Court recognized the importance and relevance of Bill Smith's role in the case when it ordered the government to disclose reports about Bill Smith and payments made to him by the FBI. While knowing the monetary incentives Bill Smith received for his actions is valuable to the defense, it is not a substitute for investigating other biases or incentives Bill Smith may have had. *See Huerta*, 2006 WL 3491145, at *1-2 (ordering disclosure of informant identity even where government had already provided significant impeachment evidence). Bill Smith had contact with Mr. Mohamud for an extended time and promoted the idea of violent action in the United States. Mr. Mohamud did not accede to Bill Smith's overtures and never sought to meet with him, despite Bill Smith's apparent efforts to make such a connection. Further, the government failed to disclose the exculpatory fact that Bill Smith was a government agent until the defense uncovered the connection. Bill Smith is a critical percipient witness whose testimony is directly relevant and helpful to the defense's position with respect to inducement and predisposition. Under the *Roviaro* balancing framework, Mr. Mohamud has a high interest in the disclosure of Bill Smith's identity.

> **B.    The Government's Interest In Nondisclosure Is Low Because There Are No Safety Concerns With Respect To Bill Smith's Actions In This Case.**

In contrast to Mr. Mohamud's high interest in the disclosure of information about Bill Smith, the government interest is relatively low because Bill Smith was not acting as a citizen-informant by turning over information about criminal activity to law enforcement. On the specific facts of this case, Bill Smith is far from the traditional "informant" the Supreme Court sought to encourage and to protect in establishing the *Roviaro* balancing test. At least with respect to Mr. Mohamud, Bill

Smith apparently is not a personal acquaintance who is feeding law enforcement agents with insider information about ongoing crime.[3] Bill Smith's role and participation in the events leading to the charges are not within the scope of the precedent addressing informer's privilege.

The government's interest in nondisclosure normally hinges on informant safety. *See Ordonez*, 737 F.2d at 809. The defense is unaware of any evidence related to Mr. Mohamud that would suggest Bill Smith is in any way imperilled. General, unspecified concerns about a backlash against an informant cannot justify nondisclosure; if that were so, there would never be disclosure because all informants theoretically face that risk. In any event, this concern alone cannot outweigh Mr. Mohamud's due process rights where disclosure would be "highly relevant and might [be] helpful to the defense." *Ordonez*, 737 F.2d at 809. The Court must guard against allegations of safety concerns that are "more speculative than real." *Pesaturo*, 519 F.Supp.2d at 186. In terms of the investigation of Mr. Mohamud, Bill Smith is simply in no danger.

Mr. Mohamud obviously cannot speak to whether the government seeks to shield Bill Smith based on an interest in preserving other ongoing investigations or sting operations of which the defense is unaware. For any ongoing government actions similar to the ones taken in this case, disclosure of Bill Smith's identity would not be detrimental because Bill Smith was not an insider providing information about crime; he was a stranger on the internet whose real identity was never known. Bill Smith's online persona and ability to communicate with unseen strangers should not

---

[3] The defense's understanding of the government's position is that Bill Smith and Mr. Mohamud do not know each other personally. If this understanding is incorrect, disclosure is even more critical because the first government contact may have been earlier than November 2009 and there may be contacts that have not been memorialized in official reports. As noted above, because Bill Smith's identity has not been disclosed the defense is currently prevented from investigating this possibility.

**PAGE 11   MOTION FOR RECONSIDERATION OF DISCOVERY ORDER REGARDING DISCLOSURE OF GOVERNMENT AGENT BILL SMITH'S TRUE IDENTITY**

be threatened by disclosure of his true identity in this case. Even if other investigations could be affected by disclosure, the government has put itself in this position by using Bill Smith the way it did. As Bill Smith did not act as a traditional informant – *i.e.*, providing information about ongoing crime that he was personally aware of – the FBI could simply have used its own employees to contact Mr. Mohamud online, as it did on November 13 and 18, 2009. Instead, it chose to use Bill Smith and risk that his identity would be revealed. Mr. Mohamud should not suffer a loss of constitutional rights because of the government's decision. If Bill Smith's anonymity is of such importance to the government, it is free to withhold the information by dismissing its case against Mr. Mohamud. *See Roviaro*, 353 U.S. at 628; *United States v. Rawlinson*, 487 F.2d 5, 7 n.3 (9th Cir. 1973) ("Of course, the government can still protect the informant's identity by dropping the charges against the defendant.").

