UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,                    Criminal Case No. 3:10-CR-00475-KI

             Plaintiff,

                                 OPINION AND ORDER

             v.

**MOHAMED OSMAN MOHAMUD**,

             Defendant.


      Amanda Marshall
      United States Attorney
      District of Oregon
      Ethan D. Knight
      Pamala Holsinger
      Jolie F. Zimmerman
      Assistant United States Attorneys
      1000 S.W. Third Avenue, Suite 600
      Portland, Oregon  97204

          Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Steven T. Wax
Federal Public Defender
Stephen R. Sady
Assistant Federal Pubic Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204

      Attorneys for Defendant


KING, Judge:

Defendant Mohamed Osman Mohamud is charged with attempting to use a weapon of mass

destruction, specifically a destructive device or explosive bomb, against a person or property

within the United States, in violation of 18 U.S.C. § 2332a(a)(2)(A).

Oregon State Police ("OSP") investigated Mohamud after a student accused him of

possible date rape.  FBI agents were involved in the investigation.  Mohamud moves to suppress

the evidence seized, namely, statements he made and information from his computer and cell

phone.  Mohamud claims his consent for the search was not freely and voluntarily given, and the

searches and seizures went beyond the scope of his consent.  Mohamud also moves to suppress all

evidence collected by the government in its parallel national security investigation because he

claims all evidence obtained after the OSP investigation is the fruit of evidence obtained illegally

in the OSP investigation.

Based on the government's representation in the briefing that it did not intend to offer at

trial any of the disputed evidence obtained during the OSP interview, I declined to determine as a

first step if the government violated Mohamud's constitutional rights.  Instead, the court focused

the parties on whether evidence the government obtained after the OSP investigation was fruit of

Page 2 - OPINION AND ORDER

the evidence obtained in that investigation.  This inquiry has two parts:  whether the FBI learned

anything from the OSP investigation that tainted evidence gathered later and whether evidence

gathered later had an independent source.  The court assured the parties it would address whether

Mohamud's constitutional rights were violated if the "fruit" inquiry did not resolve the issue.  For

the reasons explained below, I conclude any taint has dissipated.  Additionally, evidence obtained

through the national security investigation has an independent source.  Thus, there is no need to

address the alleged constitutional violation.  I also find Mohamud made the statements at the

Portland airport voluntarily.  Consequently, I deny Mohamud's motion to suppress.

## NATIONAL SECURITY OBJECTIONS

During the evidentiary hearings, numerous questions from defense counsel drew national

security objections from the government, along with a relevancy objection in some instances.

None of the questions were answered in court.  To comply with CIPA § 8(c), 18 U.S.C. app. III

§ 8(c), I used different procedures at the two hearings.

At the first hearing on May 1, 2012, where most objections were raised, I asked counsel to

confer.  Defense counsel gave the government a list of questions which drew objections plus some

additional questions defense counsel did not ask because they expected to draw an objection.  The

government provided a letter to the defense with unclassified answers for some of the questions.

The government also provided classified answers to the court which addressed the remaining

questions.

On May 22, 2012, I filed a sealed Order, ECF No. 135, which ruled on these objections.

At the second hearing on May 2, 2012, a single question to Special Agent ("SA") Trousas

drew a national security objection.  After the public hearing, I held an in camera, ex parte hearing

in which SA Trousas answered the question under oath.  I sustained the objection, ruling the relevance was minimal and outweighed by the national security concerns.  Again, the classified response would not be helpful to Mohamud.

## FACTS

These facts were adduced at evidentiary hearings.

FBI SA Ryan Dwyer is the current case agent in Mohamud's case.  SA Dwyer was aware of the national security investigation into Mohamud's activities in 2009 but was not directly involved until June 2010.  He testified about activity before June 2010 based on his review of reports and discussions with people.

In early November 2009, OSP[1] began investigating rape accusations a student made against Mohamud.  As part of the investigation, OSP found Mohamud's name on one of the National Crime Information Center lists.  OSP notified the FBI of the rape investigation on November 2, 2009.

A.    National Security Investigation

On August 31, 2009, the FBI interviewed Mohamud's father.  His father called the FBI to report Mohamud's intent to travel to Yemen to study.  Mohamud's father told the FBI of his fear of radical recruiters overseas, his fear for his son's safety, and his fear his son would be brainwashed if he went overseas.  Mohamud's father had read about Somali youth being recruited for radical activity.  He gave the FBI his son's email address.  The next day, Mohamud's father called the FBI

---

[1]  It is not clear which OSP officers were involved in the investigation.  I will refer to the officers generally as "OSP."

back to report Mohamud did not have a visa or ticket to Yemen, and the father had taken

Mohamud's passport.

