S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**ETHAN D. KNIGHT**, OSB #99298
**PAMALA R. HOLSINGER**, OSB #89263
Assistant United States Attorneys
ethan.knight@usdoj.gov
pamala.holsinger@usdoj.gov
1000 SW Third, Suite 600
Portland, OR 97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 727-1117
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 3:10-CR-00475-KI |
| v. | GOVERNMENT'S MOTION FOR PROTECTIVE ORDER PERTAINING TO THE TESTIMONY OF UNDERCOVER EMPLOYEES AT TRIAL |
| **MOHAMED OSMAN MOHAMUD,** | |
| Defendant. | |

The United States of America, by and through S. Amanda Marshall, United States Attorney for the District of Oregon, and Ethan D. Knight and Pamala R. Holsinger, Assistant United States Attorneys, hereby moves this Court for a protective order authorizing the government to use certain measures to protect the identity and security of the two undercover employees (UCEs) of the Federal Bureau of Investigation (FBI) when the UCEs testify at trial.

As discussed more fully below, the government intends to call two FBI undercover employees who had direct contact with the defendant throughout the course of this undercover

investigation. The government has recently been advised that the true names of the UCEs are classified.[1] In support of this motion, the government has submitted two separate declarations prepared by Andrew G. McCabe, Assistant Director of the Counterterrorism Division, Federal Bureau of Investigation. The declarations explain why public disclosure of the UCEs' true identities or physical images will jeopardize other undercover investigations and the government's undercover investigative procedures, and pose a risk of danger to the UCEs. One of these declarations is classified and has been submitted to the Court *in camera*, *ex parte*, and under seal, due to the sensitive and classified nature of the information contained therein. An unclassified version, without the UCEs' personal information and information regarding undercover activities of the UCEs in other investigations, is being filed publicly herewith.

## I.     Factual Background

On November 26, 2010, defendant was arrested and charged in a criminal complaint with one count of Attempted Use of a Weapon of Mass Destruction. Defendant was arrested after he attempted to detonate what he believed to be a vehicle bomb at Portland's annual Christmas tree lighting ceremony at Portland's Pioneer Courthouse Square. The timing of defendant's arrest was dictated by a single factor: his selection of the November 26, 2010 tree lighting ceremony as a target. The government filed a complaint the morning of Monday, November 29, 2010, and

---

[1] The government has previously represented to the Court and counsel that the true names of the UCEs would be disclosed with the names of the other witnesses the government intends to call at trial pursuant to the Protective Order pertaining to discovery. The FBI's position as original classification authority is that the identities of UCE1 and UCE2 are classified based on their connection to a national security investigation. Therefore, government counsel is prohibited from disclosing that information to defense counsel. The government will seek authorization under CIPA Section 4 to delete the true identities of the two UCEs from discovery. This motion pursuant to CIPA Section 4 will be filed separately from this motion.

defendant was indicted by a grand jury in the District of Oregon on that same day on a single count of Attempted Use of a Weapon of Mass Destruction.

The government's evidence at trial will show that in 2009 and 2010 defendant had been radicalized and inspired to support violent terrorist acts through his internet communications with violent Islamic extremists, which included, Samir Khan and Amro Al-Ali. Samir Khan was one of defendant's closest contacts regarding Islamic ideology. The nature of their contacts varied, but consistently centered on one unifying theme: the consumption and creation of material devoted to the cause of radical violent Islamic jihad. Khan left the United States for Yemen in 2009. Khan published *Jihad Recollections* and, while in Yemen, *Inspire* magazine. *Jihad Recollections* was an online publication intended to be the "first Jihadi magazine in English" and *Inspire* was the official magazine of Al Qaeda in the Arabian Peninsula. Khan's influence was integral in Al Qaeda's efforts to reach out to English-speaking jihadists living in Western countries to encourage them to commit "lone wolf" style attacks. Defendant did not simply collect and distribute terrorist propaganda, he was also a published author of this material. In addition to his frequent online posts in chat rooms and on blogs, defendant published four articles in *Jihad Recollections* and, according to him, was preparing another for publication in *Inspire*. These articles were intended by the defendant to advance the cause of violent jihad.

