Stephen R. Sady
Chief Deputy Federal Public Defender
steve_sady@fd.org
Steven T. Wax
Federal Public Defender
steve_wax@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
503-326-2123 Telephone
503-326-5524 Facsimile

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | Case No. 3:10-cr-00475-KI-1 |
| | Plaintiff, | DEFENSE TRIAL MEMORANDUM |
| v. | | |
| MOHAMED OSMAN MOHAMUD, | | |
| | Defendant. | |

# TABLE OF CONTENTS

**Page**

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.   The Law of Entrapment For Dispositive Motions And Trial.. . . . . . . . . . . . . . . . . . . . . . 2

1.   At The Close Of The Government's Case, The Court Should Enter A Judgment Of Acquittal Or, In The Alternative, Dismiss The Case With Prejudice Based On Government Overreaching. . . . . . . . . . . . . . . . . . . . . . . . . . 3

a.   *Jacobson*, *Sherman*, And *Poehlman*, Separately And Together, Require Entry Of Judgment Of Acquittal. . . . . . . . . . . . . . . . . . . . . . . . 3

1.   *Jacobson* Is Directly Analogous To The Present Case. . . . . . . . . . 4

2.   *Sherman* Is Directly Analogous To The Present Case.. . . . . . . . . . 6

3.   *Poehlman* Is Directly Analogous To The Present Case.. . . . . . . . . 8

b.   Under The Ninth Circuit's Due Process Standard, The Court Should Dismiss This Case With Prejudice Based On Government Overreaching. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2.   If The Case Is For The Jury, The Government Will Bear The Burden Of Proving Mr. Mohamud Was Not Entrapped. . . . . . . . . . . . . . . . . . . . . . . . . . . 11

a.   The Inducement Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

b.   The Predisposition Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B.   General Legal Principles Underlying Anticipated Evidentiary Issues.. . . . . . . . . . . . . . . 17

1.   Because The Activities Of November 26, 2010, Are Largely Undisputed, The Court Should Limit Evidence Regarding Those Events. . . . . . . . . . . . . . . . . . . 19

2.   The Constitution And The Rules Of Evidence Limit Uses Of General Character And Prior Bad Acts Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

3.   Rule 403 Should Limit Evidence Based On The Danger Of Unfair Prejudice And Other Rule 403 Grounds For Excluding Or Limiting Evidence. . . . . . . . . 22

i

C.      Pretrial Non-FISA Motions To Suppress..........................................24

D.      Status Of Discovery Motions.....................................................26

E.      CIPA And FISA Issues.........................................................30

F.      Issues Related To Jury Selection Given Pretrial Publicity And Potential For Unfair Prejudice...........................................................................31

        1.      Questionnaire..........................................................32

        2.      Court-Conducted Voir Dire..........................................33

        3.      Attorney-Conducted Voir Dire......................................34

        4.      Sequestered Questioning............................................36

        5.      Extra Defense Peremptory Challenges..................................36

Stephen R. Sady
**Chief Deputy Federal Public Defender**
steve_sady@fd.org
Steven T. Wax
**Federal Public Defender**
steve_wax@fd.org
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**503-326-2123 Telephone**
**503-326-5524 Facsimile**

**Attorneys for Defendant**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:10-cr-00475-KI-1** |
| Plaintiff, | **DEFENSE TRIAL MEMORANDUM** |
| v. | |
| **MOHAMED OSMAN MOHAMUD,** | |
| Defendant. | |

**Introduction**

On November 26, 2010, Mohamed Osman Mohamud, acting under the direction of two

government operatives, attempted to detonate an explosion in downtown Portland. He deeply regrets

his actions and is humiliated and ashamed for what he said and did. The trial of this case does not

involve any dispute that Mr. Mohamud attempted to use a weapon of mass destruction on November

26, 2010; the question is whether, given Mr. Mohamud's state of mind on November 9, 2009 – the

earliest known direct government contact – he was predisposed to commit the crime charged. Although Mr. Mohamud had expressed unpopular political ideas and fundamentalist religious beliefs, he was not ready and willing – had not even contemplated – using a weapon of mass destruction in the United States against his fellow citizens. The material disclosed by the government to date is devoid of such evidence. Because starting on November 9, 2009, and continuously thereafter, government operatives took action to mold and manipulate a confused and conflicted teenager in order to encourage the crime, they entrapped Mr. Mohamud, and he should be acquitted.

## A.    The Law of Entrapment For Dispositive Motions And Trial

The governmental intrusion into and influence over Mr. Mohamud's life constitutes unprecedented governmental involvement in encouraging the commission of a criminal act. Among the unique attributes of the sting operation that resulted in Mr. Mohamud's arrest are:

- Almost a year of electronic surveillance of the 17-year-old Mr. Mohamud during which the government learned intimate details regarding Mr. Mohamud's religious, political, and personal life;

- The government's failure to treat Mr. Mohamud's parents fairly when they asked for assistance and its actions to undercut the agreement to defer study abroad until after his college studies;

- In the absence of any expressed desire by Mr. Mohamud to carry out violence in the United States, initial direct contact by undercover operatives priming Mr. Mohamud to commit acts of violence in the United States both through internet communications and face-to-face meetings; and

- Utilization of the no-fly listing of Mr. Mohamud to intrude in Mr. Mohamud's life by preventing him from pursuing a legitimate summer job opportunity in Alaska, then following up that intervention shortly thereafter by having an undercover operative initiate communication with him.

**PAGE 2    DEFENSE TRIAL MEMORANDUM**

This trial memorandum provides the defense statement of entrapment law for the array of potential issues anticipated to arise during the course of the trial, many of which are closely related. Most importantly, the Supreme Court authority on entrapment as a matter of law, based primarily on *Jacobson v. United States*, 503 U.S. 540, 549 (1992), and *Sherman v. United States*, 356 U.S. 369 (1958), addressed in the first section below, provides the predicate principles for anticipated evidentiary rulings and jury instructions on entrapment addressed in the second section.

1.    **At The Close Of The Government's Case, The Court Should Enter A Judgment Of Acquittal Or, In The Alternative, Dismiss The Case With Prejudice Based On Government Overreaching.**

Under the controlling Supreme Court precedent of *Jacobson* and *Sherman*, as elaborated by the Ninth Circuit in *United States v. Poehlman*, 217 F.3d 692 (9th Cir. 2000), the Court should enter a judgment of acquittal at the close of the government's case for failure to establish beyond a reasonable doubt predisposition to commit the crime charged and lack of inducement. In the alternative, under due process case law, the Court should dismiss with prejudice based on the totality of the circumstances, including government initiation of criminal acts, constitutional violations during the investigation, extensive manipulation of a teenager by trained operatives, acquiescence in contacts between a juvenile and extremist propagandists, interference with familial relationships, and failure to record critical events during the investigation. In considering entrapment, it is critical to distinguish predisposition from potential and vulnerability; the potential that a vulnerable person could commit a crime is not predisposition.

a.    *Jacobson, Sherman, And Poehlman, Separately And Together, Require Entry Of Judgment Of Acquittal.*

This case involves two fact patterns that the Supreme Court has held require acquittal of the target of government sting operations. In *Jacobson*, the government sent correspondence by mail

to a defendant, who had solicited pornography, that subtly encouraged, and ultimately resulted in, purchase of child pornography.  In *Sherman*, the government approached a drug user in a treatment program and persuaded him to provide a connection to a drug seller.  In both cases, the Supreme Court found entrapment as a matter of law.  In the present case, at the time of the Bill Smith email on November 9, 2009, Mr. Mohamud had, like Mr. Jacobson, expressed interests and views protected by the First Amendment that did not include Bill Smith's contemplation of violence in the United States.  Further, like Mr. Sherman, Mr. Mohamud had agreed with his parents to forego study overseas until after he completed college.   Especially in the context of other governmental overreaching, such as the June 23rd email invoking God's will and the unrecorded meeting on July 30th, the Supreme Court authority requires acquittal of the charges.

