1      IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF OREGON

3              PORTLAND DIVISION

4

UNITED STATES OF AMERICA,        )

5                                 )
                    Plaintiff,    )   Case No. 3:10-CR-475-KI
6                                 )
                 v.               )
7                                 )   January 25, 2013
MOHAMED OSMAN MOHAMUD,            )
8                                 )
                    Defendant.    )   Portland, Oregon
9    _____)

10

11

12

13                  **TRIAL - DAY 10**

14                 **AFTERNOON SESSION**

15              TRANSCRIPT OF PROCEEDINGS

16        BEFORE THE HONORABLE GARR M. KING

17        UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

1                        APPEARANCES

2   FOR THE PLAINTIFF:    Pamala R. Holsinger
                          Ethan D. Knight
3                         Ryan W. Bounds
                          Assistant United States Attorneys
4                         United States Attorney's Office
                          1000 SW Third Avenue
5                         Room 600
                          Portland, OR 97204
6
    FOR THE DEFENDANT:    Steven T. Wax
7                         Public Defender
                          Stephen R. Sady
8                         Lisa Hay
                          Deputy Public Defenders
9                         Federal Public Defender's Office
                          101 SW Main
10                        Suite 1700
                          Portland, OR 97204
11

12  ALSO PRESENT:         Ryan Dwyer
                          Susan Cooke
13                        Nicole Ciccarello
                          Mark Ahlemeyer
14

15  COURT REPORTER:       Jill L. Erwin, CSR, RMR, CRR
                          Certified Realtime Reporter
16                        Registered Merit Reporter

17                        United States District Courthouse
                          1000 SW Third Avenue, Room 301
18                        Portland, OR 97204

19                        (503)326-8191

20                            *   *   *

21

22

23

24

25

1936

1                              INDEX

2    PLAINTIFF'S WITNESSES:

3    JEREMY SPRINGER

4    Direct Examination by Ms. Holsinger          1943

5    Cross-Examination by Mr. Wax                 1967

6    Redirect Examination by Ms. Holsinger        1981

7    Recross-Examination by Mr. Wax               1983

8    EVAN KOHLMANN

9    Direct Examination by Mr. Knight             1990

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1    DEPUTY COURTROOM CLERK:  All rise.

2    THE COURT:  All right.  Good afternoon.  Now, as
3 we finished this morning, Mr. Wax raised an issue about 403
4 problems with an exhibit.  Have you offered the exhibit at
5 this point?

6    MS. HOLSINGER:  Yes, Your Honor, we offered 240-1
7 and 240-2, which are two very -- less-than-a-minute videos.
8 The Court I believe admitted those into evidence just prior
9 to the break.

10   THE COURT:  Right.  And those two videos were
11 found within the computer of the defendant in this case; is
12 that correct?

13   MS. HOLSINGER:  That is correct, and that is what
14 the witness has already testified to.

15   THE COURT:  All right.  Mr. Wax, you are saying
16 that the prejudice of these videos outweighs the probative
17 value?  You're making an argument under 403; is that
18 correct?

19   MR. WAX:  Yes.

20   THE COURT:  All right.  Now, I don't know how many
21 of these you have, but if you make a 403 argument, I have to
22 stop and I have to look at these materials, and I have to
23 take a -- or make a decision on it.  How many of the 403
24 arguments are you going to make at this point?  In other

1   words, do we try going through, or do we just take them one

2   by one?

3        MR. WAX:  I don't believe there are any other

4   specific 403 arguments on this particular set of exhibits.

5        THE COURT:  All right.

6        MR. WAX:  In addition to 403, I mean, we do also

7   argue they're cumulative, but in terms of response to your

8   question, these two are what we are objecting to.  There is

9   one other objection to a number of the exhibits that are

10  coming up that is based on a lack of foundation that may

11  make more sense to take up out of the presence of the jury

12  so that the exhibits are not discussed in front of the jury.

13       The issue, Judge, is that there are a number of GIF

14  banners that are coming up in the 262 series.  Those are --

15  well, it looks like a banner.  It's in Arabic.  It has some

16  music and stuff like that.

17       The issue that we have with that is while they're found

18  on the computer, as we understand the way in which computers

19  work, the Government cannot establish anything more than

20  they were found on the computer.  And with respect to these

21  particular types of items, our understanding is that if, for

22  example, you do a Google search, every item on the page that

23  comes up on your computer will be downloaded onto the

24  computer whether you are clicking on that item or not, so

25  that if there are -- if you type in, just as an example, the

1   word "wrench," Google could give you wrench, a Home Depot

2   add; Google could give you wrench, an article from

3   *The Oregonian* on a homicide committed with a wrench, et

4   cetera.   So I don't think they can establish a sufficient

5   link to the client having acted intentionally or even ever

6   seeing these items.

7       So the mere fact that they're on the computer, we

8   submit, is proof of nothing, and I guess in that sense I am

9   saying 403 -- you know, the prejudice outweighs the

10  probative value, because the probative value is so minimum.

11          THE COURT:  Well, is it admissible, though?

12          MR. WAX:  Well, if there is no connection to the

13  client, then it seems, to me -- if there's an insufficient

14  connection, then it seems, to me, it's not admissible.

15          THE COURT:  We'll take up the admissibility first,

16  and I'll make a decision as to whether it's admissible.  And

17  if you're going to argue as part of your argument on -- they

18  haven't laid a foundation, then you can make that argument

19  at that time, the relative probative value of that.

20      But it's a two-stage thing.  Admissibility and then a

21  question of prejudice outweighing probative value.  You've

22  kind of thrown probative value in there as an element of

23  admissibility, which I'm not sure that that's appropriate.

24      But, in any event, you can make your argument.

25          Now, I have, with 241 and 242, those both have

1   substantial probative value, and I'm going to receive them.

2       So you're ready to proceed with those -- the showing

3   video on that?

4           MS. HOLSINGER:  We are, Your Honor.  And I don't

5   think taking the time outside the presence of the jury is

6   appropriate with this witness on these 262 exhibits.  And if

7   I could explain to the Court what they are, they are GIF

8   images, and the only thing the witness is going to say --

9   they're banners -- that is that they are essentially in the

10  browser cache in the remnants of a site visited.  They are

11  on his computer, but they are clearly relevant and probative

12  in that they relate to Al Sahab Media, which is the al-Qaeda

13  media wing, and evidence of videos, including *Rappeling the*

14  *Aggression*, which is in the defendant's computer, and other

15  al-Qaeda videos.

16      There are -- they relate to those items.  And all the

17  witness is going to say is these are remnants of a website

18  visited.  The defense could argue and certainly ask the

19  witness, "We don't know if he downloaded or clicked on

20  anything," but the fact that they're remnants of a website

21  visited, that's an al-Qaeda media outlet, is probative.

22          THE COURT:  Well, you're arguing that now.  In my

23  view, we'll take these up one at a time.  The problem is

24  with a 403 motion, I've got to stop and look at that

25  material at that point in time and make that decision, and I

1    don't want to do that and have the jury waiting during this

2    time.

3        So let's take it step by step when we get to those

4    exhibits.  What you can do is go ahead and identify them and

5    you can offer them.

6        If they object, I'll find out what the basis for the

7    objection is.  If 403 is the basis, then I'm going to have

8    to figure out what to do to satisfy my requirements under

9    403.

10            MS. HOLSINGER:  Very good.  They are the next

11    exhibits after the 240.

12            THE COURT:  Let's go ahead with it.  I know

13    Mr. Wax would like to do this outside the presence of the

14    jury, and I'll have to decide whether we do.  But you'll

15    have to be very specific, Mr. Wax, as to your objection,

16    whether there's any basis for arguing they are not

17    admissible other than 403, because 403, I think, is the

18    second step in making a decision.

19            MR. WAX:  I appreciate that, Your Honor.  Perhaps

20    if the Court reserves on admitting them until I've had an

21    opportunity to cross on them, it might make the most sense,

22    and at the end of the cross, you rule, and the Government

23    either gets to show them or not.

24            THE COURT:  Yeah.  You can either cross or ask to

25    inquire in leave of objection if you want.

 1          MR. WAX:  Thank you.

 2          THE COURT:  We'll wait until we get to that point.

 3          MS. HOLSINGER:  Just for the Court's assistance,

 4   the Government Exhibit -- summary exhibit 243, the exhibits

 5   are listed and -- as 262-1 and they go through to 262-9, and

 6   the description of each of those files is listed on that

 7   exhibit, and that's what the witness will testify to.

 8          THE COURT:  Let me see if I've got them back here.

 9   They're here?

10          THE LAW CLERK:  Right here.

11          THE COURT:  Good.  All right.  In the exhibit list

12   I have those materials.  It's fortunate.  The binders and

13   the materials back there are too big for me to lift, so I'll

14   work with this.

15      All right.  Let's bring the jury in.

16          (The jury panel enters the courtroom.)

17          DEPUTY COURTROOM CLERK:  I'll remind you you're

18   still under oath.

19          THE COURT:  Good afternoon, members of the jury.

20   Sorry to keep you waiting.  We did have a couple of legal

21   things to take care of, which we have hopefully done at this

22   point, and so we'll now continue with the testimony.

23      Ms. Holsinger?

24          MS. HOLSINGER:  Thank you, Your Honor.

25

Springer - D

1            DIRECT EXAMINATION

2   BY MS. HOLSINGER:

3   Q.   Sir, when we left off, we spoke about 240-1 and 240-2,

4   which you described as videos that were downloaded and

5   located in the computer on the downloads folder there.  Do

6   you recall that?

7   A.   I do, yes.  The downloads directory is a little bit

8   different listing these files here.  The path -- reviewing

9   the path on this, if we go through users, Mohamed, video

10  RealPlayer, downloads.  This signifies, to me, that the file

11  it was downloaded with is a different application called

12  RealPlayer Media.

13  Q.   So they're on the computer?

14  A.   They're on the computer, yes.

15  Q.   Have you reviewed those videos previously?

16  A.   Yes, I have.

17  Q.   We'll go ahead and show the jury 240-1.  In terms of

18  the length, is it less than a minute long?

19  A.   Yes, they are.

20           (Video Exhibit 240-1 played for the jury.)

21            MS. HOLSINGER:  And Exhibit 242-2.

22           (Video Exhibit 240-2 played for the jury.)

23  BY MS. HOLSINGER:  (Continuing)

24  Q.   Mr. Springer, the next exhibits we're going to go to

25  are marked as Government's 262-1 through 262-9.  In terms of

Springer - D

1    the exhibits, you can see the chart on the screen there?

2    A.    Yes.

3    Q.    First of all, tell us what these exhibits are.

4    What -- in terms of a file or what is it?

5    A.    Okay.  These are -- these are GIF images.  And GIF

6    stands for graphic interchange format.  It's a compressed

7    image format that's typical of websites.  You would see GIF

8    banners.  A lot of times you see GIF files in animation form

9    where they morph or change -- they change images, they

10   rotate, they cycle through a certain -- you can take video

11   and turn it into a GIF -- a video clip and turn that clip

12   into a GIF image that's animated, so it loops through

13   itself, displaying whatever it is displaying.  And these are

14   files that you would typically find, you know, on a

15   website -- website type.

16   Q.    They're -- all those exhibits are GIF images --

17   A.    Yes.

18   Q.    -- or graphic interchange format?

19   A.    That's correct.

20   Q.    Which is meant to be some kind of moving thing you

21   would see on a website.

22   A.    There are some animated; there are some that are still.

23   But, yeah, it's either/or.

24   Q.    And where are these -- where were these exhibits found

25   on this computer?

Springer - D

1   A.   The file path, if you --

2   Q.   Before you go to each one of them, I want to talk

3   generally where these are located in the computer.

4   A.   Okay.   These are located in the -- there's a cache

5   folder underneath the users Mohamed directory.   Do you want

6   me to go through the whole path?

7   Q.   No.

8   A.   No?   Oh, sorry.

9   Q.   Sorry, I'm not being clear.   It's in a cache folder?

10  A.   It is, yes.

11  Q.   And what does it -- how does a GIF image get onto the

12  cache folder of a computer?

13  A.   Okay.   On an initial visit to a website, those images

14  are downloaded.   We discussed earlier about cache and what

15  browser cache is, is when you visit a website, basically a

16  copy of that website is being downloaded to your local cache

17  folder.   So then on any subsequent visits, the machine looks

18  locally and will -- looks locally at a copy of that

19  previously visited site, and the page will load from the

20  local copy.   No download was necessary.

21  Q.   So what does it forensically tell you about this

22  computer to have the GIF image located -- to find a GIF

23  image?

24  A.   That would tell me that that particular website that

25  was posting or viewing -- showing that GIF image was

Springer - D

1    visited.

2    Q.   Going to -- back to 243, the summary chart, which

3    identifies all nine of those GIF images, can you tell us,

4    first, 262-1 -- oh, Mr. Wax is going to object here.

5         MR. WAX:  Yes.  May I have some questions in aid

6    of objection to determine whether we would be objecting?

7         THE COURT:  Yes, you may.  Well, excuse me.  If

8    she offers it, at that point you can question in aid of

9    objection.  I want you to defer your questions until she

10   gets to that point.

11        MR. WAX:  Thank you.

12      I assume this is not being shown to the jury then at

13   this point.

14        THE COURT:  No, it won't be shown to the jury

15   until it's offered.

16        MS. HOLSINGER:  The actual GIF image is not being

17   shown to the jury, Your Honor.  This chart and the summary

18   chart, 243, which lists what the GIF image is, the chart is

19   in front of the jury.

20        THE COURT:  Okay.  Has it been received?

21        MS. HOLSINGER:  Yes, it has, Your Honor.

22        THE COURT:  Then it's in front of the jury, okay.

23   BY MS. HOLSINGER: (Continuing)

24   Q.   So can you tell us the specific description of this GIF

25   image banner identified in 262-1?

Springer - D

```
 1    A.    From the description column there, the -- it says
 2    animated GIF banner image, advertisement for As-Sahab Media
 3    video titled Nights of Corizan, martyrdom operation of the
 4    Marij al base.
 5    Q.    And you indicated before that was in essentially the
 6    Internet cache?
 7    A.    Internet cache for the Mozilla Firefox browser, yes.
 8    Q.    Were you able to determine a creation date or the last
 9    time that that image hit that computer?
10    A.    Yes, it appears that the download -- the date of
11    November 25th of 2010 appears to be the creation date of
12    that.
13    Q.    Going to 262-2, that is, again, another GIF banner from
14    a website visited?
15    A.    Yes.
16    Q.    And what is the description of that particular GIF
17    banner located in the browser cache?
18    A.    Description here is animated GIF banner image.
19    Advertisement for an English subtitled version.  An As-Sahab
20    Media video titled Whoever Prepares a Fighter has
21    Participated in the Fight.
22    Q.    And, again, the location is the same in the browser
23    cache of the computer?
24    A.    Yes.
25    Q.    And the -- or the creation date for that particular GIF
```

Springer - D

1  banner was what?

2  A.   It appeared, yeah, November 25th, 2010.

3  Q.   Moving to 262-3, this particular GIF image banner, what

4  is the description of that item found on the defendant's

5  computer?

6  A.   The description is a GIF image.  It's -- *Rappeling the*

7  *Aggression* is -- the advertising video *Rappeling the*

8  *Aggression*.

9  Q.   And does that indicate the creation date for that GIF

10  image on that computer?

11  A.   Yes.  November the 25th, 2010, yes.

12  Q.   Going to 262-4, can you identify the description of

13  this GIF banner image that was found on the computer?

14  A.   The description there states advertising in English

15  translation of an AQAP, title -- statement titled.

16  *Statement Regarding the Lies of the Government on the Recent*

17  *Arrest*.

18  Q.   And, again, that was what -- what's the creation date

19  for that particular GIF banner image?

20  A.   Creation date is November 25th, 2010, as well.

21  Q.   Going to 262-5, can you please identify the description

22  of this GIF banner that was located on the defendant's

23  computer?

24  A.   The description listed here is advertising the Al

25  Shabaab video and inspire the believers with the creation

1949

Springer - D

1   date of 11/25/2010.

2   Q.    And also located in the browser cache of the computer?

3   A.    Yes.   That's correct.

4   Q.    Going to 262-6, can you identify the description of

5   this GIF banner image located on the computer?

6   A.    This listed here is advertising *Inspire* magazine on

7   Operation Hemorrhage.   Same file path as before.   The

8   Mozilla Firefox, Mozilla Firefox browser cache, with the

9   creation date of November 25, 2010.

10   Q.    Going to 262-7, what is the description of this GIF

11   banner image?

12   A.    This GIF is advertising an English translation of the

13   video by the Lord of the Ka'aba.   I Have Succeeded.   Part 1.

14   Q.    And also located in the browser cache in the

15   defendant's computer?

16   A.    Yes.

17   Q.    Creation date?

18   A.    November 25, 2010.

19   Q.    Going to 262-8?   What is the description of this GIF

20   banner image?

21   A.    The description here is advertising in the English

22   translation of the video *Together to Topple the House of*

23   *Saud,* and --

24   Q.    This also has the same -- located in the same place in

25   the computer with the same creation date?

Springer - D

1   A.    Yes, that's correct.

2   Q.    And 262-9.   What is this GIF banner image?

3   A.    The -- all that's listed here is the actual

4   title -- the name of the file.   It's 1D7E5715D01.

5   Q.    And is this located in the same location?

6   A.    Yes, it is.

7   Q.    And creation date is the same?

8   A.    Creation date is the same.   November 25th of 2010.

9   Q.    And in terms of these GIF banner images, you indicated

10  there what you could tell forensically was that computer

11  visited a site and then it stored that on the computer?

12  A.    That's correct, yes.

13  Q.    In the Internet cache or the browser cache?

14      Can you tell much more about what the user of the

15  computer did once they got to the site?

16  A.    You really -- you really can't.   Yeah, there's not much

17  more I can say about that, other than the site was visited

18  and the files were downloaded from that site.

19          MS. HOLSINGER:   Your Honor, I would move in 262-1

20  through -9.

21          THE COURT:   262-1 through 262-9 are offered.

22      Now, you've indicated to me that the summary has been

23  received.

24          MS. HOLSINGER:   That's correct, Your Honor.

25          THE COURT:   All right.   What you want to

Springer - D

1    offer -- are you offering something specific?  A banner?

2            MS. HOLSINGER:  Yes, Your Honor.  We have the GIF

3    banner images, but they are -- they're something you have to

4    play on the computer.  They're digital, so they fill in like

5    they would if you were on the website.

6            THE COURT:  Counsel, they've been offered.  What's

7    your position?

8            MR. WAX:  Yeah, I object, and I would like to ask

9    some questions in aid of objection.

10           THE COURT:  You can question in aid of objection.

11   Go ahead.

12           MR. WAX:  Thank you.  Mr. Springer?

13           THE WITNESS:  Yes.

14           MR. WAX:  If I understand correctly, you have

15   identified all but the last one of these items as an

16   advertisement?

17           THE WITNESS:  That's correct, yeah.

18           MR. WAX:  Now, just so that we can orient

19   ourselves, when one clicks on the website, many websites

20   have advertisements that are running automatically?

