1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3                      PORTLAND DIVISION

4
   UNITED STATES OF AMERICA,        )
5                                   )
                       Plaintiff,   )  Case No. 3:10-CR-475-KI
6                                   )
                  v.                )
7                                   )  January 28, 2013
   MOHAMED OSMAN MOHAMUD,           )
8                                   )
                       Defendant.   )  Portland, Oregon
9  _____)

10

11

12

13                   **TRIAL - DAY 11**

14                   **MORNING SESSION**

15               TRANSCRIPT OF PROCEEDINGS

16        BEFORE THE HONORABLE GARR M. KING

17        UNITED STATES DISTRICT COURT JUDGE

18

19

20

21

22

23

24

25

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF:      Pamala R. Holsinger
                            Ethan D. Knight
 3                          Ryan W. Bounds
                            Assistant United States Attorneys
 4                          United States Attorney's Office
                            1000 SW Third Avenue
 5                          Room 600
                            Portland, OR 97204
 6
     FOR THE DEFENDANT:      Steven T. Wax
 7                          Public Defender
                            Stephen R. Sady
 8                          Lisa Hay
                            Deputy Public Defenders
 9                          Federal Public Defender's Office
                            101 SW Main
10                          Suite 1700
                            Portland, OR 97204
11

12   ALSO PRESENT:          Ryan Dwyer
                            Susan Cooke
13                          Nicole Ciccarello
                            Mark Ahlemeyer
14

15

16   COURT REPORTER:        Jill L. Erwin, CSR, RMR, CRR
                            Certified Realtime Reporter
17                          Registered Merit Reporter

18                          United States District Courthouse
                            1000 SW Third Avenue, Room 301
19                          Portland, OR 97204

20                          (503)326-8191

21                               *   *   *

22

23

24

25
```

2072

1                                   INDEX

2       PLAINTIFF'S WITNESSES:

3       EVAN KOHLMANN

4       Direct Examination by Mr. Knight              2077

5       Cross-Examination by Mr. Wax                  2119

6       Redirect Examination by Mr. Knight            2130

7

8       DEFENDANT'S WITNESSES:

9       OSMAN BARRE

10      Direct Examination by Ms. Hay                 2132

11      Cross-Examination by Mr. Knight               2171

12      MOHAMED MOHAMMUD

13      Direct Examination by Ms. Hay                 2175

14      Cross-Examination by Ms. Holsinger            2189

15      Redirect Examination by Ms. Hay               2192

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2    (Court reconvened out of the presence of the jury.)
 3              DEPUTY COURTROOM CLERK:  All rise.
 4              THE COURT:  Good morning.
 5              MR. SADY:  Good morning, Your Honor.
 6              THE COURT:  I have the Government's motion for
 7    offer of proof.  For defense witness.  Has the defense
 8    responded?
 9              MS. HAY:  No, Your Honor.  I think that was just
10    filed 15 minutes ago or so.  I -- I believe -- the issue is
11    we have the equivalent of -- Agent Dwyer testified for the
12    Government the other day.  We want our investigative
13    equivalent to testify, as well.  That would be
14    Mr. Ahlemeyer.
15              THE COURT:  What's he going to say?
16              MS. HAY:  Oh, he's going to remember the things
17    that Agent Dwyer and Agent Springer were unable to remember
18    about what was in the discovery.  As you recall, when they
19    were asked questions, they often said, "I can't recall.  I
20    can't recall," so we need to have a witness who can come in
21    and say, yes, in the discovery there is a document with a
22    certain date on it.
23         He won't be testifying to the content.  He's not an
24    expert witness.  He's testifying to documents that were
25    received and the dates they were received.
```

1          THE COURT:  Just the fact of receipt?

2          MS. HAY:  Yes.  Simply -- it's essentially like

3   Agent Springer.

4          THE COURT:  Why can't you agree to that?

5          MS. HAY:  Well, Your Honor, we had tried that, but

6   I think we need to have a witness put some of those items in

7   evidence.  I don't expect it would be very long testimony,

8   but we would want to walk through and say this is a document

9   that was received or written on a certain date.

10         THE COURT:  Well, either that, or just stand up

11  and stipulate with the Government.  That's -- if -- if

12  there's no dispute, I'd hate to have a witness up there

13  testifying when you can just stipulate that this is a

14  document, you know, whatever it is.

15         MS. HAY:  Well, Your Honor, we had offered to

16  stipulate to part of the Government's case, and the Court

17  said, no, the Government is entitled to have a witness put

18  the evidence in.  We would ask for the same consideration

19  that we could have a witness testify about the document.

20         THE COURT:  I don't remember specifically what

21  part of the Government's case you were going to stipulate

22  to.

23         MS. HAY:  Your Honor, it was all related to what

24  occurred on November 26th; that they didn't need certain

25  videos and they didn't need evidence.

1           THE COURT:  Well --

2           MS. HAY:  So, in this case, for --

3           THE COURT:  Why don't you work out a stipulation?

4    That's the way it's normally done.  And if you have any

5    trouble with the stipulation, then you can call a witness to

6    state, "I work with the Public Defender's Office, and this

7    document came in as part of the discovery."

8           MS. HAY:  Your Honor, the other testimony the

9    witness would give is about the summary exhibits that have

10   already been offered into evidence, but the Government

11   witness called into question some of the statements in the

12   summary document.  So, again, for example, the text message

13   summary that was in evidence already, the Government witness

14   continued to suggest that the names in those text messages

15   might be inaccurate and the Government witness also

16   suggested that the defense had not provided all of the text

17   messages that the Government gave us.

18       So, again, that's an implication on the record that we

19   need to correct.

20           THE COURT:  Well, we've got a witness who we have

21   to get to, so I'll take a look at this, and I want to hear

22   from the Government at the break on it, and we'll take care

23   of it then.

24       Let me raise an issue with you.  Today at 3:00 there's

25   a court memorial for Judge Skopil.  I had not planned on

1    attending it, but Judge O'Scannlain is a little concerned

2    that maybe a lot of people who want to attend that won't be

3    able to do so because of this trial.  Was anyone here

4    planning on attending the Judge Skopil -- it's a -- it's a

5    court event for him at the Pioneer Courthouse.  It would

6    probably take about an hour or two.

7              MR. WAX:  Your Honor, we passed on our regrets

8    that we would not be able to attend because of the trial.

9    We have scheduled a number of the experts based on the

10   expectation that we would be in court today and -- until

11   5:00, and we have some tight flight schedules that we're

12   working with.

13             THE COURT:  All right.  That's all I wanted to

14   know at this point.  I'll advise Judge O'Scannlain that

15   we're sorry we can't accommodate him.

16        All right.  Let's go ahead with our testimony, then.

17             (The jury panel enters the courtroom.)

18             THE COURT:  Good morning, members of the jury.  I

19   can't tell you how happy we are when we come in on Monday

20   morning and all the members of the jury are here and they're

21   smiling and ready to go, so thank you.

22        All right.  We'll go ahead with the testimony of the

23   witness then.

24             MR. KNIGHT:  Thank you, Your Honor.

25

Kohlmann - D

1                        EVAN KOHLMANN,

2    called as a witness in behalf of the Plaintiff, being

3    previously been sworn, is examined and testified as follows:

4

5                        DIRECT EXAMINATION

6    BY MR. KNIGHT: (Continuing)

7    Q.   Thank you.  Mr. Kohlmann, when we left off on Friday

8    afternoon you were discussing the criteria you applied to

9    the evidence in the case.  Do you recall that?

10   A.   Yes, I do.

11   Q.   At the conclusion of Friday afternoon, we had just

12   completed your discussion of your third factor of analysis.

13   Could you now begin by describing to the jury what your

14   fourth factor and analysis is in looking at the evidence in

15   this case?

16   A.   Yes.  Again, the first factor being the self-selecting

17   plots and schemes; the second factor, of course, being the

18   ties to extremist groups or preexisting ties to extremist

19   groups; the third factor, of course, being adoption of a

20   hard lined sectarian ideology; and the fourth prong being

21   logistical subterfuge or the use of logistical subterfuge.

22   Q.   Thank you.  I think we were discussing that.  So if we

23   can begin by describing to the jury, please, what the next

24   or the fifth factor is.

25   A.   Sure.  Beyond that, the next factor would be the

Kohlmann - D

1    deliberative collection and/or redistribution of terrorist

2    propaganda.   That being video recordings, audio recordings,

3    magazines, or other materials which are produced by

4    terrorist organizations for the purposes of press coverage

5    and as well as recruitment.

6    Q.   Why have you identified through your research and work

7    this as a criteria for looking at this type of evidence?

8    A.   In recent years, as I've described previously, al-Qaeda

9    has had great difficulty in trying to directly recruit

10   people or most -- most jihadi groups have had difficulty

11   trying to directly recruit people because of the tremendous

12   law enforcement focus on those kind of efforts.

13       As a result, these groups have been forced to try to

14   indoctrinate and recruit people indirectly.   Instead of

15   having recruiters go out there and directly find people,

16   they're forced to put our their propaganda, put out their

17   video recordings, and hope that people will self-recruit.

18       In other words, they'll see these video recordings or

19   audio recordings or magazines, and they'll take it upon

20   themselves to take those ideas and those philosophies and

21   methodologies and put them into action.

22       In other words, it's a way for them to, number one,

23   identify people who might be sympathizers or supporters of

24   them.   It's a way of educating those people and getting them

25   on the right path, both ideologically and methodologically

2079

Kohlmann - D

1   and a way of spurring those people into action and actually

2   causing those people to take action without ever receiving a

3   phone call from Osama bin Laden or Dr. al-Zawahiri or

4   another senior al-Qaeda leader.

5   Q.   Over the past five years, or so, have you seen a change

6   or evolution in this type of effort or the manner in which

7   this material is collected or distributed?

8   A.   Yes.   In the past 12 years, there's been ex -- an

9   explosion of media from jihadi extremist groups, terrorist

10  groups, like al-Qaeda.   In the beginning it was one or two

11  video recordings, one or two magazines, one or two

12  materials, but they're all in Arabic, which is the original

13  language of most of the original members of al-Qaeda, which

14  makes sense.

15      But in recent years both al-Qaeda, along with other

16  groups, like As-Sahab in Somalia, have begun aggressively

17  looking for Westerners, individuals from the United States,

18  Canada, the United Kingdom, to join these organizations.

19  The reason being is that these people have access, number

20  one, to financing channels, funding, money, that is not

21  available in a place like Afghanistan or Pakistan or

22  Somalia.

23      These individuals also bring with them skill -- a

24  skill-set or skill-sets that are not necessarily in great

25  supply in a place like Yemen or Afghanistan; i.e., computer

1   skills, media skills, the skills that are necessary to make

2   new propaganda.  And also there's a certain panache that

3   these groups have found in having English-speaking members,

4   particularly Americans, because in terms of their media and

5   their outreach, it makes them seem much more organized, much

6   more capable, much more effective, if they're even able to

7   bring in people from a completely different environment and

8   bring them into the group.

9        So, as a result, these organizations have increasingly

10  turned to producing propaganda that is not just in Arabic,

11  but is available in English, in Urdu, in a variety of other

12  languages, but, primarily in English, because of the fact

13  that there's such a wide variety of people that you can

14  reach out to by speaking English.

15  Q.   How would one go about gathering or collecting this

16  type of material generally?

17  A.   Generally speaking, this material is all released

18  through Internet websites that are run by or on behalf of

19  these terrorist organizations.  There is a group of these

20  sites that are, again, social networking sites.  They're

21  like bulletin boards.

22       In each of these sites there's one room which is

23  dedicated only to official propaganda from terrorist

24  organizations.  Only authenticated couriers from these

25  groups can go in there and post new material.  Anyone can go

Kohlmann - D

1  in and read it, but only the authenticated couriers can post

2  in there.

3      So if you want to get the latest video recording or

4  audio recording from a group like al-Qaeda or As-Sahab, or

5  AQAP in Yemen, the first place to go is the official place

6  that it's released through, which are these online social

7  networking forums.

8  Q.   Can you explain to the jury what an encrypted file is

9  in the context of this type of media?

10 A.   Several years ago, these organizations started having a

11 problem.  They were uploading their media onto free file

12 hosting sites on the Internet and then they were advertising

13 them on the forums.  But individuals, such as myself, were

14 finding these video recordings on these free file hosting

15 sites on the Internet before they were officially being

16 released.

17     So, in other words, we were getting access to these

18 propaganda items before these groups actually wanted to put

19 them out there, and they started getting very frustrated,

20 they started getting very angry about this, and they started

21 thinking about if they could thwart people like me or people

22 like --

23         MR. WAX:  Your Honor, excuse me, if I could object

24 to "they started thinking."  I don't believe this witness --

25         THE COURT:  I'll sustain that.

Kohlmann - D

1           MR. WAX:  Thank you.

2           THE WITNESS:  They started arguing that in

3    order --

4           MR. WAX:  Again, Your Honor, I object to

5    "they started arguing."

6           MR. KNIGHT:  It's a factual statement, Your Honor.

7           MR. WAX:  If there's a --

8           THE COURT:  You can't testify to the mind-set of

9    another individual.

10       Why don't you rephrase your question?

11   BY MR. KNIGHT: (Continuing)

12   Q.   Can you explain the difficulty with distributing files

13   that led to the encryption of these files?

14   A.   Yes.  Again, in order to prevent individuals from

15   grabbing these files early or for -- to prevent people from

16   getting access to them --

17          MR. WAX:  Again, objection, Your Honor.  I believe

18   it's the same response.

19          MR. KNIGHT:  No, that's --

20          MR. WAX:  In order -- in order to prevent --

21          THE COURT:  Let me read it.

22       Overruled.

23          THE WITNESS:  In order to prevent these files from

24   being released to people who weren't supposed to have them,

25   these groups started encrypting these files with very, very

Kohlmann - D

1    long, very complicated passwords, and so basically what

2    would happen is the file itself, if you got it, without

3    having the official press release where the file came from,

4    you wouldn't necessarily be able to open it.  It would be an

5    encrypted file with a name you wouldn't be able to

6    understand, with a very, very long encryption password.

7         And the encryption password would then be included in

8    the press release that was posted on the forum advertising

9    the video.

10        So, in other words, if you downloaded the video, you

11   would have access to the press release with the unencryption

12   password.  Once you download, you could then put the

13   password in and bring the video out and you could watch it.

14        But if someone was to look at your hard drive

15   afterwards and look at the stuff you downloaded, they would

16   just see an encrypted file with a weird name, and they

17   wouldn't be able to find out what was inside of there,

18   because the encryption password was so long and so complex

19   it almost defies being cracked by any contrary means.

20   BY MR. KNIGHT: (Continuing)

21   Q.   In this specific case, did you see evidence of

22   encrypted files being accessed?

23   A.   Yes.

24   Q.   Can you briefly describe that to the jury, and then

25   later on we'll talk about the individual file itself.

Kohlmann - D

1    A.    Yes.    In conducting an analysis on the hard drive that

2    was seized from the defendant, I found an encrypted file of

3    which I immediately recognized the file name.   I recognized

4    the file name because I had personally downloaded the exact

5    same file from an al-Qaeda online forum and had downloaded

6    that file because I had understood that to be an encrypted

7    al-Qaeda video, and I also had the unencryption password,

8    which I then used the unencryption password that was stored

9    in my database to open up the encrypted file and take the

10   video that was contained inside of it out and then viewed

11   it.

12   Q.    What was the name of that particular video or sequence

13   of videos?

14   A.    It's a segmented video, but the name of the video is

15   *Rappeling the Aggression*.   It was produced by al-Qaeda in

16   the Arabian Peninsula in 2009.

17   Q.    Thank you.

18        Again, speaking to the general topic of distribution of

19   collection of propaganda, Mr. Kohlmann, you had testified

20   that you're familiar with *Jihad Recollections*.

21   A.    Yes.

22   Q.    And, in your research and work and examination of other

23   cases, do you see *Jihad Recollections* and the articles from

24   it come up in those cases?

25   A.    Yes.   I have worked previously on other cases in which

Kohlmann - D

1  *Jihad Recollections* has been part of the seized evidence.

2  Q.    And have you seen instances where this defendant's

3  writings are indeed collected or distributed elsewhere?

4  A.    Yes.  The writings that the -- which the defendant

5  allegedly published in *Jihad Recollections*, I have -- I have

6  encountered before in several different terrorism

7  investigations.

8  Q.    Now, speaking of one of those specific articles, are

9  you familiar with a piece written by the defendant related

10  to as As-Sahab Media?

11  A.    Yes, I am.

12  Q.    You spoke a little bit about this in a context of

13  another segment on Friday afternoon, but when you're talking

14  about distribution of this propaganda, can you explain to

15  the jury the role that As-Sahab Media has?

16  A.    Yes.

17       Each al-Qaeda franchise or each al-Qaeda faction has

18  their own official media wing.  In other words, every single

19  official statement from the leaders of this group all come

20  through that one single media wing.

21       When it comes to al-Qaeda central branch in Afghanistan

22  and Pakistan, the branch, the branch that was founded by

23  Osama bin Laden and headed by Osama bin Laden until his

24  death, the name of their official media wing is known as

25  As-Sahab, which is A-S, dash, S-A-H-A-B, which, in Arabic,

Kohlmann - D

1   just means the clouds.

2         But since approximately 1999, 2000, every single video

3   regarding official video recording of bin Laden,

4   al-Zawahiri, all other al-Qaeda leaders in that region,

5   they're all put out through officially through Al-Sahab.

