UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES OF AMERICA**,                    Criminal Case No. 3:10-CR-00475-KI

               Plaintiff,

                              OPINION AND ORDER

                v.

**MOHAMED OSMAN MOHAMUD**,

               Defendant.


    S. Amanda Marshall
    United States Attorney
    District of Oregon
    Ethan D. Knight
    Pamala R. Holsinger
    Ryan W. Bounds
    Assistant United States Attorneys
    1000 SW Third Avenue, Suite 600
    Portland, Oregon  97204-2902

        Attorneys for Plaintiff

Stephen R. Sady
Chief Deputy Federal Public Defender
Steven T. Wax
Federal Public Defender
Lisa Hay
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon  97204

      Attorney for Defendant

KING, Judge:

      A jury convicted defendant Mohamed Osman Mohamud of attempting to use a weapon of mass destruction, specifically a destructive device or explosive bomb, against a person or property within the United States, in violation of 18 U.S.C. § 2332a(a)(2)(A).  Before the court are defendant's Motion for Judgment of Acquittal After Jury Verdict [431] and Motion for a New Trial [432].  I deny both motions for the reasons stated below.

## LEGAL STANDARDS

I.    <u>Motion for Judgment of Acquittal</u>

      In determining if sufficient evidence exists to support a verdict, the court

> must first construe the evidence in the light most favorable to the [government], and . . . then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  When viewing the evidence in the light most favorable to the government, we may not usurp the role of the finder of fact by considering how [we] would have resolved the conflicts, made the inferences, or considered the evidence at trial.  Therefore, in a case involving factual disputes and credibility determinations, we must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

<u>United States v. H.B.</u>, 695 F.3d 931, 935 (9th Cir. 2012) (internal quotations and citations omitted).  A jury is entitled to disbelieve a witness.  <u>United States v. Nevils</u>, 598 F.3d 1158, 1169

(9th Cir. 2010).  When a defendant pursues an entrapment defense, the court "should not disturb the jury's finding unless, viewing the evidence in the light most favorable to the government, no reasonable jury could have concluded that the defendants were predisposed to commit the charged offenses."  United States v. Davis, 36 F.3d 1424, 1430 (9th Cir. 1994).

II.    Motion for a New Trial

In considering whether to grant a new trial, a district court is not required to view the evidence in the light most favorable to the verdict.  The court may weigh the evidence and evaluate the credibility of the witnesses.  United States v. A. Lanoy Alston, D.M.D., P.C., 974 F.2d 1206, 1211 (9th Cir. 1992).  "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred," the court may set aside the verdict and grant a new trial.  Id. at 1211-12 (internal quotation omitted).

**DISCUSSION**

I.    Motion for Judgment of Acquittal

Mohamud seeks a judgment of acquittal, arguing the evidence at trial was insufficient to negate entrapment beyond a reasonable doubt.  The United States responds generally that Mohamud's arguments rest on disputed facts or conflicting evidence the jury was entitled to discount or reject.  Because the law requires the court to construe the evidence in the light most favorable to the government, the United States contends the court must deny the motion for judgment of acquittal.

A.        Analogy to Sherman v. United States, 356 U.S. 369 (1958)

Mohamud argues that after his family intervened to prevent his overseas travel, the evidence establishes he agreed to complete college in the United States. According to Mohamud, the subsequent contact by undercover agents redirected Mohamud out of the college-based rehabilitative program his parents designed and toward committing terrorist acts in the United States. Mohamud claims the government contact is analogous to Sherman v. United States, 356 U.S. 369 (1958), making acquittal required.

In Sherman, a government informant met the defendant at a doctor's office where both were receiving treatment for narcotics addiction. The informant repeatedly asked the defendant for a narcotics source, explaining the treatment was not working and he was suffering. The defendant tried to avoid the issue at first but eventually acquiesced and purchased narcotics for each to use, charging the informant only for his share. Id. at 371. The Court reversed the conviction and found entrapment as a matter of law, based on the defendant's efforts to end his addiction, the informant's repeated requests to join in illegal activity, the informant's use of sympathy, the defendant's reluctance to provide narcotics, and the lack of evidence defendant was selling narcotics to anyone else. Id. at 373-75. The Court also concluded the defendant's nine-year old narcotics sale conviction and five-year-old possession conviction were insufficient to prove the defendant's predisposition to sell narcotics at the time the informant approached him, when the defendant was trying to overcome his addiction. Id. at 375-76.

The jury is not required to believe Mohamud meant to complete college when he agreed to do so. Viewing the evidence in the light most favorable to the government, Mohamud began thinking of taking part in violent jihad at the age of 15. He originally planned to wage war in the

Page 4 - OPINION AND ORDER

United States until a dream refocused him on Yemen; he wrote three articles in 2009 for Jihad Recollections, an on-line magazine promoting violent jihad against Americans; and he had lengthy email conversations with two men the FBI believed promoted terrorism. Mohamud did these things before he was contacted by a government agent. Thirteen minutes after meeting undercover agent Youssef in person, Mohamud explained he wanted to become operational by using a car bomb; he did not demonstrate the reluctance shown by the defendant in Sherman.

Sherman is not analogous to Mohamud's situation and is not a basis to grant a judgment of acquittal.