To the extent the Court is privy to *ex parte* information from the government that the Court continues to believe counsels against public disclosure of Bill Smith's identity, those concerns can be alleviated by resort to a protective order. *See e.g.*, *Huerta*, 2006 WL 3491145, at *1; *Pesaturo*, 519 F.Supp.2d at 187. Given the protective order, the government's interest in nondisclosure is further minimized. Because the government's interest in nondisclosure is minimal and can, if necessary, be ameliorated by use of the protective order, and because Mr. Mohamud's interests are high, the Court should order disclosure of Bill Smith's true identity. Where a defendant shows that disclosure would be "highly relevant and might [be] helpful to the defense," it is an "error of constitutional dimension to deny disclosure solely because of the potential danger to the informer." *United States v. Ordonez*, 737 F.2d 793, 809 (9th Cir. 1984).

**III.    If Disclosure Of Bill Smith's Identity Is Not Ordered Forthwith, An *In Camera* Adversarial Hearing Is Required To Determine The Extent To Which Disclosure Would Be Helpful And Relevant To Mr. Mohamud's Defense.**

If this Court finds that disclosure of Bill Smith's identity is appropriate after weighing the *Roviaro* factors, no *in camera* hearing is required. *See Williams*, 2010 WL 3447704, at *4 (no *in camera* hearing needed where balancing test favors defendant because disclosure of informant would help defendant's entrapment defense). In the event that this Court does not find that the current record supports Mr. Mohamud's motion for disclosure, an *in camera* adversarial hearing is required to assess the relevance and helpfulness of Bill Smith's potential testimony. *See United States v. Spires*, 3 F.3d 1234, 1238-39 (9th Cir. 1993).

In *Spires*, the Ninth Circuit held that an *in camera* hearing is required "where the defendant makes a 'minimal threshold showing' that disclosure would be relevant to at least one defense." 3 F.3d at 1238 (quoting *Wong*, 886 F.2d at 256). A "district court abuses its discretion if it fails to hold an *in camera* hearing on disclosure" after a defendant has made such a minimal showing of relevancy. *Id*. at 1239. The purpose of an *in camera* hearing is to allow the court to gauge whether Bill Smith "would be helpful to the defendant, and to aid in its application of the *Roviaro* balancing test." *United States v. Amador-Galvan*, 9 F.3d 1414, 1417 (9th Cir. 1993). Thus, where a defendant has made a minimal threshold showing of relevance, but a court is not persuaded that the defendant should prevail on the *Roviaro* balancing test, an *in camera* hearing must be conducted in order to accurately assess the value of the informant's information. Only then can an accurate balance be struck under *Roviaro* while assuring a defendant's rights have been protected.

Procedurally, a district court should "require that a complete record be made of its *in camera* proceedings so that [an appellate court] can determine if the *Roviaro* balancing test was properly

applied to the facts presented to the court." *Ordonez*, 737 F.2d at 809. In *Ordonez*, the Ninth Circuit also noted the importance of a court articulating its "express findings" to "facilitate the work of the reviewing courts and avoid unnecessary reversals," given that the "balancing task imposed on trial courts by *Roviaro* is critical to the preservation of due process." 737 F. 2d at 808-09. The Court should allow defense counsel's participation in the *in camera* hearing to ensure that all the necessary facts are adduced and given proper context. *See Henderson*, 241 F.3d at 645; *Ordonez*, 737 F.2d at 810. As noted in *Henderson*, "defense counsel may participate under an order not to reveal any information disclosed during the hearing." 241 F.3d at 645.

    Here, Mr. Mohamud has made more than a minimal threshold showing of relevance. Bill Smith is highly relevant to an entrapment defense because he was the first known government agent to contact Mr. Mohamud and suggested the idea of taking violent action in the United States, purportedly as a means of assisting the plight of socially or politically oppressed Muslims overseas. Testimony about those communications go directly to both inducement and predisposition. *See Poehlman*, 217 F.3d at 699 (government agent first raised the idea of the crime, which court analyzed under inducement); *United States v. Gurolla*, 333 F.3d 944, 955 (9th Cir. 2003) ("whether the government made the initial suggestion of criminal activity" is a factor in predisposition). Further, Mr. Mohamud did not accept the overtures, which is another consideration in analyzing predisposition. *See Gurolla*, 333 F.3d at 955 (defendant's reluctance is a factor in predisposition). Because Mr. Mohamud can show relevancy, this Court must at least hold an *in camera* hearing regarding Bill Smith before denying the defense request for Bill Smith's identity.

**Conclusion**

For the reasons stated above, the Court should order disclosure of Bill Smith's true identity forthwith. To the extent the Court does not find in Mr. Mohamud's favor, an *in camera* adversarial hearing is necessary to properly weigh the *Roviaro* factors.

Dated this 23rd day of May, 2012.

                                              /s/ Stephen R. Sady
                                              Stephen R. Sady
                                              Chief Deputy Federal Public Defender

                                              /s/ Steven T. Wax
                                              Steven T. Wax
                                              Federal Public Defender

                                              /s/ Ellen C. Pitcher
                                              Ellen C. Pitcher
                                              Assistant Federal Public Defender