Before OSP notified the FBI of the rape investigation on November 2, 2009, the FBI had

already begun a national security investigation into Mohamud's activity. This investigation

corroborated Mohamud's father's fear his son was being radicalized. Between February and

August 2009, Mohamud and Samir Khan exchanged over 150 emails. The FBI considers Khan an

Islamic extremist who promotes international terrorism and violent jihad. He administered

fundamentalist pro-jihad blogs and ran online publications, such as Jihad Recollections and

Inspire, the English language publication of al-Qaeda on the Arabian Peninsula.

The FBI knew of Mohamud's email contacts with Khan prior to November 2, 2009. The

email subjects included editing comments on Khan's publications, Mohamud soliciting advice on

how to lead a more Islamic life, how to find the best jihadi videos and mujahadeen pictures,

downloading September 11 martyr videos, and lectures of Anwar al-Awlaki, a well-known

al-Qaeda spokesperson.

Mohamud wrote four articles published under pen names in Jihad Recollections before

November 2, 2009. SA Dwyer characterized Jihad Recollections as an anti-American, pro-violent

jihad, extremist publication. The FBI was aware of the articles before November 2, 2009.

SA Dodd tasked a confidential human source to contact Mohamud through email using the pen

name "Bill Smith." Although "Bill Smith" sent the first of many emails on November 9, 2009, SA

Dodd tasked the informant before that date and did so because of Mohamud's email contacts with

Khan. According to SA Dwyer, the OSP investigation did not influence the decision to start the

"Bill Smith" contacts in any way.

Page 5 - OPINION AND ORDER

SA Dwyer explained a series of emails between Mohamud and Amro Salaman Alali which the FBI obtained through court-authorized surveillance. Before November 2, 2009, the FBI obtained email Mohamud received from Alali about attending a religious school in Yemen. Alali, who had lived in Portland in 2007 and 2008, sent the email from Yemen. On December 3, 2009, Alali sent Mohamud an email to tell him about a brother who could help Mohamud with the necessary paperwork to come to Yemen. Alali sent the email from the North-West Frontier Province in Pakistan, an area where militants frequently train. Based on the emails, Dwyer thought Alali was inviting Mohamud to join him in violent jihad.

On December 5, 2009, Mohamud emailed Alali responding it would be wonderful to come, asking what he needs to do, and stating he always wanted to see the Kaaba. SA Dwyer thought this was code Mohamud used to conceal a location because the Kaaba is located in Saudi Arabia, not in Yemen.

On December 10, 2009, SA Trousas interviewed a community member who thought Mohamud was looking for guidance and easily influenced. SA Trousas did not consider this information relevant.

On December 12, 2009, Alali emailed Mohamud and gave him a hotmail email address and password to establish covert communication with Abdul Hadi. On the same day, Mohamud sent an email to the hotmail address and asked Abdul Hadi to get back to him. This email was never delivered because Mohamud typed the address incorrectly. Mohamud unsuccessfully tried to contact Abdul Hadi numerous times in December 2009, January 2010, and March 2010.

The Terrorism Working Group, including several FBI agents and OSP detectives with the appropriate security clearance, met on January 5, 2010 for operations planning. OSP Detective

Ashenfelter, who does not have the appropriate clearance, had to leave the meeting when classified information was discussed. The subject matter of the meeting is classified. SA Dwyer, SA Burdick, and Analyst Tanton testified that nothing learned from the rape investigation was used to guide decisions at that meeting. SA Trousas did not attend the meeting.

In a January 24, 2010 email from Mohamud to a Saudi Arabian friend, Mohamud asked the friend to pray for him because he will be a martyr. SA Dwyer thought this email meant Mohamud was willing to die for jihad.

SA Trousas was assigned as co-case agent in the spring of 2010 to be in charge of the undercover operations. He was told a known terrorist overseas was in contact with Mohamud and the FBI had to assess what was going on. SA Trousas developed the plan to pretend to be one of the brothers and contact Mohamud online. Mohamud agreed to a meeting. SA Trousas was aware of the OSP investigation but was not involved. He never read any of the reports and did not look at anything from Mohamud's cell phone or laptop. He never talked to others about information obtained from the OSP.