The government's evidence will show that defendant believed in and supported violent jihad and was seeking a way to participate in violent jihad with the help of his friend Amro Al-Ali who was in Yemen during the fall of 2009. Defendant planned to travel to Yemen to join Al-Ali in August 2009. While defendant has claimed that the purpose of his planned travel was to

**Government's Motion for Protective Order Pertaining to the Testimony
of Undercover Employees at Trial**                                                          **Page 3**

pursue religious study, the evidence will show that the ultimate purpose of this travel was to train for and participate in violent jihad. Al-Ali is a Saudi-based national who lived in Portland, Oregon in 2007 and 2008. Defendant and Al-Ali were in frequent contact regarding defendant's stated desire to travel to Yemen. Al-Ali was also a wanted international terrorist. On October 18, 2009, Interpol, the International Criminal Police Association, issued a "Red Notice" for Al-Ali on behalf of the Saudi Arabian government stating that Al-Ali "helped the Al Qaeda division in Yemen and other countries by providing them with foreign fighters to carry out terrorist attacks against western and tourists interests." On January 4, 2011, Interpol again issued the same notice for Al-Ali. In January 2011 the Saudi Arabian government also announced that Al-Ali was one of its "47 most wanted terrorists linked to Al-Qaeda." The Saudi government has since publicly confirmed that Al-Ali is in custody.

Defendant had a number of significant e-mail contacts with Al-Ali regarding his desire to travel to Yemen to train for violent jihad. As the government has detailed in past documents, these contacts appeared to have begun in 2009. In an e-mail sent August 31, 2009, Al-Ali forwarded an e-mail link regarding a religious school in Yemen to defendant. A review of the IP address associated with this e-mail shows that it was sent from Yemen. On December 3, 2009, Al-Ali sent an e-mail to defendant telling him to contact another brother who will contact the defendant about the proper paperwork for defendant to travel. This e-mail was sent from the northwest frontier province of Pakistan which borders Afghanistan and Pakistan's Federally Administered Tribal Area (FATA). As the evidence will show, this e-mail was an invitation for defendant to join Al-Ali in participating in violent jihad. On December 5, 2009, defendant replied to Al-Ali that he wanted to join him and stated "just tell me what to do." On

December 12, 2009, defendant received a response from Al-Ali that directed him to an e-mail and password as a contact for "abdulhadi." Both messages Al-Ali sent to defendant on December 12 were also sent from the northwest frontier region of Pakistan. The evidence will show that defendant made several attempts to get in touch with "abdulhadi" using the e-mail and password but was not successful due to a mistake in the e-mail address he used.

In June 2010 the FBI began an undercover investigation to assess the dangerousness of the defendant given his extremist views, contact with known terrorists and his intent to travel overseas to commit violent terrorist acts. UCE1 contacted defendant via e-mail posing as a terrorist and acting as an associate of Al-Ali who could help the defendant with his desired goal. UCE1 first met with the defendant on July 30, 2010, for approximately thirty minutes. During this initial meeting, defendant made it clear that he was ready, willing, and able to commit a terrorist act in the United States. After the initial meeting, there were seven additional in-person meetings between defendant and UCE1 and another FBI undercover employee (UCE2). During these meetings, defendant planned and ultimately executed a scheme to blow up thousands of people watching the Christmas tree lighting ceremony in Pioneer Courthouse Square on November 26, 2010.

The government intends to offer as evidence portions of the consensual audio and video recordings made by the FBI during these meetings. The government intends to offer these consensual recordings as evidence through the trial testimony of one or both of the UCEs who were present.

///

///

Government's Motion for Protective Order Pertaining to the Testimony
of Undercover Employees at Trial                                                                                           Page 5

As set forth in both declarations, the UCEs have been utilized in an undercover capacity in other investigations. The UCEs have used pseudonyms, and their true identities have not been disclosed during the UCEs' undercover activities with defendant.