1.    *Jacobson* Is Directly Analogous To The Present Case.

The *Jacobson* case is directly analogous to the emails promoting unlawful action in the present case.  In *Jacobson*, the defendant did not claim to be virtuous.  Rather he asserted that his activity before any government contact in seeking magazines from an adult bookstore, entitled Bare Boys I and II, was not a crime.  Similarly, Mr. Mohamud's internet activity constituted protected First Amendment activity, regardless of how repugnant and misguided the government may consider the protected beliefs and conduct.  *See Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (First Amendment protects expression unless both the intent of the speaker and the tendency of the words is to produce or incite an imminent lawless act, one likely to occur).  As in *Jacobson*, the government followed up on initial identification of the target with correspondence aimed at normalizing reprehensible action that went a step beyond the previous actions and belief.  In *Jacobson*, the government actor favored child pornography; here, the government actor favored violent action in

the United States.  Mr. Mohamud did not act on the initial series of emails from Bill Smith, as Mr. Jacobson did not initially seek illegal child pornography.

An important holding of *Jacobson* is that the target's lack of predisposition simply means that he was not engaged in criminal activity, not that the individual's mind is virtuous.  "[E]vidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition."  *Jacobson*, 503 U.S. at 550.  The repugnance for Mr. Jacobson's interest in pictures of naked boys, like repugnance for sympathy with al-Qaeda, does not provide the measure for entrapment.  *Id.* at 551 ("[T]he fact that petitioner legally ordered and received the Bare Boys magazines does little to further the Government's burden of proving that petitioner was predisposed to commit a criminal act.").  A predisposition to political or religious rhetoric, like the "predisposition to view photographs of preteen sex and a willingness to promote a given agenda by supporting lobbying organizations," "hardly support[s] an inference" that the individual would commit the crime charged.  *Id.* "[A] person's inclinations and 'fantasies'" – in sex, politics, and religion – "'are his own and beyond the reach of the government.'"  *Id.* at 551-52 (citations omitted).

*Jacobson* also holds that predisposition is measured from the time of the first government contact:  "[T]he prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents."  503 U.S. at 549. In *Jacobson*, the government "not only excited petitioner's interest in sexually explicit materials banned by law but also exerted substantial pressure on petitioner to obtain and read such material as part of a fight against censorship and the infringement of individual rights."  *Id.* at 552.  Similarly, the government agents in this case raised issues about the need for action in the West to support

oppressed co-religionists worldwide.  In both cases, a "ready response to these solicitations cannot be enough to establish beyond reasonable doubt that he was predisposed, prior to the Government acts intended to create predisposition, to commit the crime . . . ."  *Id*. at 553.  "Law enforcement officials go too far when they 'implant in the mind of an innocent person the *disposition* to commit the alleged offense and induce its commission in order that they may prosecute.'"  *Id*. (emphasis in original) (citing *Sorrells v. United States*, 287 U.S. 435 (1932)).

The predisposition the government must prove beyond a reasonable doubt is not to general mischief or even other crimes:  the predisposition must be "to commit the crime charged." *Jacobson*, 503 U.S. at 551 n.3.  The crime charged in the present case is attempted use of a weapon of mass destruction against any person or property within the United States, in violation of 18 U.S.C. § 2332a(a)(2).  There is no evidence that Mr. Mohamud had planned – or even contemplated – an attack in the United States involving a weapon of mass destruction prior to government influence. "[P]roof that petitioner engaged in legal conduct and possessed certain generalized personal inclinations is not sufficient evidence to prove beyond a reasonable doubt that he would have been predisposed to commit the crime charged independent of the Government's coaxing."  *Id*.

### 2.  *Sherman* Is Directly Analogous To The Present Case.

In addition to and in conjunction with *Jacobson*, the government actions in this case support entry of judgment of acquittal under *Sherman v. United States*, 356 U.S. 369 (1958).  In that case, the government informer met Mr. Sherman during the course of Mr. Sherman's efforts to receive treatment for his narcotics addiction.  *Sherman*, 356 U.S. at 371.  There was no question that Mr. Sherman was involved in buying drugs, had prior convictions for both possessing and selling drugs, and, when asked, stated he knew of "a good source of narcotics."  *Id*.  After initial reluctance,

Mr. Sherman purchased drugs, shared them with the informant, and set up several more sales, which ultimately resulted in arrest and prosecution.

The Court found the prior convictions "are insufficient to prove petitioner had a readiness to sell narcotics at the time [the informant] approached him, particularly when we must assume from the record he was trying to overcome the narcotics habit at the time." *Sherman*, 356 U.S. at 375-76. The prohibition on "implant[ing] in the mind of an innocent person the disposition to commit the alleged offense and induce its commission" is not limited to people without vulnerabilities and vices. *Id*. at 372. Just as Mr. Sherman had entered into treatment and was attempting to recover from his addiction, and was then tempted to drug dealing, so had Mr. Mohamud forsaken his attempts to live abroad and agreed with his father to complete his college education in the United States, and was then tempted to act violently in this country by Bill Smith and an undercover operative. As in *Sherman*, Mr. Mohamud initially deflected and ignored suggestions regarding action in America.

Despite Mr. Sherman's deep involvement in drug activity, the Court reversed the conviction because "the Government play[ed] on the weaknesses of an innocent party and beguile[d] him into committing crimes he otherwise would not have attempted." *Id*. at 376. The Court was unconcerned with law violations other than the offense charged: "There is no evidence that petitioner himself was in the trade." *Id*. at 375. And criminal actions after the government inducement began were irrelevant to predisposition for entrapment purposes:

> It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of the course of conduct which was the product of the inducement.

*Id*. at 375. Similarly, Mr. Mohamud's actions after being induced are not independent acts but the products of inducement.

3.    *Poehlman* Is Directly Analogous To The Present Case.

In *Poehlman*, the Ninth Circuit followed Supreme Court authority on entrapment as a matter of law in the context of sex trafficking of a minor.  Again, the defendant was not virtuous and had deep flaws.  "[L]onely and depressed," he trawled the internet, receiving rebukes for deviant sexual suggestions he made on-line.  *Poehlman*, 217 F.3d at 695.  He eventually received responsive emails from undercover agents that went beyond what he was initially looking for and proposed sex with children.  *Id*. at 695-96.  After initial hesitancy, Mr. Poehlman agreed to act as a sexual tutor for his correspondent's children, sending explicit emails, buying gifts, and traveling with the intent to sexually abuse the children.  *Id*. at 696.  Upon arriving at the designated hotel room, Mr. Poehlman met the purported parent, saw pictures of the purported children, and entered a room to have unlawful sex with the children, at which point the sting was revealed and Mr. Poehlman was arrested.

As with *Jacobson* and *Sherman*, the Ninth Circuit's holding in *Poehlman* compels acquittal in the present case.  The target of the sting was vulnerable to inducement but was not predisposed to commit the crime charged.  The persuasion drew an individual, who had marginal and deviate interests that had not ripened to a present intention, to commit the crime charged.  The activities after inducement began were the products of government activity, hence the importance of the "pre" in predisposition.  *Poehlman*, 217 F.3d at 703 ("[T]he relevant time frame for assessing a defendant's disposition comes before he has any contact with government agents, which is doubtless why it's called *pre*disposition.") (emphasis in original).  Especially in conjunction with the factors favoring due process dismissal, the Court should enter judgment of acquittal based on controlling precedent

from the Supreme Court and the Ninth Circuit limiting when the government can induce vulnerable

individuals to commit crimes.