21           THE WITNESS:  Yes, that's correct.

22           MR. WAX:  All right.  So if, for example, I were

23   to click on Google and type in a Google search -- I don't

24   know if Google actually has ads in that way -- but a website

25   that has ads, if I clicked on a Home Depot site, they might

Springer - D

1    have stuff running on a Home Depot site?

2              THE WITNESS:  Yes, that's correct.

3              MR. WAX:  And when a web page comes up, sometimes

4    there are portions of the page that's coming up that one can

5    see, but there might be other items that one would have to

6    scroll down to, toward the bottom of the page, that wouldn't

7    actually be visible on the screen; correct?

8              THE WITNESS:  That's correct, yes.

9              MR. WAX:  Okay.  And now the way in which these

10   ads work -- let me see if we can understand this -- whether

11   or not a person clicks on the advertisement, the computer

12   will automatically download the item to your computer?

13             THE WITNESS:  That's correct.  That

14   initial -- that initial page would -- remnants of that page

15   would download locally to the cache.  That is correct.

16             MR. WAX:  And so an advertisement, a GIF

17   advertisement, will appear on your computer whether you

18   click on the advertisement or not?

19             THE WITNESS:  Yes, that's correct.

20             MR. WAX:  Okay.  In terms of the way in which the

21   computers work, is it the case that when one goes to a

22   website there can, at times, be many items that are listed

23   or embedded -- I don't know the exact words -- on that site

24   that will automatically be downloaded to your computer

25   whether you look at them or not?

1953

Springer - D

1    THE WITNESS:  Yes, that's correct.

2    MR. WAX:  Okay.  So just with something that many

3  people would be familiar with, for example, if a person

4  types a search into Google, types in the word "wrench," you

5  get a list of responses to your term "wrench."  Okay?  Are

6  you with me so far?

7    THE WITNESS:  Yes.

8    MR. WAX:  So one might be, for example, a hardware

9  store advertising wrenches, and there could be an entry for

10 that.  Are you with me?

11    THE WITNESS:  I'm with you, yes.

12    MR. WAX:  Next line could perhaps be an article

13 from a newspaper about a crime that was committed with a

14 wrench; correct?

15    THE WITNESS:  Uh-huh.

16    MR. WAX:  Another line could be an advertisement

17 or an entry from an auto mechanic with wrenches; correct?

18    THE WITNESS:  That's correct.

19    MR. WAX:  All right.  So regardless of which, if

20 any, of those sites a person actually clicks the mouse on,

21 once that Google page appears on your screen, there will be

22 an image of all of those sites stored in the cache?

23    THE WITNESS:  Just -- I want to make sure I'm

24 following you.  When you're referring to sites -- so

25 we -- are you -- had we traversed through multiple sites or

1954

Springer - D

1    are we on one initial page?

2              MR. WAX:  I used the wrong phrase.  There would be

3    an image of each of those lines, those entries, on the

4    Google page.  Those would all be downloaded onto your

5    computer?

6              THE WITNESS:  Yes.  From the -- if we're talking

7    about one initial page, that's correct.  Whatever is on that

8    initial page that was visited will be downloaded into the

9    local cache folder.

10             MR. WAX:  Okay.  And if a person goes on to a

11   website and is reading an article on the website, as one

12   scrolls through the article, it is often the case that there

13   are multiple images and advertisements on different portions

14   of the article that one is scrolling through on the

15   computer?

16             THE WITNESS:  Yes, that's --

17             MR. WAX:  Correct?

18             THE WITNESS:  -- that's correct, yes.

19             MR. WAX:  So that as a person scrolls through one

20   article, there could be five, ten, 50, or more, different

21   images that are being automatically downloaded onto the

22   computer?

23             THE WITNESS:  That's correct, yeah.  It's very

24   possible, yeah.

25             MR. WAX:  In terms of these exhibits, there is no

Springer - D

1    way for you to determine whether their presence on the

2    computer was the result of an intentional click by Mohamed

3    on any one of these banners, as opposed to the type of

4    automatic downloading that the system does whether or not

5    one clicks?

6            THE WITNESS:  That's correct.

7            MR. WAX:  Okay.  If all that is correct, then is

8    it not also correct that in looking at the total number of

9    images on a computer -- for example, these types of GIFs in

10   Exhibit 262 -- they can give a distorted picture of the

11   actual intentional activity of the computer user?

12           THE WITNESS:  Could I -- could I see the list?

13           MR. WAX:  Well, it's the exhibit we've been going

14   through.  262.

15           THE COURT:  He can see it.

16           MR. WAX:  Yeah, I don't have it in front of me.

17   If Ms. Cooke can put it up on the screen --

18           THE WITNESS:  Restate your question, if you would,

19   please.

20           MR. WAX:  Sure.  I think you told us you have no

21   way to know whether these items in 262 were appearing on the

22   computer as a result of any intentional action by Mohamed in

23   clicking on any of these images.

24           THE WITNESS:  I think I would have to look

25   at -- what it appears, to me, if I were to -- if I were to

Springer - D

1   focus in on the creation date of these files, what it

2   appears to me -- if you could -- could you scroll up,

3   please, on the spreadsheet?  I want to get a better --

4           MR. WAX:  Let me direct your attention to one

5   piece that has not yet been mentioned.  Look at the creation

6   times and modified and last accessed.  For each of these,

7   it's either 12 -- 11/25, November 25, at either 12:16 or

8   12:17 p.m.?

9           THE WITNESS:  That's correct.

10          MR. WAX:  So we're not seeing here any gaps of

11  time between the creation, the modification, and the last

12  access, among these images, except for one minute; correct?

13          THE WITNESS:  That's correct.

14          MR. WAX:  Now, is that also relevant in attempting

15  to assess whether or not a person has intentionally clicked

16  on and downloaded nine separate items?

17          THE WITNESS:  Right.  There would be no way to

18  tell if -- if it was an intentional click or if one site was

19  visited and all these -- all these banners were on the site,

20  you know, so, yeah, it's difficult to tell, yes.

21          MR. WAX:  Your Honor, then I would object to their

22  admission as to having no foundation.

23          THE COURT:  I'm going to let Counsel examine

24  further on this question, and then we'll decide it.

25      Go ahead.

1  BY MS. HOLSINGER: (Continuing)

2  Q.   Sir, is what you can tell from these GIF images is that

3  a website was visited that had these advertisements for

4  al-Qaeda videos?

5  A.   That's correct, yes.

6  Q.   And one of the advertisements of the website visited

7  was *Rappeling the Aggression*?

8  A.   Yes.  Yes, that's correct.

9  Q.   And the video *Rappeling the Aggression* was in his

10 computer that you found; correct?

11 A.   Uhm --

12 Q.   The zip file?

13 A.   The compressed RAR files, yes.

14 Q.   So he went to a website where they advertised al-Qaeda

15 videos, and they're listed as a GIF, and he actually

16 downloaded at least one?

17 A.   Yes, that's what it appears, yes.

18        MS. HOLSINGER:  That's all the questions I have on

19 that particular exhibit, Your Honor.

20        THE COURT:  All right.

21        MR. WAX:  Your Honor, I do have to follow up from

22 that, please.

23        THE COURT:  Go ahead.

24        MR. WAX:  The one item that was downloaded, if I

25 am understanding this exhibit correctly, was downloaded on a

Springer - D

1  different date; correct?

2          THE WITNESS:  You -- which item are you referring

3  to?

4          MR. WAX:  If we could go to the exhibit on chart

5  number 237, which is the one, I believe, Ms. Holsinger just

6  asked you about, that's the one *Rappeling the Aggression*

7  that is, in fact, found on the computer that we've just

8  heard testimony about?  And let's look at the date and times

9  listed there for that exhibit.

10          THE WITNESS:  That -- yes, that.

11          MR. WAX:  Not November 25?

12          THE WITNESS:  That's correct, yes.

13          MR. WAX:  Okay.  So the appearance of the

14  advertising banner on November 25 would forensically be

15  unrelated to the appearance of the actual video on an

16  earlier date?

17          THE WITNESS:  It's possible, based on the date --

18  you know, the differences in the dates and times, it's very

19  possible they are -- they are unrelated.

20          MR. WAX:  And with respect to the other eight

21  items that you identified in 262, did I understand correctly

22  that none of those other eight items were found on the

23  computer?

24          THE WITNESS:  I'm sorry.  Repeat that again.

25          MR. WAX:  With respect to the items advertised in

Springer - D

1    the 262 series of exhibits --

2             THE WITNESS:  Okay.

3             MR. WAX:  -- none of those items, with this one

4    exception, were found on the computer?

5             THE WITNESS:  Yeah, that's correct.

6             MR. WAX:  Okay.  I renew my objection, Your Honor.

7             THE COURT:  Counsel?

8             MS. HOLSINGER:  Your Honor, if I may, just again,

9    the only thing.

10   BY MS. HOLSINGER:  (Continuing)

11   Q.   You're saying that these GIF banners actually mean is

12   that this computer visited a website where al-Qaeda videos

13   were advertised?

14   A.   Yes.

15   Q.   And, beyond that, you cannot say much else what's

16   happened?

17   A.   That's -- yes.  The site was visited, and these items

18   were downloaded as a result of that visit.

19            THE COURT:  I'm going to defer ruling on this.

20   The witness will remain, and we'll try and get this taken

21   care of before -- over the lunch hour, at least, so the

22   witness will have to remain.

23        You can proceed with your testimony.

24            MS. HOLSINGER:  Thank you, Your Honor.

25            THE COURT:  And I'm going to defer ruling on the

Springer - D

1   motion -- on the 403 motion, as well.

2         MS. HOLSINGER:  Okay.  Thank you.

3   BY MS. HOLSINGER: (Continuing)

4   Q.   Sir, we're going to continue on and just identify the

5   remaining items on the summary, and we're going to start

6   with Exhibit -- not an exhibit, but it's the next item on

7   Exhibit 243.  If you could just identify this for the jury

8   and where you located this item on the computer.

9   A.   This is an audio -- MP3 audio file.  And mp is --

10  stands for m.peg.  It's short for m.peg.  It's a common

11  audio -- audio -- compressed audio type format.  And the

12  title of this audio file was nopeacewiththejews_1, and this

13  item was found in the users directory, Mohamed, and the

14  folders -- or the directory downloads.

15  Q.   And the next series of items are a number of audio or

16  MP3 audio files; is that correct?

17  A.   That's correct.

18  Q.   And are they all by the same author, if you will?

19  A.   It appears, just based on the title of it, the

20  directory that they were found in.

21  Q.   And approximately how many are listed here?

22  A.   There were -- if I recall correctly, there were 41

23  audio files listed.

24  Q.   And was that just actually two separate series, but

25  they were multiple files?

Springer - D

1   A.   Two series, that's correct.

2   Q.   And could you tell the jury where those -- we're not

3   going to go through each one of these individually, but

4   where those audio files were located on the computer?

5   A.   One series was located in the file path users, Mohamed,

6   Desktop, lectures, Anwar Al-Awlaki, Madina2 was one path for

7   one series, and the other series was located in the same

8   path leading up to -- to hereafter.  So users, Mohamed,

9   Desktop, lectures, Anwar Al-Awlaki, and then the directory

10  hereafter.

11  Q.   And do those have all the same creation dates?

12  A.   They do.  It appears they all were -- the creation date

13  is October the 21st of 2010.

14  Q.   And the next item is the last item on that summary

15  exhibit.  Can you identify that item and where it was

16  located on the computer?

17  A.   This is a PDF file, a -- the title of the file is

18  tawhid_actionPDF.  The file path is user, Mohamed, Desktop,

19  books and poetry writings.

20  Q.   And what was the creation date on that item?

21  A.   That is July the 21st of 2010.

22  Q.   Moving to the general browser history of the computer,

23  did you examine the hard drive for information about how

24  often the computer visited certain Internet forums?

25  A.   Yes, I did.

Springer - D

1   Q.   And, forensically, can you tell whether a forum or a

2   site has been visited?

3   A.   You can, based on the history or the cache file, as

4   well.

5   Q.   I'm going to show you Government 242, and that is not

6   in evidence yet, I don't believe.

7        And what is Government Exhibit 242?

8   A.   Okay.  This is a collection of -- these entries were

9   found in the Firefox cache.  We have a tool that can recover

10  cache files, browser cache files, called history extractor,

11  and it allows us to recover, you know, cache files from the

12  browser, and these are -- this is a summary of these

13  particular websites visited and the last visited date there.

14  Q.   And those websites are ansar1.net, islamicawakening.com

15  and dawnoftheummah.com?

16  A.   That is correct, yes.

17        MS. HOLSINGER:  Your Honor, I move into evidence

18  Government Exhibit 242, the summary of the browser cache.

19        THE COURT:  Objection to 242?

20        MR. WAX:  No, Your Honor.  Thank you.

21        THE COURT:  It will be received.

22  BY MS. HOLSINGER: (Continuing)

23  Q.   Sir, also, on the computer, did you locate computer

24  usernames and passwords for several websites or forums?

25  A.   Yes, I did.

Springer - D

1   Q.   And did you locate a username or password for the forum

2   dawnoftheummah?

3   A.   Yes, I did.

4   Q.   In this computer?

5   A.   Yes, I did.

6   Q.   And did you locate a username and password for a

7   website deenalhaq.info?

8   A.   I did, if I remember correctly.

9   Q.   Do you want to -- do you -- can I show you something to

10  refresh your recollection?

11  A.   Yes, you and --

12          MS. HOLSINGER:  May I approach the witness,

13  Your Honor?

14          THE COURT:  You may.

15          THE WITNESS:  Okay.

16  BY MS. HOLSINGER: (Continuing)

17  Q.   Do you recall if you located a username and password

18  for deenalhaq?

19  A.   Yes, I did.

20  Q.   And did you locate a username and password for

21  jamayahabsaforum.com?

22  A.   Yes, I did.

23  Q.   Did you also locate a username and password for

24  www.hushmail.com?

25  A.   Yes, I did.

Springer - D

1    Q.    Did you also located a username and password for

2    islamicawakenings.com?

3    A.    Yes, I did.

4    Q.    Also, were there other usernames and passwords I'm not

5    asking you about, like for Oregon State and other things?

6    A.    Yes, there were.

7    Q.    And, in terms of searching this computer, you mentioned

8    previously that there were searches done with search terms?

9    A.    Yes.  There's a pretty extensive list of search terms

10   out that were submitted to me by the case agent.

11   Q.    And was the entire hard drive searched for these terms?

12   A.    It is.  The index search runs against the entire -- the

13   entire process case.

14   Q.    And if a word shows up, if it hits on a word, say the

15   word "Oregon" comes up 5,000 times, where would it get all

16   that from?  Would it show up on every single document?  Show

17   up --

18   A.    It's going to show up anywhere the word is mentioned.

19   Either a news article, online news article, it will show up

20   in a document.  A title of a picture, it's going to show up.

21   Any document or any -- any file, even -- even deleted files,

22   fragments of files, that are found in, you know, unallocated

23   space, it's going to show -- it's going to hit on every

24   single instance of that word.

25   Q.    And if they went to a website and the computer saved

Springer - D

1   the visited site information, it could hit on that?

2   A.    That's correct, yes.

3   Q.    They went to the *New York Times* and did anything on

4   that *New York Times* web page, it could hit on that?

5   A.    Yes.

6   Q.    If the computer went to the site and then saved that in

7   the cache?

8   A.    That's correct.

9   Q.    And did you run a search in this instance for the word

10  "jihad"?

11  A.    Yes.

12  Q.    And how many global overall hits did you get for the

13  word "jihad"?

14  A.    You know, I don't recall exactly the number.

15          MS. HOLSINGER:  May I approach the witness,

16  Your Honor, to show him something to refresh his

17  recollection?

18          THE COURT:  You may.

19  BY MS. HOLSINGER: (Continuing)

20  Q.    Does that refresh your recollection?

21  A.    It does, yes.

22  Q.    So how many overall, in the wide range, did you get for

23  the word "jihad"?

24  A.    Based on the search hit results from the query, there

25  were 2,430 hits and 441 files.

1966

Springer - D

1  Q.    And what about the word "bomb"?  Did you run that word

2  in there?

3  A.    Yes, I did.  And according to these -- the search query

4  results, there were 8,091 hits and 1,100 files.

5  Q.    And that could come from anywhere in that computer or

6  anything that that computer has looked at?

7  A.    That's correct, yes.

8  Q.    Sir, did you also look at a thumb drive in this

9  particular case?

10  A.    I did.

11  Q.    And did you do a -- take a forensic -- or take a

12  forensic image of that thumb drive?

13  A.    I did, yes.

14  Q.    In this case did you find the same items that were on

15  that thumb drive on the computer?

16  A.    Yes, I did.

17  Q.    Were those identified as Exhibit 239-5 and 239-10

18  through 239-17, the street scenes of Portland and those

19  series?

20  A.    Yes.  Those were found on there.

21  Q.    Okay.

22              MS. HOLSINGER:  That's all the questions I have on

23  direct.

24              THE COURT:  Cross-examination?

25              MR. WAX:  Thank you.  One moment, please.

Springer - X

1        CROSS-EXAMINATION

2   BY MR. WAX:

3   Q.   Sir, I want to start, please, with the subject that the

4   Government just ended on.  With respect to the material that

5   was produced in this case, you prepared a report that is in

6   computer form, an FTK report?  That report was prepared

7   solely by you or by you in conjunction with other FBI agents

8   or analysts?

9   A.   The -- the report was -- once -- once the items -- item

10  was processed, it was placed into what's called the Case

11  Agent Investigating Review Network.  And that allows the

12  case agent to begin a review process of the items, and he

13  selects -- since he's the one with case knowledge, he

14  selects the items that are relevant to the case and

15  bookmarks those items.

16  Q.   So then in terms of the FTK report that would have been

17  provided by the Government to the defense, that would

18  include the bookmarked items from your search?

19  A.   That is -- yes, that's correct.

20  Q.   All right.  So that if in the FTK report, for example,

21  the word "jihad" appears only 12 times, that is a result of

22  the analysts looking through the array of the information

23  that you had retrieved and selecting the items that appear

24  to be the most relevant or the best in some way?

25  A.   Yes.

1  Q.   Okay.  Now, just so that we all have a very clear

2  understanding of how the word "jihad" might appear a large

3  number of times on a computer, let's take a step back.  In

4  analyzing this computer and the Internet history, did you

5  observe what appeared to be an RSS feed to the news station

6  MSNBC?

7  A.   I -- you know, I don't recall.

8  Q.   All right.  We're going to show you a -- perhaps a page

9  from the Internet history material that was provided to us

10  and see whether or not you observe the entry for MSNBC.

11  A.   Okay.

12  Q.   And perhaps that will jog your recollection about the

13  number of times that that appeared.

14  A.   Okay.

15  Q.   All right.  So just starting with the example you have

16  in front of you, do you recognize what's in front of you as

17  a bookmark from your FTK report?

18  A.   Yes.

19  Q.   All right.  And do you see a line of text that refers

20  to -- well, let's start with the first word pheedo

21  P-H-E-E-D-O, colon.  What's pheedo?

22  A.   You know, I'm not -- I'm not completely sure on that.

23  Q.   Continuing in that line, do you see a web address for

24  MSNBC?

25  A.   Yes, I do.

Springer - X

1    Q.    Is this, then, indicating to us that the particular

2    item that was bookmarked here came from MSNBC?