6         So, in other words, if a video comes out and is not

7   released by As-Sahab, that's not official or legitimate or

8   authentic.  It's a way that they can make sure that when you

9   get something you know it's coming from the original source.

10  Q.   Now I want to direct your attention more specifically

11  to some of the material you analyzed that relates to the

12  defendant in this case.

13        Mr. Kohlmann, are you familiar with a video known as

14  *Knowledge is for Acting Upon* or also *High Hopes*?

15  A.   Yes.

16  Q.   Can you briefly describe what that video is;

17  particularly part one of that video?

18  A.   Yes.  In September of 2006 al-Qaeda's As-Sahab Media

19  wing released a two-part video entitled *Knowledge is for*

20  *Acting Upon*.  It's also sometimes known among jihadists as

21  *High Hopes*.

22        That's because when it was originally released, one of

23  the file names it was released under was highhopes.adi.

24        The video purports to be al-Qaeda's retelling of the

25  events of September 11, 2001, from the perspective of

Kohlmann - D

1  al-Qaeda, which includes original testimonials from several

2  of 9/11 highjackers.  It includes video footage of senior

3  al-Qaeda leadership figures, talking about 9/11, explaining

4  the logic behind 9/11, explaining the planning behind 9/11.

5  It also features video footage from al-Qaeda training camps

6  showing what the video purports to be:  Individuals

7  preparing to carry out the September 11th, 2001, terrorist

8  attacks.

9  Q.   And in this specific case, in reviewing the evidence,

10  did you see evidence of the playing or distribution of this

11  video, particularly part one?

12  A.   Yes.

13  Q.   And where do you see that in the case?

14  A.   In reviewing the communications -- I should say

15  reviewing the conversations, the recorded conversations

16  between the undercover -- the undercover -- the undercovers,

17  I should say, in this case, with the defendant, at one point

18  during their interactions the defendant played for the

19  undercover a copy of *Knowledge is for Acting Upon*.

20      I recognize this because of the fact that I could

21  actually hear *Knowledge is for Acting Upon* playing in the

22  background, and I was able to match up what was playing with

23  the video itself.  Part one of the video.

24          MR. KNIGHT:  Thank you.  At this time, Your Honor,

25  I would offer Exhibit 233, which is, in fact, *Knowledge is*

Kohlmann - D

1    *for Acting Upon.*  Part one.  The Court has already ruled on

2    its admissibility.  The expectation is at this point to play

3    three short segments to the jury?

4            THE COURT:  Any objection?

5            MR. WAX:  We have stated our positions previously,

6    Your Honor.

7            THE COURT:  All right.  It will be received.

8    BY MR. KNIGHT: (Continuing)

9    Q.  At this time, Mr. Kohlmann, we'll play three short

10   segments to the jury.  We'll play them in sequence and ask

11   you some questions afterwards.

12       First, to give a little context, how long is part one

13   total?

14   A.  I think the total is close to 60 minutes.  It's a very

15   long video.

16   Q.  We only have a few minutes to play; but, again, we're

17   going to play these in sequence and then discuss them.  So,

18   first, this is segment one of Exhibit 233.

19           (Video Exhibit 233 played for the jury.)

20           MR. KNIGHT:  Thank you, Mr. Kohlmann.  We'll play

21   the second segment of the longer video.

22           (Video Exhibit 233 played for the jury.)

23           MR. KNIGHT:  And, finally, Mr. Kohlmann, we have

24   one short segment from the longer video.

25           (Video Exhibit 233 played for the jury.)

2089

Kohlmann - D

1  BY MR. KNIGHT: (Continuing)

2  Q.    Thank you, Mr. Kohlmann.

3       You had already testified to the jury that this is a

4  lengthier segment and that you recognized that in the

5  interactions between the undercovers and the defendant.

6       First, can you explain to the jury what, if any, this

7  particular video has in significance compared to many other

8  propaganda videos that are made?

9  A.    This is arguably one of the most famous videos that was

10 ever put out by As-Sahab, based on the length of the video,

11 the content of the video, and the people that are

12 interviewed in the video.

13      The video contains the first known footage of bin Laden

14 and several other al-Qaeda leaders meeting with the alleged

15 ring leaders behind the September 11, 2001, terrorist

16 attacks.  It includes never-before-seen footage of al-Qaeda

17 training camps.  And it also includes never-before-seen

18 footage of al-Qaeda senior leaders discussing other

19 terrorist attacks that have targeted the United States,

20 including the October 2000 bombing of the USS Cole and the

21 August 1998 bombing of two U.S. Embassies in East Africa and

22 Nairobi and Dar Es Salaam.

23      So this was really a very eye-opening picture into what

24 was going on in al-Qaeda training camps between

25 approximately 1995 and 2001 and unforeseen, and it's

2090

Kohlmann - D

1   a -- it's taken on a -- a great amount of interest in the

2   jihadi community.  It's been reposted over and over again on

3   jihadi websites.  A very popular video.

4   Q.   In taking a step back for a moment, can you explain,

5   based on your research methodology and everything you've

6   looked at, why you've identified the collection or

7   distribution of this material as a factor in your research,

8   when, in fact, of course there's nothing wrong with simply

9   reviewing this material or collecting it?

10  A.   No, there's certainly nothing wrong with viewing

11  terrorism media.  I'm sure a lot of people do it who are not

12  terrorists; but, to put it simply, you can't join al-Qaeda

13  these days or a terrorist group, like As-Sahab or something

14  like that, if you haven't first seen their propaganda or if

15  you haven't first seen their videos.

16       These groups are pretty explicit about it; that they're

17  putting these videos and these audio recordings and these

18  magazines out there so that people can follow their path.

19  People can take this material and induct themselves into the

20  ranks of extremism.

21       So while it's -- it's certainly -- you know, possessing

22  a video, one video or two videos on your computer, or

23  watching one video or two videos certainly doesn't make you

24  a terrorist, if you have someone who's deliberately

25  collecting many, many of these videos or is redistributing

Kohlmann - D

1    many, many of these videos or has an encyclopedic knowledge

2    of many, many of these videos or audio recordings or

3    magazines, that certainly is a warning sign that we look at,

4    because for us it's difficult to understand why someone

5    would have that degree of a passionate interest outside of

6    an academic environment, outside of a scholarly environment,

7    outside of a university setting where there's some kind of

8    formal study ongoing.

9    Q.    Thank you.

10        On Friday you testified a little bit about the

11   publications *Jihad Recollections* and *Inspire*.  Do you recall

12   that?

13   A.    Yes.

14   Q.    Could you provide to the jury -- we've heard a lot

15   about those two.  But based on your training and experience

16   in this area, the relationship, in more detail, of *Jihad*

17   *Recollections* to *Inspire* and the role that *Inspire* has

18   played in this context?

19   A.    Based upon my research and my discussions with other

20   experts in the field, my understanding of the relationship

21   between *Jihad Recollections* and *Inspire* is that *Jihad*

22   *Recollections* was almost like a beta version of *Inspire*.  It

23   was -- it was a version -- it was nascent version of

24   *Inspire*.

25        What happened was simply that when Samir Khan, the

Kohlmann - D

1    creator, the -- I guess you could call him the genius behind

2    *Jihad Recollections*, traveled to Yemen to join al-Qaeda in

3    the Arabian Peninsula, al-Qaeda in Yemen, they liked his

4    product so much that they suggested to him, "Look, you can

5    sharpen this up a little bit.  You can add more direct

6    content from us, bomb-making instructions and that kind of

7    thing, and then we can rerelease this as *Inspire*, as *Inspire*

8    magazine.

9        And if you look at the two magazines side by side, they

10   are remarkably the same.  The typesets are very similar.

11   The graphics are almost identical.  The way that the

12   magazine was put together was almost identical.  The main

13   difference between *Jihad Recollections* and *Inspire* is that

14   *Inspire* magazine had the benefit of having actual al-Qaeda

15   operatives occasionally contribute an original article for

16   the magazine, as well as the fact that some of the training

17   material was amped up.  It went from being physical

18   training, doing pushups and whatnot in *Jihad Recollections*,

19   to *Inspire*, where it was actually telling you, "Here's how

20   you put together a bomb.  Here's how you create explosives.

21   Here's how you can murder people en masse."  But one is

22   really just a beta version of the other.  If you look at the

23   two magazines side by side, it's fairly clear they come from

24   the same -- the same origin.

25   Q.   Thank you.

Kohlmann - D

1    And turning, again, to the assessments or material

2    found in possession of this defendant, you had mentioned a

3    moment ago to the jury about *Rappeling the Aggression* video.

4        Now, first of all, we're going to play a very short

5    segment of that in a moment here.  Could you explain the

6    significance or role of that encrypted video in the larger

7    context of this global jihadi movement you have described

8    for the jury?

9    A.    Yeah.  It was one of approximately ten videos that AQAP

10   released that year.  The video itself addressed issues like

11   U.S. drone strikes in Yemen and what the appropriate

12   response would be from al-Qaeda, including from individuals

13   such as Anwar Al-Awlaki, who was featured in the video

14   discussing specifically what the proper response should be

15   to U.S. drone strikes.  The video has been widely

16   distributed.  It's been widely viewed, in the jihadi sphere

17   anyway.  And, again, it's a fairly well-known video among

18   the AQAP library.

19               MR. KNIGHT:  Thank you.

20       At this point, Your Honor, I would like to play a

21   three-minute segment of Exhibit 237 which has been

22   previously reviewed by this Court, and I'm going to offer

23   that at this time.

24               THE COURT:  All right.  Mr. Wax?

25               MR. WAX:  Our position has previously been stated,

Kohlmann - D

1    Your Honor.

2                THE COURT:  All right.  It will be received.

3                MR. KNIGHT:  Mr. Kohlmann, we'll simply play the

4    last three minutes.  I believe most of the audio is in

5    Arabic, so we'll take a look at this, and I'll have some

6    questions for you.

7                (Video Exhibit 237 played for the jury.)

8    BY MR. KNIGHT: (Continuing)

9    Q.   Thank you.  Mr. Kohlmann, briefly, the media outlet,

10   again, who produced that particular video is?

11   A.   It's known as Al-Malahem, which is A-L, dash,

12   M-A-L-A-H-E-M, which is the official media wing of al-Qaeda

13   in the Arabian Peninsula.  AQAP.  Al-Qaeda's official branch

14   in Yemen.

15   Q.   Thank you.

16        And my final questions in the context of this

17   particular prong of your analysis relate to the defendant's

18   work on *Jihad Recollections*.

19        Mr. Kohlmann, you testified a little bit about this,

20   but are you familiar in this case with the defendant's

21   contents -- or contacts with Mr. Samir Khan?

22   A.   Yes, I am.

23   Q.   And we have talked at some length about the context of

24   *Jihad Recollections*, but have you considered the defendant's

25   role in editing or looking at those particular publications?

Kohlmann - D

1  A.   Yes, I have.

2  Q.   And can you quantify or contextualize for us the

3  defendant's role in this case in editing or contributing to

4  those publications?

5  A.   Based on the emails that I reviewed, the defendant

6  appeared to have taken an active role, not just in

7  contributing material to the magazine, but then in preparing

8  what could best be described as after-action reports on what

9  he believed were the most effective sections of *Jihad*

10 *Recollections*, on what parts would have greatest benefit for

11 the mujahideen or fighters in places like Yemen and

12 elsewhere; about what was -- what was best for the cause of

13 jihad.

14     He specifically expressed a great deal of thanks to the

15 other contributors and he said they were the greatest team

16 he had ever worked with.

17 Q.   And in your research, experience, and examination of

18 these publications and others, do you frequently see or have

19 you seen that level of editorial involvement?

20 A.   I've never actually come across another case where

21 involving some -- other than Samir Khan, involving someone

22 who's a known contributor to *Jihad Recollections*.

23 Q.   Thank you.

24     I want to direct your attention now to the final prong

25 of your analysis in this type of evidence and this type of

Kohlmann - D

1    case.  Can you tell the jury what that is?

2    A.    The final prong would be visiting websites which are --

3    or social networking forums which are run for or on behalf

4    of terrorist organizations or extremist groups.

5    Q.    Why have you identified this as a separate prong,

6    separate from the one we just discussed, in looking at, in

7    context, this sort of evidence in this sort of case?

8    A.    Right.  Well, the significance of this is that if you

9    are a self-recruiting extremist, if you're trying to

10   self-recruit, very often you will have questions.  You will

11   want to seek others out who may have similar capabilities or

12   similar interests.

13       And, in fact, this is what ended up happening is that

14   individuals who coalesce on these forums start putting

15   together their own virtual networks.  They start pooling

16   resources.  You have one individual who knows a little bit

17   about explosives.  You have one individual who's very

18   knowledgeable about communications.  And while each of these

19   individuals separately may not be able to carry out an

20   attack or a violent attack or travel to a jihadi conflict

21   zone on their own, by pooling resources together, these

22   individuals have discovered that they can actually

23   accomplish something.  They can put together a functioning

24   cell.

25       And, in fact, individuals have done this.  There have

Kohlmann - D

1  been a number of individuals who have actually attempted to

2  carry out terrorist attacks after having met each other

3  entirely over the Internet and have -- having only met each

4  other face to face very, very long afterwards.

5       So when you see individuals that are gathering on these

6  forums and -- or spending an inordinate amount of time on

7  these forums, not only do they have access to the

8  propaganda, all the video recordings being put out by

9  al-Qaeda, all the magazines, et cetera, but on top of it

10  there's the social networking aspect.  The aspect that

11  they're actually able to meet people and to interact.

12       So when you see someone who has a particular interest

13  and is trying to interact -- aggressively interact on these

14  forums, that's an indication that this person is not just a

15  casual observer, this person is not just a curious person,

16  but this person is looking to -- to self-recruit.  The

17  person is looking to induct themselves into this world.

18  Q.   And by way of background, again, could you first

19  explain to the jury how some of the forums or chat rooms

20  that we'll talk about shortly actually work?

21  A.   Sure.

22  Q.   If one were to go on their computer, how would these be

23  functioning?

24  A.   These forums basically all look like bulletin boards

25  with different rooms.  Each room is dedicated to a different

Kohlmann - D

1   thing.  On those forums you'll have one room which is

2   dedicated just to jihadi propaganda.  Again, for the most

3   part, only official couriers from terrorist groups can post

4   in that room.

5        Then you'll have a room about Islam.  Then you'll have

6   a room about preparation; in other words, people sharing

7   ideas about how you can build bombs or how you can travel

8   abroad or how you can carry out an attack at home.

9        You have another room dedicated to technology; how to

10  secure your identity on the Internet, how to anonymize your

11  Internet traffic.  How to not be detected by law

12  enforcement.

13       So there's different rooms dedicated to different

14  things.

15       Also, it should be understood in the forums, in

16  general, there's a range of forums.  There are some forums

17  that are very, very hard-core, top-tier al-Qaeda or

18  terrorist web forums.  And then you have other forums out

19  there which, you know, they may have some people on there

20  who may espouse some jihadi ideas, but those forums are not

21  known as the great coalescing points where people that are

22  violent, dangerous extremists.

23       So it's to be understood there's a range of forums and

24  a range of content within those forums.

25  Q.   And can anyone just get on or access to these forums,

Kohlmann - D

1  or is there something you have to do to get in there?

2  A.    It depends on the forum.  Some forums allow visitors to

3  be able to browse openly, so you don't have to be a

4  registered user, just as a visitor you can go on and browse

5  messages.

6      Other forums require that even if you just want to just

7  read a message, even if you want to view a video or download

8  a video, you must register.  You must create a username and

9  a password on these forums, and your application for

10  membership must be approved by the administrators on those

11  forums.

12      Now, naturally, if you want to post a message, in other

13  words, if you want to interact and actually talk to people,

14  you must almost invariably register an account, a username

15  and password, and that must be approved by the people -- the

16  administrators, the people who run the forum.

17  Q.    Thank you.

18      And in this case, Mr. Kohlmann, did you discover,

19  through your database, activity you attributed to the

20  defendant on roughly six of these forums?

21  A.    Yes, I did.

22  Q.    And can you -- before we go into specifically what

23  those forums are and the activity you were able to observe,

24  can you give us a time line or some context as to the amount

25  of activity and the time period during which it took place?

Kohlmann - D

1   A.   Yes.  In -- well, I believe it was primarily between

2   2008 and 2010, but I did discover that the defendant had

3   apparently had registered accounts on several different

4   forums, some of which were top-tier al-Qaeda or terrorist

5   web forms, some were lower down or generic forums, but that

6   the defendant had posted a number of messages on these

7   different forums.

8       It wasn't thousands of messages, but in several cases

9   he had posted between five and ten messages on these forums

10  and that he interacted with people on the forums as a

11  result.

12  Q.   Thank you.

13      I'll turn your attention specifically to some of these

14  forums.  First, are you familiar with the forum that goes by

15  the acronym AMEF?

16  A.   Yes.

17  Q.   Can you tell the jury what that is?

18  A.   Yes.  AMEF stands for Ansar Al-Mujahideen English

19  Forum.  Ansar, A-N-S-A-R, A-L, dash, M-U-J-A-H-I-D-E-E-N.

20      Asnar al-Mujahideen in Arabic mean the supporters, or

21  the partisans of the mujahideen.  In other words, the people

22  that are supporting people who are carrying out violent

23  jihad.

24      This forum was specifically -- it's all in English.  It

25  was specifically created for English-speaking jihadi

Kohlmann - D

1    supporters living in western countries.