        B.      Overseas Versus Domestic Terrorism

The defense contends the evidence establishes that prior to the first Bill Smith email contact on November 9, 2009, Mohamud had only expressed interest in travel and potential support for defensive jihad overseas, not domestically. Mohamud claims no rational jury could find he was predisposed, prior to government contact, to commit terrorism in the United States.

As discussed to some extent above, Mohamud told Youssef he originally planned to wage war in the United States. As the government notes, Jihad Recollections was an English language magazine; the jury could infer the magazine was aimed at American jihadists who could act at home. There was evidence Mohamud was a fan of Osama Bin Laden and the September 11 attacks. The jury is entitled to accept this evidence and any inferences it can support, including that Mohamud was predisposed to commit domestic violent jihad prior to any government contact.

C.    Expert Testimony

Mohamud claims the three defense expert witnesses established a reasonable doubt about his predisposition to commit the crime charged and the FBI's lack of inducement.  According to Mohamud, Dr. Sageman testified Mohamud had not turned away from the discursive community and towards violence before the Bill Smith emails fomented Mohamud's frustration with the discursive community.  Professor Cauffman and Professor Moghaddam provided additional testimony about inducement, particularly in a young man Mohamud's age.  Defense lay witnesses provided uniform testimony that Mohamud was busy with school activities and not predisposed to commit the crime charged.  Considering all of this testimony together, Mohamud argues the government did not prove beyond a reasonable doubt that he was not entrapped.

The jury could have accepted all of this testimony but it apparently did not.  In analyzing a motion for judgment of acquittal, I must view the evidence in the light most favorable to the government.  The jury was entitled to disregard the defense experts' opinions and accept government expert Evan Kohlman's view of Mohamud's on-line activities.  Moreover, the jury must consider the rest of the evidence brought forth at trial, including Mohamud's lack of reluctance to commit the crime as shown by his comments early in the meeting with Youssef.  A defendant's reluctance to engage in criminal conduct is the most important factor when considering whether a defendant was predisposed to commit the crime.  United States v. Williams, 547 F.3d 1187, 1198 (9th Cir. 2008).  Thus, the defense expert testimony is not a sufficient basis to grant a motion of acquittal.

D.    Capability to Commit the Offense

Although Mohamud concedes impossibility is not a defense, he argues his inability to commit the crime on his own, along with his failure to take any steps toward commission of the crime prior to contact by Youssef, establishes his lack of predisposition.

For a jury to find a defendant is not entrapped, there is no requirement the defendant must be able to commit the crime alone or start planning the crime prior to government contact.  See United States v. Thickstun, 110 F.3d 1394, 1398 (9th Cir. 1997) ("A person's ability to commit a crime may illustrate her predisposition to do so, but should not become a separate element to be proven.").  The defense argument does not persuade me to grant a judgment of acquittal.

E.    Summary

None of Mohamud's arguments are persuasive.  When viewed in the light most favorable to the government, the evidence is sufficient for a rational jury to conclude beyond a reasonable doubt that Mohamud was not entrapped.

II.    Motion for a New Trial

Mohamud argues he is entitled to a new trial because the following issues, considered either separately or cumulatively, deprived him of a fair trial.  The government disagrees, contending the court properly ruled against the defense when the issues arose earlier.  Thus, the government argues Mohamud fails to establish that a serious miscarriage of justice occurred, and the court should deny the motion.

A.    Jury Instructions on Predisposition

Prior to trial, I denied defense and government requests to change the language in the entrapment instruction.  I decided to give the following Ninth Circuit form instruction 6.2:

INSTRUCTION NO. 18

The defendant contends that he was entrapped by government agents.  The government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped. The government must prove either:

1.      the defendant was predisposed to commit the crime before being contacted by government agents, or

2.      the defendant was not induced by the government agents to commit the crime.

When a person, independent of and before government contact, is predisposed to commit the crime, it is not entrapment if government agents merely provide an opportunity to commit the crime.  In determining whether the defendant was predisposed to commit the crime before being approached by government agents, you may consider the following:

1.      whether the defendant demonstrated reluctance to commit the offense;

2.      the defendant's character and reputation;

3.      whether government agents initially suggested the criminal activity;

4.      whether the defendant engaged in the criminal activity for profit; and

5.      the nature of the government's inducement or persuasion.

In determining whether the defendant was induced by government agents to commit the offense, you may consider any government conduct creating a substantial risk that an otherwise innocent person would commit an offense, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship.

ECF No. 426 at 19.[1]

After deliberations started, the jury sent out a note:

---

[1]  All ECF references are to the docket for United States v. Mohamud, No. 3:10-CR-00475-KI (D. Or.).

We are looking for clarification on Instruction #18 if possible:

Where it states "the crime", [sic] does that refer strictly to the crime as stated in the indictment, or could it include "a similar" crime as stated by the prosecution in closing statements.

ECF No. 430 at 6.

I discussed the note with counsel and sent a written answer to the jury:

The jury may consider evidence of similar conduct or willingness to engage in similar conduct, along with all the evidence, in deciding if the defendant was predisposed to commit the crime set forth in the indictment.  Please review all of Instruction No. 18.

Id. at 7.