On June 14, 2010, SA Petrie and SA Henderson interviewed Mohamud at Portland International Airport after he was denied boarding a plan to Alaska to work at a fishery. The agents approached the family and identified themselves. Mohamud's parents were quite upset that he could not fly and began asking the agents a lot of questions. SA Petrie offered that if the family had the time, they could go to a quiet conference room where the agents could answer questions. The family agreed and went with the agents to a Portland Police Bureau conference room in a secured part of the airport.

The conversation was cordial, with the parents doing more talking than Mohamud.  The father was concerned Mohamud was not allowed to fly because of the father's call to the FBI.  The agents explained that if the family provided some facts, the agents could possibly help by developing information.  The agents never said Mohamud could fly if he spoke to them.  Topics included that Mohamud wanted to travel to Yemen, that Mohamud never got a ticket or visa for Yemen, and that Mohamud's interest in Yemen was from a Saudi national Mohamud knew as Amer but Mohamud did not know Amer's full name.  The agents believe Amer was actually Amro Alali.

SA Petrie asked Mohamud if he was involved in any activities that prevented him from flying, such as associates, online activity, or previous contact with law enforcement.  Mohamud said he used the Internet mostly for sports interests and that he had no interest in Islamic extremists.  He denied prior negative contact with law enforcement.  Before the interview, SA Petrie knew of Mohamud's Internet activity with Islamic extremists.  The agents knew from the OSP interview that Mohamud was concerned his parents would learn of the rape investigation.

SA Petrie remembers the interview taking about 30 to 40 minutes.  The FBI's summary of the surveillance log indicates the agents contacted Mohamud and his parents at 8:57 p.m., and the family left the terminal at 9:40 p.m.  The agents never gave Mohamud a Miranda warning and let the family decide when the interview would end.  SA Petrie did not believe he had detained Mohamud because he would have let the family terminate the interview and leave at any time.

SA Dwyer explained that at some point in early 2010, the FBI decided to contact Mohamud undercover to assess his intent.  Information from Mohamud's computer, cell phone, and OSP interview did not enter into that decision.  The FBI had already learned everything necessary to

trigger the undercover operation from Alali's recruitment of Mohamud. The FBI's first undercover

meeting with Mohamud was on July 30, 2010.

When FBI undercover employees met with Mohamud in the summer and fall of 2010, he

confirmed he wanted to meet Alali and travel overseas. In the August 19, 2010 meeting,

Mohamud explained Alali told him to come to study because it was a legitimate reason to travel to

Yemen. In the November 4, 2010 undercover meeting, Mohamud said he wanted to travel from

London to Pakistan. Alali was in London at the same time Mohamud was there with his family.

Mohamud stated he had tried three times to go to jihad. In the November 18, 2010 undercover

meeting, Mohamud stated he intended to go to Yemen from Alaska after making money working

there. Alali frequently asked him to come. Mohamud planned to use school as an excuse but his

parents took his passport from him.

     B.     <u>OSP Investigation</u>

SA Burdick, SA Lew, and FBI Analyst Tanton went to Corvallis, Oregon on November 2,

2009 to coordinate with OSP to see if they could learn anything else about Mohamud. OSP had

interviewed Mohamud as part of the rape investigation the day before and was planning to

interview Mohamud again at the OSP office. The FBI agents asked OSP to ask Mohamud if he

wanted to return to Somalia.

The federal agents observed the interview without Mohamud's knowledge. Most of the

questions concerned the rape allegations. Mohamud also gave some background information,

stating that he planned to stay in the United States after finishing school, that Somalia was a

dangerous place, and admitting to marijuana and alcohol use, as well as his concern that his parents

would find out about the rape investigation. Mohamud also took a polygraph examination.

Page 9 - OPINION AND ORDER

During the interview, Mohamud gave his cell phone to OSP.  SA Burdick reviewed the cell phone and copied down the names and phone numbers it contained.  According to SA Dwyer, the information from the cell phone was not used to further the national security investigation. Through court-authorized surveillance, the FBI had already obtained Mohamud's telephone usage.

 C.  Contents of the Laptop

Also during the interview, Mohamud gave his laptop computer to OSP, which turned the laptop over to the FBI.  SA Lew and Analyst Tanton took the computer to Detective Williams, a forensic examiner with the Eugene Police Department, and asked him to make a mirror image and then await further instructions.  Prior to delivering the computer, SA Lew and Analyst Tanton did not turn it on or open it up.  Detective Williams made the mirror image on November 2, 2009 and returned the computer to Analyst Tanton the next day, who returned it to OSP, which returned it to Mohamud.