## II.     Protective Measures Sought

Based upon the need to protect from disclosure the UCEs' true identities and physical images, and the need to protect other undercover investigations and the government's undercover investigative procedures, the government respectfully submits that there are certain measures the Court may and should adopt for the testimony of the UCEs at trial. The measures we propose are based upon similar measures endorsed by the Second Circuit Court of Appeals. As set forth more fully below, the proposed security measures are narrowly tailored to assure that the identity and security of the UCEs, and the integrity of other undercover investigations will not be compromised by the UCEs' appearance, without significantly impairing the defendant's fair trial rights under the Sixth Amendment, or the public's right of access. Specifically, the government requests the Court implement the following measures:

1.     The UCEs may testify at trial using their undercover pseudonyms, without disclosing publically their true identities;

2.     The defense shall be prohibited from asking any questions seeking personal identifying information from the UCEs;

3.     The UCEs may testify using a light disguise, such as changing the UCEs' facial hair, hairstyle, or dress style;

4.     When the UCEs testify, only the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team shall be present in the courtroom.

The government shall provide a contemporaneous CCTV video or similar broadcast of the courtroom proceeding, without the visual image of the UCEs, while the UCEs testify, which shall be made available for public viewing in an adjacent courtroom;

5. The government shall be allowed to digitally obscure the facial images of the UCEs on any recorded video footage played over the CCTV feed during court proceedings (no such measures are required for any video shown or offered by the government as an exhibit at trial and viewed by defendant, his counsel, the Court, the jury, and other essential court personnel);

6. No public disclosure of any audio recording, or similar reproduction of the voices or visual images of the UCEs while testifying, shall be permitted;

7. The UCEs shall be permitted to use a non-public entrance/exit to the courthouse and the courtroom;

8. All non-official recording devices shall be prohibited from being in the courtroom in which the UCEs testify as well as the courtroom in which the CCTV feed is shown during the UCEs' testimony;

9. All unpixelated video or photographs showing the true facial images of the UCEs provided to defendant pursuant to the Protective Order for use as trial evidence shall be returned to the government at the conclusion of this case. Defendant shall retain no copies of any discovery material provided by the government that shows the true facial images or identities of the UCEs; and

10. The Protective Order sought by this motion may only be modified through a written superseding order issued by this Court.

### III. The Court Should Order Reasonable Security Measures to Protect from Public Disclosure the True Identities of the Undercover Employees Who Testify at Trial

The most drastic step used to protect the identities of undercover employees would be the closing of the courtroom during trial. The government is not seeking to close the courtroom but is seeking measures to prevent the public disclosure of the true identities and facial images of the UCEs when they testify. Based upon the standards set forth below, putting in place these reasonable alternative measures to closing the courtroom, is supported by the law.

#### A. Applicable Legal Standard

The Sixth Amendment guarantees the right to a public trial. *See* U.S. Const. amend. VI: *Waller v. Georgia*, 467 U.S. 39 (1984). The right to a public trial assures that the defendant receives a fair trial, promotes the integrity of the fact-finding process, preserves public confidence in the criminal justice system, and affords the community an outlet to address crime. *See Waller*, 467 U.S. at 46. The Supreme Court has recognized that the right to a public trial is not absolute, and under certain circumstances, courts may implement reasonable trial procedures to protect other compelling interests, without violating the Sixth Amendment. *Id*. at 45.

The Supreme Court in *Waller v. Georgia* identified four factors to determine if closed proceedings are justified:

> the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

467 U.S. 39, 48 (1984). "The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and . . . that this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom." *Ayala v. Speckard*,

131 F.3d 62, 72 (2d Cir. 1997) (en banc). "It is clear that the State has an 'overriding interest' in protecting the identity of its undercover officers." *Rodriguez v. Miller*, 537 F.3d 102, 110 (2d Cir. 2008). However, "[i]t is true that an officer's undercover status will not in itself support closure of the courtroom during his testimony." *Brown v. Kuhlmann*, 142 F.3d 529, 538 (2d Cir. 1998).