> b.    *Under The Ninth Circuit's Due Process Standard, The Court Should Dismiss This Case With Prejudice Based On Government Overreaching.*

Under the due process clause, a prosecution resulting from complete fabrication of a crime

or excessive governmental over-reaching should be dismissed with prejudice.  *United States v.*

*McClelland*, 72 F.3d 717, 721 n.1 (9th Cir. 1995).  The standard for a due process violation differs

from entrapment as a matter of law in its focus on the government activity as opposed to

predisposition:

> Although cases of improper government coercion are similar to entrapment cases, there are two differences between them.  First, "a successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense."  *U.S. v. Bogart*, 783 F.2d 1428, 1435 (9th Cir.1986) (quoting *United States v. Jannotti*, 673 F.2d 578, 607 (3d Cir.) (en banc))[.]  Second, a finding that the defendant was predisposed to commit a crime precludes a successful entrapment defense, but not a government coercion claim or any other claim of outrageous government conduct.  *See, e.g.*, *United States v. Luttrell*, 889 F.2d 806, 811 (9th Cir.1989), *amended*, 923 F.2d 764 (9th Cir.1991) (en banc)[.]  When determining whether government conduct was outrageous, the court considers the government's behavior, not the defendant's mental state or predisposition.

*Id.* (citations truncated).  In addition to the factors that support entrapment as a matter of law

described above, a number of other factors strongly support dismissal:

- **Constitutional violations during the course of the same investigation**: Regardless of whether the government used information gained, the defense has established that government investigators violated the Fourth Amendment in seizing and searching Mr. Mohamud's computer beyond the scope of any voluntary consent and submitted him to a ruse interrogation in violation of the Self-Incrimination Clause of the Fifth Amendment;

- **Prolonged surveillance of a juvenile**: The government engaged in intrusive monitoring of Mr. Mohamud's electronic communications when he was 17-years-old, failing to intervene either directly or through his parents even

though the government knew he was communicating with skilled and dangerous propagandists;

- **Destruction or failure to preserve evidence**:  The government failed to record the critical first face-to-face meeting on July 30, 2010, destroyed written notes of that meeting, failed to record a ten-minute telephone conversation with the undercover agent on August 28, 2010, and turned off the video recording so there is no film of the time leading up to the arrest on November 26, 2010;

- **Interference with familial relations**:  The government's activities directly interfered with Mr. Mohamud's parents' efforts to keep him in school and focused on his future as a civil engineer, failing to provide assistance when requested, and blocking the parentally supported summer job, instead recruiting Mr. Mohamud to "help the brothers";

- **Abuse of faith and other over-reaching inducement**:  The government exploited religious faith to an extraordinary degree, even claiming that God had a purpose for Mr. Mohamud to remain in the United States, in addition to sophisticated and effective psychological manipulation by flattery, rewards, political justifications, and other extreme measures directed at a teenager;

- **Violation of pretrial publicity regulations**:  The Attorney General made pretrial comments that "constitute a breach" of 28 C.F.R. § 50.2, which prohibits government attorneys from making prejudicial pretrial comments regarding pending federal criminal cases;

- **Knowledge of vulnerability**:  The government's actions all took place in the context of surveillance showing Mr. Mohamed to be lonely, depressed, and conflicted and of the father's statement to the FBI that his young son was immature.

Under the totality of the circumstances, the government went too far.  The massive operation to manipulate a teenager to attempt to commit a crime not otherwise contemplated shocks the conscience.  The government's manufacture of this crime is barred by the due process clause.

2.    **If The Case Is For The Jury, The Government Will Bear The Burden Of Proving Mr. Mohamud Was Not Entrapped.**

As stated in the discussion of entrapment as a matter of law, the facts of this case are more than sufficient to raise the defense.  The Court must instruct the jury on entrapment even if the defendant can support the defense with only "slight evidence." *United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003) (quoting *United States v. Becerra*, 992 F.2d 960, 963 (9th Cir. 1993)).  This standard is met even if the defendant's evidence is "weak, insufficient, inconsistent or of doubtful credibility." *Id.*  Once this standard is satisfied, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was *not* entrapped. *Poehlman*, 217 F.3d at 698.  Accordingly, at trial the government must prove beyond a reasonable doubt either that (a) Mr. Mohamud was not induced by the government or (b) Mr. Mohamud was predisposed to commit the crime charged. *Id.*

a.    *The Inducement Standard*

The government may rebut the entrapment defense by producing evidence that Mr. Mohamud was not induced.  This is a tall order because inducement does not require much.  It can occur as a consequence of even "very subtle governmental pressure." *Poehlman*, 217 F.3d at 701.  Inducement may take many forms – "any government conduct" – including "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *Id.* at 698 (quoting *United States v. Davis*, 36 F.3d 1424, 1430 (9th Cir. 1994)).  Practically, this means that any government conduct can be inducement if it pushes a citizen toward committing a crime that he would not otherwise commit:

> [A]t bottom the government induces a crime when it creates a special incentive for the defendant to commit the crime.  This incentive can consist of anything that materially alters the balance of risks and rewards bearing on the defendant's decision

whether to commit the offense, so as to increase the likelihood that he will engage in the particular criminal conduct.

*Id*. at 698.  The key issue is whether the government conduct created such influence.

To sustain its burden of proof in this case, the government must prove that it merely only offered Mr. Mohamud the opportunity to commit the crime charged:

> [w]here government agents merely make themselves available to participate in a criminal transaction, such as standing ready to buy or sell illegal drugs, they do not induce commission of the crime . . . .  "An 'inducement' consists of an 'opportunity' *plus* something else . . . ."

*Poehlman*, 217 F.3d at 701 (quoting *United States v. Gendron*, 18 F.3d 955, 961 (1st Cir. 1994)) (emphasis in original).  The presence of any "plus factor" requires the jury to find that Mr. Mohamud was induced.

Courts have found this "plus factor" to be present even where there was minimal governmental pressure on the defendant to commit the crime.  In *Poehlman*, inducement occurred when the government appealed to the defendant's desire for a romantic relationship, but conditioned that relationship on defendant's willingness to act as a sexual mentor to children.  *Id*. at 700-01.  In *Jacobson*, the government sent mailings that encouraged the defendant to buy child pornography as part of a fight against government censorship.  503 U.S. at 552.  In *Sorrells v. United States*, the government agent posed as a fellow army veteran and, during the prohibition, repeatedly asked the defendant to give him alcohol.  287 U.S. 435, 439-441 (1932).  In *Sherman*, the government merely established a friendship with defendant and then played on defendant's sympathy to obtain drugs.  356 U.S. at 371.  All of these cases indicate that minimal governmental action is required to induce a crime.

In the present case, there is substantial evidence that the government induced Mr. Mohamud to commit the crime charged.  The Bill Smith emails presented violent action in the West as necessary to accomplish desirable political goals, appealing to religion, friendship, social justice, and moral obligation.  Later, the undercover operatives asked for Mr. Mohamud's "help" for the brothers on behalf of an authoritative Council, and initiated the discussion of becoming "operational." "[I]nducement can be *any* government conduct creating a substantial risk that an otherwise law-abiding citizen would commit an offense."  *Poehlman*, 217 F.3d at 698 (emphasis added).

This case involves particularly insidious types of governmental conduct.  For example, the government used its vast powers to intrude upon and alter Mr. Mohamud's life – preventing him from pursuing a fishing job opportunity in Alaska.  Having changed the course of his life, it then sent an undercover operative to him with the proposal set out in the email of June 23, 2010.  Coupled with the government's invocation of the Council, the brothers, and the needs of Muslim people, the power of the government's intrusion on Mr. Mohamud was overwhelming.  The government's interactions with Mr. Mohamud over the next five months continued to be rife with inducing appeals to faith and brotherhood, including isolating him from other influences, requiring secrecy, and providing money.

The defense expert testimony, which is summarized in a notice filed contemporaneously with this document, elaborates on the powerful overt and subtle influences brought to bear on Mr. Mohamud.  The government's emails and recordings demonstrate a sophisticated and concerted campaign leading to the arrest.  The government cannot negate inducement beyond a reasonable doubt.