3    A.    It's -- I mean, if you look at the file path, it

4    appears to -- I can't say for sure that it came from MSNBC.

5    I just know that it came from -- based -- again, this is

6    Internet cache.  This is an Internet cache file from a

7    visited site.  I don't know if it's a -- if it's a new -- an

8    MSNBC news site.  It would appear to -- to show that, but I

9    don't know for sure if that's specifically -- because you're

10   seeing a selected text.  It's a selected segment of text

11   that's been selected and bookmarked in this -- in this

12   instance here.

13   Q.    Selected and bookmarked by one of the case analysts?

14   A.    That's correct, yes.

15   Q.    And the top line, again, pheedo, is it not your

16   understanding that there are a number of sort of metadata

17   gathering sites that provide information to other sites

18   about the use of the websites?

19   A.    The -- yeah.  It's possible, yes.

20   Q.    Well, you're familiar with the fact that such things

21   exist?

22   A.    Oh, yes.

23   Q.    And pheedo, you're not familiar with pheedo as a data

24   gatherer?

25   A.    You know, I'm not.

Springer - X

1    Q.    All right.  Let's move on, though.  After the pheedo

2    colon, orig link.  What does "orig link" mean?

3    A.    That's original link is what that is.  It's short for

4    original link, I think, on that.

5    Q.    After original link, you get an a HTTP://www.

6    A.    Okay.

7    Q.    So is that not telling us that the original link for

8    the information was what follows the www, msnbc.msn.com?

9    A.    That would appear so, yes.

10   Q.    Now, does this refresh your recollection that among the

11   many, many thousands of lines of text that were on the

12   computer, from which words such as "jihad" might appear,

13   MSNBC would be a frequent source?

14   A.    It's possible, yes.

15   Q.    Are you familiar with the term -- and I hope I'm

16   getting the right number of Rs and SS -- RSS feed?

17   A.    Yes, I am.

18   Q.    Let's explain to the jury, please, what that means.

19   A.    RSS, it's a random syndication of -- if I remember

20   correctly, I'll try and explain this.  RSS feeds allow you

21   to -- if you subscribe to certain feeds, you

22   can -- depending on the topic of the feed, if you subscribe

23   to an RSS feed, it gives you information specific to that

24   feed, to that interest.

25   Q.    Okay.  All right.  So, for example, if I'm interested

1  in learning about the news from England, I could have an RSS

2  feed to the *London Daily Times*?

3  A.   That's correct.

4  Q.   Okay.  If I want to get news about Peoria, I could have

5  a feed to a television station in Peoria?

6  A.   That's correct.

7  Q.   If I'm interested in the news provided by FOX, I could

8  have a feed to the national FOX news desk?

9  A.   That's correct.

10  Q.   Okay.  And, in your experience with computers in life,

11  you are familiar with the fact that many people have many

12  different news feeds on their computers?

13  A.   That's correct.

14  Q.   Now, you mentioned bomb 8,000 times overall?

15  A.   Overall.

16  Q.   In terms of the FTK report, the items selected by the

17  case analysts, as potentially relevant, do you recall that

18  the word "bomb" is entered four times?

19  A.   In the -- in my FTK report?

20  Q.   Yes.

21  A.   You know, I would have to see the report.  There

22  were -- there were several items.

23  Q.   All right.  I think we can show you the page, if that

24  would refresh your recollection.

25       So does this appear to be, again, an image from the FTK

Springer - X

1    report?

2    A.    That's correct, yes.

3    Q.    And you see -- excuse me, I said four.  It

4    appears -- well, there's one, two, four, five.  I guess

5    that's four.  So either four or five entries for the word

6    "bomb"?

7    A.    That's correct.

8    Q.    And do you see that the entries that are on this FTK

9    report for the word "bomb" appear to be things that could be

10   or are likely news stories?

11   A.    It appears so, yes.

12   Q.    All right.  So that in terms of what is found on the

13   computer and presented in this FTK report, none of these

14   relate to somebody searching about how to make a bomb?

15   A.    These -- these items -- these items were -- again,

16   while this case was out on CAIR and was being reviewed by

17   the analyst, and the analyst and the case agents made the

18   determination what was -- what was relevant and what was

19   not.

20   Q.    Right.  And in terms of what was chosen to be in this

21   FTK report, we don't see anything, for example, in this area

22   on bombs that relates to going out -- how to make a bomb?

23   A.    That's -- it appears that way, yes.

24   Q.    Okay.  Thank you.  So I want to just take a step back,

25   sir, and make sure that we understand the process as it went

Springer - X

1   forward here.  And I -- I'm going to start with the question

2   of the date.  If I understood you correctly in your direct

3   examination, Ms. Holsinger asked you about the creation of a

4   user account Mohamed, and you indicated that that was

5   created on October 19 of 2009; correct?

6   A.   Yes.  According -- yes.

7   Q.   The computer, however, you observed, was originally set

8   up, perhaps by the manufacturer or the distributor, in mid

9   July of 2009?

10  A.   That's correct.

11  Q.   The computer was used -- I need to ask another question

12  first.

13       When a purchase -- when a person purchases a computer,

14  it comes with some default settings?

15  A.   Yes.

16  Q.   So that if I buy a computer and take it home and want

17  to use it, I can use it with whatever the default setting is

18  that the manufacturer or distributor has created.  Sometimes

19  it might say "valued customer"?

20  A.   That's correct.

21  Q.   Okay.  So you saw on this computer that the usage of it

22  began on or about September 12th?

23  A.   September 12th?

24  Q.   Yes.  Of 2009.

25  A.   No, I don't recall September 12th.  I don't recall

Springer - X

1    saying --

2    Q.    Do you recall seeing the use of the computer under the

3    default setting valued customer for roughly five weeks

4    before the user Mohamed entry appeared?

5    A.    You know, I would have to see that registry -- that

6    registry bookmark listing the previous installation of

7    that -- prior to the upgrade to Windows 7, I would need to

8    see that.

9    Q.    I'm not sure, sir, that I have the capability of

10   showing you that from what was provided to us, but I do

11   believe I can show you something else.  So we're about to

12   put onto your screen a portion of the page that is from the

13   net analysis report.  Does this look familiar to you?

14   A.    Yes, it does.

15   Q.    Okay.  Do you see your name on it?

16   A.    Yes.

17   Q.    And does that refresh your -- well, let's just start.

18   This is a page from the report that you prepared, from your

19   analysis?

20   A.    Yes.

21   Q.    And you see the entry September 12th, 2009, valued

22   customer?

23   A.    Yes.

24   Q.    Top line?

25          And do you see host information on that top line?

Springer - X

1   A.   Yes, I do.

2   Q.   And the host is?

3   A.   The host is -- which -- oh, the very top line?

4   Q.   Yeah, top.

5   A.   Oregon State -- myoregonstate.edu.

6   Q.   You're aware of websites that many universities use the

7   .edu?

8   A.   Yes.

9   Q.   Now let's go down to what is in yellow.  Oh-oh.  We'll

10  get it back here, sorry.

11       So let's take a look at -- if we can scroll over, so

12  still on September 12th, 5:30 p.m., and if you scroll over

13  to the right in the yellow line, do you see valued customer,

14  administrative information, Oregon State University,

15  welcome?

16  A.   I do, yes.

17  Q.   And who's being welcomed?

18  A.   Mohamed.

19  Q.   Okay.  And then if we -- we'll just get the dates back

20  up, please, on the left-hand side.

21       And if we scroll down, do you see any number of entries

22  continuing for valued customer?

23  A.   I do, yes.

24  Q.   All right.  Does that refresh your recollection that

25  the computer, based on this information, was put into

1   service on or about September 12th through the Oregon

2   State -- or at Oregon State University by valued customer

3   Mohamed Mohamud?

4   A.   I mean, what you're referring to here is -- see, I

5   guess I'm somewhat confused between what you're trying

6   to -- I -- I guess I don't understand your question exactly.

7   Is it to -- what does valued customer have to do with the

8   registered -- I'm trying to figure out where, you know, your

9   line of questioning -- I'm sorry.

10  Q.   Let me try again.  I don't have access to the registry,

11  so I'm trying to get at it this way.

12  A.   Is --

13  Q.   Let me just try to break it down.

14  A.   Just a second, sir.  This is browser history.  This

15  isn't a registry setting.

16  Q.   I understand that.  Does this tell you -- this browser

17  history came from the computer that you identified as the

18  computer you searched?

19  A.   Yes.

20  Q.   This information came from the FTK report that you

21  prepared in this case based on your search of Mohamed's

22  computer?

23  A.   Yes.

24  Q.   This information was on Mohamed's computer?

25  A.   Yes, it was.

1977

Springer - X

1    Q.    This information shows that a person was using the

2    computer with the username valued customer; correct?

3    A.    That's correct.  According to this.

4    Q.    All right.  And that the person using the information

5    valued customer appears to have accessed the Oregon State

6    University website September 12th and had been welcomed;

7    correct?

8    A.    Correct.

9    Q.    And the person who was being welcomed is

10   Mohamed Mohamud?

11   A.    Correct.

12   Q.    All right.  Now, let me ask you another question.

13   A.    Okay.

14   Q.    In terms of the search that you performed on the

15   computer, if I understood you correctly, you told us that

16   the search covered every single bit and byte that's on the

17   computer; correct?

18   A.    No, it was specific to what was relevant in the search

19   warrant.

20   Q.    I understand that.  Let me try to rephrase the

21   question.

22   A.    You mean the --

23   Q.    The search terms that you employ --

24   A.    Correct.

25   Q.    -- searched through all the bits and bytes on the

1   computer?

2   A.    Yes.

3   Q.    That would include the bits and bytes that were created

4   by the computer from September 12th -- well, actually, I

5   would imagine from even before September 12th, because

6   wouldn't they pick up things that were loaded at the

7   manufacturer -- at the store -- at the distributor?

8   A.    It's quite possible, yes.

9   Q.    Okay.  So that the temporal scope of the search did not

10  begin on October 19th.

11  A.    Uhm --

12  Q.    Your search includes information that was put on the

13  computer prior to October 19th; correct?

14  A.    Yes, it does.

15  Q.    Thank you.

16       Now, in terms of the types of information that you had

17  access to in your search, that would have included all

18  documents produced on the computer in Microsoft Word

19  program?

20  A.    Pertaining to the -- are we still talking about search

21  terms or --

22  Q.    Yes, sir.  The search that you did covered documents

23  that were produced on the computer through Microsoft Word?

24  A.    Yes.

25  Q.    It included any information that might be on the

1979

Springer - X

1    computer that related to FaceBook activity?

2    A.    Yes.

3    Q.    Any activity on the computer related to Skyping?

4    A.    Yes.

5    Q.    Skype is what, sir?

6    A.    Skype is an online either chat or -- you can -- you can

7    chat with friends through Skype.  You can video conference

8    through Skype.

9    Q.    Okay.  It would include information that derived from a

10   Yahoo chat that was on the computer?

11   A.    Yes.

12   Q.    Based on your review of the computer, did it appear as

13   though most of the email activity was conducted through the

14   web browser rather than actually hosted on the computer?

15   A.    Yes, it would appear the majority was web-based email.

16   Q.    You found some email information, but the bulk of that

17   would be derived from web browsers -- excuse me, from the --

18   I'm losing the term.

19   A.    From just web-based email.

20   Q.    Thank you.  Okay.

21       And you have explained already that the search covers

22   items that I, as an old-fashioned guy that doesn't know that

23   much about computers can see, as well as things that I think

24   I've deleted but remain on the computer in the unallocated

25   space?

Springer - X

1  A.    Yes.

2  Q.    And it includes the remnants of and results of Internet

3  searching activity?

4  A.    Yes.

5          DEPUTY COURTROOM CLERK:    Judge, we have a question

6  from a juror.

7          THE COURT:  Yes?

8          JUROR:  When it's convenient, can we get up and

9  stretch?

10          THE COURT:  Let's do that now.

11     Mr. Wax is looking over something.  We'll do that now.

12          MR. WAX:  I'm turning over pages.  I'm moving

13  fast, Judge.

14                    (Pause-in-proceedings.)

15          THE COURT:  All right, Mr. Wax.

16          MR. WAX:  Your Honor, I'm nearly done.  Maybe if I

17  could just have one more moment, please.

18          THE COURT:  All right.

19          MR. WAX:  Your Honor, thank you.  I have no

20  further questions.

21          THE COURT:  All right.  Redirect?

22          MS. HOLSINGER:  Thank you, Your Honor.

23  ///

24

25

Springer - ReD

REDIRECT EXAMINATION

BY MS. HOLSINGER:

Q.   Sir, your search was not able to recover things that
were deleted and then written over by something else after
they were deleted, would it?

A.   No.

Q.   And in terms of the way the search -- the search terms
in the FTK report, Mr. Wax showed you an example of jihad 44
times.  Isn't it -- could that word "jihad" actually appear
many more times, but in different parts of your FTK report
that related to a different search term?  I can refresh your
recollection if you want me to show you something from your
report.

A.   Yeah.  If you would, please.

Q.   So an example -- go ahead and take a look at it.  Do
you recognize this as a page of your FTK report?

A.   Yes, I do.

Q.   And do you -- I'm going to ask you the question again.
Will the word "jihad" appear in other locations in the FTK
report that were located on the computer but weren't in the
specific -- under the specific term "jihad"?

         MR. WAX:  Your Honor, excuse me.  I believe that
the reference here is to an agent comment, not an item on
the computer.

         THE COURT:  All right.

1982

Springer - ReD

1   BY MS. HOLSINGER: (Continuing)

2   Q.   I just want to talk to you specifically how these

3   search terms are identified in the FTK report.

4   A.   Okay.

5   Q.   So -- I want to be clear about, well, the word -- even

6   if the search -- the search term was "jihad," and it lists a

7   number.  Will that actually -- is it possible that that word

8   appears in other portions of the FTK, in items that are

9   identified under the word "martyrdom," for example?

10  A.   It's possible, yes.  I would have to see those

11  bookmarks to --

12  Q.   Let me show you the bookmark for the search term, the

13  word "martyrdom."  And does the word "bomb" actually appear

14  in this item when the search term is "martyrdom"?

15  A.   Uhm --

16          MR. WAX:  Your Honor, it's the same objection.

17  Excuse me.  I believe what is being looked at is a case

18  agent comment.

19          THE COURT:  Okay.

20          MR. WAX:  I don't believe there's text there.

21          THE COURT:  I don't -- well, I have it over here.

22  You say you believe something is happening.  Are you

23  objecting to the form of the question, then?

24          MR. WAX:  Yes.  Thank you.

25          THE COURT:  All right.  I will sustain it.  Go

Springer - ReX

1    ahead.

2              MS. HOLSINGER:  I have no further questions,

3    Your Honor.

4              THE COURT:  All right.  You may step down.

5         Thank you.  Did you have another question?

6              MR. WAX:  Well, in trying to be efficient, I

7    missed -- I have about five minutes that I would appreciate

8    the Court's indulgence that I did not --

9              THE COURT:  Okay.  Five minutes.

10             MR. WAX:  Thank you.

11

12                        RECROSS-EXAMINATION

13   BY MR. WAX:

14   Q.   Sir, in terms of the searching that you did, do you

15   recall that in addition to the items that appear in -- we

16   have them printed out in some very thick books.  In addition

17   to the items that are listed in the FTK report, you found

18   numerous other things, such as reference to watching the

19   Dave Chappelle show, purchasings on eBay, advertisements for

20   other movies and things of that nature?

21   A.   You know, I would have to specifically see the

22   reference.  I don't remember exactly.  You know, if those

23   are in there, I would have to see the reference.

24   Q.   Do you recall generally -- I'm trying to move this

25   along.

Springer - ReX

1    A.    Okay.

2    Q.    Do you recall generally that in terms of the Internet

3    activity that you observed there was a whole vast array of

4    items of -- let me just call it ordinary daily general use,

5    movies -- what adults and kids do on computers; movies, ads,

6    eBay, et cetera, et cetera?

7    A.    That are part of this report?

8    Q.    Yes.  Not the FTK report.  The browser history.

9    A.    Overall, okay.

10   Q.    Yes.  Do you recall that?

11   A.    I mean, off the top of my head, I can't.  I would have

12   to see and look through the browser history to really --

13   Q.    We'll show you a couple of examples and see if it

14   refreshes your recollection.

15   A.    Okay.

16   Q.    We'll start September 14th.  I'll pick -- we'll move

17   through this quickly.  September 14.  I think it's page 1935

18   of the report.

19         Okay.  Do you see eBay?

20   A.    I do see that.

21   Q.    Okay.  Let's go to October 9.  1363.  Do you see -- did

22   you -- do you see this entry that we've marked?

23   A.    Yes, I do.

24   Q.    And did you, for example, click on entries of this to

25   see -- this leads you to a Dave Chappelle album?

Springer - ReX

1    A.    No, I did not.

2    Q.    All right.  Let's go to -- we'll just jump ahead.

3          May 28th.  Do you see a -- yeah, do you see a Google

4    search, David Deangelo?

5    A.    I do see that.

6    Q.    Are you familiar with the Deangelo website, dating

7    advice?

8    A.    No, I'm not.

9    Q.    You see that's for David Deangelo.  David Deangelo,

10   okay.

11         Let's just take August 27.  Do you see the entry of

12   Rise of Nations Gold Edition?

13   A.    This -- I need to clarify with what we're looking at

14   here.  This is not -- this is local browsing history is what

15   we're looking at.

16   Q.    Local browsing?

17   A.    This is local browsing history.  It's referencing a

18   local file path.  This is not a web --

19   Q.    This particular one is not, but the others were all

20   web-based?

21   A.    That's correct.

22   Q.    And this one, Rise of Nations, you're familiar with as

23   a video game?

24   A.    I believe I've heard of that.

25   Q.    Okay.  Let's just do one more.  Well, let's just go to

Springer - ReX

1   November 20.  And Windows Media, do you see that?

2   A.   I do.

3   Q.   Did you by any chance click on this to see that it was

4   the movie American Pie?

5   A.   I did not, no.

6   Q.   Are you familiar with the movie American Pie?

7   A.   Yes, I am.

8   Q.   Does this refresh your recollection that throughout

9   this vast array of Internet history there were lots of

10  entries of this nature?

11  A.   Yeah, it would appear there are entries of that nature

12  in the history, yes.

13           MR. WAX:  Thank you.  I have nothing further.

14           THE COURT:  All right.

15           MS. HOLSINGER:  No, Your Honor.  Thank you.

16           THE COURT:  All right.  You may step down.

17      Okay.  All right.  We have another witness ready?

18           MR. KNIGHT:  We do.  It's our next expert,

19  Your Honor.

20           THE COURT:  Okay.  Well, then we'll take a break.

21  Come back at five minutes after 3:00.  And let me see the

22  lawyers for a minute.

23           DEPUTY COURTROOM CLERK:  Court's in recess.

24        (The jury panel leaves the courtroom.)