2        It is, arguably, the most important and the most real

3    English language al-Qaeda forum out there.  The forum has

4    included in its membership official representatives of

5    groups like the Pakistani Taliban.

6        And, in fact, when the Pakistani Taliban claimed

7    responsibility for a failed car bombing in New York in 2010,

8    they posted claims of responsibility for that bombing in two

9    places.  YouTube and the Ansar Al-Mujahideen English forum.

10   Q.   And did you see specifically in your research and

11   investigation in this case evidence that the defendant had

12   been on this forum?

13   A.   Yes, I did.

14   Q.   And could you briefly characterize to the jury the time

15   period during which this occurred and what you saw?

16   A.   I have to review my notes to be sure, but I believe it

17   was between 2008 and 2010.

18   Q.   And do you recall or do you remember material that

19   suggested the defendant had specifically applied for

20   admission onto this forum?

21   A.   I believe that he had read messages.  I can't recall

22   whether or not he applied for membership.

23   Q.   I want to turn your attention to another forum, and

24   eventually we'll talk more specifically about some posts

25   known as JHUF.  Could you tell the jury what that forum is?

Kohlmann - D

A.    JHUF stands for the Jamia Hafsa Urdu Forum.  Jamia is

J-A-M-I-A, Hafsa H-A-F-S-A, Urdu U-R-D-U, forum.

The Jamia Hafsa Urdu Forum, JHUF, is arguably the most

important Urdu language jihadi forum on the Internet.  Urdu

is the official language spoken in Pakistan.

However JHUF, as we call it, has many users to speak in

English.  So, actually, most of the content, really on the

site, is in English.  Although, there's a substantial piece

that is in Urdu.

Jamia Hafsa is the official forum of something known as

al-Qaeda's 313 brigade in Pakistan.  This is an official

unit of al-Qaeda active in Pakistan, which was headed by

someone named Mohamed Ilys Kashmiri.  Mohamed, Ilys,

I-L-Y-S, Kashmiri K-A-S-H-M-I-R-I.  Kashmiri was killed in a

drone strike approximately a year and a half ago.

Al-Qaeda's 313 brigade has carried out a number of

high-profile terrorist attacks inside Pakistan, including

attacks on western hotels, on Pakistani Government

officials, and a variety of other targets.

Jamia Hafsa, again, it's -- I think to put it -- put

the conclusion, it's the most important Urdu language jihadi

forum on the web.

Q.    In researching your own database did you see activity

or postings that you attributed to this defendant in that

particular forum?

Kohlmann - D

1   A.   Yes, I did.

2   Q.   And do you recall specifically or generally when that

3   occurred or what those were?

4   A.   I think it was in 2009, and the forum -- the posting

5   was regarding Osama bin Laden.  Specifically about -- I

6   forget which context of it was talking about Osama bin

7   Laden.

8   Q.   Thank you.

9        And briefly, before we turn to one of the more

10  substantive areas in this line of questioning, do you know a

11  forum called the Deen al-Haq forum?

12  A.   Yes.

13  Q.   And, briefly, what was that?  And did you see the

14  defendant active on that forum?

15  A.   Yes.  Deen al-Haq is, again, arguably the most

16  importantly jihadi forum on the Internet that's in Pashto.

17  Pashto is one of the languages that is spoken in

18  Afghanistan.  It is the language that is spoken

19  predominantly in southeastern and southern Afghanistan,

20  along the border with Pakistan.

21       So the areas of greatest conflict activity in

22  Afghanistan, most of the people there speak Pashto.

23       But like Jamia Hafsa, Deen al-Haq, a lot of the

24  interactions taking place in Deen al-Haq were actually in

25  English.  Many of the members only speak in English.  Most

Kohlmann - D

1    of what was going on was in English.  Although, there was

2    some Pashto material.

3        Deen al-Haq is a password-protected forum.  It requires

4    a login and password to access it.  And, once again, what is

5    being discussed in there, jihadi propaganda is being posted

6    on there.  People are talking about violent acts.  People

7    are talking about support for attacks on the United States.

8    Q.   Thank you.

9        And did you examine, again, in the course of your own

10   research, some activity by the defendant on that forum?

11   A.   I did.

12   Q.   To clarify, when we talk about your own research, you

13   earlier testified about your database.  Are the forum

14   postings that you identified and are talking about things

15   that you found that you did not separately see generally in

16   the discovery provided to you by the U.S. Attorney's Office?

17            MR. WAX:  Objection.

18            THE COURT:  It's a leading question.

19   BY MR. KNIGHT:  (Continuing)

20   Q.   Did you see this material elsewhere?

21   A.   No.  No.  This material was -- I retrieved it myself.

22   Q.   Thank you.

23        I want to turn to the next specific forum,

24   Mr. Kohlmann.  Are you familiar with Dawn of the Ummah?

25   A.   Yes.

Kohlmann - D

1    Q.   And can you tell the jury what that particular forum

2    is?

3    A.   Dawn of the Ummah, otherwise known as DWTU, is a

4    now-defunct English language jihadi forum that was active

5    between approximately 2009 and 2011.

6         Dawn of the Ummah was password protected.  It required

7    a username and password to access it.  And it specifically

8    was created because of the fact that the administrators kept

9    trying to post jihadi propaganda on YouTube, terrorist

10   videos, and the videos kept getting removed by YouTube,

11   because YouTube said it was a violation of their terms of

12   service.

13        As a result, these individuals created this forum so

14   that they could distribute the propaganda to others without

15   having to mess with YouTube or the regulations on YouTube

16   that would prevent the distribution of terrorist propaganda,

17   specifically to an English language audience.

18   Q.   The case of Dawn of the Ummah, did you see a number of

19   specific posts attributed by this defendant?

20   A.   Yes.  I recovered a number of pieces that were posted

21   by the defendant on Dawn of the Ummah.

22   Q.   We'll take a look at a few of those at this point.

23        Now, at this time I'd like you to take a look at

24   Exhibit 258 for the witness only.  Pages Bates 498 and 499.

25   Please let me know when you have a chance to look at that

Kohlmann - D

1   page, and then we'll turn to the second page.

2   A.   I have, yes.

3   Q.   Look at the next page.

4   A.   Yes.

5   Q.   And if you could briefly describe, please, what this

6   particular post is and if there's a statement you see

7   attributed to the defendant there.

8   A.   This posting is a reaction to a news article about the

9   fact that another online jihadist had suggested that in

10  order to thwart FBI counterterrorism efforts that those who

11  support jihad should go and leave suspicious packages with

12  wires hanging out or with suspicious substances in various

13  different locations in order to waste the time of the FBI,

14  in order to send the FBI on wild goose chases and in order

15  to create a sense of hysteria.  And then the defendant then

16  appears to add a comment on the bottom.

17          MR. WAX:  Objection.  That cannot be within his

18  knowledge, Your Honor.

19          THE COURT:  I -- I agree with that.  Sustained.

20          THE WITNESS:  Okay.  There's a comment posted on

21  the bottom.

22          MR. KNIGHT:  Can I ask a question to establish --

23          THE COURT:  You can ask a question, a background

24  question.

25

Kohlmann - D

1    BY MR. KNIGHT: (Continuing)

2    Q.    Thank you.  Mr. Kohlmann, you reviewed this post?

3    A.    Yes.

4    Q.    Are you familiar with posts similar to this?

5    A.    Yes.

6    Q.    Are you familiar with the process of posting and

7    reacting to posts on Internet forums?

8    A.    Yes.

9    Q.    And in this particular post is there a news article?

10   A.    Yes, there is.

11   Q.    And is there a comment at the end of the news article?

12   A.    Yes, there is.

13   Q.    Does the comment appear to be separate from the article

14   itself?

15             MR. WAX:  Objection.

16             THE COURT:  What's the basis for the objection?

17             MR. WAX:  He can have no basis of knowledge of

18   that, Your Honor.

19             THE COURT:  He's looking at the article and the

20   content.

21             MR. WAX:  I appreciate that.  There's no basis.

22             THE COURT:  Overruled.

23             THE WITNESS:  It does not appear to be -- yeah, it

24   appears that's a separate comment.  It does not appear to be

25   part of the article.

Kohlmann - D

1   BY MR. KNIGHT: (Continuing)

2   Q.    Is this particular post attributed to an individual or

3   a pseudonym you have identified belonging to the defendant?

4   A.    Yes.   It's attributed to username Ibnulakwa, which I

5   understood from materials provided in discovery, that that

6   was a username registered by the defendant.

7            MR. KNIGHT:   Now, at this time, Your Honor, I

8   would like to offer this segment of 258.  I believe a

9   foundation has been laid.   It's a statement attributed to

10   the defendant.   It could arguably be the defendant's, and

11   before I have the witness read it, I would like to offer it.

12            MR. WAX:   I have some questions in aid of

13   objection, Your Honor.

14            THE COURT:   Go ahead.

15            MR. WAX:   Mr. Kohlmann, the article here appears

16   to be cut-and-pasted from some other place?

17            THE WITNESS:   Yeah.   That's correct, yes.

18            MR. WAX:   You do not know whether the article,

19   when it was cut-and-pasted, had that last paragraph on it,

20   do you?

21            THE WITNESS:   I reviewed this article when it was

22   posted.  I don't recall that comment being on the bottom.

23   It's been a while, so it's possible, but it doesn't fit the

24   rest of the article.

25            MR. WAX:   You do not know whether some other

Kohlmann - D

1  person on some other aspect of the posting had added that

2  paragraph at the end; correct?

3            THE WITNESS:  It's possible, correct.

4            MR. WAX:  I object, Your Honor, to its admission.

5            THE COURT:  Sustained.

6            MR. WAX:  Thank you.

7  BY MR. KNIGHT: (Continuing)

8  Q.   All right.  Thank you.

9       I'll go down, if we can, to Exhibit 231, Bates pages

10  10177 and 10178.

11       Are you familiar with these two pages?

12  A.   Yes, I am.

13  Q.   And can you briefly describe, please, before they're

14  offered, what these are?

15  A.   This appears to be a list of individuals who have,

16  quote, offended Allah and his messenger, or who have

17  insulted or attacked Islam.  These individuals appear to

18  be -- or include, I should say, a number of Danish nationals

19  or European nationals, or Dutch nationals who have been

20  responsible for either drawing or republishing cartoons

21  which were deemed offensive to Islam because they lampooned

22  the Prophet Muhammad.

23       You also have on here people like Anders Rasmussen, who

24  is the head of NATO, who's a Dane.  And of course

25  Pope Benedict is on this list.  But, again, primarily these

1  are Europeans, primarily northern Europeans involved in the

2  distribution or publication of cartoons lampooning the

3  Prophet Muhammad.

4  Q.   Thank you.

5      By way of explanation, do you recall, Mr. Kohlmann,

6  previously providing testimony about the significance of

7  this issue and these individuals in the context of the

8  global jihadi movement as you described it?

9  A.   Yes.

10 Q.   And, specifically, is there a username and a date

11 attributed to this post?

12 A.   Yes.

13 Q.   First of all, please tell us what the username and date

14 are.

15 A.   The username attributed to this post is ibnulakwa and

16 the date of this post was June 24th, 2009, at 1:26 p.m.

17 Q.   Are there subsequent posts by this username related to

18 this same list?

19 A.   There are, yes.

20 Q.   Do they provide additional information about the intent

21 or purpose of this list?

22 A.   They do, yes.

23     MR. KNIGHT:   Your Honor, I would like to offer

24 Exhibit 231, Bates 10177 and 10178.   I did not have the

25 witness read it.   There could be more information provided

Kohlmann - D

1   related to its probative value, but I didn't think it was

2   appropriate before receiving it.

3           THE COURT:  Mr. Wax, any objections?

4           MR. WAX:  No, Your Honor.  Thank you.  Not beyond

5   what has been previously stated.

6           THE COURT:  Received.

7           MR. KNIGHT:  Thank you.  At this time we'll

8   publish this to the jury.

9   BY MR. KNIGHT: (Continuing)

10  Q.   If you would, please, Mr. Kohlmann, I would like you to

11  read for the jury the first paragraph that has been

12  highlighted.

13  A.   Yes.  The title of the paragraph is Islam's Most Wanted

14  List.

15      Assalamu Alaykum, brothers and sisters.  I'm working on

16  a huge project to et names down who have offended Allah and

17  his messenger and who have insulted or attacked Islam.  Just

18  like the FBI has a list, I wanted to collect all the names

19  of those Denmark cartoonists, presidents, interior

20  ministers, et cetera.  I'll give you an example.  Here are

21  some of what I have, ops, everyone post a -- ops is

22  operators -- everyone post a bunch of names.  I want to make

23  a long list and inshallah alphabetize them.  Black list.

24  Q.   Thank you.

25      And if we can review, then, the next page of what has

Kohlmann - D

1    just been received, Exhibit 231, 10178, and do you see

2    another follow-up post related to the list?

3    A.    Yes.

4    Q.    And if we can just look specifically at that and if you

5    can read that to the jury?

6    A.    Yes.  This posting is from 5:02 p.m. on the same day.

7    Also from user ibnulakwa.

8         I wanted to publish it just to put it out there

9    inshallah -- in Arabic that means God willing -- I'll put a

10   disclaimer on it, but anyone can do with it whatever they

11   please.

12   Q.    Thank you.

13        At this time, Mr. Kohlmann, I want to direct your

14   attention, for the witness only, to Exhibit 231, Bates

15   10011.  And specifically to a posting in the middle of the

16   page.  Mr. Kohlmann, do you recognize that?

17   A.    I do, yes.

18   Q.    And if you could please, again, look at the username

19   and identify that.

20   A.    Yes.  The username, once again, here is ibnulakwa.

21   Q.    The date and time of posting, please?

22   A.    August 11, 2009, at 10:10 a.m.

23        MR. KNIGHT:  Thank you.  At this time I would like

24   to offer this into evidence, Your Honor.  I believe the

25   content is self-explanatory, but before I have him read it

Kohlmann - D

1    to the jury --

2                THE COURT:  Is this 231 you're offering?

3                MR. KNIGHT:  231, yes.

4                THE COURT:  Any objection?

5                MR. WAX:  Is the only portion that's being offered

6    the piece in the middle?

7                MR. KNIGHT:  Yes.  Well, yes.  I mean, yes.

8                MR. WAX:  That's all that will be shown to the

9    jury?

10               MR. KNIGHT:  We can enlarge that and show it to

11   the jury.

12               MR. WAX:  No objections beyond what has been

13   previously noted.

14               THE COURT:  It will be received.  At least

15   received as indicated.

16   BY MR. KNIGHT:  (Continuing)

17   Q.    Thank you.  Published to the jury the segment you

18   already identified by date and time, Mr. Kohlmann, can you

19   read that posting to the jury?

20   A.    Yes.  Part of winning the war is not let the West

21   brainwash you into just going with whatever they -- this is

22   a very important concept.  You are not on the ground to say

23   really what is going on.  Even having relatives who live

24   there is not enough.  You must experience the jihad for

25   yourself to truly understand the many faces of this war, so

2114

Kohlmann - D

1  go and learn.

2  Q.   Thank you.

3       Mr. Kohlmann, you just identified a few posts.

4       To give us some idea of volume for this site and the

5  others you've identified, could you tell us, roughly, how

6  many posts in the time period you've identified -- you

7  identified or attributed to the defendant and his username?

8  A.   I believe I recovered a total of approximately 20

9  postings or more.  I would have to check again my notes, but

10 it's -- there were a substantial number of postings.

11 Q.   And would those postings often be the same thread and

12 repeated postings?

13 A.   Yes.  Some of those postings would be in the same

14 message thread in which the defendant would simply reply

15 multiple times within the same thread.

16 Q.   To quantify that more, what does that mean if someone

17 is replying multiple times to the same thread?

18 A.   It would suggest that the person is, number one, very

19 interested in the conversation; but, number two, that the

20 person is paying very close attention to the forum and is

21 logging into the forum over and over again in a very short

22 space of time.

23 Q.   Does that mean only 20 visits to the forum?

24 A.   No.  That would suggest many more than 20 visits.

25 Especially, if you're able to issue replies multiple times

Kohlmann - D

1    within a day, it means you're logging in at least several

2    times a day.

3    Q.    Thank you.

4         And were you looking at only Dawn of the Ummah when you

5    specifically talk about that number of postings, or is that

6    a reference to all six forums you examined?

7    A.    That's primarily Dawn of the Ummah.  If you include the

8    other postings, I think that goes up substantially.

9    Q.    Thank you.

10         And briefly we talked about contents of Dawn of the

11   Ummah.  Are you familiar with forums -- a forum known as

12   islamicawakening.com?

13   A.    Yes.

14   Q.    Can you explain to the jury what that particular forum

15   is?

16   A.    Islamicawakening is a forum -- an English language

17   forum about Islam.  It does tend to gather people that are

18   fairly conservative about Islam, people who have

19   conservative political beliefs about Islam, but it is not

20   explicitly a jihadi forum.  There is, however, a room within

21   islamicawakening which is dedicated to politics in jihad.

22         You tend to get some people in there who have fairly

23   stringent views about jihad and about mujahideen; however,

24   this is not, generally speaking, a forum that is known as

25   being a major beacon for violent extremists or people that

Kohlmann - D

1    are violent.

2    Q.    Thank you.

3          And do you recall seeing some activity attributed to

4    this defendant on that forum?

5    A.    I did, yes.

6    Q.    And, specifically, did you recall seeing a posting or

7    postings attributed to the defendant that contains some

8    content?