Mohamud argues the defense theory of the case depended on a narrow area of reasonable doubt:  even though Mohamud may have thought about and planned to go overseas, he never planned or thought about terrorist action in the United States until the government agents induced the crime charged in the indictment.  He claims the jury note shows the jury instructions failed to adequately communicate both the government's burden and the defense theory of the case.  He further argues the note shows at least one juror understood the difference between the crime charged and other similar conduct.  Mohamud contends my response to the jury note instructed on a particular kind of predisposition evidence which I did not include in the original instructions–predisposition to commit similar crimes, a factor argued by the government–and did not clearly answer the jury's question.  Additionally, the response failed to instruct on the kind of predisposition evidence favored by the defense–the lack of wherewithal to commit the crime.  Thus, Mohamud claims my response "communicated approval of the jury's misunderstanding of

the prosecution argument and disapproval of the strict standard advocated by the defense." Mot. for a New Trial at 5.

The government argues my response to the jury's note correctly told the jury it could consider Mohamud's desire to commit crimes similar to the crime charged in the indictment when assessing if the government met its burden of negating the entrapment defense. According to the government, proof that Mohamud wanted to commit an act of violence against Americans in the United States or overseas is probative of predisposition, even if he did not have a clearly formed plan to bomb Pioneer Square prior to his contact with government agents. The government claims the evidence of predisposition was overwhelming, regardless of the instructions, because of Mohamud's lack of reluctance when the agents attempted to impress upon him the gravity of what he proposed.

My response to the jury note reiterated a pretrial ruling I made concerning what evidence was admissible to prove or disprove entrapment. I am still convinced the ruling is a correct statement of the law. See Williams, 547 F.3d at 1198 ("The second factor also supports the conclusion that Williams was predisposed to commit the robbery. Although the government initially suggested the [drug] stash house robbery, it did so only after Williams told the agents of his plans to commit bank robbery, which he concocted entirely on his own. While the criminal schemes are not identical, they both involve stealing property with force as well as the use of firearms."). I agree with Mohamud that the note indicates at least one juror understood the difference between the crime charged and other similar conduct, but I do not see the problem with this fact. It shows the juror was able to understand the entrapment instruction. I was careful to ask the jury to consider all the evidence and to review the entrapment instruction in its entirety.

Page 10 - OPINION AND ORDER

With these precautions, I do not think my response to the jury note unfairly favored the

prosecution's evidence and ignored the defense's evidence.

I see no error and no serious miscarriage of justice concerning the response to this jury

note.

B.    Government's Closing Argument

At the beginning of the government's closing argument, the prosecutor stated:

> Ladies and gentlemen, this case, at its core, is about a choice; a single and remarkable choice by this defendant to take the lives of thousands of people he had never met before.

> And before we talk in more detail about the facts, before we talk in more detail about the law, there is an element of common sense you should consider as you begin your deliberations, and that is this:  An individual simply cannot be entrapped to commit an offense such as this.

> There is nothing a government agent can do or did do to persuade someone to take the lives of these people.  There is nothing the Government did do in this case to persuade or induce this defendant to take these steps, because this decision was made by this defendant long before the Government arrived.

Tr. 2539, ECF No. 452.

The defense waited until I called a recess and then objected that the prosecutor's

statement was improper under the law.  I refused to give a corrective instruction as the defense

requested.

Mohamud claims the prosecutor's statement directly contravened the jury instructions,

nullified the legal authority on which the entire defense rested, and shifted the constitutional

burden of proof.

The government argues the prosecutor asked the jury to consider the gravity and enormity

of the crime and neither suggested the entrapment defense was not a legally viable theory nor

watered down the government's burden of proof.  Thus, the government contends the closing

argument was persuasive and effective and not a misstatement of the law.

As the government noted, I had instructed the jury prior to closing arguments, including

stating that the lawyers' arguments are not evidence.  Jury instructions carry more weight than an

attorney's argument.  United States v. Begay, 673 F.3d 1038, 1146 (9th Cir. 2011).  The cases the

defense consider analogous concern prosecutors' closing arguments which tread heavily and

incorrectly on the burden of proof.  See United States v. Sandoval-Gonzalez, 642 F.3d 717,

726-27 (9th Cir. 2011) (prosecutor misstated that a presumption of alienage existed and

defendant had to establish derivative citizenship; actually, alienage is an element of the crime the

government must prove); United States v. Perlaza, 439 F.3d 1149, 1169-73 (9th Cir. 2006)

(prosecutor stated the presumption of guilt would take over the jury during deliberations); United

States v. Segna, 555 F.2d 226, 230-32 (9th Cir.1977) (prosecutor misstated a presumption of

sanity existed after defendant had mounted an insanity defense sufficient to overcome the

presumption).

Here, the prosecutor spoke of the sole defense raised by Mohamud but I do not interpret

the statement to shift the burden of proof impermissibly as in the cited cases.  Instead, I see the

statement as a comment on the gravity of the crime for the jury to consider when analyzing the

entrapment factors.  Moreover, the defense is objecting to two sentences in a trial lasting fourteen

days; the prosecutor did not return to the point time and again during the argument.  United

States v. Moreland, 622 F.3d 1147, 1163 (9th Cir. 2010) (internal quotation omitted) (prosecutor

referred to testifying defendant as a liar; "Put in proper context, the [two-sentence] statement was

an isolated moment in a 34-day trial.").

Page 12 - OPINION AND ORDER

In sum, the prosecutor did not go too far here.  "[T]he prosecution must have reasonable latitude to fashion closing arguments."  Id. at 1161 (internal quotation omitted).  The statement was well within the bounds for closing argument.