Detective Williams next spoke to Analyst Tanton on December 29, 2009.  The computer was a fairly new one, first used by Mohamud on October 19, 2009.  Analyst Tanton asked Detective Williams to search for several terms:  Yemen, music folder, @hotmail, and email. Detective Williams reported back that the computer had four readable files.[2]  Based on court authority, Analyst Tanton asked Detective Williams to make him a copy of those folders.  They contained about 100 photos of a party scene, with Mohamud in some of them, about 40 other photos of people, about a half dozen audio files including some from extremists, and a video file. According to SA Dwyer and Analyst Tanton, none of the information from Mohamud's computer

---

 [2] Based on Government Exhibit 1, more than four files were copied for the FBI.  It appears four folders containing numerous files were copied.  The difference is immaterial.

was used to further the national security investigation because there was nothing of significance on the computer. By December 29, 2009, the FBI already had significant information about Mohamud including his Internet activity and his email address.

Defense counsel retained a digital forensics examiner, Josiah Roloff. I granted the defense's request to reopen the hearing after Roloff reported he had found additional material on the image of the laptop's hard drive.

Roloff testified he found 13 readable, undeleted files which Detective Williams had not found on his examination. The files are: a 22 page Undergraduate Advising Guide from Oregon State University ("OSU"); a system file, desktop.ini; a 116-page The Rapper's Handbook; contact information for Metropolitan Presort, Inc.; order details for downloading Windows 7; the first two pages of Moe's Guide to Surviving College, apparently written by Mohamud; My Book of Rhymes, apparently a rap Mohamud was writing; the October schedule for the Islamic Center of Portland, Masjed As-Saber; OSU computer support login information; Rap Games; Rap Steps; a resume for Mohamud; and a list of songs to download.

Roloff also searched the image for the terms Yemen and hotmail and found 14,000 results. Most of the results were false positives from things like dictionaries but Roloff found more than 20 results indicating user activity for the term Yemen and several results indicating user activity for the term hotmail.

Roloff also concluded use of the laptop began on September 12, 2009, including logging onto the OSU website on that date. There was substantial use between that date and November 1, 2009. A default account named "valued customer" was created on September 12, 2009 and changed to a user account named "Mohamed" on October 19, 2009.

Page 11 - OPINION AND ORDER

SA Dwyer then testified to explain the difference between Exhibit 1 and Amended Exhibit 1, also known as Exhibit 2. Exhibit 1 was intended to be a copy of the CD Detective Williams gave Analyst Tanton. A discovery coordinator in the United States Attorney's Office used a program to Bates stamp the files on the CD to create Exhibit 1, but some files did not get processed. These were the files Roloff found on the image of the laptop provided to the defense. The government did not figure out the error until it looked into the defense motion to reopen the hearing. According to SA Dwyer, no information from the recently located files was used to direct the national security investigation, even though those files were on the CD in the FBI's possession as of December 29, 2009. In particular, the FBI already knew of Mohamud's two significant email addresses from the national security investigation.

OSP Detective Ashenfelter testified that after Mohamud got his laptop back from the November 2, 2009 seizure, Detective Ashenfelter took the laptop from Mohamud a second time and gave it to an FBI agent. The laptop was later returned to Mohamud.

### DISCUSSION

I will consider two exceptions to the exclusionary rule: (1) the attenuated basis exception, which addresses whether evidence gathered earlier tainted evidence gathered afterwards; and (2) the independent source exception. I again stress that I have not drawn any conclusions about whether the government violated Mohamud's constitutional rights. I will address the defense arguments about Mohamud's statement at the airport in the final section below.

I.    Attenuated Basis Exception

Mohamud moves to suppress all evidence gathered as part of the national intelligence investigation. He contends this evidence was tainted by information the FBI learned when its

agents observed the OSP interview and polygraph and searched his cell phone and computer obtained from OSP.

The Supreme Court has refused to adopt a "per se" or "but for" rule "that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest." United States v. Smith, 155 F.3d 1051, 1060 (9th Cir. 1998) (quoting United States v. Ceccolini, 435 U.S. 268, 276, 98 S. Ct. 1054 (1978)). The Ninth Circuit likens a taint inquiry to a proximate cause analysis. "[A]t *some* point, even in the event of a direct and unbroken causal chain, the relationship between the unlawful search or seizure and the challenged evidence becomes sufficiently weak to dissipate any taint resulting from the original illegality." Id.