> In *Ayala*, the court noted:
>
> The state interest in maintaining the continued effectiveness of an undercover officer is an extremely substantial interest, and the trial judge in each case was amply justified in concluding that this interest would be seriously prejudiced by requiring the officer to testify in an open courtroom. There is no requirement that the prosecution must prove that particular individuals likely to attend the trial will disclose the officer's identity. Of course, the defendant himself has an opportunity to observe the officer (a second opportunity, if the defendant is guilty), and might communicate a description of the officer to others, particularly if the defendant is at liberty pending trial. The defendant's right of presence at his trial requires accepting that risk, but the right to a public trial does not require the further risk that the officer's identity will become known through observation by members of the public who might enter the courtroom and see the officer testifying. The gravity of the state interest in protecting the secrecy of the officer's identity from casual observers and the likelihood that this interest will be prejudiced by the officer's testifying in open court are both sufficiently substantial to justify the limited closure of the courtroom during the officer's testimony. The closure is limited not only because it lasts only for the testimony of one witness, albeit an important witness, but also because there is no limitation at all on the right of the public or the press to examine the transcript of the officer's testimony. Since the state interest in maintaining the secrecy of the undercover officer's identity warranted the limited closure, we need not consider the respondents' additional point that the closure was also justified by the risk to the officer's safety.

131 F.3d at 72. The court in *Ayala* allowed the proceedings to take place with the public completely excluded from the courtroom, however it was only limited to the time that the undercover officer was testifying. *Id*.

/ / /

In evaluating the third prong of *Waller*, "the trial court must consider reasonable alternatives to closing the proceeding . . . ." 467 U.S. 39, 48 (1984). Courts have utilized several different techniques in accommodating these alternatives:

> We also suggested some possible alternatives to closure during the undercover officer's testimony: a strategically placed board to conceal the witness from public view; a disguise of the witness; and a direction that the defendant specify the individuals he desires to be present in the courtroom, with the state to show cause why any such person should be barred. *Ayala,* 102 F.3d at 653. In the absence of any consideration of alternatives whatsoever, we have no choice but to say that there has not been compliance with the *Waller* test and, consequently, that Okonkwo has been deprived of his Sixth Amendment right to a public trial.

*Okonkwo v. Lacy*, 104 F.3d 21, 26, *on reh'g in banc sub nom. Ayala v. Speckard*, 131 F.3d 62 (2d Cir. 1997). The court in *Morales v. Artuz* approved the use of sunglasses by the witness because the jury had "full opportunity to combine these fully observable aspects of demeanor with their consideration of the substance of her testimony, assessing her opportunity to observe, the consistency of her account, any hostile motive, and all the other traditional bases for evaluating testimony. All that was lacking was the jury's ability to discern whatever might have been indicated by the movement of her eyes." 281 F.3d 55, 60–62 (2d Cir. 2002) (footnotes omitted).

In *United States v. Lucas* "the government sought to protect Detective Brown's identity, arguing that use of a screen was necessary to protect her personal safety and to avoid jeopardizing the extensive drug investigations in which she was involved at the time of the trial." 932 F.2d 1210, 1216 (8th Cir. 1991). Detective Brown was one of "only a small number of black female detectives in the Division, and that at the time of trial she was involved in 'very extensive [drug] investigations . . . of major importance to the community.'" *Id.* The court

"concluded that the government had established two 'overriding interest[s]' likely to be prejudiced if Detective Brown's identity was not concealed: the ability of the police to conduct effective law enforcement operations, and the physical welfare of the officers involved." *Id.* at 1217. The court

> then considered the use of a disguise, the use of a screen, and full closure of the courtroom as means of concealing her identity. It concluded that, in order most effectively to protect Detective Brown as well as the right to a public trial and the right to confrontation, a screen should be used during her testimony in such a way as to permit spectators to hear but not see her, while not interfering with the ability of the defendants, the court, or the jury to see her when she testified.