PAGE 13   DEFENSE TRIAL MEMORANDUM

      b.     *The Predisposition Standard*

To rebut the entrapment defense, the government must prove beyond a reasonable doubt that Mr. Mohamud was predisposed to commit the crime charged. *Poehlman*, 217 F.3d at 703. Predisposition "is the defendant's willingness to commit the offense prior to being contacted by government agents, coupled with the wherewithal to do so." *Id*. at 698. In other words, a defendant is predisposed if he was "ready and willing" to commit the crime charged before the government intervened. *United States v. LaRizza*, 72 F.3d 775, 778 (9th Cir. 1995) (quoting *Black's Law Dictionary* 1177 (6th ed. 1990)).

To assess predisposition, the jury is required to look back in time to determine Mr. Mohamud's state of mind when government agents first began talking to him. *Jacobson*, 503 U.S. at 549; *Sherman*, 356 U.S. at 375-76; *Poehlman*, 217 F.3d at 703 (holding that "we must consider what evidence there is as to [defendant's] state of mind *prior* to his contact with [government agents].") (emphasis in original). Given the narrow focus of predisposition, there are many issues that are irrelevant or have little probative value in proving predisposition.

It is irrelevant that Mr. Mohamud was willing to commit a crime at the culmination of the undercover operation. *Poehlman*, 217 F.3d at 703 (holding that willingness alone is not enough to constitute predisposition). The only fact at issue is Mr. Mohamud's willingness to commit the crime *prior* to government contact. *Id*.; *United States v. Thomas*, 134 F.3d 975, 978 (9th Cir. 1998). This means that the government may not prove predisposition by offering evidence that is tainted by the government's inducement. *Id*. at 704-05 ("only those statements that indicate a state of mind untainted by the inducement are relevant to show predisposition."). In *Poehlman*, the Ninth Circuit ignored numerous erotic emails that were exchanged between the defendant and government agents

because nothing in them differentiated the defendant's "state of mind prior to the government's intervention from that afterwards." *Id*. at 704 ("The e-mails thus tell us what Poehlman's disposition was once the government had implanted in his mind the idea of sex with Sharon's children, but not whether Poehlman would have engaged in such conduct had he not been pushed in that direction by the government.").

The Ninth Circuit has also held that the defendant's lack of "the wherewithal to do so" indicates a lack of predisposition. *Poehlman*, 217 F.3d at 698.  Review of the development of the fake bomb plan reveals that it was the fabrication of the government operatives; Mr. Mohamud did not have the "wherewithal" to commit the offense charged in the absence of the operatives.  They directed Mr. Mohamud at every turn, and provided all the "wherewithal" for the offense: transportation, electronics, storage, apartment, barrels, fake explosives.  As the government well knew, nine months after the government first began its manipulation of Mr. Mohamud, he had neither the knowledge nor the resources to attempt to use a weapon of mass destruction.

In addition to consideration of evidence regarding "the wherewithal to do so," the Ninth Circuit has identified other factors that are relevant in determining whether a defendant was predisposed to commit the crime charged. *Thomas*, 134 F.3d at 978.  The jury can consider the character or reputation of the accused, whether the government made the initial suggestion of the criminal activity charged,  whether the defendant engaged in the activity for profit, whether the defendant showed any reluctance, and the nature of the government's inducement.  *Id*.  All these factors militate against predisposition to attempt to use a weapon of mass destruction in the United States.  The government's intrusion into Mr. Mohamud's life and its expenditure of resources to set him up is unique.  The psychological manipulation of a conflicted teenager the government knew

intimately from extensive active surveillance achieved precisely its aim: agreement and participation to commit a spectacular act that Mr. Mohamud himself neither planned, intended, nor even contemplated prior to the governmental contacts.

The government cannot satisfy its burden of proof by producing evidence that Mr. Mohamud expressed sympathy toward Islamic extremism: "evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." *Jacobson*, 503 U.S. at 550. Further, the First Amendment protects views, expression, and advocacy unless both the intent and the tendency of the words was to produce or incite an imminent lawless act, one likely to occur. *Brandenburg*, 395 U.S. at 447-48. Even prior unlawful activity would not be sufficient. *See Sherman*, 356 U.S. at 371 (target had previous drug possession and sales); *Thomas*, 134 F.3d at 979 (despite prior drug convictions and admitted minor trafficking, "the government had the burden of proving beyond a reasonable doubt that Thomas was predisposed to engage in a drug transaction involving three pounds of methamphetamine, at a purchase price of $25,000."). Proof of predisposition must be narrowly tailored. To establish predisposition at trial the government must do more than produce evidence that Mr. Mohamud wanted to travel abroad and associate with Islamic extremists. It must prove that he was disposed to commit the charged act of domestic terrorism.

Finally, the government cannot prove predisposition simply by showing that Mr. Mohamud held repugnant fantasies, personal opinions, or inclinations. *Jacobson*, 503 U.S. at 552 ("a person's inclinations and 'fantasies . . . are his own and beyond the reach of government'" (quoting *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67 (1973))); *see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995) (noting that the purpose of First

Amendment protection is "to shield just those choices of [expression] that . . . are misguided, or even hurtful."). The mere fact that Mr. Mohamud held or expressed unpopular opinions, without more, is not sufficient to prove predisposition. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). The Supreme Court has recently affirmed this principle in the context of false claims of military valor (*United States v. Alvarez*, 132 S. Ct. 2537 (2012)), homophobic and abusive expression during a military funeral (*Snyder v. Phelps*, 131 S. Ct. 1207 (2011)), and movies involving the crushing of small animals (*United States v. Stevens*, 130 S. Ct. 1577 (2010)).

Under these circumstances, the government cannot prove the required predisposition beyond a reasonable doubt. The government must produce evidence that indicates that, before any government contact, Mr. Mohamud was ready and willing to commit the act of attempting to use a weapon of mass destruction in the United States, when no such evidence exists – the government initiated the request to help the brothers, initiated the question of becoming "operational," and directed Mr. Mohamud to identify a target. It is not enough to show that Mr. Mohamud was willing to commit a crime after inducement occurred, nor is it enough to prove that Mr. Mohamud had generic inclinations opposed to American interests, nor it is not enough to show that Mr. Mohamud held repugnant opinions. Stripping away evidence that is prejudicial but not probative, the government is left with insufficient evidence to prove that Mr. Mohamud was predisposed to commit violence on domestic soil.

## B.    General Legal Principles Underlying Anticipated Evidentiary Issues

Because the defense has asserted an entrapment defense, the government bears the burden of proving beyond a reasonable doubt that, by at least November 9, 2009, Mr. Mohamud was

predisposed to attempt to use a weapon of mass destruction in the United States against his fellow citizens. The events on the date of the attempt, on the other hand, are of very limited probative value. Traditionally, the government would demonstrate predisposition by providing evidence that the defendant had committed the type of crime charged on previous occasions or that he had taken steps to commit the charged offense prior to contact by any government operatives. In the absence of the normal indicia of predisposition in the present case, the defense anticipates that the government will attempt to establish predisposition by relying on prior lawful activity involving reading, writing, and association – all of which is protected by the First Amendment. The great – perhaps insurmountable – challenge of this case is for the jury to deliberate on the basis of predisposition for the charged crime, not on an improper basis, commonly, though not necessarily, an emotional one. *Old Chief v. United States*, 519 U.S. 172, 180 (1997). It is likely the jury will look upon some of Mr. Mohamud's First Amendment-protected activities with contempt, given the almost unanimous condemnation of all things related to Osama bin Laden, al-Qaeda, and the perpetrators of the 9/11 mass murders. To achieve a fair trial, the Court will need to carefully distinguish between evidence of little to no probative value regarding the crime charged, and evidence that, at the time of the first government contact, Mr. Mohamud was not ready and willing to attempt to use a weapon of mass destruction in the United States. *United States v. Waters*, 627 F.3d 345, 355 (9th Cir. 2010) ("attempts to use [First Amendment-protected material] against the defendant must be viewed and reviewed with a careful and skeptical eye."). Mr. Mohamud anticipates that the Court will make evidentiary rulings utilizing the principles set out herein on the motions in limine and other issues that may arise before and during trial.