25           THE COURT:  All right.  You may sit down.  I'll be

1  looking at the issue of the banners and get back to you on

2  that.  Before we go any further, I want to make sure that

3  I'm not missing something.  Are there any pending motions or

4  matters other than this issue of the banners, from the

5  Government's standpoint?

6          MS. HOLSINGER:  Not that I believe, Your Honor.

7          THE COURT:  And Ms. -- yes, Ms. Hay?

8          MS. HAY:  Your Honor, you had the two limiting

9  instructions to read to the jury --

10          THE COURT:  Right.  I have those.

11          MS. HAY:  -- before this expert begins.

12          THE COURT:  And you want us to give them before

13  the expert starts?

14          MS. HAY:  Yep.

15          THE COURT:  We will do that.

16          MR. WAX:  Your Honor, I believe that in his expert

17  report at least Mr. Kohlmann discusses those GIF banners, we

18  think that a ruling on their admissibility will be.

19          THE COURT:  I'll try.  And come back in with a

20  ruling in 15 minutes.

21          MR. KNIGHT:  And I'll say they're already in the

22  summary chart.  The expert testimony, we won't be playing

23  them for the jury, so --

24          THE COURT:  Okay.  All right.  Tell me where you

25  are, then.  I'm asking the Government at this point.  You're

1    starting your expert as the next witness?

2         MR. KNIGHT:  Your Honor, it's our expectation that

3    Mr. Kohlmann will be our last witness in our case-in-chief.

4         THE COURT:  Okay.  Thank you.  We'll be in recess,

5    then.

6                   (A recess was taken.)

7         DEPUTY COURTROOM CLERK:  All rise.

8         THE COURT:  All right.  With regard to 262-1 and

9    262-9, after considering the testimony, it seems to me that

10   there are issues of whether or not the possession of this

11   was intentional or if it's unrelated in some fashion.  I

12   think the -- Mr. Wax made a number of points about what

13   could have happened and the witness agreed with him.  Given

14   the fact that there are 403 issues with regard to them, I

15   will not -- I will accept the argument of Mr. Wax, and I

16   will not receive those documents as exhibits that go to the

17   jury.

18       All right.  Will you bring the jury in?

19               (The jury panel enters the courtroom.)

20         THE COURT:  All right.  You can call your next

21   witness.

22         MR. KNIGHT:  Thank you.  The Government calls

23   Evan Kohlmann to the stand, Your Honor.

24         THE COURT:  Okay.

25

1989

Kohlmann - D

1    EVAN KOHLMANN,

2  called as a witness in behalf of the Plaintiff, being first

3  duly sworn, is examined and testified as follows:

4

5    DEPUTY COURTROOM CLERK:  Please be seated.

6    THE COURT:  Before we start, the -- have you sworn

7  the witness?  You have, okay.

8    DEPUTY COURTROOM CLERK:  Pull your chair all the

9  way forward.

10    THE COURT:  Before we start the testimony, I have

11 an instruction for the jury.  It's a limiting instruction.

12 I've given you a couple.  In fact, this one you've probably

13 heard before.

14    You have heard and seen evidence about Government

15 Exhibit 80, the Interpol notice.  I instruct you that this

16 evidence is admitted only for the limited purpose of what

17 affect it had on the mental state of the agents who reviewed

18 it and not for the truth of the matter asserted therein.

19 You must consider it for that purpose and for no other

20 purpose.

21    Now, with regard to hearsay statements generally, as

22 I've mentioned during the course of the trial, you have

23 heard evidence about what the defendant said other people

24 said.  I instruct you that this testimony about what other

25 people said is admitted only for the limited purpose of what

1    affect it had on the mental state of the defendant and not

2    for any other purpose, and you must consider those

3    statements for that purpose and for no other purpose.

4        All right.  You may proceed with the testimony of the

5    witness.

6            DEPUTY COURTROOM CLERK:  Can you please state your

7    full name and spell your last name?

8            THE WITNESS:  Yes.  My name is Evan F. Kohlmann.

9    E-V-A-N, F, K-O-H-L-M-A-N-N.

10

11                    DIRECT EXAMINATION

12   BY MR. KNIGHT:

13   Q.   Good afternoon, Mr. Kohlmann.  If you could tell the

14   jury what you do for a living.

15   A.   Yes, I work as a international terrorism consultant.

16   Q.   And were you hired by the Government in this case to

17   analyze the facts of the defendant's case?

18   A.   I was, yes.

19   Q.   And before we get into the specifics of your

20   background, can you tell the jury on a day-to-day basis what

21   you do as a terrorism consultant?

22   A.   Yes.  I work on behalf of private clients, as well as

23   public clients.  On a daily basis, I spend about -- usually

24   about 30 percent to 40 percent of my day conducting

25   research.  Research would come in the form of, number one,

Kohlmann - D

1    browsing and viewing forums and websites and other online

2    venues that are run by terrorist organizations, their

3    supporters, their underling, et cetera.  It also includes

4    reviewing other materials, secondhand, third-tier materials

5    that are taken from the ground.  We have an office in

6    Peshawar, Pakistan.  We gather materials from -- we gather

7    materials directly from terrorist organizations.

8         Then about 30 percent of my day is also spent, then, on

9    software, on coding automated software, which can then go

10   through these various websites and venues of information and

11   collect this information automatically, if possible.

12        And about another 30 percent of my day is spent working

13   either with other experts, working with clients, discussing

14   these issues with colleagues, writing up a memorandum about

15   these public subjects.  Basically conducting analysis.

16   Taking the original research and distilling it into actual

17   analysis.

18   Q.   Thank you.  And about how many years have you been

19   doing this work?

20   A.   I started working as a terrorism consultant back in

21   1998, approximately.  1998 I was employed at think tank in

22   Washington, D.C.  Later, in 2003, I left the think tank and

23   began work on my own.

24   Q.   If you could describe for the jury your background,

25   where you went to school and what you studied.

Kohlmann - D

1    A.    Yes.  I have a BSFS, which is a bachelor in science of

2    foreign service from the Edmund A. Walsh School of Foreign

3    Service at Georgetown University in Washington, D.C.  I also

4    have a certificate in Islam and Muslim-Christian

5    understanding from the Prince Alwaleed Bin-Talal Center for

6    Muslim-Christian Understanding at Georgetown University.

7    And I have a JD, or a Juris Doctorate, a law degree from the

8    University of Pennsylvania Law School in Philadelphia,

9    Pennsylvania.

10   Q.    Thank you.

11         And you briefly alluded to the fact that you started

12   this work in 1998.  Can you tell the jury, briefly, that

13   think tank work, where it was and what it entailed?

14   A.    Yes.  Between 1998 and 2003, I was employed as an

15   intern first, and later as an analyst, at a think tank in

16   Washington, D.C., known as the investigative project.  The

17   investigative project was started in 1995 by a former CNN

18   journalist which the idea of creating an independent

19   watchdog group that could conduct -- excuse me, that could

20   conduct actual research, open source research, on

21   international terrorist organizations, their supporters,

22   their financiers, their communications, et cetera, and then

23   take this information from out in the open source and then

24   provide it to a variety of different people, everything

25   from --

Kohlmann - D

1    THE COURT:  Mr. Kohlmann, let me interrupt you.

2  You're going awfully fast.  I mean, the court reporter is

3  getting it, but slow down a bit.

4    THE WITNESS:  No problem, Your Honor.  Sorry about

5  that.

6    Again, we're conducting open source research and then

7  providing this to a variety of different clients, including

8  everything from law enforcement agencies, media,

9  congressional committees, independent researchers,

10 academics, basically anyone with a very specific interest in

11 the nitty-gritty of international terrorism, bank account

12 numbers, communications, things that would go beyond kind of

13 the immediate view of these groups.

14 BY MR. KNIGHT: (Continuing)

15 Q.   Thank you.  And after you left the investigative

16 project, what did you do?

17 A.   In 2003, when I left the investigative project, I then

18 founded my own company, a private company, that at first was

19 simply known as globalterroralert.com, the name of my

20 website, and it eventually expanded in 2010 to be known as

21 Flashpoint Global Partners.

22    The reason that we changed the name was because of the

23 fact that it expanded to not only include myself, but a

24 number of other researchers, including individuals who run

25 our office in Peshawar, Pakistan, as well as translators, as

1   well as other analysts, et cetera, to provide us the

2   greatest breadth possible, in terms of both

3   research -- gathering research, as well as then providing

4   accurate analysis about that research.

5   Q.   And you mentioned the office in Pakistan.  How many

6   total, full- and part-time employees, work for Flashpoint?

7   A.   We -- in the United States we have a total of four

8   full-time employees.  Excuse me.  And in Pakistan we have a

9   total of four full-time employees.

10  Q.   And what type of work research do you do there?  You

11  generally alluded to terrorism, but tell us what you do.

12  A.   Specifically, we're looking at a number of different

13  groups, everything from al-Qaeda, Hamas, Hezbollah, a

14  variety of different groups, really, around the world.  Our

15  focus primarily is on groups that espouse a jihadi sentiment

16  or a jihadi ideology, and we trace these organizations,

17  their interactions with each other.  These are mostly

18  transnational groups in the sense that they're not based in

19  one country.  They're based in several different countries.

20       So we try to understand who the leadership is, how they

21  communicate, what their ideology is, what kind of targets

22  they're going after, what weaknesses they have, what their

23  recruitment strategy is.  Who is doing their recruitment for

24  them, things like that.

25  Q.   On a day-to-day basis, in doing this, what sort of

1   information or research are you and your associates doing?

2   A.   We're looking at everything, again, from original

3   communications -- emails, message postings, transcripts,

4   sometimes of phone calls -- to other materials, books, video

5   recordings.  Many of these organizations have their own

6   media wings, so they're continually releasing video

7   recordings that are Hollywood quality, really, which tell

8   the story about what they're trying to achieve and how

9   they're trying to achieve it, and who they're looking to

10  bring in to their midst.  So it's a combination of all of

11  that, really.

12  Q.   And what do you do with the collected, accumulated

13  material that you've described, the chat rooms, the videos,

14  what do you do with that information?

15  A.   We take all of this information and then we store it

16  inside of an electronic database, a digital database, and

17  the purpose of doing that is so then we can go back and run

18  searches through vast, vast quantities of material, and we

19  can even do a search for a phone number, a bank account

20  number, part of somebody's name.

21       And we can search across, basically, every single

22  public message that's ever been posted on a jihadi chat

23  forum.  We can search through every other court record,

24  every single court transcript.  We can search through a

25  variety of different materials all at once in order to try

Kohlmann - D

1   to nail down very, very specific points about these

2   organizations.   The kind of information that, generally

3   speaking, you don't find outside of a Government agency or a

4   classified environment.

5   Q.   You talked about voluminous amount of material.   Is

6   much of it in Arabic?

7   A.   A lot of it is, yes.   The primary language that these

8   folks speak is Arabic, so a great deal of it is in Arabic,

9   yes.

10  Q.   And do you, yourself, speak Arabic?

11  A.   Not fluently, no.

12  Q.   How do you reconcile that issue with your research in

13  your work?

14  A.   Throughout the time that I have conducted this

15  research, I have worked with native language Arabic

16  speakers, as well as native language Urdu speakers, as well

17  as native language Pashto speakers.   We work with native

18  language translators and analysts because they have the best

19  understanding of the language that's involved.

20      I currently work side by side with a native language

21  analyst, someone who graduated from grad school in the

22  United States, a native of Jordan, who obviously speaks

23  Arabic fluently and who serves as my research assistant.

24  Q.   Now, the database you just described, can you give us a

25  general idea of its size and if you know of any comparable

1997
Kohlmann - D

1 databases?

2 A.    Yes.   The digital database that we have is

3 approximately six to seven terabytes in size.   A terabyte is

4 a digital unit of size.   It's equivalent to about a thousand

5 gigabytes.   So it's about 7,000 gigabytes worth of

6 information.

7      To give you an idea, a DVD holds about four gigabytes,

8 so you're talking about literally thousands of DVDs' worth

9 of data.   This material is everything from .txt documents,

10 which obviously don't take up as much space, and video

11 recordings, which take up more space.

12      We have, again, virtually every single video recording,

13 virtually every single audio recording, communique, magazine

14 released by any major jihadi organization in about the last

15 ten years.

16      We then, again, collect all this together and then

17 we're able to search through it.

18 Q.    And could you describe for us in more detail who the

19 clients -- your clients of Flashpoint typically are?

20 A.    Our clients are -- our clients range -- obviously, we

21 certainly work with the United States Government.   The U.S.

22 Government agencies.   We work the Federal Bureau of

23 Investigation.   We work with the Department of Justice.   We

24 work with the Department of Treasury.   We work with the

25 State Department.   We have also done work with intelligence

Kohlmann - D

1    agencies more recently.

2        Outside the United States, we have done work with

3    Scotland Yards Counterterrorism Branch.  We have done work

4    with Central Scotland police.  We have done work with the

5    Danish PET Police Intelligence Service, we have done work on

6    behalf of the Australian Federal Police, the AFP.  Most

7    recently, I did work for the third or fourth time on behalf

8    of the Supreme Court of Bosnia-Herzegovina.

9            THE COURT REPORTER:  I'm sorry?

10           THE WITNESS:  B-O-S-N-I-A, H-E-R-Z-E-G-O-V-I-N-A.

11       But beyond governments, we also do work with a variety

12   of other clients.  We do work with everything from media.

13   I'm employed as an official on-air analyst on behalf of NBC

14   news, MSNBC here in the United States.  We also work from

15   everything from Al Jazeera to BBC, in terms of media.  We

16   also work with humanitarian groups.  We work with human

17   rights groups.  Recently I met with folks from Human Rights

18   Watch.  We provide information to basically anyone who's

19   interested in what we're doing.

20       And, again, it can range.  And because of the fact that

21   we're an open source, we're willing to work with a variety

22   of different parties.

23   Q.   You say you provide information.  Before we get into

24   some specific analysis, what type of product would

25   Flashpoint provide to any of these clients you've just

1999

Kohlmann - D

1  described?

2  A.   It could be a variety of different products.  It could

3  be anything from us taking material out of our database; a

4  particular magazine, a particular video recording, a

5  particular audio recording, and then providing that directly

6  to someone who's interested in a particular aspect of that

7  piece of evidence.

8      It could be a matter of distilling something into a

9  memorandum.  Somebody is interested to know how many times a

10 particular person has surfaced in video recordings released

11 by an organization, and they want to know what that person

12 has said each time they've been shown in a video.

13     So we'll lay out a memorandum saying:  These are the

14 various different times this person has appeared.  This is

15 what they said.  Or this is how many recordings have been

16 released, et cetera, et cetera.

17     Sometimes we're asked to take a look at individuals and

18 decide is this person potentially a threat based on what the

19 factors are, you know, based on the evidence that's gathered

20 against somebody.

21     Sometimes we're asked to provide video recordings,

22 custom-made video recordings, in which we take terrorist

23 propaganda and we cut it down into something that can be

24 shown to a mainstream audience.  And this frequently happens

25 in regards to media work.

Kohlmann - D

1  Q.   And you use the phrase "open source" when describing

2  what the firm does.  Can you just tell the jury what that

3  means and how it relates to your research?

4  A.   Open source refers to materials that are nonclassified,

5  materials that were not gathered by -- specifically by a

6  government agency or by an intelligence agency.  We focus on

7  gathering our own research, so we look to our own sources.

8  So when we want to get information about a terrorist

9  organization, we will try to interview the leaders of that

10 organization.  We will try to interview the members of that

11 organization.  We will look at the communications of that

12 group, the public communications.  We take what's out there

13 publicly and we put it all together in a comprehensive,

14 cohesive manner.

15 Q.   And you mentioned a number of different U.S. Government

16 agencies that you've worked for.  Is employment or work for

17 the U.S. Government a significant source of your income?

18 A.   Yeah, it's a significant source.

19 Q.   And, specifically, have you served and been recognized

20 as an expert witness in a number of cases?

21 A.   I have, yes.

22 Q.   Now, I want to talk a little bit more about your

23 background.  Have you also published a considerable amount

24 of work in the area of international terrorism and Islamic

25 terrorism?

Kohlmann - D

1  A.    That's correct, yes.

2  Q.    Without going into obviously all the publications, can

3  you generally quantify for the jury how much you have been

4  published in this subject area?

5  A.    Yes, I have published a book titled *al-Qaeda's Jihad in*

6  *Europe*, which was published in 2004, first in London, and

7  then later here in United States by Palgrave Macmillan.  I

8  also regularly publish articles in a variety of different

9  publications.  I have published, I'd say, several dozen

10 different products in everything from peer-reviewed

11 journals, to journals such as the official magazine of the

12 West Point Counterterrorism Center.

13     It just depends on what the interest level is and what

14 the audience level is, but I do regularly publish material

15 about this, yes.

16 Q.    And you alluded to your television work.  Do you also

17 do some other public speaking work in your professional

18 capacity besides that?

19 A.    Yes.  I regularly present the work that we do, and I

20 regularly present the work that we don't do at a variety of

21 international conferences.  Everything from conferences put

22 on by the United Nations to individual governments.  I have

23 presented -- I've been invited and I have presented in

24 conferences on behalf of the United Nations in Saudi Arabia,

25 Riyadh.  I have presented on behalf of a variety of

Kohlmann - D

1  different European security organizations and nonprofit

2  groups in places like Baku Azerbaijan.

3         THE COURT REPORTER:  I'm sorry?

4         THE WITNESS:  B-A-K-U, A-Z-E-R-B-A-I-J-A-N,

5  Croatia, Bosnia-Herzegovina, around the region and around

6  the world, really.  Indonesia, the Philippines, et cetera.

7  BY MR. KNIGHT: (Continuing)

8  Q.    Thank you.

9         I have one more plea for you to slow down just a little

10 bit for our afternoon court reporter here.

11 A.    I'm sorry.

12 Q.    And then I'll get into another area.  But in this

13 public speaking, have you also testified before Congress?

14 A.    I have, yes.

15 Q.    And what areas has that covered?

16 A.    I have testified several times in front of Congress

17 about a variety of issues, including both terrorism finance,

18 as well as the current status of the terrorist organization

19 known as al-Qaeda, as well as the phenomenon of homegrown

20 extremism or violent homegrown extremism.

21 Q.    And terrorism, obviously, is a broad area.  Within the

22 written work you've described, your professional work you

23 described, is there a particular area or trend that you

24 focus on?

25 A.    Yeah.  My particular expertise is on, number one, the

Kohlmann - D

1    use of the Internet by international terrorist

2    organizations, particularly al-Qaeda; and, number two, how

3    that fits in generally with the greater trend of violent

4    homegrown extremists.   In other words, individuals who are

5    not necessarily directly recruited by al-Qaeda, but

6    individuals who have adopted an al-Qaeda ideology and seek

7    to carry out their own missions in line with what they

8    perceive al-Qaeda would like them to do or what another

9    organization would like them to do.

10   Q.   In the 15 years you have been working on this, can you

11   describe for the jury if the role of the Internet has

12   evolved or changed in the context of looking at

13   international terrorism?

14   A.   Yes.   Prior to 9/11 -- it's probably not a secret, but

15   most terrorist organizations were not on the Internet.   They

16   didn't really have an Internet presence.   When they wanted

17   to communicate with each other, they communicated via

18   satellite phone or cell phone or couriers.   However, after

19   9/11, because of the resulting security clampdown on behalf

20   of the United States Government, as well as other

21   governments, it no longer became feasible for these

22   organizations to communicate via satellite telephone or via

23   couriers or having fixed locations, because those kind of

24   fixed locations simply became obvious targets for the FBI or

25   the CIA or other U.S. Government agencies, the United States

Kohlmann - D

1   military.