9    A.    Yes.

10    Q.    Could you describe that for the jury?

11    A.    Yes.  The defendant posted or appeared to have posted

12    or an account registered by the defendant appeared to have

13    posted a number of messages including everything from humor,

14    off-color humor about religious minorities, to statements

15    about jihad and the mujahideen, also including poetry, poems

16    that I -- I identified as having also been included in the

17    discovery evidence.

18    Q.    And do you particularly remember a posting attributed

19    to the defendant of a poem that has already been admitted

20    into evidence captioned *Dear Martyr whose Story I Should*

21    *Tell*?

22    A.    Yes.  That was posted on islamicawakening.

23    Q.    Can you describe for the jury, based on your review of

24    the material, what happened when that was posted?

25    A.    Shortly after the account registered by the defendant

Kohlmann - D

1  posted that poem, the message was removed.  The message was

2  frozen by administrators on the forum.

3      The administrator posted a response -- or emailed a

4  response over the forum to the defendant's account.  I

5  recovered that message with the discovery.  The defendant

6  was advised or the defendant's account was advised by the

7  administrators on the forum that the message was in

8  violation of the rules on islamicawakenings.  Specifically,

9  it violated a rule that nobody is supposed to post material

10 that recruits or incites people to carry out a terrorist

11 act.

12 Q.   Thank you.

13      And in the larger context of these forums, did you also

14 see some activity by the defendant attributed to him on

15 ummah.com?

16 A.   Yes.  The defendant also appeared to have posted

17 messages on ummah.com.

18 Q.   What is ummah.com?

19 A.   Ummah.com is very similar to islamicawakening.  It's a

20 site where you do get people with conservative views of

21 Islam, but it's not explicitly a site about jihad.  It's not

22 explicitly a site where you have a lot of violent jihadists

23 gather.  You have some people gather there, but it's in all

24 English, the English language.

25 Q.   Thank you.

                            Kohlmann - D

1        Again, with respect to the time period during which

2   these posts occurred, do you have a recollection as to when

3   items were posted on ummah.com?

4   A.    Yeah, I believe it was 2009.

5   Q.    Thank you.

6        Now, Mr. Kohlmann, we reviewed your analysis of your

7   material in this case as it relates to the six factors.  Is

8   it your opinion that the evidence you reviewed and testified

9   to in this case, as it relates to these six factors -- is it

10  your opinion that the evidence you reviewed and testified to

11  in this case falls into or is indicative of all six factors

12  you've described to this jury and identified in your

13  research?

14  A.    I did see evidence of all six factors.  That's correct.

15        MR. KNIGHT:  Thank you.  I have no further

16  questions for this witness, Your Honor.

17        THE COURT:  All right.  Cross-examination.

18        Well, first, let's have the jury stand up and stretch.

19        MR. WAX:  Your Honor, might I suggest we take the

20  morning break at this time?  It might enable me to shorten

21  cross-examination somewhat.

22        THE COURT:  Well, given that representation, I --

23        MR. WAX:  I did say "might."

24        THE COURT:  We'll take a 15-minute break, then,

25  until 20 after.  Okay.

Kohlmann - D/X

1          (The jury panel leaves the courtroom.)

2               (A recess was taken.)

3          (The jury panel enters the courtroom.)

4          DEPUTY COURTROOM CLERK:  All rise.

5          THE COURT:  You may be seated.  I have a note here

6    indicating the jurors would like to say something before we

7    begin.  Yes?

8          A JUROR:  Your Honor, on behalf of the jury, we

9    want to wish you a Happy Birthday.

10         THE COURT:  Somebody told.  Well, all right.

11   It's -- it's better to keep having birthdays even if you are

12   getting old.

13      Okay.  Thank you.  All right.  We would like to start

14   then.

15         MR. WAX:  Thank you, Your Honor.

16

17                    CROSS-EXAMINATION

18   BY MR. WAX:

19   Q.   Mr. Kohlmann, you began working at the investigative

20   project as an intern while you were a student at Georgetown?

21   A.   That's correct, yes.

22   Q.   What year was that, sir?

23   A.   That was in February of 1998.

24   Q.   How old were you?

25   A.   At the time I was 18 years old.

Kohlmann - X

1    Q.    You graduated from Georgetown in what year?

2    A.    I graduated from Georgetown in May of 2001.

3    Q.    You were how old?

4    A.    At the time I graduated, I believe 21 or 22.

5    Q.    You described the degree and certificate that you have.

6    You did not either major or minor in psychology?

7    A.    No.    That's correct.    I did not.

8    Q.    You went into law school right after college?

9    A.    Correct.

10   Q.    You have not at any point obtained a master's degree in

11   any of the social sciences?

12   A.    Correct.

13   Q.    You have no formal training in statistics at the

14   graduate level?

15   A.    Correct.

16   Q.    And you have no doctoral degree in any field relevant

17   to the study of international terrorism?

18   A.    Correct.

19   Q.    You're not an Islamic scholar?

20   A.    I wouldn't characterize myself as such, no.

21   Q.    You do not teach full time as a faculty member at any

22   university?

23   A.    No, I do not.

24   Q.    You've written one book you described, and that was

25   published in 2004?

Kohlmann - X

1    A.    That's correct, yes.

2    Q.    You have never worked as a regular employee for any of

3    the government intelligence agencies?

4    A.    No.   That's -- just as a consultant.   That's correct.

5    Q.    Nor have you worked as a regular employee for the

6    Department of Justice or any prosecuting agency?

7    A.    No.   Just as a consultant.

8    Q.    You do not have a security clearance?

9    A.    No, I do not.

10   Q.    You have never had a security clearance?

11   A.    Correct.

12   Q.    And in terms of your view of the relevance of security

13   clearance to your work, if I understand correctly, you don't

14   view access to secured -- or having a class -- security

15   clearance as important to your work?

16   A.    No.   To preserve my objectivity, no.

17   Q.    In terms of the nature of the work that you do for the

18   United States Government, if I understand correctly, most of

19   it is done on a consulting basis, as you've done in this

20   case, after a person has been arrested?

21   A.    Not -- I -- I don't know about most.   I would say

22   significant degrees, but I don't know if I would use the

23   word most.

24   Q.    Okay.   We've gone down the road of the dollars you

25   earned and the sources in prior proceedings.

Kohlmann - X

1    A.    Yes.

2    Q.    Do I understand correctly that the majority -- a

3    significant majority of the money that you are paid by the

4    federal government comes from consulting of this nature in

5    cases of this nature?

6    A.    Yeah.  It varies year by year, but I think it's a

7    significant portion of it.  If not, a significant majority

8    is probably accurate, yeah.

9    Q.    Okay.  Thank you.

10         With respect to the types of access that you have to

11   information, you used the phrase open sources in your direct

12   examination.

13   A.    Correct.

14   Q.    I'd just like to flesh that out a little bit.  You do

15   not have the authority to obtain search warrants?

16   A.    No, I not.

17   Q.    You do not have the authority to intercept

18   communications?

19   A.    Not illicitly intercept communications, no.

20   Q.    You go on forums or websites; correct?

21   A.    That's correct, yes.

22   Q.    But you do not have the authority that the United

23   States Government has to obtain warrants to intercept

24   communications?

25   A.    Correct.  No, I don't have that authority, no.

Kohlmann - X

1   Q.   Do you not have the subpoena power?

2   A.   No, I do not.

3   Q.   Okay.  You do not have any contracts with Internet

4   service providers, such as Google or Yahoo, that gives you

5   any sort of insider access to the information that they

6   maintain on people who use their services?

7   A.   We don't have contracts, no.

8   Q.   Okay.  You do not engage in illicit activity.  You

9   don't hack into computers or things of that nature?

10  A.   That's correct, yes.

11  Q.   And in terms of the access that you have, you've

12  described your ability to -- to register on some forums?

13  A.   Yeah.  We have registered accounts on basically every

14  single relevant web forum that's out there, yeah.

15  Q.   You have access, then, to the information on those

16  forums?

17  A.   Correct.  We take all that information offline and we

18  preserve it in case it disappears; but, yes, that's correct.

19  Q.   You have access to that information?

20  A.   Correct, yes.

21  Q.   You have access to email information --

22  A.   Yeah.

23  Q.   -- as it appears on a forum, for example?

24  A.   Correct, yes.

25  Q.   You do not have access, as a general matter, to

2124

Kohlmann - X

1  people's hard drives?

2  A.    As a general matter, no, no.

3  Q.    If, for example, as occurred in this case, the

4  government has seized a hard drive, they can provide that to

5  you?

6  A.    That's one instance, yeah.

7  Q.    But as a general proposition for the many, many

8  thousands or tens of thousands or hundreds of thousands of

9  people who are viewing things online or posting things, you

10  don't have access to their hard drives?

11  A.    No.  It would be a small minority.

12  Q.    Okay.  Nor do you have access to their email accounts?

13  A.    Again, it would be a small -- it would be a minority.

14  I would say minority.  Yeah.

15  Q.    In terms of what you can see or what you can have

16  access to with respect to emails, if a person is posting

17  something on a site, and that includes emails, you might see

18  an email exchange in that forum; correct?

19  A.    That's one example, yeah.

20  Q.    But, for example, in this case, you know, the

21  Government had access to emails, and the Government provided

22  you with those emails that it had; correct?

23  A.    Correct, yes.

24  Q.    And that is -- would be the way in which you would

25  generally have access to a wide array of emails from an

Kohlmann - X

1    individual?

2    A.    That would be the predominant source of that kind of

3    information, yes.

4    Q.    Okay.  Now, if I understand correctly -- I'm sorry, I

5    don't recall if you said it in this case or if you said it

6    in a prior proceeding, some of the -- the videos, the

7    al-Qaeda or bin Laden videos, have had as many as, for

8    example, 2.5 million hits?

9    A.    I don't think I said that.  But I would say that

10   depending on where they're posted, if something is posted on

11   YouTube, yeah, it's possible to get a substantial number of

12   hits.  I can't personally recall any video that's been

13   posted on YouTube, an al-Qaeda video, that got that many

14   hits.  It's possible, but I've never seen that.

15   Q.    But there's no question that there are hundreds of

16   thousands or in excess of a million hits on some of the

17   al-Qaeda videos or postings?

18   A.    Well, I don't know if I would give that high a number.

19   I would say it's a substantial number.  Probably in the

20   thousands.  I don't know if -- again, I've never seen a

21   video that's gotten more than -- in this sphere, that's

22   gotten more than maybe 10- or 15,000 hits.

23   Q.    Okay.  With respect to those 10- or 15,000 hits, given

24   the conversation that we've just had, you would not have had

25   access to the hard drives of the overwhelming majority of

 1  the people who viewed those videos?

 2  A.    Yeah, I would say it would be a minority that I would

 3  have access to.  That's correct.

 4  Q.    It would be a very small minority, would it not?

 5  A.    It would depend on a case -- case to case.  It depends

 6  on how many people viewed it and what the video is.  It

 7  would be definitely a minority, yes.

 8  Q.    Same would be true with respect with people who have

 9  viewed Al-Awlaki videos or Al-Awlaki sermons?

10  A.    Yes.  That's true, yes.

11  Q.    If I understood you correctly, I think you said that

12  there are many, many, many people around the world who have

13  viewed Al-Awlaki things?

14  A.    Yeah, I think that's fair to say.

15  Q.    So in terms of the number of people who have viewed an

16  Al-Awlaki video or some other As-Sahab media, without access

17  to the total pool of hard drives or email sets, you

18  have -- you do not know how many people have actually viewed

19  both sets of things?

20  A.    We -- we have some idea, but it's not a definitive

21  thing.  It's -- it would be an estimate, yeah.

22  Q.    Okay.  You've agreed that the number -- all right.

23  I'll stop there.  Thank you.

24        You talked about the issues with respect to Denmark and

25  the cartoonist in Denmark?

Kohlmann - X

1   A.   Yes.

2   Q.   Same type of question.  Many, many Muslims around the

3   world were upset at some of the things that happened

4   in -- at the cartoons and other things in Denmark?

5   A.   Yeah.  I think that's fair to say.

6   Q.   Many people around the world, Muslims and perhaps

7   nonMuslims, said pretty inflammatory things about what had

8   happened in Denmark?

9   A.   That's true, yes.

10  Q.   Without access to the hard drives, full hard drives or

11  full email sets, for example, of those people, you would not

12  know how many people said things that were really

13  inflammatory?

14  A.   Well, I was a witness to some of this stuff, so

15  I -- I -- again, it depends on -- on case -- the case, and

16  it depends on the specific circumstance, but it's fair to

17  say that was a common sentiment, yeah.

18  Q.   I appreciate you have access to a certain number of

19  things.  I think I was asking you a different question, sir.

20  A.   Okay.

21  Q.   Let me try again, please.

22       So the total number of actual hard drives you have had

23  full access to is what?

24  A.   It's probably around 30 or 40.

25  Q.   Okay.  The total number of people who are viewing and

Kohlmann - X

1  posting on the forums and the websites that you've described

2  is far, far greater than 30 or 40?

3  A.    Yeah.    I'd say it would be in the hundreds or

4  thousands, yeah.

5  Q.    Previously, I think you have said it's up in the many

6  thousands, not just limiting it to the hundreds.

7  A.    It depends on which video.    If it's an Al-Awlaki thing,

8  it probably has more views because of the fact that

9  Al-Awlaki speaks in English.    But an As-Sahab video that

10  gets less distribution, it's all in Arabic, it doesn't

11  necessarily get posted on YouTube, that would have -- it

12  just depends on the video.

13  Q.    Okay.    30 to 40 hard drives total that you've had full

14  access to?

15  A.    Approximately.

16  Q.    In terms of the number of people for whom you have had

17  access to, their full email accounts, all of their emails,

18  roughly how many would that be?

19  A.    I can't really -- I don't really know the answer to

20  that.    I only know what I've been provided, so I can't -- if

21  I've been provided with email, I can't say for certain

22  whether or not that email is everything that that person

23  emailed out or everything in their inbox.    It's only what

24  I've been provided in discovery.    Assuming that I've been

25  provided it by the Government in a case like this.

Kohlmann - X

1  Q.  Right.  So I appreciate that caveat, but the total

2  number in which you might have had access to the full set of

3  emails is going to be 20, 30?

4  A.  Probably 20 or 30, yeah.

5  Q.  Thank you.

6     All right.  With respect to Samir Khan, you've not had

7  access to any full hard drives from any of his computers?

8  A.  Not that I'm aware of, no.

9  Q.  You have not had full access to whatever email accounts

10  he had?

11  A.  Not full access, no.

12  Q.  And, sir, if I -- if I understand correctly from prior

13  testimony that you have given, as a general proposition, you

14  do not study legal documents or the charges in a case?

15  A.  If I can, I try to avoid that.  It's not necessarily

16  relevant to the analysis I'm doing.

17  Q.  And if I understand your testimony from prior

18  proceedings correctly, it's your belief that the fact that

19  an individual acts at the direction of the FBI is irrelevant

20  to your analysis?

21  A.  It's not part of what I -- what my analysis is, no.

22         MR. WAX:  Thank you.  Judge, I have no further

23  questions.

24         THE COURT:  All right.  Anything on redirect?

25         MR. KNIGHT:  Yes.

Kohlmann - ReD

1                        REDIRECT EXAMINATION

2

3    BY MR. KNIGHT:

4    Q.    Mr. Wax asked you a number of questions about the

5    volume of videos you've come across in your work.

6    A.    Uh-huh.

7    Q.    How many folks -- or how many As-Sahab articles have

8    you seen where people have published commentary about

9    As-Sahab Media?

10   A.    I've only seen one in *Jihad Recollections*.

11   Q.    And speaking generally about the quantity of items you

12   look at -- videos, emails -- are your opinions based on one

13   set of emails or one set of individuals or the totality of

14   that material?

15   A.    No, the totality of that material.  I'm looking at all

16   the evidence plus whatever is in my database.

17           MR. KNIGHT:  Thank you.  No further questions.

18           THE COURT:  Anything further?

19           MR. WAX:  No, thank you, Your Honor.

20           THE COURT:  May this witness be excused?

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  You're excused.  All right.  Call your

23   next witness.

24           MR. KNIGHT:  Your Honor, at this time the

25   Government rests.  The only clarification I'll add is we

Barre - D

1   need to confer with the Court related to the exhibits to

2   make sure we've got that squared away.

3           THE COURT:  We'll defer ruling -- not defer

4   ruling, but we'll defer the exhibit issue, and we'll go

5   ahead.

6       You have nothing further by way of witnesses.  You do

7   have some exhibits that we'll take up.

8       All right.  You may -- are you ready to begin your

9   case, Mr. Wax?

10          MR. SADY:  We --

11          THE COURT:  You can reserve motions.

12          MR. SADY:  Thank you.

13          MS. HAY:  The defense would call Osman Barre.

14          THE COURT:  All right.

15          DEPUTY COURTROOM CLERK:  Come forward.

16

17                          OSMAN BARRE,

18  called as a witness in behalf of the Defendant, being first

19  duly sworn, is examined and testified as follows:

20

21          DEPUTY COURTROOM CLERK:  Please be seated.  Pull

22  your chair all the way forward.  State your full name and

23  spell your last name for the record.

24          THE WITNESS:  Osman Mohamud Barre.  B-A-R-R-E,

25  last name.

Barre - D

1                       DIRECT EXAMINATION

2    BY MS. HAY:

3    Q.    Mr. Barre, could you tell the jury your relationship to

4    Mohamed, the defendant here?

5    A.    Mohamed Osman Mohamud is my son.

6    Q.    And I expect this has been a very difficult two and a

7    half years for you; is that right?