     C.      Status of Amro Al Ali

Evidence at trial showed Mohamud exchanged many emails with Amro Al Ali.  An FBI agent testified this was one of the factors which brought Mohamud to the attention of the FBI.  I admitted Exhibit 80 to allow the government to provide the jury some background on how the investigation started; thus, I admitted Exhibit 80 for the FBI's state of mind and not for the truth of the information within it.  Exhibit 80 is an INTERPOL Red Notice dated October 18, 2009 identifying a fugitive wanted for prosecution, Al Ali.  The exhibit also states:

> SUMMARY OF FACTS OF THE CASE:  SAUDI ARABIA:  On 13 October 2009, AL ALI was known to be connected to a fugitive wanted by Saudi Arabian authorities who is an expert in manufacturing explosives and who plays a coordinating role in facilitating the movement of extremists inside Saudi Arabia.  He also helped AL Qaeda division in Yemen and other countries by providing them with foreign fighters to carry out terrorist attacks against western and tourist interests.
>
> . . . .
>
> CHARGE:  Links to terrorist organizations and connection to a fugitive who is an expert in explosive manufacturing.

Ex. 80, at 2 (emphasis added).

During trial, I instructed the jury:

> You heard evidence yesterday relating to an Interpol notice and Amro Al Ali.  I instruct you that this evidence is admitted only for the limited purpose of what it means regarding the agents' and the defendant's mental state; and, therefore, you must consider it for that purpose and not for any other purpose.

Tr. 587, ECF No. 457.

Page 13 - OPINION AND ORDER

There was a lot of testimony about whether the pronoun "he" in the last sentence of the Red Notice summary referred to Al Ali or to the fugitive Al Ali knew.  Government witnesses testified "he" referred to Al Ali, even if somewhat ambiguous; defense witnesses testified "he" referred to the fugitive.

Mohamud argues the government's case depended on the truth of the FBI's belief that Al Ali was an Al Qaeda recruiter when he was communicating with Mohamud.  The defense insists this is a false premise which could have been corrected if I had allowed SA Johnson to testify to the jury about Exhibit 80.  The defense also requests discovery of classified material to supplement the record about the government agents' states of mind, whether the agents knew Al Ali was not a recruiter for Al Qaeda in October 2009, and the Saudi Arabian interrogations of Al Ali once he was in Saudi custody.  Further, Mohamud contends the admission of Exhibit 80 to show the government agents' states of mind requires a new trial because the agents' states of mind were irrelevant and unfairly prejudicial.

The government argues the accuracy of the Red Notice's information, and the FBI's interpretation of it, is not at issue.  According to the government, the important point is that the FBI believed Al Ali was a wanted terrorist, not whether he actually was at that time.

I disagree with the defense argument that the government's case depended on whether Al Ali was an Al Qaeda recruiter when he was communicating with Mohamud.  The truth about Al Ali's status at the time is not relevant–the FBI was investigating Al Ali and, when he started communicating with Mohamud, the FBI concluded Mohamud might also be worth investigating.  Even if Al Ali was a completely benign figure at the time, the only important point was the FBI's opinion of him, right or wrong.  That is why I instructed the jury to only consider the Red Notice

for what it meant about the agents' mental states and nothing more.  A jury may hear some

background information on why a criminal investigation began.  I admitted the Red Notice and

testimony about its effect on the FBI for that purpose.

 The Ninth Circuit approved a similar situation in <u>United States v. Wahchumwah</u>,

No. 11-30101, 2013 WL 811610 (9th Cir. Mar. 4, 2013), in which the court allowed two law

enforcement officers to testify at trial about complaints from unnamed tribal members that the

defendant was selling eagle parts.  The Ninth Circuit held the testimony did not violate the

Confrontation Clause and reasoned:  "The anonymous complaints were not offered to prove that

Wahchumwah was selling eagle parts, but merely to explain why the federal agents began

investigating him."  <u>Id.</u>, slip. op. at 17.  That is indistinguishable from the purpose of the Red

Notice but here, the government's discussion of the Red Notice was much more limited.  The

defense kept the Red Notice in the jury's attention for a much longer period by prolonged

questioning about whether the pronoun "he" referred to Al Ali or the fugitive.

 I conclude admission of the Red Notice does not require a new trial and the defense was

not entitled to additional discovery to try to determine the true status of Al Ali when he was

emailing Mohamud.

  D. <u>Replaying Recordings During Jury Deliberation</u>

 During the investigation, the government made video or audio recordings of all but the

first face-to-face meeting between Mohamud and the undercover agents, as well as many phone

calls.  At trial, I admitted numerous government and defense exhibits in the form of portions of

these tapes with a transcript of the audio scrolling at the bottom of the screen.  The transcripts

were helpful because they contained translations of the Arabic phrases sprinkled throughout the

conversations, identified the speakers, and allowed the jury to read transcriptions of

conversations which could not be understood without listening to the conversations numerous

times.  Unfortunately, it was not technically possible to play the tapes with the transcripts on the

equipment available in the jury room; I was unaware of this when I admitted the tapes.  Thus, I

did not discuss with counsel or rule prior to jury deliberations whether the exhibits consisted of

only the audio/video or whether the exhibits also included the transcripts.  After discussions with

counsel, and changes of heart on both sides, I decided to send the tapes to the jury room during

deliberations without separate paper transcripts.