> [T]he baseline inquiry in evaluating taint is not whether an unlawful search was the impetus for the investigation or whether there exists an unbroken causal chain between the search and the incriminating evidence; rather, courts must determine whether anything seized illegally, or any leads gained from illegal activity, tend[ed] *significantly to direct* the investigation toward the specific evidence sought to be suppressed. And although it is by no means clear precisely what constitutes significant direction sufficient to trigger the exclusion remedy, courts have deemed it probative whether the initial illegality led *directly* to any of the evidence actually used against the defendant at trial, or, to put the matter slightly differently, whether the government's evidence was the direct result of an unlawful search or seizure. On the other hand, it is *not* sufficient in demonstrating taint that an unlawful wiretap may have been a factor in the decision to target a specific defendant, or that an illegal search uncovers the alleged perpetrator's identity, and therefore directs attention to a particular suspect. The nexus between the original illegality and the specific evidence subject to challenge must be a close one.

Id. at 1061 (internal quotations and citations omitted).

Mohamud argues anything learned in an investigation must have an effect on the direction of the investigation, requiring suppression of all evidence obtained after an illegal search or

seizure.  To illustrate the argument, defense counsel asked witnesses several questions about the

mosaic theory, explained as:

> [T]he mosaic theory, . . . the concept that while some information in specific
> [documents] may appear harmless to disclose when read in isolation, such
> information may be very valuable as part of a mosaic of information gleaned from
> various sources, including multiple [documents] prepared over time.  The Supreme
> Court endorsed the mosaic theory in Sims, commenting that
>
> "[B]its and pieces of data may aid in piecing together bits of other information even
> when the individual piece is not of obvious importance in itself.  Thus, [what] may
> seem trivial to the uninformed, may appear of great moment to one who has a broad
> view of the scene and may put the questioned item of information in its proper
> context."

Berman v. CIA, 501 F.3d 1136, 1143 (9th Cir. 2007) (internal quotations omitted in first

paragraph) (quoting CIA v. Sims, 471 U.S. 159, 178, 105 S. Ct. 1881 (1985)).

The mosaic theory is not the standard, however, when deciding if tainted evidence must be

suppressed.  The mosaic theory is generally discussed in cases involving the state secrets privilege

or the Freedom of Information Act ("FOIA") exemptions for intelligence sources and methods.

See Berman, 501 F.3d 1136 (FOIA exemptions); Mohamed v. Jeppesen Dataplan, Inc., 614 F.3d

1070, 1082 (9th Cir. 2010) (state secrets privilege), cert. denied, 131 S. Ct. 2442 (2011).  In

analyzing whether evidence is tainted, I will employ the standard explained in Smith, 155 F.3d

1051.

Thus, I must consider whether anything the FBI seized from the OSP investigation, or any

leads it gained there, tended "*significantly to direct*" the national security investigation toward all

evidence the FBI collected after November 2, 2009.  Smith, 155 F.3d at 1061.  I conclude it did

not.

Page 14 - OPINION AND ORDER

Through the OSP investigation, the FBI got three types of evidence.  First, the federal agents observed Mohamud's interview and polygraph.  Specifically, they learned he planned to stay in the United States after finishing school, that he believed Somalia was a dangerous place, that he used marijuana and alcohol, and that he was concerned his parents would find out about the rape investigation.  There is no evidence that any of this information significantly directed the national security investigation or, with one exception, that this information was implicated at all.  The exception is that when the FBI interviewed Mohamud at the airport, they asked him in front of his parents if he had ever had negative police contact.  Obviously, the FBI agents knew of Mohamud's police contact and his concern that his parents would learn of it.  That fear would be common in young college students, however.  More importantly, there is no evidence the FBI used that fear in fashioning the undercover contacts with Mohamud.

Second, the FBI got the telephone numbers from Mohamud's cell phone.  There is no evidence of how the FBI used these numbers, if at all.  The agents also testified they were already aware of Mohamud's telephone use through the national security investigation.