*Id.* Under the abuse of discretion review, the Second Circuit upheld the use of the screen at trial. *Id.*

The Second Circuit "pointed out that the Supreme Court has demonstrated 'a special concern for assuring the attendance of family members of the accused' . . . and we held that a trial court cannot deny a defendant's request to keep his family members in court simply because the family resides in the borough where the undercover officer works." *Brown v. Kuhlmann*, 142 F.3d 529, 538 (2d Cir. 1998) (internal citations omitted). But the court in *Hargett v. Giambruno* affirmed a trial judge's decision to place the defendant's family behind a blackboard while the undercover agent was testifying because "[t]he court's interposition of the blackboard (1) was limited to the time when the undercover was testifying; (2) screened only certain individuals, not the public-at-large; and (3) enabled Hargett's family to hear the testimony from within the courtroom." 291 F. App'x 402, 404 (2d Cir. 2008) (unpublished). The government wanted the family behind the blackboard because the family still lived in the area where the undercover officer worked. *Id.* The court made findings that satisfied the fourth prong of *Waller*, in that

**Government's Motion for Protective Order Pertaining to the Testimony
of Undercover Employees at Trial**                                                                                                 **Page 11**

> the undercover testified that (1) he worked in the arrest area on a weekly basis, had other investigations pending in that area, and intended to return there in an undercover capacity in the future; (2) he took precautions to protect his identity- including not testifying in open court, not wearing a uniform, and using rear entrances to the courthouse-whenever he appeared in court; (3) he had been threatened a dozen times that "if I find out you're a cop[,] I'll kill you or have you killed;" and (4) on prior occasions where he had been identified as a police officer, the undercover operations had to be terminated.

*Id.*

Also in *Brown*, the court recognized that in closing the portion of the court's proceeding,

> concern for the officer's safety had a stronger basis. The officer was the main witness in several cases pending in the Manhattan courts where Brown's trial was taking place, and the officer was concerned that his safety would be jeopardized if anyone involved in one of those cases were to enter the courtroom while he was testifying against Brown. We have "repeatedly acknowledged the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose." Given the predisposition of drug dealers to violence, and the "threats of physical and permanent harm and reprisals" involved in the drug-related kidnaping of Isidro Sanchez to which the trial judge made reference, Officer Roe was understandably concerned that his safety would be jeopardized should one of those parties enter the courtroom as a spectator.

142 F.3d at 537–38. The court used a balancing test to determine the justification needed for a greater closure of the court, and because the court's closure was limited to the time of the officer's testimony, little justification was required. *Id.* at 538.

### B.    Argument

Under the foregoing principles, the proposed measures requested by the government to protect the security and safety of the UCEs, and to protect the integrity of other undercover investigations, are all compatible with defendant's Sixth Amendment rights. The government is not seeking the drastic measure of closing the courtroom during the testimony of the UCEs. The government only seeks to protect from disclosure the true identities of the UCEs. To accomplish

that goal the government has proposed reasonable procedures that will not interfere with defendant's Sixth Amendment rights and will allow the public to hear the testimony of the UCEs in real time. Specifically, when the UCEs testify, only the Court, essential personnel, the jury, the defendant and his counsel, and the government's trial team shall be present in the courtroom. The government will provide a contemporaneous CCTV[2] video or similar broadcast of the courtroom proceeding, without the visual images of the UCEs, while the UCEs are testifying, which shall be made available for public viewing in an adjacent courtroom. The recorded video footage played over the CCTV to the public will have the facial images of the UCEs blurred or pixelated (no such measures are required for any video shown or offered by the government as an exhibit at trial and viewed by defendant, his counsel, the Court, the jury, and other essential court personnel). The transcript of the testimony will be available for review by the public or press but there will be no public disclosure of the audio or video evidence presented to the jury. Similar procedures have been used in other federal district courts. *See United States v. Trofimoff*, No. 8:00-CR-197-T-24EAJ, 2001 WL 1644230, at *3 (M.D. Fla. June 12, 2001) (Blurring the image of the undercover officer and altering the voice was "a narrow remedy carefully tailored to protect the effectiveness of the undercover agent while allowing the media access to the full substance of the video tape."). Thus, although the public will not be in the

/ / /

---

[2] The government proposes the CCTV to an adjacent courtroom rather than the screen only because the configuration of this Court's courtroom does not seem to be amenable to having the UCEs testify behind a screen where the defendant, the Court, the jury and the government can all see the witness but the public cannot. If that could be accomplished the government does not object to the screen option.

**Government's Motion for Protective Order Pertaining to the Testimony
of Undercover Employees at Trial                                                             Page 13**

same courtroom, the public will have full access to the trial proceeding, except for the images of the UCEs' faces.