**PAGE 18   DEFENSE TRIAL MEMORANDUM**

1.  **Because The Activities Of November 26, 2010, Are Largely Undisputed, The Court Should Limit Evidence Regarding Those Events.**

The core conduct charged on November 26, 2010, well after the inducement, is not controverted. Therefore, where facts are not in dispute, evidence that may be probative of an element of the offense is likely to be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." *Old Chief*, 519 U.S. at 180 (quoting Fed. R. Evid. 403). The Court found in *Old Chief* that a stipulation that the accused was a felon, in a case involving possession of a firearm by a felon, made unnecessary detailed evidence regarding the nature of the prior conviction. Similarly, evidence regarding the ruse offense – attempted use of the weapon of mass destruction – because it does not involve disputed facts, makes detailed explication of the attempted offense largely superfluous, cumulative, and unfairly prejudicial.

2.  **The Constitution And The Rules Of Evidence Limit Uses Of General Character And Prior Bad Acts Evidence.**

In general, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002) (citing Fed. R. Evid. 404(a)); *see also United States v. Derington*, 229 F.3d 1243, 1247 (9th Cir. 2000). In the entrapment context, character evidence is available only to the limited extent it is placed in issue by the defendant. *Michelson v. United States*, 335 U.S. 469, 483 (1948) ("The good character which the defendant had sought to establish was broader than the crime charged and included traits of 'honesty and truthfulness' and 'being a law abiding citizen.'"). Mr. Mohamud seeks to invoke no character traits; he only puts the government to its burden of establishing the narrow but essential predisposition to commit the crime charged.

*Matthews v. United States*, 485 U.S. 58, 64-65 (1988) ("A simple plea of not guilty . . . puts the prosecution to its proof as to all elements of the crime charged, and raises the defense of entrapment.") (citing *Sorrells*, 287 U.S. at 452).

"Character evidence is of slight probative value and may be very prejudicial . . . .  It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened." *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc) (quoting Advisory Committee Notes to the 1972 Proposed Rules).  In *Curtin*, the Court reversed a conviction because the trial court failed to carefully review all material protected by the First Amendment that was introduced at trial to show that a person involved in a attempt to have sex with a minor was truly interested in children, not acting out an adult fantasy.  Although rejecting a universal ban on First Amendment-protected material as evidence, the Court, and particularly the concurring judges, noted the need to guard against the use of protected expression as simply negative character evidence that warrants conviction regardless of the facts of the individual case. *Compare Curtin*, 489 F.3d at 957 ("Because evidence of other crimes, wrongs, or acts carries with it the inherent potential to see the defendant simply as a bad person and then to convict because of who he is rather than what he did, a trial court must take appropriate care to see that this does not happen."), *with id*. at 959 (Kleinfeld, J., concurring) ("We ought to be wary when the government wants to use what people read against them.  Our freedom to read and think requires a high wall restricting official scrutiny.").

"Rule 404(b) permits evidence of prior wrongs or acts to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Romero*, 282 F.3d at 688.  To establish entrapment did not occur, the government's use of prior bad act evidence must

be limited to the crime charged – attempted use of a weapon of mass destruction in the United States – not some other form of mischief or illegality. *Jacobson*, 503 U.S. at 551 n.3; *cf. Thomas*, 134 F.3d at 978 (defendant's lack of prior convictions probative to "whether he was predisposed to engage in large-scale drug deals like the one that underlies his conviction."). The defendant's actions and statements after the initial contact have limited probative value on predisposition because the "relevant time frame for assessing predisposition comes before" government contact, not in response to induced disposition. *Poehlman*, 217 F.3d at 703.

There are four requirements for admissibility of prior bad act evidence: (1) evidence of other crimes, wrongs, or acts must be introduced for a proper purpose; (2) the evidence must be relevant; (3) the court must make a Rule 403 determination whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) the court, upon request, must instruct the jury that the evidence of similar acts is to be considered only for the limited purpose for which it was admitted. *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988). The government "has the burden of proving that the evidence meets all of the above requirements." *United States v. Arambula-Ruiz*, 987 F.2d 599, 602 (9th Cir. 1993). In addition, the evidence must be sufficient to support a finding that the defendant committed the act, which should not be too remote in time and should be similar to the offense charged. *United States v. Santini*, 656 F.3d 1075, 1077-78 (9th Cir. 2011) (citing *Romero*, 282 F.3d at 688). "If the evidence meets this test under Rule 404(b), the court must then decide whether the probative value is substantially outweighed by the prejudicial impact under Rule 403." *Romero*, 282 F.3d at 688 (citation omitted).

### 3.    Rule 403 Should Limit Evidence Based On The Danger Of Unfair Prejudice And Other Rule 403 Grounds For Excluding Or Limiting Evidence.

"[E]vidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition." *Jacobson*, 503 U.S. at 550.  The probative value of speech and other conduct protected by the First Amendment is limited based on *Jacobson*'s focus on precontact predisposition to "the crime charged," not generic inclinations, dreams, and fantasies.  503 U.S. at 551-52 & n.3; *see Curtin*, 489 F.3d at 965 (Kleinfeld, J., concurring) ("Fantasies and dreams are not intentions, or close to them.").  "[A] defendant's choice of reading material will rarely have a particularly significant probative value." *United States v. Waters*, 627 F.3d 345, 355 (9th Cir. 2010).

In *Waters*, the court reversed based on the admission of the defendant's "anarchist literature" at a trial for arson.  627 F.3d at 357.  The court found that the literature possessed a "repugnant and self-absorbed embrace of destruction" that was "likely to have swayed jurors' emotions, leading them to convict Waters not because of facts before them but because she represented a threat to their own values." *Id.*, at 356.  In light of the danger of unfair prejudice nature from First Amendment-protected materials, both *Waters* and *Curtin* require that trial judges meticulously examine any such materials offered by the government:

> as a matter of law [] a court does not properly exercise its balancing discretion under Rule 403 when it fails to . . . evaluate *all* that it must weigh.  Relying only on the descriptions of adversary counsel is insufficient to ensure that a defendant receives the due process and fair trial to which he is entitled under our Constitution . . . .

*Curtin*, 489 F.3d at 958 (emphasis original).

This case presents extraordinary risks of unfair prejudice based on the individual – a foreign-born, African Muslim – and the charge – attempting to bomb Pioneer Square during a

Christmas tree lighting ceremony.  "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  *Old Chief*, 519 U.S. at 180; *accord Curtin*, 489 F.3d at 964 ("Evidence is unduly prejudicial if it creates a genuine risk that the emotions of the jury will be excited to irrational behavior and this risk is disproportionate to the probative value of the offered evidence.") (internal quotation marks omitted).  In deciding whether evidence should be admitted under Rule 403, courts have readily reversed for abuse of discretion where trial courts admit evidence that either appeals to bias or is likely to inflame the jury.  *See United States v. Cabrera*, 222 F.3d 590, 596-97 (9th Cir. 2000) (reversing for plain error when trial court allowed an officer to make repeated references to defendant's Cuban origin and derogatory generalizations about the Cuban community); *United States v. Hitt*, 981 F.2d 422, 423-25 (9th Cir. 1992) (reversing for abuse of discretion where trial court admitted photographs of automatic weapons allegedly owned by defendant and several more owned by his roommate, where the only issue was the internal operation of the firearms); *see United States v. Al-Moayad*, 545 F.3d 139, 159-162 (2d Cir. 2008) (reversing for abuse of discretion where trial court allowed testimony about terrorist bombing of Tel Aviv bus and about a witness's experiences at an al-Qaeda training camp, despite the fact that the defendants were not charged with bus bombing).