2       As a result, these organizations, al-Qaeda and its

3   allies, were forced to innovate.  They were forced to adopt

4   a new means of communication and recruitment; a way of both

5   communicating amongst leaders of the group, as well as

6   communicating to people who are supporters or would-be

7   recruits and bringing them in.  It was no longer possible to

8   have a fixed guesthouse where you could say, "Come here and

9   come meet us," because that's a place where obviously it

10  could be struck by a drone or people could go and be

11  arrested there.

12      So the Internet became the new frontier, it became the

13  new guesthouse.  It became the new location in which

14  recruiters and leaders of terrorist organizations could meet

15  people who were potential financiers or potential recruits

16  or potential supporters.

17      And it worked that way because of the fact that the

18  Internet is a bit of a frontier.  It's a bit of a wild

19  frontier, and there are ways that you can conceal your

20  identity on the Internet.  And because of the way the

21  Internet works, you can have two people who are separated by

22  thousands and thousands of miles of distance but, in

23  reality, it doesn't matter, because they're able to

24  communicate like they live next door to each other; be it

25  video, be it chat, et cetera, et cetera.

Kohlmann - D

1    Q.    And this trend, can you quantify it at all even in the
2    last five years?
3    A.    I can say that basically if you're not on the Internet
4    now, if you're not on jihadi web forums, you will have no
5    clue whatsoever in what's going on within al-Qaeda's
6    hierarchy or in its financing or in any aspect of the group.
7    If you want to really understand how these organizations
8    operate now, the best source of information, by far, about
9    how -- open source, I should say, the best open source of
10    information about how these organizations operate, aside
11    from going and physically, you know, trying to join them,
12    would be to view the material and communications that are
13    available openly on the Internet if you know where to look
14    for them and you understand what the context is of them.
15    Q.    And you talked about academic work and your academic
16    background and your professional work, but dovetailing off
17    what you just said, do you do field work and research
18    investigation of this primary source material?
19    A.    Yes.  First of all, I regularly engage with individuals
20    on the web.  We try to see what people are saying and
21    observe this.
22         But, more importantly, I try to go out and contact some
23    of these folks in real life, and we try to identify who they
24    are in real life.  We try to figure out what their
25    background is and what led them to join a group or what even

2006
Kohlmann - D

1   led them to a forum, because some of the people that we

2   identify are not actually yet at the stage where they have

3   joined a violent group.  They are still in the midst -- the

4   middle of become radicalized and somehow their identity has

5   been disclosed.

6       So one of the things we're always looking at is the

7   process of radicalization, both to understand, obviously,

8   how to deradicalize somebody, but also to understand what

9   the recruitment strategy is of groups like al-Qaeda and try

10  to determine how you can figure out when someone has reached

11  the point at which they have become a genuine threat to the

12  community that they live in.

13  Q.   And you talked about specifically going on to some of

14  these websites.  Can you tell the jury what a forum or a

15  chat room is, first?

16  A.   Yes.  A forum or a chat room or a social networking

17  forum is essentially like a bulletin board.  There are

18  various different rooms inside of these forums.  One room is

19  usually dedicated to just jihadi media.  In other words,

20  only authorized couriers from particular terrorist groups

21  can go in that particular room and post material; but

22  everyone else can go in and view it.

23      So, in other words, this is a way for terrorist groups

24  to be able to disseminate their propaganda in such a way

25  that there's no question whether something is legitimate or

2007

Kohlmann - D

1  not legitimate or is it made up or fraudulent?  The only

2  people who can post in these rooms are people who have been

3  vetted as being the official couriers of various different

4  terrorist organizations.

5      Then within these forums there are also often other

6  rooms dedicated to a variety of things.  You have a general

7  room, you have a computer, a technology room, you have a

8  religious or a religious questions room.  And in the other

9  rooms pretty much any other registered user, anyone who has

10  a log-in and a password to be able to access this forum, can

11  then post messages and can chat with people and can post

12  questions or can post their own original material.

13      It's a way that individuals who support these groups,

14  as well as the people who run these groups, can get together

15  and kind of all get to know each other in a fairly secure

16  environment.

17  Q.    And is this the type of material, these forums, chat

18  rooms, that is included in your database that you've

19  described to the jury already?

20  A.    Yes.  One of the things we have in our database, in our

21  in-house database, is that we actually have credentials for

22  all these different forums.  Some forums don't require you

23  to log in.  But many of the most important ones require that

24  you have a log-in and a password.

25      So what we do is we use our log-in credentials to go

Kohlmann - D

1  out and we grab basically every single public message that's

2  posted on these forums, and we save it inside of our

3  database.  Because you never know, you know, looking

4  prospectively what will become important five years from

5  now.  So we want to get everything.

6       We also want -- for the purposes of comparative

7  analysis, we want to see it all.  We don't just want to see

8  bits and pieces.

9       So we grab pretty much every single public message on

10 these forums using specific computer technology, which is

11 designed to do this.  In other words, it's not us physically

12 going and trying to save every file.

13      However, we also have human analysts that go on these

14 forums and that will save individual entries that they think

15 are important and will save these categorically.

16      In other words, if al-Qaeda central, if they release a

17 new video recording, not only with our automated systems

18 grab a copy of that press release advertising that's in the

19 video, but one of our analysts will physically note that and

20 will save the video and go through the video.

21      And we have all of this inside of our database.

22 Q.   Now, I want to direct your attention to work in this

23 case, this defendant's case.  You testified already that you

24 have served as an expert witness in a number of cases.

25 A.   That's correct, yes.

2009

Kohlmann - D

1    Q.    And has that been for the Government?

2    A.    That's correct, yes.

3    Q.    Has that been in a number of countries?

4    A.    Yes.  It's been in at least five different countries.

5    Q.    And are those cases typically relating to the area of

6    international terrorism?

7    A.    Yes, that's correct.

8    Q.    Now, I want to ask you specifically about what you did

9    in this case.  First of all, did you review materials

10   provided to you in this case?

11   A.    I did, yes.

12   Q.    And based on those materials, did you write a detailed

13   report?

14   A.    I did, yes.

15   Q.    And was that report in the area of 70 pages, single

16   spaced?

17   A.    Approximately.

18   Q.    And you just talked a little bit about these chat

19   rooms.  Were you able to locate some postings or materials

20   attributed to this defendant that the Government had not

21   previously found and provided to you?

22   A.    That's correct.  I was using the materials from our

23   database.  I was able to locate messages that were

24   apparently posted or perhaps posted by the defendant on

25   these forums that we had recovered that I do not believe the

2010

Kohlmann - D

1  FBI had recovered.

2  Q.    And was that material included with the discovery, or

3  material of the investigation, in the material that you

4  analyzed?

5  A.    It -- it was.  It was included in the material I

6  analyzed.  They were cited in my report, and I did turn over

7  copies of every single message that we located, regardless

8  of the content -- if it looked -- if it looked like it had

9  been posted by the defendant, we provided copies to the

10  Government.

11  Q.    And your analysis and bill in this case, what is your

12  hourly rate, roughly, in a case like this?

13  A.    In a case like this, usually my hourly rate is about

14  $400 an hour.

15  Q.    Your final bill was somewhere in the neighborhood of

16  $37,000?

17  A.    That's correct, yes.

18  Q.    So roughly a hundred hours, or so, of work in this

19  case?

20  A.    I have to check the invoice, but I think that's about

21  right, yes.

22  Q.    And that's for the analysis that led to what we're

23  going to talk about in your report?

24  A.    That's correct, yes.

25  Q.    So I want to talk specifically about your methodology

Kohlmann - D

1  and analysis.

2      Mr. Kohlmann, have you, through your research and

3  academic work, identified six factors that you

4  have -- consider to be important in identifying

5  characteristics common with people engaged in violent

6  jihadist behavior?

7  A.   I have, yes.

8  Q.   Can you tell us what those factors are?

9  A.   Yes.  Sure.  In order to determine whether or not or

10 try to -- try to see whether or not someone is potentially a

11 threat, we often look to six factors.  These are not

12 exclusive factors, obviously; but they are factors we

13 believe shed light on whether or not someone can be

14 considered to be a genuine violent threat.

15     Those factors include the evidence of -- or, excuse

16 me -- evidence of self-selecting plots or schemes.  In other

17 words, has someone gone out and done research and is someone

18 actively trying to come up with a terrorist plot to the

19 point that they have details and they have a plan and

20 they're showing some kind of commitment to -- to a

21 particular scheme?

22     Number two, we look to whether or not someone like this

23 has previous or preexisting ties to a known extremist or

24 known representative of a terrorist organization or a known

25 recruiter for a terrorist organization.

2012

Kohlmann - D

1        We look to see whether or not someone has been -- or, I

2   should say, someone has adopted a radical sectarian ideology

3   that has put them at odds, not only with the mainstream

4   community inside the United States, but even within the

5   Muslim community itself, this is considered to be a very

6   aberrant viewpoint or could be an aberrant viewpoint.

7        Number three, we look whether or not this person is

8   engaging in logistical subterfuge -- this is number four --

9   engaged in logistical subterfuge.  Is this person trying to

10  conceal their activities from law enforcement?  Are they

11  engaged in activity that doesn't make any sense other than

12  them trying to hide themselves from public view?  Because

13  that -- obviously there are questions raised by why someone

14  is trying to conceal what they're doing.

15       We look to whether or not somebody is deliberately

16  collecting and/or redistributing large amounts of terrorist

17  propaganda; i.e., video recordings produced by al-Qaeda's

18  official media wing, magazines produced by official media

19  wing of al-Qaeda.

20       And, obviously, one part of that is if someone is

21  trying to redistribute that; i.e., trying to send that out

22  to other people in order to radicalize other people, as

23  well.

24       And we look to see whether or not someone is browsing

25  websites or social networking forums which are explicitly

2013

Kohlmann - D

1   run by or on behalf of terrorist groups or terrorist

2   organizations.

3        And by looking at these various different factors, when

4   we look at them we see somebody who's been engaged in

5   self-selecting plots or schemes; i.e., without anyone

6   telling them to do this, has been coming up with, you know,

7   plots of either trying to leave the country and join a

8   terrorist organization or carry out an act of violence.

9        We see someone who's adopted in extreme ideology; a

10  very, very extreme ideology.  We see someone who's engaged

11  in logistical subterfuge; someone who's communicating with a

12  known extremist leader; someone that's immersed in terrorist

13  propaganda and websites; they're affiliated with terrorist

14  groups.

15       That's the kind of person that we look at as a

16  potential violent threat.

17  Q.   Where do these six factors you describe to the jury

18  come from?

19  A.   They come directly from our own research.  We regularly

20  look, both, at cases such as this, as well as we look at

21  other individuals who are out there on the Internet, or just

22  in general, who are fitting these various different

23  characteristics, who appear to be, you know, falling into

24  these categories, and we -- the idea is to try to understand

25  what is the difference between someone who is just posting

Kohlmann - D

1   nasty messages on the Internet and someone who may have a

2   very deviate political philosophy but is not actually a

3   threat, versus someone who looks like they're so convinced

4   of whatever their belief system is that they're actually

5   willing to take action on behalf of it.

6   Q.    And do the factors or the ideas behind these appear in

7   the academic work you've already described for the jury?

8   A.    Yeah.  I've never laid them out prong by prong.  I

9   never laid out all six prongs, but I generally write about

10  homegrown extremism and homegrown terrorism.  And all these

11  various different factors I've written about in the work

12  that I've written about, because these are fairly obviously

13  factors, and --

14          THE COURT REPORTER:  I'm sorry.  Could you slow

15  down?

16          THE WITNESS:  Excuse me.  I'm sorry.  If somebody

17  is actively plotting to carry out a terrorist attack,

18  naturally that would lead someone to be concerned that this

19  is a potential violent extremist.

20      So these are -- these are the kind of things that we

21  look to that are -- you know, that really help us separate

22  away people who are not really that threatening.

23  BY MR. KNIGHT:  (Continuing)

24  Q.    And in your research, do you look at people who are not

25  engaged in these factors or not engaged in what could be

Kohlmann - D

1  classified as terrorist-related activity?

2  A.   Yes.  We -- we engage in comparative analysis.  We are

3  doing comparative research.  And so you have to have a basis

4  for comparison.  So in addition to working with moderate

5  Muslim groups and speaking with representatives of the

6  mainstream Muslim community, we also look to web forums or

7  websites where there are people who are expressing views

8  that we don't necessarily agree with and maybe the majority

9  of Americans wouldn't agree with, but these are forums where

10 the people don't appear to be violent in any way.

11      And we're trying to understand what distinguishes

12 people who are in a forum like that or who have that kind of

13 a philosophy from the people who are really looking to carry

14 out violent acts in the name of their ideology.

15 Q.   Thank you.

16      Mr. Kohlmann, before we get into these specific factors

17 as they relate to the evidence in this defendant's case, I

18 want to ask you about some terms.

19      Are you familiar, sir, with the term the global jihadi

20 movement?

21 A.   Yes.

22 Q.   Can you explain to the jury what that is and its

23 significance to this type of analysis?

24 A.   The global jihadi movement was actually just a subject

25 of some testimony by the Secretary of State for Congress two

Kohlmann - D

1    days ago.  The global jihadi movement refers to the fact

2    that beyond al-Qaeda, which is probably the most -- most

3    well-known group within this movement, there are a variety

4    of other jihadi movements out there, Sunni jihadi movements,

5    that are based all around the world, that don't necessarily

6    have the al-Qaeda name, but they share the exact same

7    ideology, or very similar ideology, to al-Qaeda.

8        Their leaders have often received training at al-Qaeda

9    camps, oftentimes in Afghanistan, and they are working

10   together in the sense that they share resources, they share

11   personnel, they share financing, they share information,

12   they try to coordinate their activities.

13       So in addition to al-Qaeda Central, you have al-Qaeda

14   franchises.  You have al-Qaeda's committee in Iraq.  You

15   have al-Qaeda's network in Yemen.  You have al-Qaeda's

16   network in North Africa.  These are actually separate

17   organizations, even though they work under the umbrella of

18   al-Qaeda.

19       Then you have other groups, as well.  You have groups

20   like Shabaab al-mujahideen S-H-A-B-A-A-B, A-L,

21   M-U-J-A-H-I-D-E-E-N.  Shabaab al-mujahideen doesn't have the

22   name al-Qaeda in it, but Shabaab has officially sworn

23   allegiance to al-Qaeda.  They swore an oath of allegiance to

24   al-Qaeda.  And, generally speaking, they operate within

25   al-Qaeda's worldview.

Kohlmann - D

1    They believe that there is a crusade out there and that

2    the United States is leading this crusade and the crusade is

3    aiming at irradicating Islam and that only by working

4    cooperatively -- that's the only way these groups see that

5    they can defeat this threat.

6    So while these groups certainly have differences and

7    they certainly speak different languages sometimes and they

8    have differences in particular pieces of ideological

9    approaches to particular issues, the things that they can

10   agree on are the central issues, the issues that they

11   believe in Sharia.  They believe in Islamic law.  They

12   believe in an end to Western influence in the Muslim world.

13   They believe an end to what they call the apostate regime of

14   the Middle East; i.e., secular or nonhard-core Sunni

15   regimes, and a variety of other different things.

16   But, again, they see eye to eye on these issues and

17   they obviously share an enmity towards the United States.

18   Q.   Next I want to ask you about the word or the term

19   "jihad."

20   A.   Yes.

21   Q.   Could you tell the jury, in the context of all your

22   work in research, what that term is?

23   A.   Yes.  Jihad is an Arabic word which means holy

24   struggle.  Jihad can be an internal or it can be an external

25   thing.  A jihad could be if you -- you're an alcoholic and

1   you decided to fight your alcoholism.  You could wage an

2   internal jihad against alcoholism.

3       But there's external jihad.  And external jihad

4   oftentimes takes, you know, the context of something

5   violent.  That's oftentimes why this term has been

6   mislabeled, really, to be Holy War, because in the

7   contemporary context, violent organizations have so often

8   used this word that it's become almost a pejorative term.

9   Some Muslims don't like using it anymore, because it has

10  that immediate connotation to a violence or to al-Qaeda.

11      But jihad itself -- jihad itself, all it means is holy

12  struggle.  It's just, unfortunately, in the contemporary

13  context, extremists have hijacked this term and turned it

14  into their own term referring to violent acts in the name of

15  their religion.

16  Q.  How can you tell what the term or phrase is intended to

17  mean, given the different meanings you just described to it?

18  A.  Well, it's based entirely in the -- in context.  If

19  someone is talking about an external jihad and they start

20  talking about mujahideen -- mujahideen means the holy

21  warriors.

22      Well, people cannot wage an internal jihad inside of

23  somebody else.  That's physically impossible.  So if you're

24  talking about plural people who are engaged in external

25  jihad, i.e., mujahideen, that almost invariably refers to

Kohlmann - D

1   people who are engaged in violent external jihad.

2   Q.    I want to ask you a few questions about individuals in

3   the context of your research.  Are you familiar with the

4   person by the name of Anwar Al-Awlaki?

5   A.    Yes.

6   Q.    And who is that?

7   A.    Shaykh Anwar Al-Awlaki, now deceased, is a former

8   Yemeni-American cleric who was born in New Mexico to Yemeni

9   parents.  Anwar Al-Awlaki drew a following amongst mostly

10  younger Muslims from a particular sect within Islam known as

11  the Salafi sect, which is a -- puritanical, I think is a way

12  to put it, but a conservative sect in Islam.

13      Anwar Al-Awlaki began having contact with extremists as

14  early as 1999.  According to the FBI, he had contact with at

15  least two 9/11 highjackers prior to 9/11.

16      Following 9/11, Anwar Al-Awlaki began increasingly

17  issuing English language sermons encouraging Muslims in the

18  West to join violent jihadi groups, to engage in acts of

19  violent jihad, and to adopt a philosophy of violent jihad.

20      This eventually culminated in Anwar Al-Awlaki leaving

21  the United States and traveling to Yemen, where he began

22  providing support and assistance to al-Qaeda's network in

23  Yemen.

24      He was imprisoned in Yemen for approximately a year,

25  was released, and then went right back to al-Qaeda, where he

Kohlmann - D

1    began working officially as an advisor and lieutenant on

2    their behalf.

3        He began issuing official video recordings and audio

4    recordings on behalf of al-Qaeda, ordering Muslims living in

5    the West to carry out acts of violent jihad imminently, in

6    English.

7        In September of 2011 Anwar Al-Awlaki was killed in a

8    missile strike in an undisclosed area of central Yemen.