8    A.    That's correct.

9    Q.    I wanted to ask you some questions about your

10   background, about your son, okay?

11   A.    Okay.

12   Q.    First, could you just give us some background about

13   your family and how you came to the United States?

14   A.    I came here as a refugee in 1993, because there was

15   Civil War going on in Somalia that started at the end

16   of -- first of all, I wanted to add one more thing.  I don't

17   make eye contact because of my culture.  So if I don't look

18   at your eyes, I'm not lying.  I just want to make sure you

19   understand that.

20        So there was Civil War going on in Somalia that started

21   at the end of 1990, and Mohamed was born during the Civil

22   War, and at that time they start -- especially the -- I was

23   one of them, I had to leave my family behind and come to --

24   sorry.

25   Q.    I know this is difficult.  Did you have to leave your

Barre - D

1  wife and your young son behind when you came to the United
2  States eventually?
3  A.    Excuse me.  That's correct.
4  Q.    Okay.  And how -- how long was it before they could
5  come and join you here?
6  A.    Around almost a year.  They come here in '94.  November
7  30th.
8  Q.    And when is your son's birthday, please?
9  A.    August 11th, 1991.
10  Q.    Once you came to the United States -- well, when they
11  came to the United States, how did they appear to you?
12  A.    They were malnourished, they were suffering, but they
13  were happy.
14  Q.    Were you able to help create a new life here with your
15  family?
16  A.    Excuse me.  That's correct.
17        So they were suffering.  When I came here, as a
18  refugee, I was grateful to come here because there was a lot
19  of suffering back home, and we were grateful to America at
20  what they gave me -- myself and my family, and I
21  started -- I had a degree in engineering when I came here,
22  and I was an assistant lecturer at the Somali National
23  University.  I was an assistant lecturer.
24        So when I came here I could not find a job.  They told
25  me everything I had -- you know, if I applied for an

Barre - D

1  engineering job, they'd say I don't have experience here.

2  And if I apply for an entry-level job, they say I'm

3  overqualified.

4  Q.    Did you take some entry-level jobs at first when you

5  came here?

6  A.    That's correct.  I worked in a packaging company.  I

7  worked 13 hours out of 24 hours a day, almost seven days a

8  week.

9  Q.    Did you eventually manage to get to a company and move

10  up in that company?

11  A.    Before I -- then what I did was when I get -- when I

12  worked there for a while, I started looking at engineering

13  jobs.  I was able -- I applied for a job at Intel through a

14  temporary agency, and I started as an assembly.  Although, I

15  was an engineer.  And I move up my way and now I'm a

16  software engineer at Intel.

17  Q.    How long have you worked at Intel, all told?

18  A.    Eighteen years, plus -- plus one year of contracting.

19  Almost 19 years.

20  Q.    Okay.  How many people are in your immediate family?

21  You and Mohamed and how many others?

22  A.    I have another son who's nine and a daughter who's 17.

23  Both of them born here.

24  Q.    And Mohamed's mother is named what?

25  A.    Miriam Hassan Barre.

Barre - D

1  Q.   You told us about one difference between Somalia and

2  the United States; that's about not looking people in the

3  eye?

4  A.   Also, when we name our kids, we don't use family names.

5  The way we name our kids are sequential names.  Your first

6  name is your given name.  The second name is your father's

7  name.  And the third name, which we call here is your last

8  name, is your grandfather's name.

9       It goes on like the three.  So, for example, my son has

10  a different last name because his name is Mohamed Osman,

11  which is me, Mohamed, which is my father's name, Barre,

12  which is my grandfather's name.

13       Every person will have sequential names, which is

14  different than, you know, the way here people name their

15  kids.

16  Q.   Thank you.  And what about the language in Somalia?

17  A.   I don't know if you guys know Somalia is in East

18  Africa.  We're African.  We're not Middle Eastern.  I don't

19  know why people -- we're Muslim a hundred percent, and we

20  speak Somali language, also.

21       I speak five languages, but I learned that, and I

22  understand two more.  But my son barely speaks Somali.  He

23  knows English, because he grew up here.  He knows a little

24  bit of Arabic because of our beliefs.  Our Quran book is

25  written in Arabic.  So every Muslim, they have to learn

Barre - D

1   Arabic because of that.  He knows minimum.

2   Q.   Can you tell us some things about your son as a child

3   and what his interests were as a child?

4   A.   Yeah, he likes swimming, basketball.  He's a big fan of

5   NBA, like me.  I'm a Blazer fan.  He's a Lakers fan.  He

6   likes, also, reading.  He likes, you know -- also, you know,

7   he was going through -- like every immigrant kid, he was

8   going through an identity crisis.  Why are we here?  Why do

9   we speak different language?  Why do women wear different

10  things?  Many kids, when we immigrate to this country, they

11  go through what we call an identity crisis.  They have to

12  relate to two different cultures, two different beliefs, and

13  they have to fit that.

14  Q.   Did you see some examples of that as your son turned a

15  teenager?

16  A.   That's correct.

17  Q.   Okay.

18  A.   Not only was he going through the rebellion age of

19  teenagers, but also he was confused between the two

20  cultures, the two cultures and the two beliefs, he was going

21  through ID crisis.

22  Q.   You go to a mosque here in Oregon?

23  A.   That's correct.

24  Q.   Okay.

25  A.   First time I come here, I live in Hillsboro, because I

Barre - D

1    was working at Intel, and I was working assembly line 13

2    hours a night, so I needed some place I could spend more

3    time with them.  We lived right across from Intel.

4        So then they -- there was nobody close to them.  My

5    wife was wearing a hijab.  My son speaks Somali; a little

6    bit he speaks.  Then I realize there was a Muslim community

7    in southwest Portland.  Then I moved them there to give them

8    at least comfort.

9    Q.   So does the mosque -- the mosque play some role in your

10   lives as a family?

11   A.   That's correct.  Because, you know, there's a lot of

12   people all over the world that live in that area, because

13   there's a mosque where Muslims are, and we go there to

14   practice our belief; not to harm anybody.

15   Q.   So you said it's like a community center?

16   A.   It's more a community center.  We have activity,

17   including gyms.  We have, you know, language.  We teach.  We

18   help with homework.  You know, and they try to associate

19   others that look like them that believe same way; they pray

20   the same way.

21       It's like, you know, if you are Christian -- if you're

22   Catholic, for example, you go to Catholic church.  If you're

23   Muslims, you go to the mosque, which is like a church for

24   us.

25   Q.   Let me ask:  Did you and your family go to London at

Barre - D

1  some point when Mohamed was a teenager?

2  A.   That's correct.  When he was around -- I think 2008 we

3  took a family vacation.  I have an extended family in

4  London.  We visited there, and I took all my three kids, you

5  know, that way they can see, you know, my family in London.

6       And I have a family also in Toronto, Canada.  He went

7  with me when he was eight.

8  Q.   So on the London trip, was there an incident at the

9  airport in London?

10 A.   That's correct.  When we landed in London, you know,

11 the immigration office picked -- picked up -- picked my son.

12 I don't know why.  He said, you know, he -- he say, you

13 know, his last name and first name sounded like "Mohamed

14 Mohamed."  When it's Mohamed Mohamud.  They took his

15 passport, and they went back to this room, and then he come

16 back and told us he doesn't like this kid.  And I told him

17 why?

18      And, you know, Mohamed felt he was profiling us, and I

19 told him, dad, this is immigration office.  We're

20 in -- we're not in America.  We're in a different country.

21 Be patient with them.  If you argue with them, they might

22 send us back.

23      Mohamed is the kind of a kid -- now he's 21.  If I tell

24 him, "Listen to me," he's -- he's simple, and even I -- I

25 can take his passport, and he will say no word to me.  He

Barre - D

1   will say, "Okay, daddy."

2   Q.    Did you keep control of the passports on that London

3   trip the whole time?

4   A.    That's correct.   I had the passport with me, because he

5   was underage.   17.

6   Q.    Okay.   Let me ask about London, generally.   I

7   understand the incident at the airport was distressing, but

8   how was London generally for the family?

9   A.    London, they have so many diverse people.   There's a

10  lot of Muslims around the world, especially from Pakistan.

11  Everywhere you go you see Islamic signs, Islamic meal.   Many

12  mosques.   Every, like, ten blocks there's a mosque.   So he

13  told me, Dad, this place seems like an Islamic -- you know,

14  a Muslim country.   You know, and I -- I like London.   He

15  fell in love with London.

16  Q.    There's a lot of food that's halal food available?

17  A.    It's like in the culture in Islam.   The way -- in the

18  Islamic way we call halal.   There was a lot of halal meat,

19  there was women wearing hijabs.   There was a lot of, you

20  know, Islamic, you know, things you could see around.

21  Q.    And was there a family event, a funeral, at that time?

22  A.    That's correct.   There was an uncle of mine who was

23  born in Somalia, who passed away, at that time, in London.

24  There was a funeral service at the time.   And Mohamed went

25  there, and he was amazed -- there was a lot of family

Barre - D

1    members who came around Europe at that time to attend the

2    funeral service, and he was amazed at how much family --

3    extended family we have in Europe.

4        He told me:  Dad, can we move here?

5        And I told him:  No, dad, because you're finishing high

6    school.  You need to go to college, because America has the

7    best colleges in the world, and you're lucky enough to have

8    the opportunity to go to college in the U.S.  So we're going

9    back and you're going to go to college.  Once you graduate,

10   you can choose where you want to live.

11   Q.   Okay.  Let me show you a few photographs.  I'll show it

12   to the witness first, so we can get the foundation.

13        Can I show you, please --

14   A.   Yeah, this?

15   Q.   1004C.  Do you recognize the photo?

16   A.   Yes.  This is in London --

17            MS. HAY:  Your Honor, may I offer that?

18            THE COURT:  You're offering?

19   BY MS. HAY: (Continuing)

20   Q.   Do you recognize the photo as from London?  Is that

21   right?

22   A.   That's correct.  It's from London.  My youngest son,

23   who's nine now -- at that time he was five -- and Mohamed in

24   a bumper car.

25            MS. HAY:  I offer this photo.

Barre - D

1          THE COURT:  Any objection?

2          MR. KNIGHT:  No objection.

3          THE COURT:  It will be received.

4          MS. HAY:  I have three others I'll show him.  If

5   there's no objection, I'll just show them to the jury.  Is

6   there?

7          MR. KNIGHT:  Which are they?

8          MS. HAY:  D, E.  Show the witness first, please.

9          THE WITNESS:  This is Mohamed, my daughter Muna,

10  my son Younis, and his nephew, you know, sitting in my

11  brother's home.

12  BY MS. HAY: (Continuing)

13  Q.   So is this a photograph in London, as well?

14  A.   In London, as well.

15         MS. HAY:  Your Honor, I offer 1004D.

16         THE COURT:  Any objection?

17         MR. KNIGHT:  No, Your Honor.

18         THE COURT:  Received.

19         MS. HAY:  And then 1004A.  Can we show the jury?

20  I mean, show the witness, rather.

21      We can publish 1004D.  If we can show 1004D to the

22  jury, please.

23         THE COURT:  Any objection?

24         MR. KNIGHT:  No objection.

25         THE COURT:  Okay.  It will be received.  You can

Barre - D

1    show it.

2                 MS. HAY:  Okay.  Now I'd like to show you another

3    photograph, 1004A.  To the witness only, please.

4    BY MS. HAY: (Continuing)

5    Q.   And is this one of your photographs?

6    A.   Yeah.

7    Q.   Can you identify the people in that photo?

8    A.   Yeah.  It is my daughter Muna and my son Mohamed, and

9    this is his graduation from high school.  Westview High

10   School.

11                MS. HAY:  Your Honor, I'd offer 1004A.

12                MR. KNIGHT:  No objection.

13                THE COURT:  Received.

14                MS. HAY:  And publish that to the jury.

15        And 1004B to the witness, please.

16   BY MS. HAY: (Continuing)

17   Q.   And is this a photo that was in your possession?

18   A.   That's correct.

19   Q.   And who -- can you identify the people in this photo?

20   A.   This is myself, his mom -- Mohamed's mom -- Mohamed,

21   Muna my daughter, and my youngest son.

22   Q.   So this is a family portrait.  Is this at the time of

23   his graduation, as well?

24   A.   His graduation from high school.  That's correct.

25                MS. HAY:  Your Honor, I offer 1004B.

Barre - D

1        THE COURT:  Any objection?

2        MR. KNIGHT:  No objection.

3        THE COURT:  Received.

4   BY MS. HAY:  (Continuing)

5   Q.    So at the time of this photo in -- your son's

6   graduation, I notice your wife at that point was not wearing

7   a hijab; is that correct?

8   A.    That's correct.

9   Q.    Did she at some time change her decisions about that?

10  A.    When she come here she was wearing hijab, but I think

11  around 2004 she decided not to wear hijab.  And then she

12  wears it whenever she feels.  That's her choice.  At this

13  time she was not wearing it.

14  Q.    And can I show you, please, 1004A again?  And in this

15  photo is it -- Mohamed is wearing braces; is that right?

16  A.    That's correct.  He -- we -- you know, he

17  started -- you know, putting braces -- we took him to a

18  dentist when he was in senior high school.

19  Q.    And how long did he have to keep those braces?

20  A.    Through the -- through the first year, I'm sure.  I

21  don't remember when we took it off, but it was, like, around

22  two years.  This was the middle of his senior year.  All the

23  way to college, when he was in his first year of college, he

24  was wearing braces.

25  Q.    So his freshman year of college he still had braces?

2144

Barre - D

1  A.    Yes, that's correct.

2  Q.    How did he get to the orthodontist?

3  A.    He was going to Sylvan Orthodontics, and I have to go

4  every other weekend or whenever he had appoint -- I used to

5  drive all the way to Corvallis to pick him up and drop him

6  to the -- the dentist, and then take him back to Corvallis

7  where he was going to college.

8        Okay.  And I wanted to show you another exhibit, just

9  to the witness only, please.  Defendant's 107A or B, 1007A.

10 No.

11             MS. HAY:  Your Honor, may I approach the witness

12 to show him a paper copy?

13             THE COURT:  You may.

14 BY MS. HAY: (Continuing)

15 Q.    Here you go.  Do you see that?

16 A.    Yeah.

17 Q.    Now, your son enjoyed writing; is that correct?

18 A.    He enjoyed writing.  He enjoyed reading -- he had a lot

19 of books, like Harry Potter.

20 Q.    Harry Potter?

21 A.    He used to like reading.  He used to like writing.

22 Q.    And in tenth grade did he enter a poetry competition?

23 A.    He entered a poetry competition that was, you know, the

24 American Literacy Forum.

25 Q.    Did you see the video earlier that was played in the

Barre - D

1    courtroom for that?

2    A.    He won an award for that, if I remember correctly.

3    Q.    Okay.  Looking at Defendant's 1007A, does that appear

4    to be the book in which your son's poem was published?

5    A.    That's correct.

6    Q.    Can you find the page in there which is his poem?

7    A.    Yeah.

8    Q.    Can you -- can you tell us what page number that is, if

9    you can read it?

10   A.    53, I think.

11   Q.    Okay.  And does it have his name, or how does it

12   identify him?

13   A.    Yeah, he has, you know, gender, male, his age, and also

14   the place of birth was Mogadishu, Somalia.

15   Q.    Mogadishu, Somalia?

16   A.    Yeah.

17          MS. HAY:  I'll offer 1007A.

18          THE COURT:  Any objection?

19          MR. KNIGHT:  No, Your Honor.

20          THE COURT:  Received.

21   BY MS. HAY: (Continuing)

22   Q.    So let me turn now to August of 2009.  Do you recall an

23   incident when you were concerned that your son was leaving

24   the country in August of 2009?

25   A.    That's correct.

Barre - D

1    Q.   And can you tell us what happened?  What's the first

2    thing that you understood?

3    A.   What happened was that day I was at work.  Before

4    I -- before that, you know, me and my wife, we split.  We

5    had a family issue for like a year and a half, so we decided

6    it was not working.  Let's split and see what happens.  And

7    then Mohamed and my -- all three kids and their mom, they

8    move to an apartment, and I move into different apartment.

9        So in August 2009 Mohamed called me while I was at

10   work.  It was around 2:00, and he told me:  Dad, I want to

11   leave the country.  I'm leaving the country.

12       I said:  Can you wait?  Can we talk tonight when I get

13   home?

14       And he told me:  No, it's too late.  He has a passport,

15   visa, and ticket.

16   Q.   So what did you do once you heard that?

17   A.   I called his mom and said:  Do you have the passport?

18   You know, do you have the passport?  Mohamed called me and

19   told me he's leaving the country.  He's too young and

20   immature, and we need to talk to him.

21       And she told me that she will drive home.  And I drove

22   from work to her house, so we met there and the -- the

23   passport was missing.

24   Q.   Okay.  The passport was missing.  So then what did you

25   do?

Barre - D

1    A.    We started calling Mohamed, and he didn't answer his

2    phone.   So I -- at the time that this incident happened --

3    as a parent, we were concerned, because there was a lot of

4    Somali kids, especially in the Minneapolis area, where we

5    have a big number of Somali community, they were

6    disappearing and going back to Somalia.   So we panic.   Our

7    son was young and he told us he's leaving the country.   And

8    there was an incident I saw on the Internet of kids

9    disappearing.   And then I saw one incident that the parent,

10   you know, lost his kid -- they didn't know where they were,

11   and they were looking on the Internet, and they saw their

12   son shot in the head, dead, in Somalia.