Mohamud raises a few objections to my decision.  First, he argues the Ninth Circuit

prohibits sending recordings to be played unsupervised in the jury room.  Mohamud characterizes

the exhibits as testimonial evidence which cannot be reviewed by the jury without judicial

supervision.  He claims my decision allowed the jury to place undue emphasis on a portion of the

testimony.  Instead, I should have advised the jury it could ask for an exhibit to be replayed for

them in the courtroom, with defendant present and proper judicial oversight to provide

appropriate limiting instructions.  Failure to do so violated the law of the Circuit and Mohamud's

constitutional right to be present at all stages of the trial.  Mohamud also argues the recordings in

the jury room were not in the form admitted at trial, thus compounding the problem.

The government argues jurors are entitled to examine documents properly admitted in

evidence, and no federal court limits this general rule to paper documents as opposed to audio

and video recordings.  The government distinguishes the case law relied on by the defense as

only applying to tapes never received in evidence or tapes replayed for the jury in the presence of

outsiders.

Page 16 - OPINION AND ORDER

I will first address the fact that the recordings in the jury room did not include the transcripts at the bottom. It is unfortunate that I could not address this issue with counsel prior to trial–technology outpaced us. When the issue arose just prior to jury deliberations, the government argued the transcripts were demonstrative only and not included as part of the exhibits. This theory is in accord with the way recordings and associated paper transcripts are traditionally handled by courts. See United States v. Delgado, 357 F.3d 1061, 1070-71 (9th Cir. 2004) (discussion of use of transcripts as an aid to listening to recordings; "court specifically instructed the jury that the recordings only–and not the transcripts–constituted evidence"). Although I could not instruct the jury as such, I see no significant difference between reading a transcript at the bottom of the screen and reading a transcript from papers held in the jurors' hands. Consequently, I find the exhibits consisted of the recordings only, and not the transcripts. Thus, no error occurred because the recordings in the jury room differed from those in the courtroom in this respect.

The remaining issue is whether I erred by sending the recordings to the jury room for possible unsupervised listening. As a threshold matter, I disagree with Mohamud's contention that the recordings are testimonial evidence. In the context of Fifth Amendment protection, testimonial evidence includes trial or deposition testimony, affidavits, questioning by law enforcement, and required production of documents for investigative bodies. United States v. Sideman & Bancroft, LLP, 704 F.3d 1197, 1201 (9th Cir. 2013) (oral statements and production of documents); United States v. Anekwu, 695 F.3d 967, 973-74 (9th Cir. 2012) (in-court testimony, affidavits, and depositions); Delgadillo v. Woodford, 527 F.3d 919, 926 (9th Cir. 2008) (statements responding to police questioning). These recordings of conversations between

Mohamud and the undercover employees are far removed from traditional categories of testimonial evidence.

Generally, jurors are entitled to examine all documents properly admitted into evidence. The court has discretion to send admitted exhibits to the jury room for deliberations. United States v. DeCoito, 764 F.2d 690, 695 (9th Cir. 1985). Mohamud relies on cases which are distinguishable.[2] In United States v. Noushfar, 78 F.3d 1442, 144-45. (9th Cir. 1996), amended on other grounds, 140 F.3d 1244 (1998), the court reversed convictions because the trial court sent fourteen tapes to the jury room for deliberations when the tapes had never been played during the trial. Although Noushfar contains broader language concerning a defendant's right to be present when the tapes are played, it is dicta. Noushfar relied on the following three cases.

In United States v. Felix-Rodriguez, 22 F.3d 964 (9th Cir. 1994), the government played to the jury a recording of a Spanish-language phone conversation between the defendant and a cooperating witness. The cooperating witness then read the English transcript to the jury. During deliberations, the jury asked for the transcript. The judge brought the jury back to the courtroom and replayed the Spanish recording while the jury read along with the English transcript. The courtroom contained the jury, judge, and court staff, but the judge excluded the defendant and defense and prosecution teams. The jury then returned to the jury room without the transcript. Id. at 966. Using an analysis for rereading/replaying testimony, the court held that replaying the recording, with the assistance of the transcripts, did not cause undue emphasis of that testimony. Id. The court further held it was harmless error to replay the recorded

---

[2] I do not think the state law cases cited by Mohamud are of assistance in this question. The Ninth Circuit cases rely on the Federal Rules of Criminal Procedure, obviously inapplicable in state court. Thus, I decline to address the state law cases.

conversations without defendant present, a violation of Federal Rule of Criminal Procedure 43. Id. at 967-68.

In United States v. Brown, 832 F.2d 128 (9th Cir. 1987), the deliberating jurors twice asked to have a recording replayed for them which had been played during trial but not received as an exhibit. Each time, the judge had the case agent, who had operated the recording equipment during trial, replay the recording for the jurors in the courtroom with only the jurors, the case agent, and the court clerk present. Id. at 129. The court reversed the conviction and remanded the case for a new trial because replaying the recording without the presence of the defendants, their counsel, and the judge violated Rule 43 and the error was not harmless beyond a reasonable doubt. The court was concerned about the possibility of prejudicial contact between the case agent and the jury, even if unintended by the case agent. Id. at 130.