Third, the FBI retrieved many files off Mohamud's computer from the mirror image made on November 2, 2009.[3]  The majority of the files are pictures of Mohamud at a party with friends.  Again, there is no evidence these pictures directed the national security investigation in any way.  The computer also contained some audio files from extremists.  Prior to the OSP investigation, however, the FBI was well aware of Mohamud's interest in extremists through his emails to Khan and his publication of articles in Jihad Recollections.  The files located by Roloff indicate

---

[3] I will address the alleged second computer search below.

Page 15 - OPINION AND ORDER

Mohamud's interest in rap music and poetry.  This is not unusual for a college student and had nothing to do with the national security investigation.

All witnesses testified that no evidence obtained through the OSP investigation was used to further the national security investigation because there was nothing of significance found from the OSP investigation that the FBI did not already know.  There is no evidence, or even an inference, that any of the evidence the FBI obtained through the OSP investigation significantly directed the national security investigation or led directly to any of the evidence the government intends to use at trial.  Much of the information, such as the pictures, appears irrelevant to the charges.  The rest was already known to the FBI.  Close timing of events in the two investigations does not demonstrate causation.  I cannot find there is a close nexus between the evidence obtained through the OSP investigation and the evidence later obtained through the national security investigation. Thus, I conclude any taint has dissipated.

II.    Independent Source Exception

The independent source exception is explained in Murray v. United States, 487 U.S. 533, 108 S. Ct. 2529 (1988).  Based on information from informants, federal agents observed Murray and his co-conspirators drive two vehicles into a warehouse and leave soon thereafter.  The agents found marijuana in the vehicles after lawfully seizing them, then forced entry into the warehouse without a warrant and observed numerous burlap-wrapped bales in plain view.  The agents applied for a search warrant without mentioning the prior entry or observations made during it.  After obtaining the warrant, the agents seized 270 bales of marijuana in the warehouse.  Murray, 487 U.S. at 535-36.

Page 16 - OPINION AND ORDER

The Court considered the reasons behind the exclusionary rule and the independent source rule:

> The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint."

Id. at 536 (citations omitted).

"'[I]n the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source.'"

Id. at 538-39 (quoting United States v. Silvestri, 787 F.2d 736, 739 (1st Cir. 1986)).

> To apply what we have said to the present cases: Knowledge that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it was also acquired at the time of entry pursuant to the warrant, and if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply. Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one.

Id. at 541.

> The ultimate question, therefore, is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here. This would not have been the case if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.

Id. at 542.

The district court found the agents did not reveal their warrantless entry to the Magistrate when applying for the warrant and did not include in the application any recitation of their

Page 17 - OPINION AND ORDER

observations in the warehouse. But the district court did not "explicitly find that the agents would have sought a warrant if they had not earlier entered the warehouse[,]" so the Court remanded the case for the district court to make that determination. Id. at 543-44.

The "Bill Smith" emails have been discussed many times in my courtroom. The only evidence is that the FBI tasked the confidential human source to make email contact with Mohamud prior to the start of the OSP investigation.

The defense is very concerned the FBI used evidence learned during the OSP investigation at the January 5, 2010 Terrorism Working Group meeting to plan the upcoming operation. Three agents testified that nothing learned from the OSP investigation was used to guide decisions at that meeting. There is no evidence to the contrary.

The FBI gathered several types of information which triggered a national security investigation into Mohamud's activity: (1) information the agents learned from his father; (2) Mohamud's email contacts with Khan; (3) the articles Mohamud published in Jihad Recollections; and (4) Mohamud's email contacts with Alali and Alali's attempt to recruit Mohamud for jihad. The FBI began the national security investigation well before it ever heard of the OSP rape investigation.

I conclude all evidence gathered during the national security investigation after November 2, 2009, and all tactical decisions made after that date, had an independent source, namely the national security investigation underway prior to that date. There is no reason to invoke the exclusionary rule, and I deny Mohamud's motion to suppress.

Page 18 - OPINION AND ORDER

III.    <u>Alleged Second Computer Search</u>

OSP Detective Ashenfelter testified that after Mohamud got his laptop back from the November 2, 2009 seizure, Detective Ashenfelter took the laptop from Mohamud a second time and gave it to an FBI agent.  The laptop was later returned to Mohamud.

Mohamud moves to suppress all evidence obtained from this second seizure of the laptop, contending the FBI must have performed a search at the time of the second seizure and this second seizure and search are unconstitutional for the same reasons as the first seizure and search. Mohamud cannot flesh out his argument of what evidence was derived from the fruits of the alleged unconstitutional second search because the government does not admit a second search took place.