The declarations submitted in support of this motion set forth details that the government's interests here in protecting the UCEs' safety and maintaining the continued effectiveness of ongoing undercover investigations are "extremely substantial interest[s]," and the Court would be justified in concluding that these interests "would be seriously prejudiced by requiring the officer to testify in an open courtroom." *Ayala*, 131 F.3d at 72. The analysis set forth in *Waller* supports the government's request for reasonable alternative measures no broader than necessary to protect the security and safety of the UCEs and the integrity of ongoing national security investigations. *Waller,* 467 U.S. 39, 48 (1984) (ensuring the closure must be no broader than necessary to protect that interest, the court can employ the series of alternatives in obscuring the identities of undercover officers. This ranges from closing the courtroom during the undercover agent's testimony, to using screens, disguises, sunglasses, and placing certain individuals behind blackboards).

The UCEs have serious concerns about the disclosure of their identities, both by name and appearance, and the dire consequences that could result from such disclosure. *See generally* McCabe Decls. Defendant had direct connections to known international terrorists, including Amro Al-Ali and (now deceased) Samir Khan. Terrorist groups such as Al Qaeda are always looking to thwart law enforcement efforts to identify persons willing to commit violent acts against the United States and its citizens. While the government is not aware of any particular individual who might attend the proceedings during the UCEs' testimony who would pose a threat, there is "no requirement that the prosecution must prove that particular individuals likely

to attend the trial will disclose the officer's identity." *Ayala*, 131 F.3d at 72.  The risk that anyone in the courtroom might recognize either UCE or reveal the appearance of either UCE to others would create a personal danger to the UCEs, running the risk of jeopardizing ongoing FBI investigations.

While the requested procedure of shielding from public view the facial images of the UCEs from the public while they testify, the defendant himself would suffer no such deprivation, as he would be able to observe the UCEs throughout their testimony.  This procedure will neither deprive defendant of the ability to confront the UCEs when they testify against him, nor will it deprive the defendant or the jury of the ability to evaluate their demeanor.  In addition, the transcript of the UCEs' testimony would be made available to the public in its entirety after their testimony is concluded.  As a result, on balance, the deprivation to the public pales in comparison to the government's interest in protecting the UCEs by concealing the UCEs' identities from the public during their continued work as undercover employees.

For all of the reasons set forth above, the Court should order that all unpixelated videos or photographs showing the true facial images of the UCEs provided to defendant pursuant to the Protective Order for use as trial evidence, shall be returned to the government at the conclusion of this case.  There is no reason the defendant should retain any copies of any discovery material provided by the government that shows the true facial images or identities of the UCEs.  Defendant will have all the unpixelated video and photographs he needs at trial and can cross-examine each UCE and will have a full unobstructed view of the UCEs' facial images.  After the trial this very sensitive, non-public information should be returned to the government.

/ / /

In addition, prohibiting the public dissemination of any reproductions of oral recordings of the UCEs' testimony and visual images will not impair any Sixth Amendment rights. Federal judicial policy prohibits the taking of in-court photographs or videotape of criminal trials. In addition, the trial courts have the authority to redact sensitive information from the public record of judicial proceedings available to the public. Here, a written transcript of the UCEs' testimony will be available to the public. To the extent a sketch artist wants to prepare a courtroom drawing of the trial, the artist may do so by watching the CCTV video feed. Only the visual images of the UCEs on the witness stand will be obscured from the public.

### IV.     The UCEs Should Not Have to Disclose Their True Names

#### A.      Applicable Legal Standard

The confrontation clause of the Sixth Amendment provides that the defendant in a criminal trial has the right to confront and cross-examine the government's witnesses who testify against the defendant. See U.S. Const. amend. VI; *Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois*, 390 U.S. 129 (1968). The "elements of confrontation - physical presence, oath, cross-examination, and observation of demeanor by the trier of fact - serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Maryland v. Craig*, 497 U.S. at 846. "The rule is that once cross-examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied." *United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983).