Erroneous admission of this type of material is likely to constitute reversible error.  *Waters*, 627 F.3d at 359 ("[M]aterials advocating violence, not to mention the overthrow of government, were 'likely to elicit a response from jurors that cause[d] them to reach a conclusion based on emotion rather than the evidence presented.") (quoting *United States v. Ellis*, 147 F.3d 1131, 1136 (9th Cir. 1998)); *see United States v. Gozalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) ("Where

the evidence is of very slight (if any) probative value, it's an abuse of discrition to admit it if there's

even a modest likelihood of unfair prejudice or a small risk of misleading the jury.") (quoting *Hitt*,

981 F.2d at 424).

This case presents many obstacles to a fair trial. The defendant presents several of the equal

protection bases for heightened scrutiny: he is a racial minority; he belongs to a religious minority;

he exercised unpopular First Amendment rights; and, although he is a United States citizen, he is

foreign born. The nature of the charge creates serious risks of prejudgment, which are exacerbated

by the pretrial publicity in this case. In addition to unfair prejudice, the First Amendment-protected

reading, writing, and association implicate the Rule 403 dangers of confusing the issues, misleading

the jury, and needless presentation of cumulative evidence. The Court's evidentiary rulings should

be guided by protection against evidence that unnecessarily creates risks of unfairness under

generally applicable evidentiary principles.

## C.    Pretrial Non-FISA Motions To Suppress

On June 22, 2011, Mr. Mohamud filed a motion to suppress the products of searches,

seizures, and interrogations by federal officers who surreptitiously became involved in a state police

investigation on November 2, 2009 (CR 56, 57). After initial briefing was completed (CR 75, 87),

the defense moved to bifurcate the legality of the search from the question of taint (CR 110). The

Court denied that request on April 24, 2012 (CR 112). In preparation for the hearing on the motion,

the defense objected to the ruling focusing only on taint (CR 114) as well as to the government's

proposal to provide *ex parte* testimony on the matter (CR 116, 120). On May 1 and 2, the Court held

hearings on the matter: the Court initially conducted an *ex parte* hearing (CR 123), then heard

testimony from FBI agents and state officers involved in the computer search (CR 124-25).

Following the hearing, the defense moved to supplement the motion to suppress with computer forensic testimony establishing that several factual predicates of the government's presentation were incorrect (CR 129).  The government objected, to which the defense replied on May 29, 2012 (CR 133, 138).  On that same day, the Court granted the request to reopen the record (CR 139).  The Court held a hearing regarding the supplemented record, including the testimony from the defense computer forensics expert, resulting in agreement that the record should be supplemented (CR 150).  The proceedings included an *ex parte* matter before the Court (CR 151).

On June 18, 2012, the defense filed a second motion to supplement the record, this time focusing on evidence regarding the second search and the potential use of statements from the June 14, 2009, interrogation of Mr. Mohamud (CR 142).  The government filed a response on July 6, 2012, to the second motion to supplement, to which the defense replied on July 16, 2012 (CR 154, 158).

On July 23, 2012, the Court entered a general *Jencks* order requiring the government to provide any statements of testifying officers (CR 169).  On September 24 and 26, 2012, the Court supplemented the record with testimony from former Special Agent Petrie and former Special Agent Henderson (CR 192, 196).  On September 25, 2012, the defense moved for production of the case file in order for the *Jencks* obligation to be fulfilled by the testifying witnesses (CR 194).  On October 17, 2012, the defense filed its memorandum in support of the request for *Jencks* material (CR 218).  The Court set the *Jencks* issue for hearing on November 14, 2012 (CR 219).

In this context, the Court entered an opinion and order denying relief on October 22, 2012 (CR 224).  The defense has requested reconsideration (CR 225) which if granted, should lead to the following:

- The Court should order the production of all statements by any of the testifying witnesses, including review of statements contained in the classified and unclassified repositories for such material, including the case file;

- Depending on the material produced, the Court should reopen the hearing for further cross-examination of government actors;

- The Court should reconsider whether there has been a sufficient showing of taint for the Court to rule that the search and seizure of Mr. Mohamud's laptop violated the Fourth Amendment and that the federal participation in the interrogation violated the Fifth Amendment right against self-incrimination;

- The Court should make a determination that there was a second unlawful non-FISA search and seizure when Seargent Ashenfelter, at the federal government's behest, seized and provided the laptop again to federal agents after November 2, 2009;

- The Court should determine that the government cannot adduce testimony in its case-in-chief regarding the interrogation of Mr. Mohamud on June 14, 2010, both as the product of prior illegality and, independently, as involuntary because the government has not borne its burden of proof on voluntariness;

- The Court should make a determination of the scope of use, the any effect referred to in *Murray v. United States*, 487 U.S. 533, 542 n.3 (1988), and either order specific evidence excluded, authorize an adverse inference instruction, or dismiss the case.

## D.    Status Of Discovery Motions

The Court has pending discovery issues currently set for hearing on November 14, 2012, as well as discovery matters that should be addressed or reexamined in light of case developments.

On March 7, 2011, the defense filed the initial request for discovery and first motion to compel discovery (CR 25, 26, 27). The government filed its response on April 7, 2011, to which the defense replied on May 6, 2011 (CR 28, 42). After a hearing on June 1, 2011, the Court granted the motion in part, denied it in part, and deferred other rulings (CR 52). Although the transcripts and recording of meetings with Mr. Mohamud were to be produced, the defense has yet to receive the government's final version of the transcripts and the unpixelated version of the videos. The defense expects to receive these materials by the end of the month.

PAGE 26    DEFENSE TRIAL MEMORANDUM

On February 21, 2012, the defense filed its second motion to compel discovery (CR 77-78). The government filed its response on March 15, 2012, to which the defense replied on March 30, 2012 (CR 91, 99). The Court held a hearing on the second motion to compel discovery on April 17, 2012 (CR 108). The Court followed up its oral rulings with a written order granting in part and denying in part the motion to compel (CR 127).

On May 23, 2012, the defense moved the Court to reconsider a change in the ruling that was apparently based on *ex parte* proceedings addressing the identity of "Bill Smith" (CR 137). The government filed a response on June 19, 2012, to which the defense replied on June 26, 2012 (CR 146, 149). On July 23, 2012, the Court reconsidered its decision and concluded that an *ex parte*, *in camera*, hearing was required in order for the Court to question Bill Smith directly and assess the need to disclose his identity (CR 167). On September 26, 2012, the Court denied the defense motion for reconsideration, deeming the role of Bill Smith to be sufficiently illuminated by the written exchanges themselves, the significance of which was for the jury to decide (CR 195). The Bill Smith opinion was clarified to eliminate an error that apparently occurred during the *ex parte* proceedings (CR 199, 202).

On July 20, 2012, the government filed a motion to clarify regarding the Court's order to produce transcripts and recordings regarding recorded agent conversations not in Mr. Mohamud's presence (CR 164). The defense filed its response on July 30, 2012, to which the government replied on September 20, 2012 (CR 171, 188). On September 24, 2012, the Court ordered the production of the full transcripts and recordings of the outtakes (CR 192).

There are two pending matters involving the outtake recordings. First, the government has produced the full transcript but not the recordings of the outtakes, which the government is awaiting

PAGE 27    DEFENSE TRIAL MEMORANDUM

pending the production of the recordings without the names of the operatives. Those recordings should be produced. Second, the Court has qualified the production of the material at the discovery level to attorneys' eyes only. Now that the discovery issues have been resolved, the defense requests clarification that, although the material will not be used in public filings or otherwise prior to trial, the defense can use the material at trial without restriction, except upon objections that the Court will rule on during the trial itself.

On October 1, 2012, the defense moved for a court order regarding the inspection of the 7/30 electronic devices (CR 200). The government filed its sealed response on October 15, 2012 (CR 216). The defense will be filing its reply on October 26, 2012. On November 14, 2012, the Court will hold its hearing to resolve the motion regarding inspection of the recording, transmitting, and receiving devices. The Court will also be resolving the discovery questions on sealed matters related to the identity of the undercover operatives and the form of their testimony at trial.