9    Q.    Do you know a person by the name of Samir Khan?

10   A.    Yes.

11   Q.    Who is he?

12   A.    Samir Khan was a U.S. national who was killed in the

13   exact same drone strike as Anwar Al-Awlaki in September of

14   2011.  Samir Khan became famous in the United States prior

15   to ever leaving the U.S. borders because of the fact that he

16   became arguably the most well-known American jihadist on the

17   Internet.

18       Samir Khan began by starting a blog, which was known as

19   inshallah shaheed -- I-N-S-H-A-L-L-A-H, S-H-A-H-E-E-D --

20   which, in Arabic, means God-willing a martyr.  The blog was

21   set up in order to help redistribute al-Qaeda propaganda, as

22   well as to encourage English-speaking Muslims to either

23   adopt al-Qaeda's philosophy or to try to join one of its

24   various different organizations or entities.

25       Eventually Mr. Khan joined others and formed another

1    website known as Revolution Muslim; again, dedicated to the

2    exact same cause.

3        He also eventually produced a magazine, an English

4    language magazine, entitled *Jihad Recollections*, which was

5    aimed as English-speaking al-Qaeda supporters in the West;

6    primarily in the United States.

7        In 2009, after being profiled on television, after

8    being shown in reports in FOX News channel and CBS, after

9    having reporters having camped outside of his house, because

10   he was such a well-known extremist leader -- on the Internet

11   anyway -- Khan, who was very young, you know -- he was in

12   the early twenties -- left the United States and traveled to

13   Yemen, where he purportedly was going to be engaged in

14   teaching English.

15       However, Mr. Khan immediately used the opportunity to

16   travel into central Yemen, where he joined al-Qaeda in the

17   Arabian Peninsula, al-Qaeda's local outfit in Yemen, and he

18   began producing something on their behalf known as *Inspire*

19   magazine.

20       *Inspire* magazine was simply a rebranded version of his

21   previous magazine *Jihad Recollections*.  The main difference

22   being is that *Inspire* magazine had the added benefit of

23   having official al-Qaeda personnel contribute --

24   contribute -- contributing an occasional article to the

25   magazine.

Kohlmann - D

1    So whereas before the articles were being written by,

2    generally speaking, homegrown extremists, now the articles,

3    in many cases, were being written by official al-Qaeda

4    personnel, official al-Qaeda bomb makers, official al-Qaeda

5    leaders, including Anwar Al-Awlaki.

6         And, of course, like I said, after issuing

7    several -- several -- several -- I should say after

8    releasing several issues of *Inspire* magazine in September of

9    2011, Mr. Khan was killed in the same drone strike as

10   Anwar Al-Awlaki.

11   Q.   You've alluded already to the importance of the acronym

12   AQAP in Yemen.  Can you briefly describe, factually, the

13   significance of the Afghan conflict in the global jihadi

14   movement?

15   A.   Yes.  In the late 1980s and early 1990s a group of

16   foreign fighters from around the Muslim world, in places

17   like Egypt, Algeria, and Saudi Arabia, and as far as away as

18   Indonesia, left their homes to travel to Afghanistan in an

19   idea they would wage jihad on half of the Afghan people

20   against the Soviet Army, against the -- the Afghan Communist

21   Army.

22        However, some of these people were diehard world

23   extremists who believed that this conflict was the beginning

24   of a much greater conflict, which would see them sweep

25   across the Muslim world, removing, again, what they

Kohlmann - D

1    described as apostate or secular regimes, and removing

2    Western influence.  This was going to be a crucible from

3    which a greater jihad would be borne.

4              MR. WAX:  Excuse me, Your Honor, I have an

5    objection that we need to take up out of the presence of the

6    jury.

7              THE COURT:  At this time?

8              MR. WAX:  Yes.  Given what the witness has been

9    saying, I believe we need to address it at this time,

10   Your Honor.

11             THE COURT:  All right.  I'm going to -- I'm going

12   to ask the jury to be taken out, then, just for a short

13   time.

14             (The jury panel leaves the courtroom.)

15             THE COURT:  What's your objection, Mr. Wax?

16             MR. WAX:  Well, Your Honor, the witness has on a

17   number of occasions used the phrase "homegrown terrorist,"

18   and "temporary violent extremists," et cetera.  I did not

19   object earlier in his testimony when he was using those

20   terms in the abstract, but he has now said that the

21   contributors to the *Jihad Recollections* magazine were

22   homegrown extremists or homegrown terrorists.

23        And as I'm reading page 12 of your opinion, that is

24   precisely the type of testimony that you had ordered

25   precluded.

2024

Kohlmann - D

1        THE COURT:  I believe that I ruled that the

2   experts cannot give an opinion on ultimate mental state that

3   defendant was or was not a homegrown terrorist.

4        MR. WAX:  And I believe that by saying that the

5   contributors to *Jihad Recollections* were such people, when

6   there's been testimony in this case that Mr. Mohamud made

7   some contributions, and I anticipate that Mr. Kohlmann will

8   make such comments, as well, that he has crossed the line.

9   We ask that his testimony be stricken, and we ask that he be

10  precluded from any further testimony.

11       THE COURT:  The motion is denied.  He made a

12  statement about people who contributed were homegrown

13  terrorists.

14     Be very careful about what you say.  Don't say anything

15  that is an opinion, on your part, as to the defendant in

16  this case --

17       THE WITNESS:  Yes, Your Honor.

18       THE COURT:  -- and the ultimate issue.

19     All right.  Bring the jury back.

20       MR. WAX:  Thank you.

21       THE COURT:  Mr. Wax, if you have another

22  objection, make your objection in a general way.  I have my

23  notes here, and I can make a ruling if I hear anything that

24  violates the court order.

25       MR. WAX:  Thank you.  Will do.

Kohlmann - D

1              (The jury panel enters the courtroom.)

2              THE COURT:  All right.  We'll take that as your

3    afternoon stretch.  All right.  You may proceed.

4              MR. KNIGHT:  Thank you.

5    BY MR. KNIGHT: (Continuing)

6    Q.   Mr. Kohlmann, when we left off you were completing an

7    explanation to the jury about the U.S. role in Afghanistan,

8    as it relates to what you described as the global jihadi

9    movement.  Can you finish with that?

10   A.   Yes.  And so I was explaining that these individuals,

11   these foreign fighters, came there with the idea that this

12   would be a crucible for a greater struggle.  So Afghanistan

13   became home for approximately about 10 or 11 years to a

14   series of training camps.

15        These became the epic, the very famous, al-Qaeda

16   training camps; the ones that you see in video recordings

17   that are on TV showing al-Qaeda personnel training.  And

18   obviously these were released in propaganda videos.  So

19   there became -- legends, you know, became about within the

20   extremist community talking about --

21              THE COURT REPORTER:  I'm sorry.

22              THE WITNESS:  I'm sorry.

23        -- talking about how important the conflict in

24   Afghanistan was and how important the training camps were,

25   and, most importantly, how important the jihadi leaders, the

2026

Kohlmann - D

1   transnational jihadi leaders and commanders who were based

2   there, how important those individuals were, people like

3   Osama bin Laden or his top deputy, now the leader of

4   al-Qaeda, Dr. Ayman al-Zawahiri.

5   BY MR. KNIGHT: (Continuing)

6   Q.    Thank you.

7         Now, given that context and background, I want to

8   direct your attention to the facts and evidence you've

9   reviewed in this defendant's case.

10        Now, you described for the jury six factors common in

11  your research and analysis in these cases.  So, first, I

12  want to turn your attention to the first of those factors.

13        Could you, again, briefly tell the jury what the factor

14  is, and then explain initially how you looked at the

15  defendant's case and the facts in his case under that

16  factor?

17  A.    The first factor that I -- enumerated in my report is

18  the idea of self-selecting plots or schemes.  Was somebody

19  engaged in a meaningful effort or efforts to try to either

20  travel abroad to join a terrorist organization or to carry

21  out an act of violence or some other meaningful act here at

22  home on behalf of an organization?

23        In reviewing the materials in the present case, I found

24  evidence of at least one, if not two, serious efforts to

25  travel to Yemen in order to join -- presumably in order to

Kohlmann - D

1    join a violent jihadi group there, which at the time this

2    trip was supposed to take place, would have been al-Qaeda in

3    the Arabian Peninsula.

4        I also found discussion of a potential terrorist plot

5    that wasn't that detailed, but, nonetheless, there was

6    discussion of it, styled around what happened in November of

7    2008 in Mumbai, India, when a group of individuals carried

8    out a series of attacks on hotels in downtown Mumbai using

9    small arms, using AK47s and grenades; using basic weapons.

10       There was also discussion about attempting to travel to

11   Denmark in order to murder individuals in Denmark who were

12   accused of blaspheming against Islam for publishing

13   controversial cartoons depicting the Prophet Muhammad.

14       There was discussion in there of a variety of different

15   schemes, aside from obviously the scheme that is in question

16   in -- in this case primarily, which is a scheme to

17   potentially target somewhere locally here in Portland,

18   Oregon.

19   Q.   Thank you.

20       I want to direct your specific attention to travel.

21       Are you aware, Mr. Kohlmann, of an email that was sent

22   between the defendant and an individual named Amro Al-Ali

23   about the university in Yemen?

24   A.   Yes.

25   Q.   Are you familiar with that university?

Kohlmann - D

1   A.    I am, yes.

2   Q.    And what is the name of it, and how are you familiar

3   with it?

4   A.    The name of the institution is Dar ul-Hadith.

5         D-A-R, U-L, H-A-D-I-T-H.  Dar ul-Hadith is a seminary

6   in Yemen, in a place call Dammaj, D-A-M-M-A-J.  It was

7   founded by a cleric known as Shaykh Muqbil M-U-Q-B-I-L, bin

8   Hadi.  B-I-N, H-A-D-I, al-Wadiee, A-L, W-A-D-I-E-E.

9         Shaykh Muqbil was an avid supporter of jihad.  And his

10  seminary, even though he eventually had an argument with

11  Osama bin Laden, his seminary in Yemen gained a reputation

12  among -- principally amongst English-speaking jihadists from

13  the West to be a good place to go to be a steppingstone to

14  find either a violent jihadi group or a very, very jihadist

15  cleric or some -- somewhere in the jihadi community.

16       This was viewed openly and was discussed openly on the

17  Internet as an excellent steppingstone for people in the

18  West who had no other way to get inside of a jihadi

19  organization.

20  Q.    Now, speaking more generally about travel -- and you

21  just alluded to it -- what specific evidence did you see, in

22  what you reviewed, that indicated that you characterized as

23  a self-selecting scheme aimed at traveling abroad to join

24  organizations?

25  A.    I viewed repeated discussions, both between the

Kohlmann - D

1   defendant and individuals in Yemen, as well as the defendant

2   with the undercover agents in this case, in which the

3   defendant described his interest in traveling to Yemen and

4   the fact that in September of 2009 he actually made it as

5   far as the airport before being turned around at the airport

6   by FBI agents who met him there.

7        At the time, my understanding is the defendant -- based

8   on the communications that I reviewed, the defendant accused

9   or blamed his parents for turning him into the FBI because

10  of the fact they feared that he was traveling to either

11  Somalia or Yemen in order to join a violent jihadi

12  organization.

13  Q.   Now I want to direct your attention to the second prong

14  of this analysis, not the second methodology -- sorry,

15  factor, but achieving imminent acts of physical violence.

16  What specific evidence were you looking at in this pool of

17  evidence that drew your attention to that issue?

18  A.   Well, first of all, there was the discussion of things

19  like Mumbai, specific -- repeated discussions both with the

20  UCEs, as well as, I believe, separate from the UCEs, of

21  discussion about the importance of Mumbai and the

22  defendant's interest in Mumbai or carrying out potentially

23  an attack similar to Mumbai.

24       Obviously, there was discussion again of Denmark about

25  the idea of murdering people of Denmark abroad.  And, of

Kohlmann - D

1    course, there's the -- there's the plot that is the basis

2    for this case, which is potentially a terrorist plot or a

3    plot to carry out a terrorist act locally here in Portland.

4    Q.    And a little later on we'll talk specifically about

5    evidence you reviewed related to Denmark.  Can you tell the

6    jury briefly what significance Denmark has in the larger

7    context of Islamic terrorism in the global jihadi movement?

8    Why does it come up frequently?

9    A.    Denmark is a very small country in Europe and most

10   Danes don't understand why they have become targeted by

11   jihadists, but there is a very good reason why.  In 2006 a

12   Danish cartoonist named Kurt Westergaard --

13              THE COURT REPORTER:  I'm sorry; the name?

14              THE WITNESS:  Sorry.  It's Kurt Westergaard.

15   There's actually a couple of them.  It's probably fair to

16   say that there was a Danish cartoonist and several

17   individuals in Denmark who helped publish cartoons, which

18   lampooned the Prophet Muhammad.  They drew him with a bomb

19   in his turban, et cetera, et cetera.

20        These cartoons were perceived as deeply offensive to

21   faithful Muslims; so offensive that when the cartoons were

22   published and received widespread coverage in the media,

23   that there were riots that took place in a number of

24   different capitals across the Muslim world.  There were

25   angry demonstrations and various different terrorist

 1   organizations, principally official venues or official

 2   affiliates of al-Qaeda, began issuing offers of rewards for

 3   anyone who would go out and murder the cartoonist and anyone

 4   involved in the publication or republication of these

 5   cartoons.

 6       As a result, several different individuals have made

 7   aggressive efforts at trying to kill that cartoonist,

 8   including one individual of Somali origin who attempted to

 9   take an ax and break down this man's door.

10       Another group of individuals based in Pennsylvania,

11   Maryland, and, really, across the East Coast, also attempted

12   to travel to Denmark in order to kill the cartoonist.  In

13   fact, got so far as to send somebody over to follow the

14   cartoonist and try and figure out where he would be

15   vulnerable to being killed.

16       The issue continues to reverberate across the Muslim

17   world.  And, as a result, Denmark remains a major interest

18   area and a target for jihadi organization.

19   BY MR. KNIGHT: (Continuing)

20   Q.   Again, we'll turn to factual specifics later, but I

21   want to direct your attention to your second factor in your

22   analysis in reviewing the material in this case and others.

23       Could you please tell the jury, again, what that is

24   before we get into the facts?

25   A.   Yes.  The second prong that I looked at in my report

Kohlmann - D

1  would be the presence of connections to known violent

2  extremist leaders or known recruiters or known generators of

3  violent jihadi content.  In other words, has someone tried

4  reaching out to find someone who knows more than them in

5  order to get a helping hand; kind of a hand up into the

6  mainstream jihadi community.

7  Q.   And did you see evidence in this case, connections

8  between this defendant and individuals you would

9  characterize as known extremist individuals or terrorists?

10 A.   I did, yes.

11 Q.   And I want to direct your attention to a few of them.

12      First, are you familiar with a person by the name of

13 Amro Al-Ali?

14 A.   Amro Suleiman Al-Ali, yes.

15 Q.   And outside of strictly the facts in this case, what

16 has your research shown about him?

17 A.   In January 2011, the Kingdom of Saudi Arabia issued a

18 list of --

19           MR. WAX:  Objection.

20           THE COURT:  What's the basis of the objection?

21 Just state the legal basis.

22           MR. WAX:  Relevance based on time.

23           MR. KNIGHT:  That's a different issue from what

24 the agent's testified about.  This expert witness is saying

25 what the pool of his knowledge about this person is.

Kohlmann - D

1          THE COURT:  I'll allow that testimony.

2      Overruled.

3          THE WITNESS:  In January 2011 the -- the Interior

4  Ministry of the Kingdom of Saudi Arabia issued a list of 47

5  individuals who were considered to be most wanted al-Qaeda

6  terrorist suspects on the loose considered to be imminent

7  threats and sought by the Interior Ministry for questioning

8  and potentially for adjudication in a court.

9      One of the individuals on that list was Amro Suleiman

10  Al-Ali.  According to information that was provided to

11  Interpol by the Kingdom of Saudi Arabia, Mr. Al-Ali was

12  alleged to have traveled to Pakistan to receive training in

13  explosives.

14          MR. WAX:  Objection.  Hearsay.

15          THE COURT:  Overruled.

16      Mr. Kohlmann, go ahead.

17          THE WITNESS:  Thank you, Your Honor.

18      Mr. Al-Ali reportedly traveled to Yemen -- or, excuse

19  me, to Afghanistan -- excuse me, Pakistan to receive

20  training in explosives, as well as to provide financing to

21  al-Qaeda, and, according to the Interior Ministry, was also

22  involved in recruiting Americans and other Westerners to

23  join al-Qaeda.

24  BY MR. KNIGHT: (Continuing)

25  Q.   Now, are you familiar in this case, Mr. Kohlmann, with

Kohlmann - D

1  a number of communications between the defendant and

2  Mr. Al-Ali?

3  A.   I am, yes.

4  Q.   And we're not going to go into detail of all those at

5  this time, but are you also familiar with an email

6  purportedly seized from defendant's person on the day of his

7  arrest with some information from Mr. Al-Ali?

8  A.   Yes.  It was a printed-out email on his person, that's

9  correct.

10  Q.   And so we're going to take a look at that.  It's

11  already been admitted.  It's Exhibit 36.  If we could

12  enlarge the portion at the top.

13        Is this what you looked at, Mr. Kohlmann?

14  A.   Yes.

15  Q.   First of all, is there a date on this?  Do you have any

16  idea when it was sent?

17  A.   I can't see one on here, no.  It just says 3:44 a.m.,

18  four hours ago.

19  Q.   And were you able to determine where the address and

20  phone number that appear on this originate from?

21  A.   Yes.  This actual address refers to a particular

22  neighborhood in Sana'a which is a city in Yemen, a major

23  city in Yemen.

24  Q.   Is there any other information on here that you were

25  able to track or trace to a geographic location?

Kohlmann - D

1    A.    I believe I was given an IP address, as well as the

2    email; but, again, the address -- the address and the phone

3    number here clearly list a location inside of Yemen.

4    Q.    Thank you.  And below there's some language in Arabic.

5    Do you see that?

6    A.    I do, yes.

7    Q.    And do you have -- with the assistance of an Arabic

8    translator, that portion of this email translated?

9    A.    Yes.  I requested that my research assistant translate

10    that Arabic portion into English.

11    Q.    And was that translation contained in your report?

12    A.    It was, yes.

13            MR. KNIGHT:  And at this time, Your Honor, I would

14    like the witness to read -- not to publish to the jury only,

15    but have him read the translation of the poem to the jury.

16        I don't know if Mr. Wax has an objection.  It's been

17    provided.

18            THE COURT:  Go ahead.

19            THE WITNESS:  Thank you, Your Honor.  Quote:  Let

20    the supporters of the Jews know no traitor among us will

21    escape his fate.  We swear never to accept any negotiations

22    that dishonored our alasa (ph).  We shall never forget

23    Jerusalem regardless of how high are the walls.  We shall

24    not forget -- we shall not -- excuse me -- we shall not

25    forget the great Andalusia and will march to save our

Kohlmann - D

1   Chechnya.  Then our nightingale will sing, your time has

2   come.  It has just come.

3   BY MR. KNIGHT: (Continuing)

4   Q.    Thank you.

5         To clarify, that was the translation of the poem on the

6   document Exhibit 36?

7   A.    That's correct, yes.

8   Q.    Thank you.

9         And do you see in your review of the discovery and

10  materials in this case, given that background, do you see

11  significant mentions or discussions of Mr. Al-Ali in the

12  context of this case?

13  A.    Yes.

14  Q.    Could you please identify some of those to the jury

15  that you know as significant in the context of this factor?