13        So, as a parent, we panic, and we needed help to stop

14   our son to not to leave country.

15   Q.    So did you call out to try to get some help?

16   A.    We went to the yellow page, and the first number I get,

17   I call, and said:   Can you guys help me to stop my son and

18   not leave the country?

19   Q.    Did you call the FBI?

20   A.    That's correct.

21   Q.    Okay.   What happened when you called the FBI?

22   A.    When I called them, they told me:   We want to meet you.

23        And then Mohamed called his mom back.   He answered his

24   phone, and he said he's in -- somewhere in southwest

25   Portland.

Barre - D

1   Q.   Can I interrupt for -- when you called first, did you

2   give them your son's name and his --

3   A.   I gave them his name and birthday and address of his

4   mom.

5   Q.   You told them the nature of your concern?

6   A.   Yeah, I told them my son just told me he's leaving the

7   country, out of the blue, and, as a parent, I'm concerned.

8   Q.   Did you invite them to come to your house to meet?

9   A.   That's correct.

10  Q.   Okay.

11  A.   Not my house, but Miriam's house.

12  Q.   Miriam's house, okay.

13  A.   Yeah.

14  Q.   In the meantime, when you're waiting for them, were

15  they going to call you back, or what was going to happen?

16  A.   They told me they want to meet me, and they told me:

17  Can you meet us at the nearest cross intersection?  So I

18  went to the outside, and then Miriam went out to pick up

19  Mohamed.

20  Q.   Because, in the meantime, she had heard from Mohamed?

21  A.   Yeah, she heard from Mohamed.  And she drove to pick

22  him up, and she told me, you know:  Mohamed is okay.  She

23  called me back and she said:  Mohamed's okay.  He doesn't

24  have visa.  He doesn't have a ticket.  And she took the

25  passport from him.

Barre - D

1    Q.    Let me back up for a minute.    You went -- the FBI came

2    to meet with you; is that right?

3    A.    The FBI, they didn't meet -- I was standing outside of

4    the MAX station; Merlo MAX station.

5    Q.    That's where they told you to meet?

6    A.    Yeah.

7    Q.    Then what?

8    A.    And then they went to Merlo High School parking.    They

9    drove to Merlo High School parking, and they told me:    Can

10   you meet us in the Merlo High School?

11   Q.    Did you walk over to the high school?

12   A.    I walked to Merlo High School, and I met them there,

13   and then they said:    Let's go to a safe place.

14   Q.    So they drove you somewhere else?

15   A.    They showed me -- FBI ID first, and they told me, you

16   know, they're from Joint Task Terrorist Force.    And I said:

17   Why terrorism?    Are you alluding that Muslim and my son's

18   name is Mohamed?    Why terrorism?    You know, there's no

19   terrorism here.

20        We're citizen here.    We believe in Islam.    We are proud

21   to be American.    We're grateful to America.    Even I say "God

22   Bless America."    We love America.    They helped us when we

23   needed them the most.

24   Q.    Did you get in the car with the FBI --

25   A.    Correct.    And I --

Barre - D

1              THE COURT REPORTER:  I'm sorry.  Could I have one

2    at a time?

3    BY MS. HAY:  (Continuing)

4    Q.    So let me finish the whole sentence.  You got out of

5    the car and you drove with them somewhere.  Is that what

6    happened next?

7    A.    Yeah.  I told them we have nothing to hide.  We're not

8    bad people.  We are hard workers.  We come here to live.

9    We're proud of this society.  We're grateful to America.

10   They brought us here when we didn't have anywhere to go.

11   Q.    And did they want to get some information from you

12   about your son?

13   A.    That's correct.  They asked me my ID.  I give my ID.

14   They asked me the address of, you know, Miriam.  I already

15   give that.  They ask me what I do.  I told them I work for

16   Intel.  I'm a software engineer.

17   Q.    Did you describe your concerns about Somalia?

18   A.    Yeah, I -- I explained to them why I called them, which

19   was, you know, the concern I have; many kids are

20   disappearing and going back to Somalia.

21   Q.    Did you actually say you heard some of those kids

22   from --

23   A.    I saw some of the pictures on the Internet, and I told

24   them that.

25   Q.    Did you say you heard some of the kids from Minnesota

Barre - D

1   had been brainwashed?

2   A.    That's what -- that's not exactly the sentence I used.

3   What I told them was, you know, I was concerned because some

4   of the kids in the Somali community in Minneapolis, they get

5   brainwashed and taken back to Somalia and some of them died.

6   I don't want that to happen to my son.  I'm trying to stop

7   him.

8        They told me he's an adult.  There's nothing we can do.

9        I tell them he might be an adult, but he's still a

10  child and immature.

11  Q.    But they told you because he is an adult they can't --

12  A.    They can't help me.

13  Q.    Did you agree to give them any update if you learned

14  anything?

15  A.    I told them if he -- now he's home.  They told me not

16  to tell him that I talked to them; but Miriam, his mom,

17  already told him that we called the FBI, so one -- when I

18  come back home, then they -- you know, we -- they did an

19  interview and then they left.  The FBI, they brought me back

20  to, you know, Miriam's house.  And then I talked to Mohamed,

21  and I said why -- he told me it's a fluke.  This was

22  just -- I was just -- you know, I was just saying.  I was

23  not going anywhere.  I didn't have a passport.

24       I told him what made you think that you can -- you

25  know, he told me he was thinking of going to Yemen.  And

Barre - D

1  before this incident, he -- you know, expressed, my son,

2  that he loves to learn Arabic and Islam, and he would like,

3  you know --

4  Q.   He wanted to go learn Arabic and Islam?

5  A.   That's correct.  And I told him:  You can learn those

6  and do those when you graduate from college and become a man

7  and are mature enough.

8  Q.   Let me ask you.  You maybe misspoke.  You said your son

9  didn't have a passport.  Did he have his passport with him?

10  A.   He had his passport but not a ticket or a visa at the

11  time.

12  Q.   Okay.  Did you reach an agreement with your son about

13  what should happen next?

14  A.   Yeah, we -- me and his mom, Mohamed was -- we sat down,

15  and I explained to him everything, and he agreed with -- to

16  go to college and to stop thinking of going anywhere.  I

17  told him I'm not from Yemen.  I don't know nothing of Yemen,

18  and I left my home country because of violence.  I brought

19  you here to give you a life of prosperity, and we are here,

20  and you are going to be here with us and go to college, and

21  we were going to support you to do that.

22  Q.   Did you ask him why Yemen?

23  A.   Yeah, I asked him:  Why Yemen?  Why Yemen?  Why do you

24  want to go to Yemen?  I'm not from Yemen.  You're not from

25  Yemen.  We don't know anybody there.

Barre - D

1     He told me he met a kid that was going to school here

2   at the mosque.  I don't know the mosque -- it's not only for

3   the Somali community.  It's for the whole Islamic community.

4   And we have members from all over the world.  We have

5   Saudis, we have Egyptians, we have -- you know, you name it.

6   Every single -- Muslim, Americans, British, anybody who has

7   faith comes to the mosque, and we have our own community in

8   there.  And Mohamed used to go there, and I used to go

9   there.  You know, the whole family used to go there.

10     And so he met different people from different places.

11  Mohamed expressed one time one of the kids he met there, who

12  was going to college here, that he will like to learn Arabic

13  and Islam, and he said he can help him to do that.

14  Q.   What was that kid's name.

15  A.   He said the kid's name was Amr.

16     I told him, you know, he told me he forwarded to him

17  school he can learn Arabic and Islam, and I forwarded that

18  email to the FBI, and I said my son was going to school to

19  learn Arabic, and this is the link of the school that he was

20  going to.

21  Q.   So let me just make sure I understood.  Amr or Amro --

22  A.   Amr or Amro, yeah.

23  Q.   Told your son about a school in Yemen?

24  A.   That's correct.

25  Q.   And he had an email that he sent to your son?

Barre - D

1    A.    That's correct.    He send me an email that had the

2    school name.

3    Q.    Okay.

4    A.    And Mohamed told him, you know, he was going to the

5    school to learn Arabic and Islam, and I told him, dad, you

6    can learn Arabic and Islam once you finish your school here

7    and you become mature enough when you know wrong or right.

8    In the meantime, you stay here, and we help you become

9    better -- you know, a better person and help you to go to

10   college.

11   Q.    Okay.    Did your son go to college that fall?

12   A.    That's correct.

13   Q.    Why did he go?

14   A.    He went to Oregon State.    You know, he told us most of

15   his friends are going to Oregon State.    I preferred him to

16   go to PSU.    He said he would like to go to Oregon State

17   because most of his friends are going there.

18         We agreed with him.    We say as far as you going to

19   school, you know, we will support you.    I had recommended

20   him to learn medical, but he said he wanted to be an

21   engineer.    I said, that's fine, you want to be an engineer.

22   You can be an engineer.

23   Q.    Let me back up to August.    Did the FBI tell you they

24   had any concerns about your son and the people he was

25   connected to?

Barre - D

1   A.   Not at all.

2   Q.   If they had told you they were concerned about your son

3   and thought he was in contact with a dangerous extremist,

4   what would you have done?

5   A.   Well, I talked to -- you know, we have a member of the

6   community, leaders that are counselors, in our community

7   that can talk to the teenager when they're going through --

8   because teenagers, they go through -- especially those who

9   migrated here, because of the two cultures, they go through

10  an identity crisis.

11       So we have counselors that talk to them and teach them

12  what is right and wrong, and I have a few friends who he

13  respects, Mohamed, as -- as Muslim leaders, that would talk

14  to him and tell him, you know, what's right and wrong.  But

15  nobody contacted me before they arrested him.

16  Q.   The next time they talked to you was when they --

17  A.   When they arrested him.

18  Q.   And back to -- and that was actually -- first, you

19  talked to them at the airport when he was going to Alaska,

20  correct, the FBI agent?

21  A.   You're right.  I talked to FBI, also, when my son was

22  flying to Alaska.

23  Q.   Okay.  Let me just ask you a little bit about college

24  before we get to that.

25  A.   That's correct, okay.

Barre - D

1    Q.    His freshman year in college, you stayed in touch with

2    him; is that right?

3    A.    That's correct.  I used to pick him up and drive him

4    back to Corvallis every other weekend at least, if not every

5    week.  I used to drive every Friday, when I finish work, to

6    Corvallis to pick him up.  That way he can spend time with

7    his mom and two siblings.  His mom used to clean his

8    clothing and do the laundry for him and give him food and,

9    you know, some cash to go back to college.

10   Q.    Did you go to many events down at Oregon State?

11   A.    There was a big event they called African night.  They

12   had a big concert.  You know, most -- all the kids that came

13   from Africa that were going to Oregon State, they created a

14   concert called African Night Concert, and Mohamed was the

15   actor of the concert.  He was acting as the lead, you know,

16   actor role of the concert.  Me and his mom, we went there to

17   support the event.  We were there.

18   Q.    Now, are -- were you aware at the time that your son

19   was drinking quite heavily?

20   A.    Not at all.

21   Q.    Did you know he had been smoking marijuana?

22   A.    No.

23   Q.    So there were some things that he hid from you.  Is

24   that fair to say?

25   A.    That's correct.

Barre - D

1   Q.   You didn't know about what he was doing online?

2   A.   No.

3   Q.   Do you feel you still know who your true son was even

4   if he didn't tell you everything?

5   A.   That's correct.  My son, you know, he was the simplest

6   person.  I'm not saying because he was my son.  He is the

7   simplest person.  He's a goodhearted kid.  He was going

8   through ID crisis, like many kids go through.  He was a role

9   model for the whole community.  The community members used

10  to say, "Why don't you want to be like Mohamed?"  He was

11  easy going, likeable, you know, and he was just, you know,

12  down to earth.  Simple person.

13       And also we teach our kids to be -- to respect -- to

14  respect elders.  So he was very shy around -- you know, when

15  he's close to, you know -- like, he never called, you know,

16  somebody like -- if he's talking to somebody who's an adult,

17  he would never call him Mr. X.  He'll call them uncle or

18  aunt.  That's what we teach our kids; to respect others and

19  call them uncle or aunt.  That's the time he use it, from

20  the beginning.

21  Q.   Let me -- I know this is a difficult topic.  You

22  mentioned already that you and your wife had split up --

23  A.   That's correct.

24  Q.   -- while he was graduating from high school?

25  A.   Uh-huh.

Barre - D

1   Q.    Did that family difficulty continue into the spring of

2   2010?

3   A.    That's correct.  Also, you know, my daughter went

4   also -- who was teenager, also went through ID crisis.  She

5   started running away.

6   Q.    March of 2010?

7   A.    March of 2010.  And then we have to call the police and

8   say my daughter, who at that time was 13, 14, run away.  And

9   then we were going through -- we split, we called FBI,

10  because my son wanted to leave the country, but he come

11  around and he went to college, and he was doing really well.

12  So we were suffering as family.  We were going through, you

13  know, crisis.

14  Q.    And about money, did Mohamed ask you for money very

15  often when he was in school?

16  A.    He -- you know, we used to give him money, but Mohamed,

17  he's kind of, you know, what I call mellow.  Even if he

18  needs something, he doesn't ask you.  He doesn't say, "I

19  need this."

20        I have to ask him:  Do you have enough money today?

21  Tomorrow?  You know, kid is -- my daughter is opposite of

22  that, but Mohamed was just -- even if he's hungry, he will

23  never say he's hungry.  I don't know why.  If I'm hungry, I

24  will scream and say I need food.

25  Q.    Were you aware how much he was trying to borrow money

Barre - D

1   or didn't have money in the --

2   A.   No, I didn't --

3          THE COURT REPORTER:  I'm sorry, I need to get the

4   full question.

5          MS. HAY:  Did you hear the question?

6          THE COURT REPORTER:  No.

7   BY MS. HAY: (Continuing)

8   Q.   Were you aware of him needing to borrow money or

9   needing money in the spring of 2010?

10  A.   No.

11  Q.   Did -- but you would deposit money sometimes into his

12  Bank of America account?

13  A.   I would -- I would deposit money into his account.  His

14  mom did also through me.  You know, she used to give me the

15  money and say, "Can you deposit this money for my son?"

16       Both of us supported him in that way.

17  Q.   What bank account was that?

18  A.   Bank of America.

19  Q.   Bank of America?

20  A.   That's correct.

21  Q.   What were Mohamed's plans for the summer after his

22  first year of college?

23  A.   He called me and he told me he wanted to go to Alaska

24  to do fishing, and I told him, you know, just -- I trust

25  him, but I -- I used to do -- who do you know from Alaska?

Barre - D

1    Who help you to get a job?  He told me he has a friend name

2    Martinez, I think.  Luis.

3        And he said his dad, you know, has a business --

4    fishing business in Alaska.  Kodiak.  I never even heard

5    Kodiak before.  I knew Alaska, but I never heard Kodiak.

6        I said:  Where's Kodiak?

7        He told me an island in Alaska.

8        I told him:  Can you forward to me the email, the

9    itinerary, airline ticket of Luis?  That way I can match the

10    flight time and the date.  That way when you go there you

11    have somebody who knows the area that can take you where

12    you're going at least.

13    Q.   Let me show you quickly Defendant's Exhibit 1011A for

14    the witness only first.

15        We'll make this bigger for you.

16    A.   This -- this was the email my son sent to me saying

17    this is the ticket Luis had to go to Alaska.

18              MS. HAY:  Your Honor, I offer 1011A.

19              THE COURT:  Any objection?

20              MR. KNIGHT:  No objection.

21              THE COURT:  Received.

22    BY MS. HAY:  (Continuing)

23    Q.   Let me ask you, the first line, would you read that to

24    the jury, please?

25    A.   Yeah.  Baba -- which means dad or father in our

2161

Barre - D

1   language -- this is the ticket he got.  All the info is

2   attached.

3   Q.   Which is your email address up there?

4   A.   The jimaleh@gmail.com.

5   Q.   Continuing on this document, can you just describe what

6   the rest of the document includes?

7   A.   Yeah.  So this was Alaska Airline ticket that Luis had.

8   Q.   And that's -- he had that in April of 2010?  Did you

9   see that date?

10  A.   Yeah.

11  Q.   And then it was forwarded to you the next day?

12  A.   That's correct.

13  Q.   So what did you think of this plan of sending your son

14  up to Alaska to work?

15  A.   I thought it would help him to, you know, to work and

16  to get busy.  Because usually if you let teenagers stand

17  around, they get in trouble.

18       I sent my daughter also to Canada, which -- usually I

19  try to make them busy during the summertime.  So when he

20  told me he wanted to go and work in Alaska, I supported him,

21  and I bought the ticket for him.  And I bought another

22  ticket for my daughter to send to my sister who lived in

23  Canada who has two daughters she can stay with.

24  Q.   So you took your son to the airport in June of 2010?

25  A.   That's correct.

Barre - D

1   Q.    And he wasn't able to fly; is that right?

2   A.    That's correct.

3   Q.    So tell us about -- what that -- what happened when you

4   got to the airport?

5   A.    So me and his mom and Mohamed, we drove to the airport

6   to send Mohamed to Alaska to go to fishing trip.  And then

7   when we get to the airport, we went to the Alaska Airline

8   counter to check him in and we had our -- dragging his

9   luggage.  And they told us to wait.  You know, we waited.

10  We waited.  And then they told us that our son cannot fly.

11       And we -- we ask -- we ask, you know, the counter

12  lady -- I said why he cannot fly?  And she gave me a TSA

13  number to call.