In United States v. Kupau, 781 F.2d 740 (9th Cir. 1986), the deliberating jury asked to rehear recorded conversations between the defendant and a cooperating witness. Over a limited defense objection, the judge twice had an FBI agent play the recordings for the jury in an otherwise empty courtroom. Prior to the replaying, the judge explained the agent was only to operate the equipment and would not answer questions or make any comments. Id. at 741-42. The appellate court was concerned about outside contact with the jury by the FBI agent who was part of the prosecution team. Although the preferable procedure would have been replaying the recordings in open court with the reporter, judge, counsel, and defendant present, the appellate court did not reverse on this ground because the defense had not objected to the jury being alone with the agent. The court erred, however, in replaying the tapes without the defendant present but the error was harmless beyond a reasonable doubt. Id. at 742-43.

Page 19 - OPINION AND ORDER

The government distinguishes these last three cases as limited to instances in which the trial court allowed recordings to be replayed for a jury in the presence of outsiders, as opposed to the jurors having all the recordings which were admitted into evidence and replaying whatever they wished, with no outsiders present.

In another case, the Ninth Circuit found no error in sending recorded exhibits into the jury room. United States v. Doyle, 786 F.2d 1440, 1442 (9th Cir. 1986) (in a case addressing whether the court reporter must report the content of tapes played at trial, "tapes were taken into the jury room, where the jury had the opportunity to listen to all or any portion of each tape because each was admitted in evidence in its entirety").

> It is apparent that the district court viewed the tape playing as merely mechanical assistance to enable the jury to hear the evidence as a part of the jury's deliberation and not as "a stage of the trial" under Fed. R. Crim. P. 43, at which the presence of the defendant was required. However, the procedure is more properly viewed as a stage of the trial at which the presence of the defendant is required. It differs from the kind of technical assistance rendered by the marshals in dealing with the physical needs of the jury, because *it involves the crucial jury function of reviewing the evidence.*

Kupau, 781 F.2d at 743 (emphasis added).

Obviously, the jury reviews evidence alone in the jury room all the time. Paper exhibits and even physical exhibits are routinely brought into the jury room for a criminal jury to review during deliberations. I cannot discern any difference between recorded exhibits and paper exhibits which would require different procedures. As explained above, the recorded exhibits here are not testimonial. The jury did not have tapes of depositions or trial testimony to review at leisure and possibly give undue emphasis to one witness over another. The recordings are admitted exhibits. I see no problem with giving them to the jury during deliberations, to be

Page 20 - OPINION AND ORDER

played in the jury room without anyone else in attendance.  I agree with the government that the

defense cases are distinguishable from our situation, and I find no error in the procedures I used.

       E.      <u>Failure to Order Discovery of the Identities of the Undercover Employees</u>

       After reviewing classified documents about the undercover employees ("UCEs"),

Youssef and Hussein, I filed an unclassified order approving the deletion of their true names

from discovery.  ECF No. 315.  Mohamud notes he had direct contact with the UCEs over a

prolonged period during which all critical events in the case took place.  Moreover, the FBI did

not record the critical first meeting between Mohamud and Youssef due to equipment failure.

Mohamud claims he did not have a fair opportunity to cross-examine the UCEs because he could

not undertake a full investigation into their backgrounds.  Because all of Hussein's contact with

Mohamud was recorded, Mohamud argues Hussein's live testimony was superfluous and should

have been excluded completely if Mohamud could not investigate him.  Finally, Mohamud

contends the lack of effective cross-examination was exacerbated by the UCEs using false names

at trial, thus communicating to the jury that testifying put the UCEs in danger, possibly from the

defendant.

       The government notes there was no impeachment information about the UCEs to disclose

under *Giglio* and *Henthorn*.  The government did provide information about the UCEs'

background, training, and experience, as well as extensive recordings of their interactions with

Mohamud.  The defense and jury could observe the UCEs in person when they testified, thus

allowing a credibility assessment.  The government contends the defense had adequate material

to conduct a meaningful cross-examination.

"[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431 (1986). Here, the defense team had information about the UCEs' background, training, and experience, along with the bias inherent in the testimony of a government agent, from which to fashion cross-examination questions. Moreover, the defense based much of the cross-examination on its theory the agents exploited Mohamud's vulnerability in their frequent religious references and compliments about his poetry, as two examples. The recordings of nearly all meetings and phone calls allowed the defense to plow this ground easily.

The government filed an ex parte classified motion giving multiple solid reasons for keeping the UCEs' identities secret from the defense team, as well as from the public during trial. I cannot discuss the information here, but the motion is available for appellate review. True identities of trial witnesses have been withheld from the defense before, particularly when national security is at issue. United States v. El-Mezain, 664 F.3d 467, 493 (5th Cir. 2011) (in a trial concerning providing material aid and support to a designated terrorist organization, the district court did not violate defendant's confrontation rights by withholding the identities of two Israeli government employees; "although the defense could not verify the witnesses' credentials, the district court correctly observed that the defendants had access to significant information regarding the witnesses' employment, nationalities and backgrounds in order to conduct meaningful cross-examination"), cert. denied, 133 S. Ct. 525 (2012). The cross-examination of Youssef and Hussein, although not as extensive as the defense would like, was effective. The use of pseudonyms at trial did not compound the problem. United States v. Rangel, 534 F.2d

147, 148 (9th Cir. 1976) (informant not required to divulge true name on the witness stand because of threats against his personal safety).

      F.     <u>Denial of Discovery and Testimony from "Bill Smith"</u>

Under FBI supervision, an operative known as "Bill Smith" exchanged many emails with Mohamud prior to Youssef's first contact. The defense requested the operative's true identity well before trial. After a few false starts, I eventually held an ex parte hearing in which I questioned Bill Smith and concluded his identity was neither relevant nor helpful to the defense because the emails could speak for themselves. Bill Smith had no contact with Mohamud other than through email.