I deny the motion to suppress the evidence obtained during the alleged second computer search, if any was obtained.  I will file a classified opinion with my reasoning.

IV.    <u>Airport Statements</u>

A.    <u>Voluntariness</u>

Mohamud argues the government cannot meet its burden of showing his statements at the airport were voluntary.  According to Mohamud, when an American citizen is told immediately prior to boarding a plane that he cannot fly, he suffers a traumatic and jarring loss of freedom of movement our modern society takes for granted.  The FBI agents that quickly appeared represented the very entity which prevented Mohamud from flying.  Thus, Mohamud argues a reasonable person would believe talking with the FBI agents was required in order to regain flying privileges, making the statements involuntary.

Page 19 - OPINION AND ORDER

The government must establish the voluntariness of a confession by a preponderance of the evidence. United States v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003). When considering whether a confession is voluntary, the court determines whether, "considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Heller, 551 F.3d 1108, 1112 (9th Cir. 2009) (internal quotation omitted). The court should consider the length and location of the interrogation, the continuity of the interrogation, the maturity and education of the defendant, the physical and mental condition of the defendant, and whether the defendant was properly advised of his *Miranda* rights. Withrow v. Williams, 507 U.S. 680, 693-94, 113 S. Ct. 1745 (1993); Taylor v. Maddox, 366 F.3d 992, 1015 (9th Cir. 2004).

The government notes several facts in support of the argument that Mohamud's statements were voluntary. The agents were in plain clothes and their firearms were concealed. Mohamud was never out of the presence of both parents during the interview. The agents asked the family if they had time to talk about the issue and did not insist on the interview taking place. The interview was in a conference room at the airport and lasted about 30 to 40 minutes. Mohamud's parents did most of the talking. The family was free to leave whenever they wished, and they ended the interview in less than 45 minutes. There is no evidence the interview was anything but cordial on the part of the agents, even though the parents were quite upset. The agents did not promise Mohamud could fly if he spoke to them.

In Mohamud's favor, the interview took place in a police conference room in a secure part of the airport. Mohamud is a young man. Also, the agents never gave a *Miranda* warning to Mohamud.

Page 20 - OPINION AND ORDER

In balancing these facts, I find the most telling to be that the interview was for a relatively short period of time, was not mandatory, and Mohamud never left the company of his parents. I am not persuaded by the argument that the airline's refusal to board Mohamud traumatized him to the extent his will was overborne by a 30 to 40 minute nonmandatory interview in which his parents did most of the talking. It would be equally traumatizing, if not more so, to be brought to a police station for an interview about possible involvement with a crime. Courts routinely find confessions made at the police station to be voluntary. Thus, I conclude the government has established the voluntariness of Mohamud's statement by a preponderance of the evidence.

B.    "Fruit" Inquiry

Mohamud claims the OSP interview and associated computer searches provided two pieces of information which the FBI agents used when questioning Mohamud at the Portland airport on June 14, 2010: (1) Mohamud was very concerned his parents would learn about the rape investigation and his use of drugs and alcohol; and (2) he used the Internet to communicate with an Islamic extremist and participate in fundamentalist pro-jihad blogs and online publications. Mohamud asks the court to suppress the statements he made at the airport.

The government argues the ongoing national security investigation made the FBI well aware of Mohamud's Internet activity well before the OSP investigation. I agree. The national security investigation is an independent source for the question about Internet usage.

Turning to Mohamud's fear his parents would learn about the rape investigation and his use of drugs and alcohol, the FBI agents did not ask about drug or alcohol use at the airport. They did ask Mohamud about prior negative contact with law enforcement, something Mohamud denied. The OSP investigation taking place is a fact by itself, apart from any statements Mohamud made

during the interview with OSP officers.  Moreover, Mohamud's fear his parents would learn of the

investigation is likely shared by the vast majority of young college students who have been

investigated by police.  The independent source is the fact the OSP rape investigation took place,

as well as human nature.

I conclude there is an independent source for the questions the FBI agents asked Mohamud

at the Portland airport.  Accordingly, I deny the motion to suppress the statements Mohamud made

at the airport because they are not the fruit of an alleged unconstitutional search.

## CONCLUSION

Defendant's Motion and Second Motion to Suppress the Products of Non-FISA

Interrogations, Searches, and Seizures [56, 142] are denied.

IT IS SO ORDERED.

Dated this _____22nd_____ day of October, 2012.


     /s/ Garr M. King_____
Garr M. King
United States District Judge