Several circuits, including the Ninth Circuit, have concluded that an undercover witness's use of a pseudonym is appropriate, finding that the government's interest in protecting

the witness from harm outweighs any interest the defendant may have in learning the true name of the witness. *See Brown v. Kuhlman*, 142 F.3d 529, 532 n.3 (undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name); *Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992); *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) (finding that "where there is a threat to the life of the witness the right of the defendant to have the witness' true name, address and place of employment is not absolute"). *United States v. Rangel*, 534 F.2d 147 (9th Cir. 1976) (holding that where record showed that witness's life had been threatened and witness and family relocated, no error in permitting witness to testify without divulging true name, address and phone number); *United States v. Ellis*, 468 F.2d 638 (9th Cir. 1972) (affirming decisions to prohibit cross-examination on undercover agent's name and address where there were "substantial reasons" for withholding the information and the witness's testimony was of marginal significance); *United States v. Lonetree*, 35 M.J. 396 (C.M.A. 1992).

The Ninth Circuit has joined other circuits in affirming the district court's latitude in restricting the cross-examination of witnesses for the witnesses' protection. There is no absolute right of an accused to have a jury hear a witness's true name and address. *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir. 1974); *United States v. Rangel*, 534 F.2d 147 (9th Cir. 1976); *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969); *United States v. Ellis*, 468 F.2d 638 (9th Cir. 1972). This restriction of cross-examination for witness protection was recognized in the Supreme Court case of *Van Arsdall*, noting that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the

witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 674, 679 (1986).

### B.    Argument

Permitting the UCEs to testify under pseudonyms without disclosing the UCEs' true identities, will serve to protect the witnesses while offering no impediment to defendant's ability to fully cross-examine the witnesses.  The declarations submitted in support of this motion show the government has a compelling interest in protecting the safety of the UCEs, the security of other undercover investigations, and the integrity of the government's undercover procedures.  Balanced against this compelling government interest, the use of a pseudonym by the UCEs will not prejudice the defendant's confrontation rights.  The UCEs will be present in the courtroom, so the defendant's ability to confront these witnesses will not be affected.  The jury will be fully able to observe and assess the UCEs' appearance and demeanor while testifying.  For the same reasons, permitting the UCEs to testify in light disguise will not impair the defendant's confrontation rights.  A light disguise, such as facial hair or changing the UCEs' hair or dress style will simply serve to minimize the risk that the UCEs' true identities are compromised and should be permitted.

Defendant should be restricted from eliciting questions that would publicly reveal any personal information about the UCEs that would disclose the UCEs' identities for all of the same reasons set forth above.  Personal identifying information about the UCEs is not relevant to the case and is improper impeachment material under the Federal Rules of Evidence.  It is the UCEs' contacts and communications with defendant during which defendant believed they were Al Qaeda operatives, that are relevant.  If the defense is allowed to compromise the personal

safety and identities of these UCEs and their families, their careers as undercover employees are over. Cross-examination into completely irrelevant personal information should be prohibited.

## V.      Objections by Defendant

Counsel of record for defendant has been contacted and has advised the government that he objects to all of the provisions of the proposed Protective Order as it relates to the UCEs' testimony at trial except numbers 6, 7, and 8 (except the reference to CCTV). The Proposed Protective Order is attached.

## VI.     Conclusion

For all the foregoing reasons, the government respectfully requests that the Court grant the government's motion for a protective order and adopt the government's proposed protective measures to assure the security and safety of the UCEs, other undercover investigations, and the government's undercover investigative procedures. The Court should make the following findings based on the law and the information presented in the McCabe declarations: (1) The reasonable alternative measures proposed by the government are necessary to protect from disclosure the true identities of the UCEs at trial; (2) Disclosure of the UCEs' true identities would jeopardize ongoing undercover investigations in which they were or are involved; and

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /
Government's Motion for Protective Order Pertaining to the Testimony  
of Undercover Employees at Trial                                                                                                Page 19

(3) There is a real and substantial risk of danger to the UCEs and their families if their true identities are disclosed.

Dated this 23rd day of October 2012.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

*s/ Pamala R. Holsinger*
ETHAN D. KNIGHT, OSB #99298
PAMALA R. HOLSINGER, OSB #89263
Assistant United States Attorneys
(503) 727-1000