In addition to the issues that will be heard on November 14, there are a number of residual issues from prior hearings that the Court should address at the pre-trial conference, if they are not resolved by the parties before then:

• **Mr. Mohamud's Statements:** In its May 8, 2012, Order, the Court accepted the government's representation that no additional responsive material exists with respect to this discovery request. CR 127 at 3. In sealed pleadings, the defense has set forth concrete examples of phone calls, text messages, and emails that were almost certainly intercepted by the government but that have not been produced. *See* Sealed Supplement To Motion For CIPA Rulings And Disclosures; Defendant's Third Supplement To Suppression And Discovery Motions. The defense has noted the exculpatory nature of the material, the lack of any rationale for keeping the material classified, and the distortion of the fact-finding process caused by the government's selective declassification. Not only is the content of Mr. Mohamud's communications critical to presenting a complete picture of his activities to the jury, the material is also necessary for the defense to adequately assess potential trial witnesses – especially where the government has the content of any conversation a potential witness had with Mr. Mohamud but is withholding the information from the defense. In addition to content, the material is necessary to present the jury with a complete

understanding of the government's surveillance in this case, which included being able to track Mr. Mohamud's movements with location data from each of his text messages.  It is critical evidence that, despite the massive electronic and physical surveillance in this case, the government will be unable to adduce material showing intent, desire, planning, or capability to commit the specific crime charged.  Therefore, the entirety of Mr. Mohamud's intercepted communications should be produced.

- **Information Related To Government Monitoring Of Mr. Mohamud:**  As with Mr. Mohamud's statements, the Court has accepted the government's representation that no further material exists.  CR 127 at 3.  Again, the defense has established the likely existence of such material, especially in relation to potential surveillance of Mr. Mohamud's computer activity.  Disclosure of the fruits of such surveillance, as well as potential suppression based on unconstitutional activity, remains at issue.

- **Use Of Government Informants And Other Agents And Operatives:**  The Court has ordered disclosure of background information, including training and experience, of all government agents in contact with Mr. Mohamud.  CR 127 at 3.  The defense anticipates receiving such material in relation to UCE1 and UCE2.  However, the defense continues to believe that relevant material exists with respect to informants and other government agents, both in-person and on-line.  As noted in a previous pleading, the defense is also concerned that government agents have assumed the identity of others and communicated with Mr. Mohamud under that guise.  Second Ex Parte Statement In Support Of Discovery Motions at 13.  This concern is heightened by the government's apparent selective omission of IP addresses in certain emails – a practice likely done with informants who send emails, as shown by the lack of an IP address on any Bill Smith communication.  The Court should require the government to make a searching inquiry for materials related to other informants and agents, and order any such material produced.

- **Impeachment Evidence:**  The defense anticipates that the government will provide impeachment evidence for each of its witnesses, including information related to any witness's status as an informant or source for the government and material relating to mental illness or prior acts involving dishonesty or false statement.

- **Information About Mr. Mohamud's Placement On The No-Fly List:**  The government has apparently represented that it has no material regarding Mr. Mohamud's placement on the no-fly list.  CR 127 at 4.  Obviously, the government has such material – because it creates and maintains the list – but is withholding the information.  Given that the no-fly incident, which prevented Mr. Mohamud from gainful employment and set the stage for the sting operation, is part of the inducement in this case, and given that the lead case agent could not recall whether he was involved in placing Mr. Mohamud on the list (Trans. of Sept. 26, 2012, Hr'g at 23), the defense continues to believe the material should be produced.

E.    **CIPA And FISA Issues**

This case involves issues under both the Classified Information Procedures Act (CIPA) and the Foreign Intelligence Surveillance Act (FISA).  On June 22, 2011, the defense filed a motion to disclose and suppress material obtained pursuant to FISA (CR 54, 55).  On February 3, 2012, the initial memorandum was supplemented with additional citations and authority (CR 72).  The government filed its opposition on March 8, 2012, to which the defense replied on March 27, 2012 (CR 94).  The Court heard argument on the motion on April 17, 2012, and entered a written order denying the FISA motion on May 7, 2012 (CR 108, 126).

After its initial disclosure, the government has submitted eight packets of material *ex parte* to the Court:

- April 18, 2011, CR 35

- January 11, 2012, CR 65

- February 21, 2012, CR 76

- February 28, 2012, CR 81

- March 16, 2012, CR 92

- May 11, 2012, CR 128

- July 6, 2012, CR 155

- August 23, 2012, CR 176

On June 18, 2012, the defense filed a motion for CIPA rulings and disclosures (CR 143), along with a sealed supplement (CR 147).  The government filed its response on July 10, 2012, to which the defense replied on July 17, 2012 (CR 157, 160).  On September 20, 2012, the defense filed a sealed supplement regarding CIPA (CR 186).  On the same day, the defense filed objections to

forms submitted for proposed CIPA rulings submitted by the government (CR 187).  On October 2, 2012, the Court entered an opinion granting in part and denying in part the request for CIPA rulings and disclosures.  On October 9, 2012, the Court entered three orders regarding disclosure of CIPA material (CR 204, 205, 206).  Mr. Mohamud anticipates filing a pretrial notice pursuant to CIPA § 5.

**F.    Issues Related To Jury Selection Given Pretrial Publicity And Potential For Unfair Prejudice**

This case involves many factors that require a range of measures to minimize the danger of an unfair trial.  The nature of the charge alone creates the danger that jurors will look no further than the undisputed acts to foreclose meaningful deliberation on the entrapment defense.  The identity of the defendant – a young African-born, Muslim black man – creates a potential for unfair treatment by jurors on the basis of deep-seated and widely held prejudices.  Further, this case has been the subject of vast publicity since Mr. Mohamud's arrest.  Upon Mr. Mohamud's arrest, the government immediately issued a press release that included a link to the 36-page complaint in support of the arrest warrant.  The complaint was necessarily one-sided, with the inevitable effect of influencing public opinion in favor of the government.  The government's public case was bolstered by statements by then-United States Attorney Dwight Holton condemning Mr. Mohamud and praising the government agents.  CR 14-1 at 2.  The Attorney General himself improperly commented on the merits of the case in a statement that the *Oregonian* newspaper repeated in a three-column editorial.  CR 14 at 3 and CR 21-1.  This Court found that three statements by the Attorney General were highly prejudicial, serving no legitimate law enforcement function, and should not have been made.  CR 24 at 8.

These statements and the extensive media coverage of them cannot be undone.  The only way to mitigate the effect of the pretrial publicity on the actual jurors selected is to put into effect a range

of measures.  The Court should approve the defense-proposed written questionnaire, authorize extensive attorney-conducted voir dire to follow broad court-conducted voir dire, permit voir dire of individually sequestered jurors for those who express reluctance to speak publicly, and authorize six additional defense peremptory challenges.

### 1.      Questionnaire

As an initial matter, the government agrees with the defense that a detailed written questionnaire is an appropriate and efficient means of beginning the juror selection process, especially given the need for an unusually large panel necessitated by the likelihood that a substantial number of jurors will be excused.  Because jurors may hesitate to publicly reveal information about their own biases and prejudices, or may have difficulty acknowledging to themselves that they have such biases, courts have recognized that a juror's public self-assessment should not stand alone.  *See Silverthorne v. United States*, 400 F.2d 627, 639 (9th Cir. 1968) ("But whether a juror can render a verdict based solely on evidence adduced in the courtroom should not be adjudged on that juror's own assessment of self-righteousness without something more.").

The questionnaire will elicit useful information, especially from those who might have difficulty volunteering potentially embarrassing information in front of their peers.  *See* Dale W. Broeder, *Voir Dire Examinations:  An Empirical Study*, 38 S. Cal. L. Rev. 503, 528 (1965) (observing that jurors often answer untruthfully when questioned about biases) (cited with approval in *Groppi v. Wisconsin*, 400 U.S. 505, 510 (1971)).  In post-9/11 America, in which the topics regarding Islam and terrorism are highly charged, the allegations in this case make it exceptionally difficult to find untainted jurors who can both presume Mr. Mohamud's innocence and fairly consider a nuanced entrapment defense.