16  A.    There were several discussions that I reviewed in which

17  the defendant appeared to discuss Mr. Al-Ali with the

18  undercover operatives or undercover agents involved in this

19  case.  He appeared to identify Mr. Al-Ali as an extremist

20  leader, as someone he apparently associated with a violent

21  jihadi organization as someone who he perceived that could

22  bring him into the fold; could bring him into a group like

23  al-Qaeda.

24  Q.    Thank you.

25        And moving on, you've already testified briefly about a

Kohlmann - D

1   person by the name of Samir Khan.  Did you review a number

2   of emails between the defendant, in this case, and Mr. Khan?

3   A.   Yes, my understanding is that there is a total of 150

4   emails provided to me documenting communications between

5   Mr. Khan and the defendant.

6   Q.   Thank you.

7        And before we get into some specific questions, did you

8   generally note contextually any significance to those

9   contacts, either their duration or content?

10  A.   Well, there was 150 of them, which is kind of unusual,

11  because Samir Khan was a very well-known extremist.  He was,

12  arguably, the most well-known homegrown extremist still

13  living in the United States.  I have never seen anyone else

14  who has exchanged -- or I never heard of anyone else who has

15  exchanged 150 emails with Samir Khan over that period of

16  time.  It seemed like quite a bit to me.

17  Q.   You talked a little bit about Mr. Khan and his time in

18  the United States.

19       Now, you've testified already that Mr. Khan was living

20  openly when he was in the United States.  Was he still

21  espousing what you considered, in your opinion, to be

22  radical or views relative to violent jihad during that time?

23  A.   Yes.  He was routinely espousing support for violent

24  jihad and encouraging others to adopt that point of view.

25  Q.   I want to go to specifically Exhibit 239, number nine,

Kohlmann - D

1   that has already been admitted.  This is an article from

2   *Inspire* magazine, authored by Mr. Khan.

3        Now, are you familiar with this article?

4   A.   Yes, I am.

5   Q.   And what's the name of the article?

6   A.   The name of this article is:  *I'm a Traitor to America*

7   or *I'm Proud to Be a Traitor to America.*

8        There you go:  *I'm Proud to Be a Traitor to America.*

9   Q.   Thank you.

10       In this what does Mr. Khan discuss?

11  A.   Mr. Khan discusses how it is he ended up leaving his

12  home or leaving his conventional lifestyle in Charlotte,

13  North Carolina, to join al-Qaeda.  Why it happened; how it

14  happened; and how others can learn from his experience.

15       He described everything from his actual traveling

16  process from the United States to Yemen, to his actual

17  joining of al-Qaeda.

18  Q.   Thank you.

19       I want you specifically to look at a highlighted

20  portion of this, if you could, and read it to the jury by

21  Mr. Khan here.  If you could please read that exerted

22  section to the jury.

23  A.   Sure.

24       Throughout my experience of traveling from America to

25  Yemen, I was expecting to be stopped and detained, but the

Kohlmann - D

1  most trouble I went through -- if it's even considered

2  trouble -- was that it took 30 minutes extra to get my

3  boarding pass in North Carolina, since, as the receptionist

4  told me, I was being watched.  It still surprises me when I

5  reflect on it -- I mean, I was quite open about my beliefs

6  online, and it didn't take a rocket scientist to figure out

7  that I was al-Qaeda to the core.

8  Q.   Thank you.

9       And is Mr. Khan's observation about himself consistent

10 with what you observed during his time in the United States?

11 A.   Yeah.  We were just surprised that he was so open about

12 it; but, yeah, that was exactly our view, as well.

13 Q.   And can you speak to Mr. Khan's significance to the

14 global jihadi movement that you described more broadly?

15 A.   Samir Khan has become an icon of the global jihadi

16 movement, particularly because of the fact that as an

17 English-speaking American, who received a normal education,

18 was well-spoken and well-read, highly intelligent,

19 nonetheless, decided to shed his, what he referred to as,

20 his material life, and traveled to join al-Qaeda in Yemen

21 where he became the author or the inspiration behind an

22 official English-language magazine.

23      No al-Qaeda faction had ever issued its own

24 English-language magazine aimed at recruiting individuals

25 directly from the West.

Kohlmann - D

1          So by publishing this magazine on behalf of AQAP,

2    Samir Khan became a rock star within this community -- not

3    that he wasn't already a rock star in the extremist

4    community before he left the United States.

5               THE COURT REPORTER:  I'm sorry.

6               THE WITNESS:  I'm sorry.  But by producing *Inspire*

7    magazine or AQAP, it catapulted him to become, really, a

8    living legend among -- especially among homegrown

9    extremists.

10   BY MR. KNIGHT: (Continuing)

11   Q.   And you've talked a little bit before about *Inspire*

12   magazine.  Now, are you familiar with the contents and

13   authors of both of these publications?

14   A.   I'm familiar with the content, and I'm familiar with

15   the authors; however, the authors, almost exclusively, used

16   pseudonyms, they used kunions (ph), which are like Muslim

17   names which are pseudonyms, aliases.  They're not their real

18   name.

19   Q.   And based upon your knowledge of the pseudonyms,

20   roughly how many contributors, based upon your review, are

21   there to *Jihad Recollections* during the time period it was

22   published?

23   A.   I believe approximately five contributors in total.

24   Q.   And then are there articles in *Jihad Recollections* and

25   *Inspire* from more notable individuals like Osama bin Laden

Kohlmann - D

1 or Ayman al-Zawahiri?

2 A.    Yes.   Both *Jihad Recollections* and *Inspire* magazine

3 tended to recycle material from other al-Qaeda propaganda.

4 So they would take a speech by bin Laden and translate it

5 into English and translate parts of the speech in

6 *Jihad Recollections*, or, conversely, from *Inspire* magazine.

7        Likewise, they would do the same thing with other

8 al-Qaeda leaders, other al-Qaeda propaganda.   They would

9 advertise particular videos that were released by other

10 al-Qaeda factions.   It was an amalgam of information, both

11 *Inspire* and *Jihad Recollections*, of original content along

12 with recycled jihadi propaganda.

13 Q.   Now, are you aware that the defendant did, in fact,

14 write material for *Jihad Recollections*?

15 A.   I'm aware he did contribute articles to *Jihad*

16 *Recollections*, yes.

17 Q.   We'll talk about that a little bit later in the section

18 of your analysis that deals with material generated by the

19 defendant.   But at this time I want to turn your attention

20 to the third prong of your analysis.   Can you tell the jury

21 what that is?

22 A.   The third prong of my analysis is the adoption of a

23 hardline sectarian ideology that would put someone at odds,

24 not just, again, with American -- American society at large,

25 but, more specifically, even within the Muslim community;

Kohlmann - D

1   would put them at odds with the mainstream Muslim community.

2   Q.   Could you give us some context?  What is Salafiism?

3   A.   Sure.

4   Q.   And what constitutes, in your view, in your opinion, a

5   hardline sectarian perspective?

6   A.   Salafi simply means the -- sorry, refers to the elders

7   of Islam.  Salafi.  Salafis are, generally speaking, a

8   conservative brand of Islam.  They believe in returning to

9   the conditions of Islam exactly as they were laid down by

10  the Prophet Muhammad back in the seventh century.  And, by

11  doing so, they encourage the adoption of even clothing and

12  hairstyles and everything that they believe matches what the

13  Prophet would do.

14      Now, certainly, not all Salafis are violent.  In fact,

15  the majority of Salafis are nonviolent.  However, within the

16  Salafi branch of Islam or the Salafi sect of Islam, there is

17  a small group of people that believe that violence, a jihad,

18  a Holy War is an essential component of what the

19  Prophet Muhammad was doing back in the seventh century.

20      So, thus, anyone who believes in this ideology, if

21  they're really true to this, they should also be waging

22  violent jihad right now against the enemies of Islam.

23      The way in which you would know somebody would be

24  adopting a philosophy of a Salafi-jihadi philosophy -- you

25  know, there's a number of different ways.  One of the

Kohlmann - D

1    easiest ways is to look at the clerics, that -- the

2    particular clerics that this person is turning to for

3    religious guidance.  Because Islam is different from

4    Christianity in the sense that Christianity you have -- in

5    Catholicism you have a Pope, you have one person who

6    supposedly dictates what Christianity is supposed to be --

7    what Catholicism is supposed to be about.

8         In Islam there is no one central authority.  You have

9    different clerics to believe in different interpretations of

10   the religion.  And obviously there's a small group of people

11   out there who are radical clerics, who are extremist

12   clerics, and who are not just emphasizing a return to, you

13   know, particular political conditions or emphasizing Muslim

14   nationalism, but that are calling directly for violent

15   attacks against anyone that they perceive as being enemies

16   of Islam.

17        There's a short list of clerics.  It's a pretty easy

18   list.  Not a long list.  But if you see those people pop up,

19   that's a big red flashing sign telling you that this is a

20   person with a very passionate interest in the Salafi-jihadi

21   mindset or philosophy that I've just been describing to you.

22   Q.   Do you see evidence of those individual clerics in your

23   review of the materials in the defendant's case?

24   A.   Yes, I did.

25   Q.   Now, Amro Al-Awlaki is someone you mentioned before.

Kohlmann - D

1  Is much of his material simply religious proselytizing with

2  no reference to violence?

3  A.   Yes.  A significant quantity of his sermon simply refer

4  to various different aspects of Islam.  They certainly

5  promote a conservative view of Islam, but they don't openly

6  call for violent acts against particular named individuals.

7  They are -- they are more philosophical in purpose.

8  Q.   And do others of them espouse a more violent or

9  hard-lined philosophy?

10  A.   Yes.  There's a number of publications and sermons that

11  Anwar Al-Awlaki has given which explicitly, and without

12  any -- without any regret, express specific support for

13  violent jihad, urge people to carry out violent jihad,

14  specifically aimed at Muslim, young Muslims living in the

15  West.

16  Q.   Thank you.  Now, I want to direct your attention to

17  what we'll put up on the screen shortly as Exhibit 223-23,

18  an email between the defendant and Samir Khan that has

19  already been admitted.

20      We'll probably go to page 2.  I apologize on this.  Do

21  you recall this email, Mr. Kohlmann?

22  A.   Yes, I do.

23  Q.   And this is a -- there's a segment in this email that

24  goes into the second page.  Do you recall the context of the

25  material that has specifically been put up on the screen in

Kohlmann - D

1  front of you?

2  A.   Yes, this comes from an email, I believe, between the

3  defendant and Mr. Samir Khan.   Mr. Samir Khan had requested

4  the defendant to explain to him what his ideology was or

5  what clerics he's following in order for Mr. Khan to

6  determine whether or not the defendant is of the right

7  belief system, whether he's on the right ideological system,

8  whether this is somebody Mr. Khan could potentially work

9  with; specifically in the area of the magazine *Jihad*

10  *Recollections*.

11  Q.   Thank you.

12      And, specifically, we have this list here.   Did you see

13  evidence or are you familiar with some of these individuals?

14  A.   Yes, I am.

15  Q.   And I'm going to ask you some specific questions about

16  some of them, now that they've been identified here by the

17  defendant.

18      Mr. Al-Awlaki, you said quite a bit about, but do you

19  see specific evidence or did you find specific evidence of

20  written or published material attributed to him in this

21  case?

22  A.   Yes, I did.

23  Q.   And what specifically do you recall seeing or finding,

24  Mr. Kohlmann?

25  A.   Number one, I found a complete transcript of a

Kohlmann - D

1    recording that was made by Mr. Al-Awlaki titled *The Battle*
2    *of Hearts and Minds.*   I also came across a download page on
3    a jihadi web forum for what was described by Mr. Al-Awlaki
4    as a -- as a statement to American Muslims.
5    Q.   Are you familiar with that particular work?
6    A.   Yes, I am.
7    Q.   And how would you characterize that in relation to some
8    of the work by Mr. Al-Awlaki?
9    A.   Mr. Al-Awlaki's statement to the American Muslims was
10   among his most radical publications.   It was one of the
11   final publications that Mr. Al-Awlaki released prior to his
12   death.   It was a publication in which Mr. Al-Awlaki, in
13   English, directly called upon Muslims, young Muslims, living
14   in the West to abandon American society and either travel
15   abroad to join a jihadi organization or, alternatively, to
16   carry out acts of violence aimed at disbelievers or the
17   enemies of Islam wherever they could be found.
18   Q.   Thank you.
19        And there are a number of other individuals named here,
20   as well.   I'm going to be asking, since they have been named
21   by the defendant here, for briefly, based on your own expert
22   work and analysis, to describe for the jury who some of them
23   are.
24        First, if you could tell us who Abdullah Azzam is.
25   A.   Shaykh Abdullah Azzam was one of the cofounders, one of

Kohlmann - D

1   the original founders of al-Qaeda with Osama bin Laden.  At

2   the time he was Osama bin Laden's spiritual mentor.  He was

3   regarded as the Godfather of jihad in Afghanistan.  He was

4   the original person who got everyone together in the late

5   1980s to go over to Afghanistan and fight there.

6       He later began quarreling with bin Laden about

7   financing and other issues.  And, ultimately, Azzam was

8   assassinated by unknown parties in Peshawar, Pakistan, in

9   November of 1989.

10      Despite his death, he remains heavily venerated by

11  al-Qaeda.  He's routinely celebrated and cited in al-Qaeda's

12  videos and he's, generally speaking, regarded in great

13  esteem by supporters and advocates for al-Qaeda's world

14  view.

15  Q.   Thank you.  The next individual I'll ask you about on

16  the list of the defendant's here is Shaykh Rahman.  Can you

17  briefly tell the jury who that is?

18  A.   Shaykh Omar Abdel Rahman, otherwise known as the blind

19  Shaykh, is a very, very influential Egyptian cleric who was

20  the former leader of an Egyptian terrorist organization

21  known as al-Gamaa al-Islamiyya.  A-L, G-A-M-A-A, A-L,

22  I-S-L-A-M-I-Y-Y-A.

23      Shaykh Omar eventually was forced to leave Egypt after

24  being put on trial for being involved in the assassination

25  of the Egyptian president in 1981.  He eventually traveled

2048

Kohlmann - D

1  to the United States.   In 1995 the Shaykh was convicted in
2  the Southern District of New York of seditious conspiracy
3  for his role in an attempted series of terrorist plots,
4  landmarks in the greater New York area, including the United
5  Nations, including the Holland/Lincoln tunnels, including
6  various different U.S. Government leaders, and including
7  the -- the former president of Egypt Hosni Mubarak,
8  H-O-S-N-I, M-U-B-A-R-A-K.
9  Q.   There are a number of individuals listed on this page,
10 as well.   I want to direct your attention next at the
11 highlighted name there.   If you could tell us who that is.
12 A.   Shaykh Hammoud bin Uqla Ash-Shuaybi is now a deceased
13 cleric from Saudi Arabia.   He was a very conservative
14 cleric.   He has been directly cited by al-Qaeda from their
15 propaganda and has been credited with recruiting several of
16 the 9/11 highjackers and encouraging them and their
17 associates to travel to Afghanistan in order to receive
18 training and orders on behalf of al-Qaeda.
19      After the September 11th, 2001, terrorist attacks on
20 the United States, the same cleric, Hammoud bin Uqla
21 Ash-Shuaybi, issued a fatwa in which he endorsed the 9/11
22 terrorist attacks and which he defended the highjackers and
23 those who tasked them as martyrs and heros.
24 Q.   Thank you.
25      The next name on the defendant's list here.   Who is

Kohlmann - D

1    this?

2    A.    Shaykh Yusef al-Uyayri, otherwise known as al-Battar,

3    which in Arabic means the slicing sword.   Shaykh Yusef

4    al-Uyayri is a senior al-Qaeda commander, now deceased;

5    al-Uyayri was present in Somalia and Mogadishu in 1993

6    during the Black Hawk Down incident and allegedly provided

7    weapons that were used in that incident to kill U.S.

8    military personnel.

9        Al-Uyayri received training in Afghanistan and later

10   went back to Saudi Arabia.   Al-Uyayri was the founder of

11   al-Qaeda -- al-Qaeda's official branch in Saudi Arabia,

12   known as al-Qaeda in Saudi Arabia.   Al-Uyayri was a very

13   highly, highly influential jihadist, and he's often credited

14   by al-Qaeda as being the first progenitor within al-Qaeda of

15   a strategy involving homegrown terrorists.

16       Al-Uyayri kept explaining to his al-Qaeda colleagues

17   that they needed to decentralize al-Qaeda and they needed to

18   recruit in a more broad way.

19       Al-Uyayri, after founding the official branch in Saudi

20   Arabia, was killed in a clash with Saudi security forces

21   when he tried throwing a grenade at them.

22   Q.    Thank you.

23       And Dr. al-Zawahiri you already described to the jury

24   who that is, so I'll ask you next if you can describe the

25   next person on the defendant's list -- well, I'll let you

Kohlmann - D

1   tell us who he is.

2   A.   Shaykh Nasir bin Hamad al-Fahad is also a very, very

3   well-known extremist cleric in Saudi Arabia.   After --

4   shortly after the 9/11 terrorist attack in the United

5   States, Shaykh Nasir issued a fatwa endorsing the use of

6   weapons the mass destruction, including chemical,

7   biological, and radiological weapons against the United

8   States.

9        Shaykh Nasir eventually was arrested by Saudi security

10   forces because of the fact that he was caught attempting to

11   directly push an American national to carry out acts of

12   violence against the United States, including the

13   assassination of former President George Bush.

14   Q.   We're going to go back to the first page.   I have one

15   more name to ask you about.   We won't go through all of

16   these.

17        Generally in your experience, you talk about a lot

18   these folks.   Are these household names?

19   A.   For the most part -- I mean, some of those are

20   household names.   Ibn Taymiyyah is a household name.

21   Shaykh bin Ba (ph) and bin Amin (ph) are household names,

22   but somebody like Yusef Uyayri is really not known outside

23   of the circle of people who either support or are the fan

24   base of al-Qaeda, because he's not actually a cleric.   He is

25   an al-Qaeda commander.   And his only books have been

Kohlmann - D

1    published through al-Qaeda.  And he's dead and he was killed

2    in a -- you know, in a shootout.

3        He's not really a cleric.  Some of these people, maybe

4    you could define as clerics, but even so, they're not

5    mainstream.

6        I mean, one of the individuals on this, Shaykh Abdullah

7    al-Faisal --

8    Q.    That's who I was going to ask you about next.  Thank

9    you.  Go ahead and briefly tell us who he is.

10   A.    Shaykh Abdullah al-Faisal is originally from Jamaica.

11   He traveled to Saudi Arabia where he received training in

12   Islam and then eventually moved to the United Kingdom, where

13   he got into some very serious trouble with British law

14   enforcement and was eventually convicted in a British court

15   of ordering followers to kill Hindus and Jews.

16   Q.    Sorry.  I just wanted to ask you, along those lines, I

17   want to get onto another portion of this material, do you

18   recall seeing anything in defendant's computer attributed to

19   Mr. Faisal?

20   A.    Yes.

21   Q.    What was that?

22   A.    That was an audio recording by Mr. Faisal titled:  No

23   Peace with the Jews.

24   Q.    Thank you.

25        Now, did you also see in the course of your review of

Kohlmann - D

1    the material in this case other statements, either written

2    or spoken by the defendant, that were evidence of the

3    adoption of this hard-lined sectarian philosophy?