14       Then, you know, my son was really mad, because he was

15  willing to go to Alaska to work.  And I told him:  Dad,

16  don't worry.  Things we will clear, and we -- you know, we

17  will contact the authority and find out why you cannot fly.

18       And then we walked back, you know, to go to the

19  parking.  In the hallway, there was two guys in front of us,

20  waiting for us, and they told us:  Oh, we're FBI.  Can we

21  talk to Mohamed?

22  Q.    And did you see one of those agents testify here in

23  court?

24  A.    That's correct.  He was here.  I think it was Brad.

25  Q.    Brad Petrie?

2163

Barre - D

1  A.   And I think Christian Henders -- Chris Henderson.

2  Q.   Chris Henderson was the second agent?

3  A.   Right.

4  Q.   Who has not testified?

5  A.   He has not testified here.

6  Q.   So did you agree to go talk with the FBI?

7  A.   Yeah.  We told them we have nothing to hide, you know.

8  And his mom said also:  If you want to talk to him, we want

9  to be there.

10      Because to us he was just a child.  He might have been

11  18 or 19, but --

12  Q.   He was 18 at the time?

13  A.   He was 18 at the time.

14  Q.   And did you answer all of the FBI's questions?

15  A.   We did.

16  Q.   Did they want to ask some questions about Yemen?

17  A.   That's correct.  And I -- I told them, personally, he

18  was going there, and I forwarded everything to the FBI.  He

19  was going there to study Arabic and Islam, and we talked

20  about it, and I told them I told Mohamed -- we talked -- we

21  agreed Mohamed to go to college, and that -- that's that.

22  Q.   So they were asking about the incident back in August

23  of 2009?

24  A.   Yeah, when we called them.

25      And I was upset, because I thought there were profiling

Barre - D

1    my kid because I called the FBI one time.  So I -- I was

2    really mad that night, because, you know, I -- to us it was

3    unfair, without knowing why he cannot fly.  My son was going

4    to, you know, work.  They say -- they didn't explain to us

5    why.

6    Q.    They didn't tell you he had been in -- in touch with a

7    dangerous extremist since he was 17?

8    A.    No, no.

9    Q.    Did Mohamed answer the questions the FBI asked?

10   A.    He answered all the questions they asked.

11   Q.    Did he -- did you hear him say something about Amr to

12   the FBI?

13   A.    That's correct.

14   Q.    He gave the name and where he's from?

15   A.    He said, you know -- they said:  Who do you know from

16   Yemen?  He said:  I know Amr, who was from Saudi Arabia, but

17   I met in the mosque in Portland.

18   Q.    And you let them know you were going to hire a lawyer

19   and try to get your son to fly?

20   A.    Yeah.  I told them we're going to hire a lawyer.  We

21   know our rights.  We're going to clear the name of our son

22   from the no-fly list.

23        And we call a lawyer after that and he told us he

24   wanted to see all three of us -- me, his mom, and my son --

25   on December 15th.

Barre - D

1   Q.   But Mohamed was arrested?

2   A.   Mohamed was arrested before that, so we didn't have the

3   time to see the lawyer, so --

4   Q.   How did Mohamed seem to you after that no-fly incident?

5   A.   He was really upset.  Then I talked to him, and I said:

6   Dad, you know, there's a -- legal -- there's a law in this

7   country and nobody can just pick you and do something

8   because you're Muslim or this.  So this is what we're going

9   to do.

10       I told him -- I said we're going to hire you a lawyer.

11  I'll find you a job locally, in Portland, and you don't have

12  to worry about this incident.  Just put it behind you.

13       So I went out there.  I have a few friends.  I called

14  Nike, and I was able to get a job at Nike.  And also he had

15  two or three days off.  I talked to another supervisor I

16  knew from Goodwill, and I said I have a son who's going to

17  college who needs a part-time job, also.

18       So I was able to find him another part-time job.  That

19  way he can be busy and work during the summertime.  That's

20  what he did that summer.  Instead of going to Alaska, he

21  worked two jobs.  One was Nike and the other three, four

22  days he was off he was working at the Goodwill on Burnside.

23  Q.   Do you remember what shift he was working at Nike, or

24  what kind of hours?

25  A.   He was working the nighttime, night shift, from, I

Barre - D

1   think, 6:00 to 6:00 or 7:00 to 7:00.  I don't remember.

2   Q.    6:00 p.m. to 6:00 a.m.?

3   A.    Yeah.  To 6:00 a.m.  The nighttime.

4         And then he will have one day to just recuperate and

5   the next day, during the daytime, he was working at the

6   Goodwill in -- on Burnside, you know.

7   Q.    And during the summer where was he living?

8   A.    He was living with his mom.  Living in Beaverton, so --

9   Q.    And then in the fall did he go back to school?

10  A.    In the fall he went back to school, back to Oregon

11  State.

12  Q.    Did you visit him down there?

13  A.    I used to visit him and pick him up every other

14  weekend, at least, you know, and whether he has dentist

15  appointment or whether he comes home to visit, you know, his

16  mother, I used to give him a ride from there; here and back

17  to Corvallis.

18  Q.    And did you ever see the new apartment that he rented

19  down there?

20  A.    I saw one time, and I ask him how you can afford to

21  rent $500 apartment?  And I -- he told me he had -- you

22  know, he -- he's working part time at Oregon State.  I told

23  him why you don't stay in the dorm, you know, and just

24  concentrate on school instead of working?

25  Q.    Did you learn -- did you learn later the FBI paid for

Barre - D

1  that apartment?

2  A.   That's correct.

3  Q.   Now, did you become aware after he was arrested that

4  the FBI was reading the text messages between you and your

5  son?

6  A.   That's correct.

7  Q.   And in the fall did you all have some text messages

8  about your relationship and how things were going for you?

9  A.   That's correct.

10 Q.   Still some conflict within the family?  Is that fair to

11 say?

12 A.   That's correct.  We had, you know, conflict in

13 our -- you know, in our family for -- that affected also our

14 kids, because when the relationship goes south, the kids

15 will suffer, also.  He was suffering through that, too, you

16 know, so --

17 Q.   I wanted to just take you back one exhibit.  I

18 neglected to show you relating to Alaska.  It's defendant's

19 Exhibit 1011B.

20          MS. HAY:  Can you show this just to the witness

21 first?

22 BY MS. HAY:  (Continuing)

23 Q.   Does this appear to be one of your text messages?

24 A.   That's correct.

25 Q.   And does it show your --

Barre - D

1          MS. HAY:  Well, your Honor, I offer Defendant's

2   1011B.

3          THE COURT:  You're offering 1011B?  Any objection?

4          MR. KNIGHT:  No objection, Your Honor.

5          THE COURT:  Received.

6   BY MS. HAY: (Continuing)

7   Q.   Could you read that text message to the jury, please?

8   A.   Yeah.  So this is when I bought the ticket for him, and

9   I was telling him:  I get the ticket for you and emailed me

10   the itinerary.  Make dua for me and our family.  Good luck

11   and make sure you save the money you earn inshallah and use

12   wisely.

13   Q.   So you were confirming that you bought the ticket for

14   Alaska in this text message?

15   A.   That's correct.

16   Q.   And what does the phrase there "make dua for me and for

17   our family" mean?

18   A.   So kind of -- you know, which reward me with prayer.

19   Q.   Reward me with prayers?

20   A.   That's correct.

21   Q.   Or pray for me?

22   A.   Or pray for me, you know, or reward me with prayers.

23   Pray for me.  Is that -- that's an expression we use because

24   when we give money to somebody, we don't expect them to

25   pay -- as a culture, to pay us back.  But to get rewarded,

Barre - D

1    you know, we just say "Pray for me" or "Reward me with

2    prayers."

3    Q.    Okay.  So returning to the fall of 2010, what was your

4    relationship like with Mohamed; you as a father and a son?

5    A.    Fall of 2 --

6    Q.    2010.  Just -- how would you describe your relationship

7    as he was a college student?  What was your relationship

8    like?

9    A.    I used to text him almost daily, call him, email him.

10   I we -- we were in contact, you know, most of the time.

11   Q.    Would it be fair to say he thought you were pretty

12   strict with him?

13   A.    I was very strict with my kids.  You know, always -- I

14   had rules, and I used to enforce those rules.  As a parent,

15   I used to say:  This is my expectation of you.  You know,

16   you need -- I used to tell him, my son, my expectation of

17   you is way ahead of anybody else, because he was my first

18   son, and he was very sharp kid, and I used to tell him, "My

19   expectation of you is the highest."  I -- I used to remind

20   him of that all the time.

21   Q.    Now, your son has been in jail for over two years

22   awaiting the trial; is that right?

23   A.    That's correct.

24   Q.    Are you able to visit with him?

25   A.    I almost -- I visit every weekend, except few -- I can

Barre - D

```
 1   say three weekends.  Except that, I visited every weekend.
 2   Q.    And you're able to talk with him and still be in a
 3   relationship with him?
 4   A.    Not only talk to him, give him support, being there for
 5   him, give him some money to spend inside the jail.  They
 6   need a little money to buy stuff, you know.
 7   Q.    Mr. Barre, is there anything else you want this jury to
 8   know about your son?
 9   A.    Yeah.
10             MR. KNIGHT:  I object to the form.
11             THE COURT:  Sustained.
12   BY MS. HAY: (Continuing)
13   Q.    Can you just tell us the best quality about your son?
14   A.    To be honest with you, my son is a goodhearted kid.
15   He's very simple.  He was easy to influence.  That's the
16   biggest concern I had, you know, when I -- when I was trying
17   to protect him, because he was just -- and he learned Islam
18   when he was young.  He become religious when he was in high
19   school.
20        He was easy to influence, so I was scared always when
21   he say he's going somewhere; that somebody will take
22   advantage of his weakness.  He was sharp.  He was down to
23   earth.
24        Mohamed, when he was 18, I could tell him, "Can I have
25   your passport?"  He would never object.  He will say, "Here,
```

Barre - D/X

1    dad."  That's how simple he was.

2         Could have said to me, "I'm 18, 19.  Leave me alone.

3    This is my passport."

4         He would never say that.  He's just a down-to-earth,

5    simple kid, and he was -- you can ask anybody in the

6    community.  He was the role model of the whole community.

7    Kids -- parents used to say:  Why don't you want to be like

8    Mohamed?

9    Q.   I take it, you still love him?

10   A.   I love him more than anybody in the world.

11             MS. HAY:  Thank you, Your Honor.  No further

12   questions.

13             THE COURT:  All right.  Cross-examination?

14             MR. KNIGHT:  Thank you.

15

16                  CROSS-EXAMINATION

17   BY MR. KNIGHT:

18   Q.   Good morning.  I know this is very difficult for you.

19   I want to ask you just a few questions.

20   A.   All right.

21   Q.   You've just told this jury how much you love your son,

22   and, of course, as a parent, that's understandable.

23        That love is what motivated you to go to the FBI, isn't

24   it?

25   A.   The love I have and the concern I had and I -- as I

Barre - X

1    told the jury, was my biggest concern, was kids from Somalia

2    were disappearing, especially in Minneapolis, and I read the

3    Internet, and I was concerned.

4    Q.    You were concerned, and that's why you went to the FBI?

5    A.    I went to the FBI to get help to stop him not to leave

6    the country.

7    Q.    Because you were concerned that he might be

8    brainwashed, isn't that right?

9    A.    That is what I was afraid of.  But can I tell you, the

10   FBI brainwashed my son.

11   Q.    Well, that really wasn't my question.  I know you, very

12   obviously, have very strong opinions, so I want to talk

13   about the facts.

14        At that time he were concerned that your son was being

15   brainwashed; is that right?

16   A.    That is not the word I used.  The way I recall was I

17   told them there was some kids that were disappearing and

18   brainwashed in the Minneapolis area.

19   Q.    Okay.

20   A.    And that is the -- the exact way I use it.

21   Q.    Thank you.

22        You talked a little bit about that trip -- attempted

23   trip to Alaska in the summer of 2010.  You were going to

24   help your son pay for that ticket?

25   A.    I paid the ticket.

Barre - X

1   Q.    And when that didn't work out, you were trying to help

2   your son get a job?

3   A.    I helped him to get a job, also.

4   Q.    And you've helped him a lot of different ways, sir,

5   haven't you?

6   A.    What do you mean by that?  What are you talking about?

7   What are you implying?

8   Q.    Well, I'm not implying anything.  You just told this

9   jury that you tried to help him out where you can.  Is

10  that -- is that fair?

11  A.    As a father, I did what I can do to help him to get a

12  job, to be a good kid, to go to college.

13  Q.    Thank you.

14        And I just want to be clear.  Sir, you did tell the FBI

15  that your son had every chance to succeed here in the United

16  States, didn't you?

17  A.    He has -- I told them that we're grateful to America.

18  I told them that Good Bless America, because they help us

19  when we needed it the most.  I told them also that we're

20  here to be part of this society.  We're not here to make

21  trouble.  That's what I told the FBI.

22  Q.    Thank you.

23        And you did everything you could to help your son?

24  A.    I wish I did more.  I wish I could -- I -- I -- check

25  his texting -- you know, I didn't know much about this, you

Barre - X

```
 1   know, what you're trying to allude, but I do what fathers

 2   do, which is help their kids become better citizens.

 3              MR. KNIGHT:  I know.

 4         Thank you, sir, I have no further questions.

 5              THE COURT:  Anything on redirect?

 6              MS. HAY:  No.  Thank you, Your Honor.

 7              THE COURT:  This witness may be excused.  You may

 8   step down.

 9         Call your next witness.

10              MS. HAY:  Your Honor, I need to check and see if

11   the witness is outside.  I believe we have someone there.

12              THE COURT:  All right.  Let's take a stretch break

13   while we're waiting.

14              MS. HAY:  Our next witness is Mohammad Mohamed.

15

16                   MOHAMMAD MOHAMED,

17   called as a witness in behalf of the Defendant, being first

18   duly sworn, is examined and testified as follows:

19

20              DEPUTY COURTROOM CLERK:  Please be seated.  Pull

21   your chair all the way forward.  State your name and spell

22   your last name for the record.

23              THE WITNESS:  Mohammad Mohamed.  Last name

24   M-O-H-A-M-E-D.

25              THE COURT REPORTER:  Can I have you spell your
```

Mohamed - D

1    first name, too?

2             THE WITNESS:  Oh, M-O-H-A-M-M-A-D.

3

4                      DIRECT EXAMINATION

5    BY MS. HAY:

6    Q.    Mr. Mohamed, you and I have met once -- once before; is

7    that right?

8    A.    Yes.

9    Q.    And you were a student at Oregon State; is that

10   correct?

11   A.    Yes.

12   Q.    Did you meet the defendant, Mr. Mohamed Mohamud, there?

13   A.    Yes.

14   Q.    Let me ask you just some of your background, please.

15   Are you working right now?

16   A.    Yes.

17   Q.    Where do you work?

18   A.    I work for Samaritan Health Services in Corvallis,

19   Oregon.

20   Q.    What kind of work do you do for them?

21   A.    I'm a systems analyst in their Informatics Department.

22   Q.    Is that something that you studied at Oregon State

23   before that?

24   A.    Yes.  I was a health care administration.  Major,

25   health management policy.  But then right now what I'm doing

Mohamed - D

1   is more IT related.  So a little off, but same track.

2   Q.    Okay.  And when did you graduate from Oregon State?

3   A.    Oh, in 2011.

4   Q.    And had you known Mohamed before you saw him at Oregon

5   State?

6   A.    I knew of him and his family, but, like, we really

7   actually met in -- at Oregon State freshman year.

8   Q.    Had you heard of his father?

9   A.    Yes.  He was part of the Somali community, one of the

10  leaders; you know, saw him at mosques and community

11  gatherings at Eids and stuff.

12  Q.    So what year would you -- what year were you when

13  Mohamed came as a freshman?

14  A.    Third year.

15  Q.    You were a junior?

16  A.    Yes.

17  Q.    And did you live in the same building, or how did you

18  get to meet him?

19  A.    Yes.  I lived in Hawley dormitory on campus, and he

20  lived -- I lived on the fourth floor, I think, and he lived

21  on the second floor of that same building.

22  Q.    Did you take it upon yourself to try to meet him and

23  show him around?

24  A.    Yeah.  Naturally, he's Somali, like me, so like when

25  I -- when I found out that there's another Somali person in

Mohamed - D

1  town that's a college student, I mean, I definitely wanted

2  to meet him and get to know him and -- yeah.

3  Q.   Did you feel you could be a resource for him or offer

4  him advice?

5  A.   Yes.  Given that I was already in my third year, I felt

6  like -- you know, when I was a freshman in town, I felt

7  like, you know, it was a whole new world opening up, and,

8  you know, I didn't really have a person there to kind of

9  guide me along, and, you know, tell me everything is going

10  to be cool, and, you know, so I felt like, you know, being

11  the third year Somali there that I should, you know, like,

12  show him the ropes type of --

13  Q.   You mentioned that you're Somali.  Would you be willing

14  to share a little bit about your background when you came to

15  the United States and what your religion is?

16  A.   Yes.  My religion is Islam.  I'm Muslim.  In terms of

17  background, I -- I was born in Somalia, left during the

18  Civil War, I think, at age three, or something, and lived in

19  Pakistan for ten years with my family there, and then we

20  moved to the United States in September of 1999.

21  September 29, 1999.  I've been in the States ever since.

22  Q.   And so you share religion and home country with

23  Mohamed?

24  A.   Yes.

25  Q.   Did you talk about religion and living in a Muslim

Mohamed - D

1   country with him?