The defense argues the denial of Bill Smith's true identity violated Mohamud's right to compulsory process, confrontation, and presentation of the defense theory about the emails. He contends the testimony about the emails from SA Dodd, Bill Smith's FBI handler, provided a government spin which the defense could not challenge due to the lack of full discovery. Mohamud claims testimony from Bill Smith was essential to either contradict SA Dodd, provide an inconsistent explanation, or demonstrate incredible testimony from both witnesses which would provide a reason to distrust all government testimony.

The government notes I ruled "Mohamud can argue any meaning to the jury, including the beginning of an entrapment scheme, which he thinks the emails support." ECF No. 195, at 4. According to the government, the jury did not share the defense's interpretation of the Bill Smith emails in the context of all the evidence presented. Testimony from Bill Smith would not have changed the jury's analysis.

SA Dodd not only kept a close watch on Bill Smith's email contacts with Mohamud, SA Dodd helped draft all of the emails Bill Smith sent. During the government's questioning of SA Dodd, I sustained a defense objection to questions asking what SA Dodd believes Bill Smith was thinking in composing the emails. I redirected the government's questions to what was said in the emails and what SA Dodd thought about the content. Tr. 1507. The defense extensively cross-examined SA Dodd about the content of the emails, although I did sustain government objections to questions about whether SA Dodd implanted ideas in Mohamud's thinking. Tr. 1529. At the end of the day, Mohamud could only be entrapped by what was said in the emails, not by what the FBI intended. Moreover, since all contact was by email, there was no issue on whether the informant was truthful about what was said during the contacts.

Mohamud's confrontation rights were not violated because he had the opportunity for effective cross-examination, even without discovery or testimony from Bill Smith, due to the limited nature of the contacts. Delaware, 475 U.S. at. 679.

A criminal defendant has a constitutional right to present a complete defense, including the testimony of witnesses. Jackson v. Nevada, 688 F.3d 1091, 1096 (9th Cir. 2012), pet. for cert. filed, 81 U.S.L.W. 3349 (Dec. 3, 2012). The right has limitations, however.

> [A] defendant does not have an absolute right to present evidence, no matter how minimal its significance or doubtful its source. United States v. Scheffer, 523 U.S. 303, 309-11, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998). Rather, the right itself is only implicated when the evidence the defendant seeks to admit is "relevant and material, and . . . vital to the defense." [Washington v. Texas, 388 U.S. 14, 16, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).]

Jackson, 688 F.3d at 1096.

Again, the importance of Bill Smith is in the content of the emails he sent to Mohamud, which were all presented to the jury. Mohamud has not persuaded me that testimony from Bill Smith was vital to the defense, particularly in light of the information I learned from Bill Smith in the ex parte hearing. When weighed against the government's reasons not to disclose Bill Smith's identity, the lack of Bill Smith's testimony did not violate Mohamud's compulsory process rights.

Thus, I find the lack of information on Bill Smith's true identity did not violate any of Mohamud's constitutional rights.

G.    State of Mind Testimony

Mohamud contends he did not receive a fair trial due to my rulings on several types of "state of mind" evidence. He argues the admission of evidence on why the FBI agents took particular actions during the course of the investigation was irrelevant. The error was compounded when I allowed the government to withhold evidence from discovery that would have allowed the defense to demonstrate alternative motivations for government action. Further error occurred when I refused to admit evidence of Mohamud's state of mind.

The government argues Mohamud made the agents' motivations and beliefs an issue from the start of the trial when the defense focused on Mohamud's inner conflict, vulnerability, and ability to be manipulated. The government also notes instances when the defense introduced evidence of Mohamud's own state of mind.

Well before trial, it became clear Mohamud would rely on an entrapment defense based on his youth and vulnerability. The defense opening statement characterized Mohamud several times as manipulable and conflicted. I decided that prohibiting FBI agents from explaining why

Page 25 - OPINION AND ORDER

they initially targeted Mohamud and took various actions during the investigation would have

been highly unreasonable.  Lack of this testimony would have left the jury with the impression

the FBI pounced on Mohamud for no reason, something I knew was untrue from pretrial

proceedings.  I wanted to allow both sides the chance to give a balanced presentation.

The Supreme Court has discussed the need for the government to present its case in a

forceful way:

> Thus, the prosecution may fairly seek to place its evidence before the jurors, as
> much to tell a story of guiltiness as to support an inference of guilt, to convince
> the jurors that a guilty verdict would be morally reasonable as much as to point to
> the discrete elements of a defendant's legal fault.

Old Chief v. United States, 519 U.S. 172, 188, 117 S. Ct. 644 (1997) (analyzing when the

government must accept defendant's offer to admit to a prior conviction, when that is an element

of the crime, especially if the nature of the prior conviction raises the risk of a verdict tainted by

improper considerations).  Moreover, the Ninth Circuit has approved background testimony from

case agents.  See United States v. Decoud, 456 F.3d 996, 1011-12 (9th Cir. 2006) (finding

unfounded the defense hearsay and foundation objections to case agent's trial testimony about the

background of the drug investigation and the roles of co-conspirators).