The parties have agreed to exchange proposed questionnaires and submit disagreements to the Court. The defense requests that the Court schedule the jury panel to come to court before the trial date to complete the questionnaire in the jury assembly room. This procedure will assure the proper solemnity and focus for completion of the questionnaire and allow the parties to suggest to the Court jurors who need not return for the rest of the jury selection process. The detailed written questionnaire provides an efficient and effective way of beginning the juror selection process.

### 2.    Court-Conducted Voir Dire

At the outset of the voir dire, the defense requests that the Court conduct open-ended and probing questions of individual jurors. Because the scope of the questionnaire has not been determined, the parties agree the proposed questions for Court-conducted voir dire should be submitted after the questionnaire is finalized.

The voir dire of the remaining panel should include inquiry into potential jurors' racial prejudices where (1) the defendant is accused of a violent crime and he and the victim are of different racial or ethnic groups, or (2) "'external circumstances of the case indicate a reasonable possibility that racial or ethnic prejudice will influence the jury's evaluation of the evidence.'" *United States v. Sarkisian*, 197 F.3d 966, 979 (9th Cir. 1999) (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 192-93 (1981)). In our post-9/11 nation, potential and unspoken prejudices against a Muslim defendant accused of a terrorism-related act are uniquely virulent and commonplace. Even people who would condemn racial profiling of African-Americans or other minority group members often conclude that such profiling is warranted in the case of those from the Middle East. *See generally* Stephen J. Ellman, *Racial Profiling and Terrorism*, 46 N.Y. L. Sch. L. Rev. 675 (2003). A recent survey showed that 40 percent of Americans believe that Islam is more

likely than other religions to encourage violence, and nearly half of Americans believe Islam is incompatible with American values.[1]

Because this case involves evidence regarding Islamic extremism and radical political sentiment, racial or ethnic prejudice is almost certain to influence a number of potential jurors. Furthermore, this case presents the specter of terrorism – an extremely sensitive and emotionally charged issue that is a ubiquitous topic of media concern.  Especially in the context of the inappropriate public comments and pretrial publicity, *Rosales-Lopez* requires particularly searching voir dire to avoid seating jurors who have prejudged the matter, or who may harbor unconscious or conscious biases against Muslims, those of African descent, or both.

Open-ended and indirect questions are critical to the process of court-conducted voir dire that can illuminate prospective jurors' true attitudes on the issues before them.  *Cf. State v. Williams*, 550 A.2d 1172, 1182 (N.J. 1988) (noting that "use of open-ended questions" in capital voir dire is "most likely to provide counsel and the court with insight into jurors' opinions and biases").  The defense will provide particular proposed Court-conducted voir dire questions once the Court approves the form of the written questionnaire.

### 3.    Attorney-Conducted Voir Dire

After Court-conducted voir dire, the defense requests that the Court exercise its discretion under Rule 24(a) of the Federal Rules of Criminal Procedure to allow extensive counsel-conducted

---

[1] *See Continuing Divide In Views Of Islam And Violence*, PEW RESEARCH CENTER (Mar. 9, 2011), http://pewresearch.org/pubs/1921/poll-islam-violence-more-likely-other-religions-peter-king-congressional-hearings; *What It Means To Be An American: Attitudes In An Increasingly Diverse America Ten years After 9/11*, THE BROOKINGS INSTITUTION AND THE PUBLIC RELIGION RESEARCH INSTITUTE  (Sept. 6, 2011),  http://www.brookings.edu/research/reports/2011/09/06-american-attitudes.

voir dire.  While Court-conducted voir dire is an essential step in the process of probing juror attitudes, the Court should partner its authoritative inquiry with detailed follow-up for those jurors who might be more open when questioned by counsel for the parties.  *See* Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection:  The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions*, 4 Harv. L. & Pol'y. Rev.149, 160 (Winter 2010) ("As a district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can 'be fair.'").

By combining Court and attorney-conducted voir dire, the process is more likely to accomplish its purposes in a case fraught with risks of unfairness.  Counsel are also deeply familiar with the issues in the case and thus will be able to follow-up on matters that the Court would not identify as areas of risk.  Especially in assuring intelligent exercise of peremptory challenges and isolating bases for challenges for cause, this case requires much more attorney involvement than is normal.  *See* Maureen A. Howard, *Taking the High Road:  Why Prosecutors Should Voluntarily Waive Peremptory Challenges*, 23 Geo. J. Legal Ethics 369, 378 n. 44 (Spring 2010) ("[A]pproximately 54 [percent] of judges reported they allowed some questioning by attorneys in criminal cases: 29 [percent] conducted the initial questioning and then allowed follow-up questioning by the attorneys, 18 [percent] allowed extensive time for follow-up questioning by the attorneys, and approximately 7 [percent] allowed counsel to conduct most or all of the voir dire.").  The defense respectfully requests that the Court authorize extensive attorney-conducted voir, together with a written questionnaire and Court-conducted voir dire, to discover and to guard against illegitimate bias or taint in this highly charged case.

**PAGE 35   DEFENSE TRIAL MEMORANDUM**

### 4.      Sequestered Questioning

The Court should facilitate sequestered voir dire for individual jurors who express reluctance to answer questions before the rest of the panel.  Individually questioning jurors separately for voir dire serves the same purposes as having the jurors privately fill out a written questionnaire – jurors are more likely to answer honestly if they are not required to volunteer potential embarrassing information in a room full of people.  The Court should also be alert to the risks of questioning potential jurors about their knowledge of pretrial publicity before the entire venire.  *See King v. Lynaugh*, 850 F.2d 1055, 1068 (5th Cir. 1988) ("[W]hen the record reveals a significant possibility that pretrial publicity has prejudiced the venire, the district court is obligated to conduct individual voir dire to assure impartiality.").  This highly publicized and emotionally charged case presents the circumstances under which individualized and sequestered voir dire may be required to guard against extraordinarily high risks of illegitimate prejudice and prejudgment of the issues.

### 5.      Extra Defense Peremptory Challenges

This Court has discretion to grant additional peremptory challenges in cases involving sensitive subject matter and highly charged issues.  *See Rosales-Lopez v. United States*, 451 U.S. 182 (1981) (discussing broad discretion of trial court in voir dire process); *United States v. Springfield*, 829 F.2d 860, 864 (9th Cir. 1987) (in a single defendant case the court held that "the award of additional peremptories is not mandatory, but permissive, and rests in the trial court's sound discretion").  Allowing the defense six extra peremptory challenges will render the process more fair and help offset the risks of unfair prejudice caused by the government's unlawful pretrial publicity as well as the emotionally charged and culturally complex issues presented by the allegations against Mr. Mohamud.

The extra peremptory challenges should be viewed as a complement to, not a substitute for, the requested questionnaire and voir dire. "Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). "Voir dire provides a means of discovering actual or implied bias and a firmer basis upon which the parties may exercise their peremptory challenges intelligently." *J.E.B. v. Alabama*, 511 U.S. 127, 143-44 (1994). "The principal value of the peremptory is that it helps produce fair and impartial juries." *Id.* at 147 (O'Connor, J., concurring). In other words, the full effect of voir dire is achieved only if the Court and parties can ensure that biased jurors are not empaneled. In a case such as this one, involving sensitive subject matter and highly charged issues, additional peremptory challenges are necessary to provide the best chance for a fair jury.

Dated this 23rd day of October, 2012.

*/s/ Stephen R. Sady*
Stephen R. Sady
Chief Deputy Federal Public Defender

*/s/ Steven T. Wax*
Steven T. Wax
Federal Public Defender

**PAGE 37    DEFENSE TRIAL MEMORANDUM**