4    A.    Yes, I did.

5    Q.    And I want to specifically direct your attention to

6    Exhibit 10, page 2, a composition book or diary seized from

7    the defendant, and direct your attention if there was some

8    language in there, in particular, that caught your

9    attention.

10   A.    Well, that certainly is one line that caught my

11   attention, yes.

12   Q.    Can you please read that to the jury?

13   A.    NonMuslims are the eternal enemy of Islam and they must

14   be subdued and humiliated, but always call them to Islam

15   first.

16   Q.    Why did this statement by the defendant catch your

17   attention in the context of this factor about an adoption of

18   a sectarian philosophy?

19   A.    Because this runs counter to the mainstream view of

20   Islam, nonMuslims, particularly those from what's known as

21   people from the book, i.e., Christians and Jews, are

22   actually supposed to be treated with great respect and are

23   supposed to be protected because of the fact that there is a

24   shared -- a shared religious tradition through the Abrahamic

25   tradition.

Kohlmann - D

1    So this does not reflect the mainstream or general view

2    of Islam, but it -- it reflects a fairly sectarian view of

3    Islam, and I would say a fairly extreme view or version of

4    Islam.

5    Q.   Along those lines, Mr. Kohlmann, in your review of the

6    discovery and the material here, did you see evidence that

7    the defendant was engaged in personal behavior that would be

8    characterized as more Western or conventionally Western --

9    the use of drugs and alcohol, relationships with women that

10   are not consistent with the hard-lined sectarian?

11   A.   There was certainly behavior on the defendant's part

12   that would not comport with the ideals of an ideal religious

13   extremist.  That's correct, yes.

14   Q.   And in other cases where you've examined this

15   particular phenomenon or methodology, have you seen other

16   people espousing a philosophically hardline sectarian

17   philosophy while at the same time exhibiting these sorts of

18   Western behaviors?

19   A.   Yes.  It's no secret that --

20          MR. WAX:  Objection, Your Honor, to others.

21   Relevance.

22          THE COURT:  Overruled.

23          THE WITNESS:  It's no secret that human beings are

24   prey to weaknesses, all human beings -- and terrorists are

25   human beings like the rest of us -- so sometimes people have

Kohlmann - D

1  problems with alcoholism and people have problems with drug

2  use.  It happens.  And it happens such that al-Qaeda and

3  groups like al-Qaeda oftentimes see these type of

4  individuals as weak, as people that they can bring into

5  their fold, as people they can convince because they have

6  problems in their life and they feel like they can offer

7  them a solution, which is the reason that your life is not

8  working is because you're not following our ideology.  So

9  what you need to do is drop what you're doing and pick up

10  what we're doing.

11      So these are actually the kind of people that al-Qaeda

12  often looks to recruit, are former drug addicts or

13  alcoholics or people that have substance abuse problems and

14  tries to draw them in, and, quite obviously, the reality is

15  that some of these people -- these problems can persist on

16  for years, even though outwardly they're expressing an ideal

17  that doesn't necessarily match their behavior.

18      But I don't think that's restricted to terrorism.  I

19  think that's general human trait.

20  BY MR. KNIGHT: (Continuing)

21  Q.   Thank you.  In the context of this hardline sectarian

22  perspective, are you familiar or do you see the term martyr

23  or martyrdom?

24  A.   Yes.

25  Q.   Now, you, specifically in your research and review of

Kohlmann - D

1   evidence in this context, what does that mean?

2   A.   In this context, someone who's a martyr is someone

3   who's been killed while serving the cause of Islam.   But

4   from the view of Salafi-jihadis or of the Salafi-jihadi

5   sect, one can only be martyred if you are killed while

6   serving the greater cause of Islam; i.e., violent jihad.   If

7   you are killed while waging violent jihad, then you are part

8   of the Shuhadaa, S-H-U-H-A-D-A-A.   You're mujahid, you're a

9   martyr.

10   Q.   I want to take a look at something in this case

11   specifically related to that.   We're going to look at

12   225-35, an email that's been admitted.   Part of a long chain

13   of emails, but I want to focus your language -- pardon me,

14   your attention specifically on the last four words of that

15   email in the context of the discussion there.

16   A.   Yes.

17   Q.   Are you familiar with that phrase "in the highest

18   chambers of paradise," Mr. Kohlmann?

19   A.   Yes, I am.

20   Q.   Can you tell the jury your understanding of what that

21   means in the context of martyrdom in this hardline sectarian

22   philosophy?

23   A.   Yes.   In Arabic it's known as al firdaws.

24   F-I-R-D-A-W-S.   The idea here is that if you are -- if you

25   believe in the Salafi-jihadi mindset, if you believe in that

Kohlmann - D

1   particular view of Islam, the idea is that you can never

2   really achieve the highest level of paradise unless you are

3   killed while serving the cause of Islam; i.e., you are a

4   martyr.  The highest levels of paradise in the view of

5   Salafi-jihadis are reserved only for those who are martyred,

6   as well as family members who are -- who you intercede -- in

7   other words, on judgment day, you, the martyr, can intercede

8   on behalf of members of your family, and the highest level

9   of paradise is reserved for you and your family.

10  Q.   Thank you.

11       I want to direct your attention to a writing of the

12  defendant you refer to, as well, which would be Exhibit 73,

13  item number three.  And are you familiar with this

14  particular poem that has been offered, admitted, and

15  attributed to the defendant?

16  A.   Yes, I'm familiar with this.

17  Q.   And does the writing of the defendant in this instance

18  have any significance in the context of discussing martyrdom

19  vis-à-vis the hardline sectarian philosophy you're talking

20  about?

21  A.   Yes.  In the sense that there are a variety of

22  different words and phrases used in here which make it

23  pretty clear that in terms of martyrdom and in terms of

24  jihad, the meaning here is referring to the violent

25  connotation of that.

Kohlmann - D

1      The line in here referring to "he is my friend and he

2    loves my AK," AK obviously refers to an AK47, which is an

3    automatic rifle.  It's highlighted there.  Yes.  There's

4    talking about gunfire, gunfire, what a deafening sound.

5    White snowcaps and bullets direct.  Oh woe to the Christian.

6    My dagger hits his chest.

7      I don't really see how you could view this as anything

8    other than espousing Salafi-jihadi view of jihad; in other

9    words, violent jihad.

10   Q.   In the course of your view of the material,

11   Mr. Kohlmann, did you see other writings of this defendant

12   or poems of this defendant that also supported the

13   conclusion you just stated about the presence of this

14   viewpoint in the evidence?

15   A.   Yes.  I did come across a variety of poetry or pros or

16   other documents which suggested a very similar conclusion.

17   Q.   Thank you.

18      I want to direct your attention now to what has been

19   categorized as the fourth prong of your analysis.  In

20   reviewing nearly cases like this, can you tell the jury what

21   that is?

22   A.   Yes.  So we've gone through so far self-selecting plots

23   and schemes, we've covered the idea about preexisting

24   connections, and we've covered the idea about -- about

25   adopting a radical viewpoint.

Kohlmann - D

1       The next point would be logistical subterfuge.

2  Q.    What does what mean?

3  A.    Logistical subterfuge simply means that you are taking

4  efforts to conceal your behavior, to conceal your

5  activities, to conceal your true viewpoints or how you

6  really feel or what your real intentions are.

7       This is particularly relevant when it's logistical

8  subterfuge in relation to law enforcement, in relation to

9  somebody's parents and their intention of traveling abroad.

10  Things like that.  Those -- that kind of logistical

11  subterfuge certainly is a factor we look at, and it's

12  certainly relevant to our analysis.

13  Q.    And by way of comparison and contextually, have you

14  seen evidence of that in other cases?

15  A.    Yeah, it's very, very common when you have violent

16  extremists that they are engaged in logistical subterfuge

17  because of the fact they're afraid their activities will

18  come to the attention of law enforcement, their employers,

19  their parents, any authority figure.

20  Q.    And I want to ask you, then, specific questions about

21  evidence of this factor you saw in this case.

22       First of all, do you recall reviewing the 100 or 50 or

23  so emails between the defendant and Mr. Samir Khan?

24  A.    I did, yes.

25  Q.    And did you see any evidence or statements of the

Kohlmann - D

1  defendants in those emails that would indicate to you the

2  presence of this effort to avoid detection, basically?

3  A.   Yes, I did.

4  Q.   And what was that?

5  A.   The defendant specifically deferred or demurred, I

6  should say, upon the issue of telling Mr. Khan where exactly

7  he was located in the United States.  He appeared to suggest

8  that it wasn't a good idea for him to explain where exactly

9  he was located in the United States.

10 Q.   And did you see that same sort of effort in other

11 emails between the defendant and other persons in the case?

12 A.   Yes, I did.

13 Q.   And can you talk specifically about some of those?

14 A.   Yes.  The defendant specifically advised the undercover

15 agents in this case when they met with him to take their

16 cell phones out to remove the batteries and SIM cards from

17 their cell phones during meetings with him because the fact

18 that he believed that the phone could be used for

19 surveillance purposes by law enforcement.  Even though the

20 phone would be off, as long as the battery would be in, he

21 assumed it could be used, and, thus, he insisted that the

22 undercovers remove the batteries and SIM cards from their

23 phone.

24      He also communicated with Mr. -- with Mr. Amro Suleiman

25 Al-Ali, the Saudi national who was on the Saudi most wanted

Kohlmann - D

1   list, using something that is known as a draft email box

2   trick, which, basically the idea here is that emails that

3   are sent on the Internet, if you send from one person to

4   another, in order to get between those two people, they have

5   to go through various different servers, and, on their way,

6   they travel through various different countries.  And the

7   concern is that if a law enforcement or national security

8   agency wanted to grab someone's emails, they could sit on

9   the server and watch the emails as they go through.

10      The draft email box trick works so that you have one

11  email account shared between two people.  Someone writes up

12  an email and saves it as a draft.  In other words, they

13  never send it, they just save it as a temporary email in the

14  draft box of the email account.

15      The second person then logs into the same email

16  account, reads the draft message, and gets all the

17  information.  And, yet, the email itself was never actually

18  sent, so it never actually went through any of these other

19  servers on the Internet, so it just stayed in one place.

20      So, in other words, it's -- the idea, anyway, is to

21  prevent law enforcement or the NSA or other national

22  security agencies from being able to see the content of

23  those messages.

24  Q.   That's something you believe is present based on your

25  review of the emails in the case?

2061

Kohlmann - D

A.    That's correct.

Q.    And I want to direct your attention now to some
specific statements or writings of the defendant and ask
your opinion about those in the context of this factor.

If we can look at Exhibit 10, writings of the defendant
that have been offered and admitted, and go to Bates 11355.
There's a statement in there, and I want to direct your
attention to the bottom of the page, please.

A.    Yes.

Q.    And in this little segment here, is there something, in
particular, that you have noticed in the context of this
larger issue?

A.    Yes.  The defendant right here states specifically that
he believed that he needed to treat everyone around him
with, quote, mistrust and hatred.  Plus, despite his
feelings of mistrust and hatred, he felt he had to,
quote/unquote, hold onto normality, in other words, act
normally, to secure myself from the FBI, less they should
monitor me.  In other words, don't show outward signs of
radicalization, don't show outward signs of extremism
because of the fact that that kind of behavior would attract
negative attention from law enforcement.

Q.    Thank you.  I want to go, after this exhibit, to
Exhibit 18.  Additional writings of the defendant that have
been received and admitted.  Page 4 -- or Bates page, sorry,

Kohlmann - D

436.   Somewhat confusing -- it's there.

Did you review this particular page, Mr. Kohlmann?

A.   Yes, I did.

Q.   And were there statements on here that caught your
attention?

A.   Yes.  There was a number of statements that reflected
basically exactly what was in the previous document.  In
this document the defendant writes:  You are:  Hipster
Muslim rap maybe.  Has people over, but no signs of
extremism.  Free time.  Parents.  Act 2 party.  In other
words, he was talking about acting like someone who doesn't
fit the profile of an extremist.  At least not outwardly, at
least not with his friends or with his associates, and
apparently he suggests that he's going to take the -- the
image of what he described as, quote/unquote, a hipster
Muslim.

Q.   Thank you.  So --

MR. WAX:  Your Honor, I object to the -- the
profile.

THE COURT:  You object to the profile?

MR. WAX:  To the use of that phrase for reasons
previously articulated.

THE COURT:  Tell me the phrase you're talking
about.

MR. WAX:  The witness testified that this is

1    designed to avoid looking like he doesn't fit a profile.

2            MR. KNIGHT:  He's reading the defendant's writing

3    and using that word.  I don't think the word profile has

4    been banned from use.

5            THE COURT:  I'm going to overrule your objections.

6            MR. KNIGHT:  Thank you.

7    BY MR. KNIGHT:  (Continuing)

8    Q.    Mr. Kohlmann, we looked at the defendant's writings.

9    You talked about some of his email contact with others.

10   Were there statements made from the defendant to the

11   undercover agents in this case that also supported your

12   analysis or fit into your analysis about this particular

13   prong?

14   A.    Oh, yes.  Yes, a wide variety of such statements.

15   Q.    Can you specifically explain to the jury which

16   statements to the undercovers, from the defendant, raised

17   this issue of logistical subterfuge, as you call it, or

18   concealing activity?

19   A.    Well, I believe that at one point the defendant used

20   the passcode in order to enter a storage facility which he

21   labeled umra, which was supposed to be a euphemism referring

22   to jihad.

23   Q.    Sorry.  Was it hajj?

24   A.    Hajj.  Excuse me.  Hajj, not umra.  Hajj is a journey,

25   a religious pilgrimage that all Muslims are required to do

Kohlmann - D

1    once in their life to Mecca, which is the Holy City.  It's

2    the --

3                  THE COURT REPORTER:  I'm sorry, can you --

4                  THE WITNESS:  Oh, I'm sorry.  Mecca is M-E-C-C-A.

5    It's the holiest city of Islam in the Arabian Peninsula in

6    Saudi Arabia.

7    BY MR. KNIGHT: (Continuing)

8    Q.    So --

9    A.    Sorry.  Go ahead.

10   Q.    So you identified that example.  Was there some

11   evidence of this factor in the discussions you saw about the

12   defendant's potential travel to Alaska when he talked about

13   that with the undercover employees?

14   A.    Yes, yes.

15   Q.    What, in that area, did you identify?

16   A.    The defendant suggested that he had an intention of

17   using his trip to Alaska to serve as a cover or a jumping

18   off point in order to travel to Yemen.  He had -- nine

19   months previously he had been stopped at the airport by the

20   FBI and turned back.  He expressed to the undercovers the

21   idea or the notion that by using the Alaska trip as,

22   quote/unquote, a legitimate enterprise, he could then leave

23   his job in Alaska afterwards with about $15,000 in cash and

24   travel straight to Yemen.

25   Q.    I want to lastly in this area -- you talked a little

Kohlmann - D

1  bit about online activity and these articles that are

2  written.  In your experience, reviewing web forums, these

3  magazines, do individuals typically use their true given

4  names when they write on these forums?

5  A.   They would be foolish to.  It's fairly rare.

6  Q.   So is that -- are the use of pseudonyms common in this

7  context?

8  A.   It's almost universal, yeah.

9  Q.   What does the term avatar mean to you in your analysis

10  or discussion in the use of a pseudonym?

11  A.   The idea of an avatar is to create an online identity.

12  Not everyone's online identities match their real life

13  identities.  So we call these identities avatars.  These

14  avatars are often -- you build up a personality profile on

15  yourselves.

16      You have a picture that you like to represent yourself.

17  Some people in these jihadi forums use pictures of Osama bin

18  Laden or whatnot.  But you build a reputation on the forums

19  for having a particularly philosophy or being a particular

20  mindset and that's how you're taken as a credible actor in

21  the forums, by building an avatar, by build a posting

22  history, by building a history, showing what your -- what

23  your perspective is and how committed you are to a given

24  mission.

25  Q.   Thank you.

Kohlmann - D

1    And do you frequently see the uses of both pseudonyms

2  in this practice in the world in which you're examining

3  jihadi chat rooms and web sites?

4  A.   Yes, they're also -- jihadi chat rooms, they're almost

5  universal.

6         MR. KNIGHT:  Your Honor, I think this is a good

7  place.

8         THE COURT:  We'll go ahead and recess for the

9  weekend.  We'll start again at 9:00 on Monday morning.  I

10  will mention to the jury that I think we're making good

11  progress.  I believe that the Government is going to

12  complete their case fairly soon, so I'll pass that onto you.

13    Now, as we get closer to getting this case submitted to

14  you, it's still very important to remember don't form any

15  opinions whatsoever and don't discuss the case with anyone.

16    And, also, have a good weekend.  We'll see you again on

17  Monday morning.

18    I'll see the lawyers a moment.

19         (The jury panel leaves the courtroom.)

20         THE COURT:  You may be seated.  Okay.  I want to

21  make sure that the lawyers have advised the expert witnesses

22  that they're going to call of the Court's determination as

23  to what they may testify to and not testify to.  We'll have

24  to be very careful.

25    Mr. Kohlmann, I'll leave that with you, as well, not to

Kohlmann - D

1    come in the back door.

2        We're talking about here specifically that the experts

3    cannot give opinion on ultimate mental state and cannot give

4    an opinion that the defendant was or was not a homegrown

5    terrorist, a contemporary or violent extremist, turned to

6    violence or traversed the staircase to terrorism.

7        Are you getting ready to stand?

8            MR. KNIGHT:  I wanted to let the Court know I

9    addressed this with the witness, and I also conferred with

10   Mr. Wax to make sure we had the same understanding of the

11   order.

12           THE COURT:  Well, I wanted to make that clear so

13   we don't have any concern on this.

14       All right.  The other thing I would like to have you

15   do, as we're getting down to the defendant's case, I'd like

16   to know if there are disputes over any exhibits that we're

17   going to have to resolve.

18       What I'd like to have you do over the weekend or if you

19   need until noon, say, or 1:00 on Monday, just give me a

20   short letter about any exhibit issues that are going to have

21   to be resolved at this point.

22       Do you have all your exhibits in at this point?

23           MR. KNIGHT:  They're not all in, Your Honor.  I

24   think we're pretty close.  There are a few remaining

25   disputes that I think we've discussed and narrowed down that

2068

1   we can get to the Court Monday without any problem.

2             THE COURT:  All right, Mr. Wax?  Okay?

3             MR. WAX:  Will do.

4             THE COURT:  All right.  Thank you.  We'll be in

5   recess then.

6             DEPUTY COURTROOM CLERK:  Court is in recess.

7   (Proceedings were concluded on January 25, 2013, and

8   reconvened on January 28, 2013.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2                I certify, by signing below, that the foregoing is

3       a true and correct transcript of the record of proceedings

4       in the above-entitled cause.  A transcript without an

5       original signature, conformed signature, or digitally signed

6       signature is not certified.

7

8       /s/Jill L. Erwin
        _____
9       Jill L. Erwin, RMR, CRR      Date: January 25, 2013
        Official Court Reporter
10      Registered Merit Reporter
        Certified Realtime Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25