2   A.    Yes.   You know, what -- when two people are in the same

3   religion, it goes hand in hand that, you know, everything

4   you talk about -- could be religion, could be anything for

5   that matter.   But as far as talking about country, we've had

6   discussions like, you know, about his upbringing, my

7   upbringing, you know, what kind of lives we led.   Like, you

8   know, my lifestyle, like when I lived in Pakistan, what was

9   that like, you know, things like that.

10  Q.    And what was your observation about how Mohamed was his

11  freshman year, in general?

12  A.    He was a very social, energetic kid.   Very happy

13  person.   Very into life.   Serious about his studies.   He

14  wanted to make sure he was successful with his degree and

15  pretty average.   Typical.

16  Q.    Were you involved in the African Students Association?

17  A.    He actually was more involved than me.   I kind of just,

18  you know, was on the outskirts of it.   I mean, I remember

19  partaking in the African night of the Oregon State the year

20  that he was a freshman, because he was the one that talked

21  me into doing the African -- like, the modeling cat -- like,

22  the modeling fashion show and wearing, like, African garb

23  and cultural clothing for the night.

24        As a matter of fact, he was part of a show where he was

25  one of the main leading actors that did a theater-type piece

Mohamed - D

1    about, like, an African story.

2    Q.    Was that the end of his freshman year when that took

3    place?

4    A.    Yes.

5    Q.    Now, you said he was happy, outgoing.  Did he ever seem

6    lonely sometimes to you or express that?

7    A.    I remember Mohamed always had, like, a high energy his

8    freshman year.  He was very happy, very outgoing, very,

9    like, you know, involved with many things.  Multiple things.

10          But the second year coming back, I could kind of see a

11   little more withdrawn, you know, part of him.  And at the

12   time we were living together for just a couple of weeks

13   until he had things in order, and I remember, like, he was

14   sleeping during the days, and things like that, and, you

15   know, me and my roommate were, like, you know, once asked

16   him even, "Hey, what's going on?  Are you depressed or

17   something?"  We just didn't see the same kind of -- I mean,

18   he was still there, but not as we were accustomed to, in a

19   sense.

20   Q.    So you're talking there about the fall of 2010; the

21   beginning of his sophomore year?

22   A.    Yes.

23   Q.    Okay.  Let me back up a little bit and finish freshman

24   year, and we can get to that.

25          When -- when he was a freshman, did -- did he talk to

Mohamed - D

1  you sometimes about living in a Muslim country, and did you

2  discuss Pakistan with him?

3  A.   Yes.   Like, living in Pakistan, I -- you know, when

4  you've lived your whole life in a -- like a nonMuslim

5  nation, there's some certain differences in lifestyles,

6  because when it's our religious holidays in Pakistan, the

7  whole country celebrated with you.   From the morning of,

8  everyone had a -- like a celebratory jubilatory, like,

9  enthusiasm like the night before.

10      Kind of how it is here during the Christmas season.

11  There's like the Christmas carols and everybody is getting

12  their trees in order.   And there's like a cultural, you

13  know, uniformity to the happiness, you know, you could only

14  feel when you're in a nation that practices the same values,

15  the same faith, and everything with you.

16      So, I mean, I kind of told him, like, Eids here, you go

17  to the convention center, you go pray, and you go see your

18  family here and there, but then you just go back to work.

19  It's not really -- it's not a big deal here as it is over

20  there, so --

21  Q.   Sorry.   Eids is a special holiday?

22  A.   Yes.   It's -- we have two religious holidays.   One is

23  Eid Fitr and Eid Adha.   F-I-T-R and A-D-H-A.

24  Q.   And the first word is spelled E-I-D?

25  A.   Yes.

1   Q.   So that was something that you commented that would be

2   a positive thing to go be in a Muslim country?

3   A.   Yeah.   Not just that.   That's just one example.

4        The other example is it's traditional to go to the

5   mosques and see, you know, as men, for instance, and boys

6   and stuff, people go to the mosque together so your

7   direction when being a devout Muslim kind of stays on the

8   straight and narrow, because your buddies go to the mosque

9   on Fridays, kind of like a ritual kind of a thing.

10  Everybody is doing it.   So there's that angle.   So you get

11  motivated to do that, you know.

12       Or during the month of Ramadan, when, you know,

13  everyone around you is fasting.   Kind of an extra intensive

14  to say, hey, my buddy is doing this.   Why am I cheating?

15  But here, when everybody is going on lunch break and you're

16  fasting, there's a little bit of a disconnect in that sense.

17       So there's a lot of going back again to uniformity and

18  having, like, the same togetherness to the approach, made it

19  fear more homely.

20  Q.   You mentioned something about going to the cafeteria

21  and maybe feeling different if you were fasting.   Did you

22  also experience just feeling different freshman year of

23  being a Somali American, not the same as some of the black

24  athletes on campus?

25  A.   Yeah, it's natural, because when -- it doesn't matter

Mohamed - D

1   who you are, like, initially, you feel a stranger to the new

2   town, because you're feeling homesick.  You know, it's not

3   your natural element.  Your friends are not there.  And then

4   you add the fact that, you know, you're a different race

5   than most of the people there.  And then you add the fact

6   that you're a different faith.  And then you add the fact

7   that you're a different country of origin.

8        You know, people that you can relate to on a regular

9   basis that really know who you are, you can't really, you

10  know, connect with -- with the subject matter, or whatever

11  the discussions are, or how you feel in connection with

12  someone else based on how you feel as a person, your

13  identity in comparison to others, so --

14  Q.   Is that something you discussed with Mohamed,

15  occasionally, as well?

16  A.   Yeah.  I mean, you know, once again, him, that he is a

17  Somali guy, like me, a young Somali guy, we had a lot of

18  things in common.  You know, our upbringings by our

19  families, the way our parents raised us, the -- you know,

20  the rules in -- like, you know, the taboos, or, you know,

21  the -- when you're in trouble, you know, like, how we go

22  about doing things or just -- you know, certain differences,

23  so we could relate to that.

24  Q.   How much older are you than Mohamed?

25  A.   I think I'm four or five years older than him.  Six

2183

Mohamed - D

1   maybe, even.  I'm 26.

2   Q.   You're 26 now?

3   A.   Yes.

4   Q.   Born in?

5   A.   1986.

6   Q.   So is that, in your culture, significant, even that

7   kind of an age difference?

8   A.   Yeah.  We -- we hold the high reverence to elderly in

9   our -- like, in our community.  Because someone is

10  elder -- like older than someone else, they automatically

11  get that token of respect and, you know, heedance to their

12  wisdom and their talking, and that's why, like, you know,

13  the old ones amongst us are usually our sage teachers and

14  people that we look up to that when they tell us something

15  we take it into account.

16       Even as little kids, we're kind of disciplined in the

17  way that even if we don't like what's coming from their

18  mouths, even if we think it's a senile old person that don't

19  know what they're talking about that doesn't hold current to

20  what's going on these days, we had a sense of, okay, yes,

21  sir, yes, sir.  We hold them to a high standard -- higher

22  standards.

23  Q.   You have to follow their directions when they're given

24  to you?

25  A.   Yes.

Mohamed - D

1   Q.   I wonder if I could ask you about a couple of

2   expressions.   For example, the word deen -- I think it's

3   D-E-E-N?

4   A.   Yeah.

5   Q.   What does that mean?

6   A.   Your deen is -- deen is, you know -- I'm not an expert,

7   but growing up deen, to me, meant faith.   It meant your

8   religion.   It meant your knowledge of the faith.   Someone,

9   if they say someone has a strong deen, that means they have

10  a strong faith.   You know a strong, like, you know, basis;

11  like a strong -- so deen could be -- in short, be construed

12  as your faith, your knowledge, your religion.

13  Q.   Okay.   And what about a pilgrimage to Mecca?   What does

14  that significant or notify?

15  A.   It's very important.   Pilgrimage to Mecca is actually

16  part of our five pillars of Islam.   It's the fifth one.   If

17  you have the means in your lifetime to go perform the

18  spiritual journey to go to the Holy Land, so you can just

19  devote your whole time there worshiping God and just, you

20  know, not -- forgetting about the world around you and just

21  going there just for the sake of your soul and your

22  connection with God, and if you get the chance, every Muslim

23  person, that's one of their biggest wishes, to go perform

24  that.

25  Q.   Is that a time of prayer and --

Mohamed - D

1    A.    Yes.  It's a time of worship and reflection.

2    Self-reflection, yes.

3    Q.    And what about the expression make dua for me?  What

4    does that mean?

5    A.    That's actually a very normal traditional cultural

6    thing, too, and religious.  It's basically saying, you know,

7    pray for me.

8        You know, so if I tell my friend, "Hey, I'm taking an

9    exam tomorrow.  Make dua for me," that means, "Pray for me

10   that I'm successful and I pass my test, I do good in my

11   test."  It's a saying kind of a thing.

12   Q.    Sort of wish me well?

13   A.    Wish me well.

14   Q.    Or include me in your prayers?

15   A.    Yes.

16   Q.    And then how about if you heard the expression "make

17   dua for me that I will be a martyr in the highest chambers

18   of paradise;" how do you interpret a phrase like that if

19   somebody said that to you?

20            MS. HOLSINGER:  Objection.  Speculation on that

21   term.

22            THE COURT:  Overruled.

23   BY MS. HAY: (Continuing)

24   Q.    If somebody said that to you, how would that --

25   A.    Yeah.

Mohamed - D

1          MS. HOLSINGER:  Your Honor, I'm going to object.

2    That's an improper question.  She's asking him to comment on

3    evidence and --

4          THE COURT:  I overruled the objection.

5          THE WITNESS:  Like make dua for me so that I may

6    become a martyr to go to the highest place in Jeddah

7    is -- so -- in Islam, there's no more nobler, more honorable

8    way to die as a person than to die for the sake of God for

9    no love of yourself or for no love of the earthly realm and,

10   like, for money or fame or dying because you want to be

11   loved by others.  It's just the direct spiritual between you

12   and God.  You -- you died for the sake of God defending his

13   faith, defending his religion that he brought to this world.

14   So it's a very noble, honorable death.

15       Make dua for me so I may be a martyr is kind of saying,

16   "Pray for me that when it's my time" -- because we're all

17   going to die sometime -- "that when it's my time to die,

18   that I die an honorable, like, noble death, so that I make

19   it closer to God."

20   BY MS. HAY: (Continuing)

21   Q.   So if somebody was talking to you about martyrs, does

22   that mean suicide bomber to you?

23   A.   Oh --

24          MS. HOLSINGER:  Objection for speculating.

25          THE COURT:  Sustained.  Sustained.

                              Mohamed - D

1           MS. HAY:  Your Honor, may I ask how he -- if

2    someone used the word "martyr" with him, would he consider

3    that --

4           THE COURT:  Sustained.

5    BY MS. HAY: (Continuing)

6    Q.    Okay.  Let me move on, then.  Did you know anything

7    about Mohamed's plans to go to Alaska at the end of his

8    freshman year?

9    A.    Yeah, I did.  I remember him discussing that

10   with -- amongst his friends.  He was very excited about

11   going to Alaska to go fishing with his buddy Luis.  Ruiz or

12   Luis.  I don't remember.  Luis, I think.

13          They wanted to go fishing.  Fish for three months.

14   It's really good pay.  Young person going fishing for three

15   months, get good money.  So it was something he was excited

16   for.

17          And then when the time drew near, I remember him -- him

18   and I talking, and him telling me that, you know, that

19   didn't work out for me.  I -- plans got cancelled, but Luis

20   got a chance to go, but he didn't.  I remember him being

21   upset and kind of down about that, that he didn't get a

22   chance to go.

23   Q.    And then you told us that you saw him in that fall

24   again of 2010?

25   A.    Yes.

Mohamed - D

1    Q.    Were you -- you were planning to live together; is that

2    true?

3    A.    Yes.   Initially, the plans were -- I just got out of

4    the dorms of -- from last year, and I needed a place to

5    stay, and he already made arrangements with Mulugeta to live

6    with him.

7                THE COURT REPORTER:   I'm sorry, the name?

8                THE WITNESS:   Mulugeta.   One -- one of our

9    roommates that happened to become my roommate is -- he told

10   me he has a place for me to stay over there with him, and

11   then what happened is after I already moved in -- because

12   Mulugeta was already there for the summer, I think, and then

13   I moved in in late August or something.   And he moved in a

14   few weeks afterwards, and then that's when he told us that,

15   you know, I don't -- I'm going to have to get my own place

16   to stay, and that's when we just became two-person --

17   BY MS. HAY:  (Continuing)

18   Q.    So that's --

19   A.    -- roommates.

20   Q.    So that's the period you told us he seemed down and you

21   were talking to him?

22   A.    Yes.   Those were the few weeks that he stayed with us

23   until he got things in order to get his own place.

24   Q.    And then he moved into his own apartment?

25   A.    Yes.

Mohamed - X

1          MS. HAY:  Your Honor, if I could have a moment to

2    look at my notes.

3          THE COURT:  All right.

4          MS. HAY:  No further questions, Your Honor.

5          THE COURT:  Cross-examination?

6          MS. HOLSINGER:  Thank you, Your Honor.

7

8                     CROSS-EXAMINATION

9    BY MS. HOLSINGER:

10   Q.  Sir, did you know the defendant wrote articles for

11   *Jihad Recollections*?

12   A.  No.

13   Q.  Did you know he -- know he wrote an article that he

14   wanted to go into *Inspire* magazine?

15   A.  *Inspire*?  No.

16   Q.  Do you know what those magazines are?

17   A.  No.

18   Q.  Did you know that the defendant was actively working on

19   portraying a different image while he was at college?

20          MS. HAY:  Your Honor, I object to the question.  I

21   didn't ask him for his character -- a statement about his

22   character, which is what these questions are designed to --

23          THE COURT:  Overruled.

24   BY MS. HOLSINGER: (Continuing)

25   Q.  Did you know the defendant made statements that he was

Mohamed - X

1    working on a particular image, a college student image,

2    while he was in Corvallis?

3    A.   No.

4    Q.   Did you know he wanted to -- he described it as being

5    undercover while he was in Corvallis?

6    A.   No.

7    Q.   Did you know he had multiple email addresses?

8    A.   No.  But can I -- like, having multiple emails

9    is -- it's the, like, normal, like --

10   Q.   Did you know he had secret email addresses that he only

11   used for certain Islamic terrorists?

12          MS. HAY:  Objection, Your Honor.  That's not in

13   evidence.

14          THE COURT:  Overruled.

15          THE WITNESS:  No, I didn't.

16   BY MS. HOLSINGER: (Continuing)

17   Q.   Did you know that he had certain opinions about people

18   of other religion, antisemitic opinions?

19   A.   No.

20   Q.   Did you know that he actually only took really one

21   class in the fall of 2009; an engineering class?

22   A.   I did not know, but after -- it looked like after the

23   fact, later on, I heard from -- I don't remember who told me

24   exactly, but I then found out later, yes, after the fact.

25   Q.   He took one class?

Mohamed - X

1   A.   Yes.   But at the time I thought he was, you know,

2   typical; 12 credits.

3   Q.   And did you know he was actually flunking the winter

4   term of 2010?

5   A.   No, I did not know that.

6   Q.   So you thought he was active in school, as you

7   described, a good student, and he really was doing very well

8   at his image of being a college student?

9   A.   Yes.

10  Q.   As far as you knew?

11  A.   Yes.   As far as I knew, he was doing good, yes.

12          MS. HOLSINGER:   That's all the questions I have on

13  cross.

14          THE COURT:   Anything on redirect?

15          MS. HAY:   Yes.   Just a moment, Your Honor.

16      If I could get one exhibit, please?

17      Your Honor, I would like to show Exhibit 109C to the

18  witness, please.

19          THE COURT:   All right.

20          MS. HAY:   1009.   Excuse me.   I believe this has

21  already been admitted into evidence.   Is that right?

22  Your Honor, I think it was offered and admitted earlier.

23

24

25

Mohamed - ReD

1                     REDIRECT EXAMINATION

2    BY MS. HAY:

3    Q.    The Government told you Mohamed was only taking one

4    class in the fall of 2009.

5          Did you hear that?

6    A.    Yes.

7    Q.    Does this transcript show he was taking engineering,

8    chemistry, calculus, and chemistry for engineering?

9              MS. HOLSINGER:  Objection.  It's a misstatement of

10   the evidence, Your Honor.

11             THE COURT:  Counsel, is that -- are you quoting

12   from it?

13   BY MS. HAY: (Continuing)

14   Q.    I'm looking for the -- so the top two courses there,

15   CCCE orientation and chemistry for engineering; is that

16   correct.

17   A.    Uh-huh.

18             MS. HAY:  Okay.  Thank you, Your Honor.  No

19   further questions.

20             THE COURT:  All right.  Anything further?

21             MS. HOLSINGER:  No, Your Honor.  Thank you.

22             THE COURT:  You may be excused.  Thank you.

23         All right.  We'll recess.

24         I do want to see the lawyers at about 1:15, so we'll

25   recess until 1:30.

1           DEPUTY COURTROOM CLERK:  Court's in recess.

2              (The jury panel leaves the courtroom.)

3                 (Lunch recess was then taken.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2              I certify, by signing below, that the foregoing is

3    a true and correct transcript of the record of proceedings

4    in the above-entitled cause.  A transcript without an

5    original signature, conformed signature, or digitally signed

6    signature is not certified.

7

8    /s/Jill L. Erwin
     _____
9    Jill L. Erwin, RMR, CRR      Date: January 28, 2013
     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25