I did allow some testimony about Mohamud's state of mind.  His friends testified about

Mohamud's campus activities and his desire to study religion abroad.  I allowed a jail nurse to

testify about Mohamud's statements to her when he was booked into the jail after his arrest.

Mohamud's parents testified about his response to them when they were concerned he was trying

to go abroad.  Government Exhibit 18 was Mohamud's notebook containing his music lyrics, to

do lists, plans for making money, and self-imposed rules for his behavior.  Defense Exhibit 1012 was another of Mohamud's to do lists.

The rules of evidence prohibited the admission of much of Mohamud's state of mind evidence in the form of his own statements.  When offered by the government, Mohamud's own statements were not hearsay under Rule 801(d)(2) because they were offered by the opposing party.  If Mohamud offered his own statement, however, it was hearsay and could not come in unless the statement fell within a hearsay exception in Rule 803 or was not offered for the truth. United States v. Mitchell, 502 F.3d 931, 965 (9th Cir. 2007) (defendant's exculpatory statements made during interviews with law enforcement were inadmissible hearsay because they were not party-opponent admissions and did not fall within the statement against interest hearsay exception).  I did admit a few of Mohamud's statements that made it past the hearsay rules–for example, Exhibit 1049 is an email chain between Mohamud and his friend Beau Stuart–but not many.

All in all, I see no error in how I received, or refused to receive, state of mind evidence.

H.    Selective Declassification of Documents

Many times during discovery, Mohamud objected to the government's selective declassification of material.  He raises this objection again, claiming the selectiveness skewed the fact-finding process and requires a new trial to rectify the error.  Mohamud claims the selectiveness made it impossible to show that the overwhelming majority of his communications and daily activities were those of a normal, teenaged college student.  He was also unable to show the jury most of his communications around critical events, such as the time of the first Bill

Smith email, the Beau Stuart "martyr" email of January 24, 2010, and the no-fly incident at the Portland airport.

The government counters it never disputed that the vast majority of Mohamud's communications and daily activities were normal for a college student and did not relate to violent jihad. The government also notes the evidence Mohamud did offer at trial to show this, including testimony from many friends and older acquaintances at college, photos of activities with friends, and his college transcript. According to the government, this was more than sufficient to prove Mohamud's point that he spent most of his time in benign activities.

I generally agree with the government's arguments, and I believe the government fulfilled all of its discovery obligations, even though it did not follow the typical policy in this district of providing everything to the defense. The Ninth Circuit can review my decisions which limited discovery as a result of motions filed under the Classified Information Procedures Act. I do not think a serious miscarriage of justice occurred because of selective declassification of materials.

I.      First Amendment Rights

I did not give the defense's requested jury instruction concerning the First Amendment, and I prohibited arguments about the First Amendment because I was concerned they were irrelevant and confusing to the jury. Mohamud claims he was denied a fair trial by my refusal to instruct on explicit First Amendment rights because issues on speech, the press, association, and religion were at the heart of his participation in a discursive community. According to Mohamud, the distinction between acts and talking was central to his defense. He also argues my prohibition on arguments about the First Amendment erroneously precluded him from arguing his theory of defense.

Page 28 - OPINION AND ORDER

The government notes it never disputed that Mohamud's opinions, reading material, and writings pertaining to violent jihad were protected by the First Amendment. The government contends, however, the First Amendment was not a defense to the charge brought against Mohamud–attempted use of a weapon of mass destruction–because the offense conduct contains no element of activity protected by the First Amendment.

An accused has the right to make a closing argument on the theory of the defense. Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 1999). But the "right is not unlimited, and a court may limit closing arguments to ensure that they 'do[ ] not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.'" United States v. Doe, 705 F.3d 1134, 1149 (9th Cir. 2013 (quoting Herring v. New York, 422 U.S. 853, 862, 95 S. Ct. 2550 (1975)). Mohamud was not prosecuted for what he said or wrote; he was prosecuted for attempting to explode a bomb. I allowed the defense to argue its entrapment theory at closing argument.

Mohamud relies on United States v. Freeman, 761 F.2d 549 (9th Cir. 1985), in which the court held the defendant was entitled to a First Amendment defense instruction on twelve of the fourteen counts of aiding, abetting, and counseling violations of the tax code, something the defendant allegedly did at seminars he taught. In the twelve reversed counts, there was some evidence "that the purpose of the speaker or the tendency of his words [were] directed to ideas or consequences remote from the commission of the criminal act," making the defendant entitled to an instruction based on the First Amendment. Id. at 551. In the other two counts, the defendant directly participated in preparing the people's returns based on his advice. Because these two counts contained no element of protected First Amendment activity, the defendant could not have a First Amendment defense to them. Id. at 552.

Page 29 - OPINION AND ORDER

"The First Amendment. . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 489, 113 S. Ct. 2194 (1993). Here, Mohamud was not prosecuted for engaging in protected First Amendment activity. He did not just discuss the possibility of violent jihad in the United States, he attempted to engage in it directly. Thus, he was not entitled to a First Amendment defense or jury instruction.

J.    <u>Summary</u>

I conclude that no serious miscarriage of justice occurred during the trial, even when I view the issues raised by the defense cumulatively.

## CONCLUSION

Defendant's Motion for Judgment of Acquittal After Jury Verdict [431] and Motion for a New Trial [432] are denied.

IT IS SO ORDERED.

Dated this ____22nd____ day of April, 2013.


  /s/ Garr M. King
Garr M. King
United States District Judge