S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
**ETHAN D. KNIGHT**, OSB #99298
**PAMALA R. HOLSINGER**, OSB #89263
**RYAN W. BOUNDS**, OSB #00012
Assistant United States Attorneys
ethan.knight@usdoj.gov
pamala.holsinger@usdoj.gov
ryan.bounds@usdoj.gov
1000 SW Third, Suite 600
Portland, OR 97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 727-1117
Attorneys for United States of America


# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION


| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 3:10-CR-00475-KI** |
| v. | |
| | **GOVERNMENT'S SENTENCING** |
| **MOHAMED OSMAN MOHAMUD,** | **MEMORANDUM** |
| Defendant. | **Sentencing Date: September 6, 2013** |

# TABLE OF CONTENTS

I.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     Advisory Sentencing Guidelines Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.      Defendant's Failure to Accept Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      Defendant's Criminal History Category . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.    18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        A.      The Nature and Characteristics of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . 22

        B.      Imperfect Entrapment Is Not an Appropriate Basis for Departure in
                This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        C.      History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . 24
                i.      Defendant's Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
                ii.     Defendant's Proffer Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        D.      A Lengthy Sentence Is Necessary Based upon the Crime Committed . . . . . . . . 26
                i.      The Seriousness of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
                ii.     Protection of the Public and Deterrence . . . . . . . . . . . . . . . . . . . . . . . . 27

        E.      The Need to Avoid Unwarranted Sentence Disparities Among Similarly
                Situated Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV.     Government's Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Gall v. United States*, 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Blixt*, 548 F.3d 882 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Caceda*, 990 F.2d 707 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*United States v. Castaneda-Martinez*, 425 F. App'x 569 (9th Cir. 2011) (unpublished) . . . . . . 16

*United States v. Davis*, 36 F.3d 1424 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*United States v. Dickey*, 924 F.2d 836 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Gamboa-Cardenas*, 508 F.3d 491 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Garza-Juarez*, 992 F.2d 896 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Hall*, 952 F.2d 1170 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Houser*, 70 F.3d 87 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14

*United States v. Ing*, 70 F.3d 553 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Lessner*, 498 F.3d 185 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Marquardt*, 949 F.2d 283 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Martinez-Martinez*, 369 F.3d 1076 (9th Cir. 2004) . . . . . . . . . . . . . . . 14, 15, 17

*United States v. McClelland*, 72 F.3d 717 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Morhbacher*, 182 F.3d 1041 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 18-19

*United States v. Ressam*, 679 F.3d 1069 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*United States v. Rita*, 551 U.S. 338 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Royer*, 895 F.2d 28 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Scrivener*, 189 F.3d 944 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Taylor*, 475 F.3d 65 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Weiland*, 420 F.3d 1062 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Williams*, 380 F. App'x 527 (7th Cir. 2010) (unpublished) . . . . . . . . . . . . . . 13

*United States v. Zakhor*, 58 F.3d 464 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## FEDERAL STATUTES

18 U.S.C. § 2332a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 2332a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 2332a(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 2332b(g)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 3553(a)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18 U.S.C. § 3553(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 3553(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 31

## FEDERAL SENTENCING GUIDELINES

USSG § 1B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

USSG § 1B1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

USSG § 1B1.1(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

USSG § 1B1.1(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

USSG § 2M6.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

USSG § 3A1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

USSG § 3A1.4(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

USSG § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

USSG § 3E1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

USSG § 4A1.3(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

USSG § 5H1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## MISCELLANEOUS

Bruce Hoffman, *Inside Terrorism* 127-28 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Letter from J.D. Kinzie, Ph.D., Professor of Psychiatry, Or. Health & Science Univ.,
to Steven Wax & Stephen Sady, Def. Counsel (June 6, 2013) . . . . . . . . . . . . . . . . . . . . . . 14

Letter from Marc Sageman, Sageman Consulting LLC,
to Stephen R. Sady, Chief Deputy Fed. Pub. Defender (June 4, 2013) . . . . . . . . . . . . . . . . 14

U.S. Census Bureau, Dep't of Com., *Families and Living Arrangements,*
*Living Arrangements of Children*, Table CH-1 (Nov. 13, 2012),
http://www.census.gov/hhes/families/data/children.html . . . . . . . . . . . . . . . . . . . . . . . . . 25

The United States of America, by S. Amanda Marshall, United States Attorney for the District of Oregon, and through Ethan D. Knight, Pamala R. Holsinger, and Ryan W. Bounds Assistant United States Attorneys, respectfully submits this memorandum for defendant's sentencing, which is currently set for Friday, September 6, 2013, at 9:30 a.m.

On January 31, 2013, defendant was found guilty of attempting to use a weapon of mass destruction after a 13-day jury trial. At trial, defendant denied he was guilty and claimed that he was entrapped by government agents. He aggressively argued that the FBI was to blame for his criminal conduct, claiming that he was not predisposed to commit the crime but was instead induced by federal agents to do so. The jury rejected this claim. Instead, the jury, in convicting defendant, accepted the government's theory of the case: Defendant attempted to kill thousands of people in the name of his distorted and radical view of Islam.

The government agrees with the Presentence Report (PSR) that the total offense level is 43, the defendant's Criminal History Category is VI, and the resulting guideline range is life. However, there are factors present in this case based upon which the Court could find a variance from the Guidelines is appropriate pursuant to 18 U.S.C. § 3553(a). Should the Court determine a variance from the Guidelines is warranted in this case, the United States asks that the Court sentence the defendant to 40 years' imprisonment. The United States respectfully submits that a sentence of less than 40 years of imprisonment would vary inappropriately from the advisory Guidelines sentence in this case and would not be warranted after taking into account all of the factors in Section 3553(a).

/ / /

/ / /

**Government's Sentencing Memorandum**                                                        **Page 1**

## I.    Factual Background

On November 26, 2010—the day of the annual Christmas tree lighting at Portland's Pioneer Square—families had gathered to celebrate the lighting of the 70-foot tree and the beginning of the holiday season. Little did the revelers know that defendant had plotted and schemed for several months to kill them by detonating a massive truck bomb. On that night, at around 5:45 p.m., defendant dialed the cell phone that he believed would trigger a titanic explosion. When the bomb did not explode, defendant dialed the phone again. Defendant never hesitated or wavered in his willingness and desire to kill thousands that day.

The evidence at trial established that defendant's murderous conduct was the culmination of a mindset that began to develop years before the commencement of the government's investigation. Over that period, defendant became radicalized to such a startling degree that he was willing to commit chilling acts of violence in the name of Islamic extremism. The bomb did not go off at Pioneer Square, because the FBI intervened in the plans of this defendant at a critical moment. Through its investigation, the FBI prevented the defendant from finding the terrorists he was looking for—as he described it, "the right people"—to help him carry out his plot.

The evidence presented at trial established that by the time defendant met "Youssef" (an Undercover Employee (UCE) whom defendant understood to be an Al Qaeda recruiter), he had already come to believe that violence against civilians, in or outside the United States, was a justified response to what he perceived as the killing of innocent Muslims in Afghanistan by the United States and its allies. At trial, the evidence also established the radical nature of defendant's activities and mindset prior to the FBI's intervention. The jury was presented with

**Government's Sentencing Memorandum**                                      **Page 2**

defendant's extensive writings in support of violence against the United States and its allies. The jury also heard testimony about defendant's relationship and fellowship with known Al Qaeda terrorists, and the jury heard hours of defendant's own recorded statements describing his justification for mass murder and his intent to commit it.

Defendant was a prolific user of extremist Internet websites and social networking forums. (PSR ¶¶ 64-68; Gov't Trial Ex. 242.) The evidence established that these Internet forums allow access to audio and video propaganda and the chance for individuals like defendant to directly interact with radical religious figures, militant leaders, and like-minded recruits living in their own communities. (Trial Testimony of Evan Kohlmann, Tr. 2004, Jan. 14, 2013.) Defendant's postings and writings in these forums demonstrated his commitment to extremist principles, his contempt for the United States, and his support for terrorist organizations such as Al Qaeda.

The evidence at trial proved defendant was not only a consumer and distributor of extremist propaganda but also a published author in Al Qaeda's English language on-line magazine—*Jihad Recollections.* In February 2009, defendant began his relationship with *Jihad Recollections*. (PSR ¶¶ 12-28; Gov't Trial Ex. 232.) Defendant wrote four different articles for this magazine, the last in August 2009. Defendant was an editor as well as author. He regularly gave advice on appropriate topics for the Al Qaeda magazine. As the testimony at trial made clear, defendant was very proud of the attention the radical extremist publication was getting from mainstream media, and he was eager to spread the word of violent jihad. (PSR ¶¶ 16-25; Gov't Trial Ex. 223.)

/ / /

**Government's Sentencing Memorandum**                                                    **Page 3**

The jury learned that the publisher of *Jihad Recollections*, Samir Khan, was one of the world's most notorious English-speaking propagandists for radical Islam. Khan was born and raised in the United States and lived in the United States until 2009, when he left for Yemen. While in the Middle East, Khan conspired with other jihadists to blow up two cargo planes in October 2010 and was later killed in an American drone strike in 2011. In the final months of his life, Khan also published *Inspire*—the official magazine of Al Qaeda in the Arabian Peninsula—and his influence was integral to Al Qaeda's efforts to encourage English-speaking jihadists living in Western countries to commit terrorist acts. Khan was defendant's mentor. (PSR ¶¶ 12-14; Kohlmann Trial Testimony, Tr. 2020, Jan. 25, 2013.)

The evidence at trial established that defendant was also influenced by several notorious extremist clerics, including Anwar Al-Awlaki. (Gov't Trial Ex. 223-23; Kohlmann Trial Testimony, Tr. 2044, Jan. 25, 2013.) The jury heard evidence that defendant was very active in the global jihad movement well before he met Youssef or anyone else working with the FBI. Indeed, defendant regularly corresponded with Khan and wrote for *Jihad Recollections* until August 2009—over a year before defendant's attempted bombing of Pioneer Courthouse Square. (PSR ¶¶ 26, 27.)

It was in August 2009 that defendant began making plans to travel to Yemen to join his friend Amro Al-Ali, who had lived briefly in Portland in 2008. By August 2009, the FBI knew Al-Ali was wanted by the Saudi government, which had identified him as recruiting westerners to serve as foreign fighters for Al Qaeda. (PSR ¶ 31; Gov't Trial Ex. 80.) The evidence at trial established the FBI had concluded Al-Ali was headed to Afghanistan to join other fighters in violent jihad. The FBI further believed that Al-Ali was recruiting defendant to join him.

**Government's Sentencing Memorandum**                                    **Page 4**

After Al-Ali left Portland, defendant and Al-Ali remained in contact. In an email sent from Yemen on August 31, 2009, Al-Ali forwarded to defendant an email link regarding a religious school in Yemen. (PSR ¶ 32.) This was to be defendant's cover story for his travel to meet Al-Ali.

The evidence at trial established that, on the same August day in 2009 that defendant was contacted by Al-Ali about defendant's travel to Yemen, defendant's father called the Portland office of the FBI. He told the FBI that he was worried about his son. Defendant's father also told the FBI that his son had taken his passport and had told him he was leaving to go to Yemen to study Islam. Defendant's father was worried his son would get "brainwashed." (PSR ¶¶ 33-37.)

In the fall of 2009, the FBI was aware of defendant's extremist views, his communications with known terrorists, and his desire to travel to Yemen to join Al-Ali. In December 2009, Al-Ali's recruitment of defendant accelerated. (PSR ¶ 52.) At that time, Al-Ali was urging defendant to join him and sent numerous emails from the northwest frontier province of Pakistan (which borders Afghanistan and Pakistan's Federally Administered Tribal Area (FATA)), giving defendant a contact to facilitate his travel. Defendant tried on multiple occasions to make email contact with Al-Ali and his associate, "Abdul Hadi," through the spring of 2010. (PSR ¶¶ 56-58; Gov't Trial Ex. 224.) These emails enabled the FBI to intervene in defendant's planning at a critical time and to assume the identity of Al-Ali's associate.

On June 23, 2010, the FBI arranged for Youssef, the UCE, to email defendant, posing as an associate of Al-Ali. Defendant and Youssef started a dialogue and exchanged emails, until they ultimately agreed to meet in person on July 30, 2010. The evidence at trial established that,

**Government's Sentencing Memorandum**                                    **Page 5**

before their meeting, defendant was concerned that Youssef might not be a terrorist but instead a

government agent.  As a result, defendant went so far as to question Youssef in an email about

how he got his email and challenged Youssef about how he knew Al-Ali.  (PSR ¶¶ 76-81; Gov't

Trial Exs. 47-61a.)

On July 30, 2010, the first face-to-face meeting between defendant and Youssef took

place in the lobby of a downtown Portland hotel.  Shortly after the two met, Youssef asked what

defendant would do "for the cause."  (Youssef Trial Testimony, Tr. 557, Jan. 14, 2013.)  Without

hesitation, defendant answered: He had initially wanted to wage war in the U.S., but he had read

one of the Hadiths and then had a dream.  In the dream, defendant had traveled to Yemen and

received training.  Afterwards, he had gone to Afghanistan to lead an army against the infidels.

(PSR ¶ 84; Youssef Trial Testimony, Tr. 558, Jan. 14, 2013.)

Youssef again asked what defendant would do for the cause.  Defendant said he "could

do anything."  (Youssef Trial Testimony, Tr. 559, Jan. 14, 2013.)  Youssef said he could not tell

defendant what to do, that it had to come from his own heart and Allah.  Youssef identified the

following options: (1) pray five times a day and spread Islam to others; (2) continue studying and

get an engineering or medical degree so he could help the brothers overseas; (3) raise funds for

the brothers overseas; (4) become "operational"; or (5) become a "shaheed" (martyr).  As they

stood in the hotel lobby, defendant immediately, and without prompting from Youssef, said he

wanted to be "operational."  Defendant explained that he did not know how to do so, however,

and that he would need training.  (PSR ¶ 85; Youssef Trial Testimony, Tr. 560, Jan. 14, 2013.)

Youssef asked defendant to explain what he meant by becoming operational.  Defendant

responded that he wanted to put an explosion together and went on to say that he had heard of

**Government's Sentencing Memorandum**                                                          **Page 6**

brothers putting stuff in a car, parking it by a target, and detonating it. (Youssef Trial Testimony, Tr. 560, Jan. 14, 2013.) In an effort to see if defendant was serious about his plan and desire to be "operational," Youssef asked defendant to do some research about possible targets. (PSR ¶ 86; Youssef Trial Testimony, Tr. 561, Jan. 14, 2013.) The entire meeting lasted approximately thirty minutes.

It was clear during their meeting that defendant believed he was meeting with an associate of Al-Ali and that Youssef was an Al Qaeda recruiter. Against this backdrop, defendant outlined a clear plan: He wanted to become operational and detonate a car bomb. (PSR ¶ 86.)

Defendant's second meeting with Youssef occurred on August 19, 2010. At this meeting, Youssef introduced defendant to "Hussein," another UCE who was posing as an Al Qaeda operative and explosives expert. (PSR ¶ 94.) The timing and duration of this meeting were critical. Up to this point, defendant had spent only about 30 minutes with Youssef. Within ten minutes of meeting Hussein, however, defendant told both UCEs that he had begun thinking about violent jihad when he was fifteen years old. (PSR ¶¶ 95, 96; Gov't Trial Ex. 82.)

The evidence at trial also established that within minutes of meeting Hussein, defendant revealed his plan to detonate a massive bomb in Pioneer Square at the tree-lighting ceremony. Defendant told the agents the date, the location, and the number of people he hoped to kill at the event. But defendant needed help. He wanted Hussein to help him make a truck bomb. Defendant came to this second meeting with his plan already developed. He just needed "the right people" to help him execute it. (PSR ¶ 97; Gov't Trial Ex. 84.)

/ / /

**Government's Sentencing Memorandum**                                                    **Page 7**

As the undercover agents tried to get defendant to understand the gravity of what he was talking about, defendant remained steadfast:

> YOUSSEF:    You know there's gonna be a lot of children there.
>
> MOHAMUD: *Yeah I mean that's what I'm looking for*.
>
> YOUSSEF:    For *kids*?

Defendant responded he was looking for a "huge mass" that would slaughter people "in their own element with their families celebrating their holidays." Hussein asked defendant for specifics:

> HUSSEIN:    I mean [you are my brother, as close to me as my head and eyes are], like they say. So, so what do you want?
>
> MOHAMED: Uh, uh, I was thinking uh, you know, you know what's going on right now? You know, the, the U.S. is losing the war you know
>
> HUSSEIN:    Yes, they are
>
> MOHAMED: so they,
>
> HUSSEIN:    [Praise be to God].
>
> YOUSSEF:    [Praise be to God].
>
> MOHAMED: So they, they have resorted to intentionally killing civilians you know. So I you know, and it, and, and you know, [God the Glorified, the Exalted] , had said in the Quran, ["The prohibited, - there is the law of equality."]
> (UNINTELLIGIBLE) If they kill your women and children intentionally Then you're allowed to you know do the same to them. And the same amount too.
>
> HUSSEIN:    Don't they say that here too, 'eye for an eye?'

**Government's Sentencing Memorandum**                                  **Page 8**

MOHAMED:   Yeah.  And (UNINTELLIGIBLE) , I mean you know he commented on this and you know he said what it, it, it also beneficial and it humiliates them you know and *when they see that their own women and children are killed you know when they do that to others, then they, and they will refrain from doing that*.   You know, [God the glorified the exalted (UNINTELLIGIBLE): "It may be that God will restrain the fury of the unbelievers, for God is the strongest in might and in punishment."] So it's a way to refrain from doing that.  So you know I was hoping that  [If God wills it] you know I already thought about it and you know, you know Pioneer Square, right?

HUSSEIN:   What?

MOHAMED: (UNINTELLIGIBLE)  you  guys  know  Pioneer Square?

(PSR ¶ 98; Gov't Trial Ex. 84 (emphases added.).)

Defendant had thought through the timing and the impact of an attack at a holiday event: He thought it would be perfect.  Defendant explained that he decided he would drive the vehicle with explosives and blow it up while he was in it.  He justified his decision to commit a suicide attack and was willing to kill himself.  (PSR ¶ 100; Gov't Trial Ex. 86.)

During this second meeting with defendant, Youssef and Hussein confronted him about the significance of what he was suggesting, repeatedly reminding defendant how difficult the operation would be.  They cautioned him to think about what he was proposing—they asked him if he was worried about killing himself and defendant responded matter of factly: "[I]f you were to going to [Paradise] you wouldn't have to worry, right?"  (PSR ¶¶ 99-101; Gov't Trial Ex. 86.)

Evidence at trial established that, within minutes of meeting Hussein, defendant cooly offered a rationale for the attack and dismissed any potential concerns that he would be unable to

follow through with it.  He said he would push the button.  It would make him happy to "see the enemy of God then they are you know their bodies are torn everywhere."  (Gov't Trial Ex. 86.) The evidence at trial established that, throughout this second meeting, the UCEs gave defendant multiple opportunities to pick some other way to help the "cause."  (PSR ¶ 103.)

At this stage in the investigation, the FBI was confronted with the fact that defendant had picked a target date more than three months away.  The FBI had to make sure that defendant continued to work only with the FBI and that he did not take his plans to anyone else.  The evidence at trial established the FBI closely monitored defendant and that Youssef and Hussein met with him five more times.  (PSR ¶¶ 107-114, 117-119, 121-125, 129-132.)  Their final meeting was on November 26, 2010.  (PSR ¶ 133.)

The evidence presented at trial made clear that the agents continued throughout to emphasize to defendant the sobering reality of using a bomb to commit mass murder.  At one of the meetings, Youssef asked defendant if he was capable of looking at the bodies of those who would be killed in the explosion.  Defendant replied emphatically: "I want to see, you remember when 9/11 happened when those people were jumping from skyscrapers? . . . I thought that was awesome."  (Gov't Trial Ex. 159.)  Youssef told defendant that he was going to see body parts and blood.  Defendant responded, "I want to see that, that's, that's what I want for these people." He continued, "I want whoever is attending that event to be, to leave either dead or injured." (PSR ¶ 124; Gov't Trial Ex. 159.)

On November 26, 2010, defendant was calm but enthusiastic about what he was about to accomplish.  At noon on November 26, 2010, Youssef picked up defendant at a friend's house in Beaverton.  The two drove to a Portland hotel where they waited for Hussein.  After Hussein's

arrival, the group left the hotel to look at the bomb, which was inside the back of a late-model, white, full-size van parked at a nearby location. (PSR ¶ 134.) The bomb was actually a fake that had been constructed by the FBI. (PSR ¶ 135; Gov't Trial Ex. 214.) The evidence at trial established the bomb was made to look real and was made to look like it could accomplish what defendant intended—the slaughter of thousands of people.

Hussein opened up the side of the van exposing the bomb to defendant. Defendant leaned inside to take a look as the odor of diesel filled the air. After looking at the bomb, defendant stepped back and with a smile on his face remarked that the 1800-pound bomb was "beautiful." (PSR ¶ 135; Gov't Trial Exs. 209, 253.)

They all returned to the hotel and waited to leave for Pioneer Courthouse Square. Defendant had identified the precise time to depart. According to defendant, the timing was important because he wanted to maximize casualties. Just hours before the planned attack, defendant displayed no signs of nervousness. Rather, he was focused on logistics. He was pleased with the weather and glad to hear news reporting that the crowd at the ceremony was expected to reach 25,000 people. (PSR ¶ 136; Gov't Trial Exs. 212, 213.)

At 4:45 p.m., they all left the hotel. Youssef dropped off Hussein and defendant at the van. Hussein and defendant then drove to the parking spot near the square that defendant had selected. (PSR ¶ 137; Gov't Trial Ex. 217.) After the van was parked, defendant attached the blasting cap to the device. Hussein turned on the phone and asked defendant to flip the toggle switch, which he did. The bomb, defendant believed, had been armed. (PSR ¶ 138.) Hussein and defendant then left the truck bomb on the street as the crowd swelled nearby.

/ / /

**Government's Sentencing Memorandum**                                            **Page 11**

Youssef picked up defendant and Hussein, and the three drove to Union Station to drop off Youssef. They were minutes away from the explosion. Remarkably, defendant thought he saw his own mother driving past them as they left the area. (PSR ¶ 139; Gov't Trial Ex. 221.) This did not appear to deter him. As Youssef testified at trial, defendant seemed "at peace" with what he was about to do. (Youssef Trial Testimony, Tr. 1042, Jan. 17, 2013.) Hussein and defendant then drove to a nearby parking lot. Hussein pulled into the lot, parked, and gave defendant the phone that defendant believed would detonate the bomb. Hussein started to read the phone number to defendant, but defendant appeared so eager that he started to read over Hussein's shoulder and to dial the number faster than Hussein could recite it. There was no explosion. Hussein then suggested that defendant step out of the car where the signal might be stronger and try it again. Defendant called the number again. FBI agents arrested defendant on the spot. (PSR ¶ 140; Gov't Trial Ex. 221.)

## II.    Advisory Sentencing Guidelines Calculation

The PSR indicates that the advisory guideline range for the single count for which defendant has been convicted is a sentence of life in prison. This sentence is based upon determinations that the total offense level for the crime of conviction is 43 and that defendant's Criminal History Category is VI. These calculations are correct.[1]

---

[1] The base offense level for a violation of 18 U.S.C. § 2332a(a)(2)(A) is located in USSG § 2M6.1. Under paragraph (a)(1), the base offense level is 42 if the offense was committed: (1) with the intent to injure the United States or (2) to aid a foreign nation or terrorist organization. Defendant committed the offense of conviction in order to injure the United States government for its military involvement in Afghanistan, and he did so on behalf of Al Qaeda and affiliated jihadist groups. (PSR ¶¶ 98, 102, 124-25 (noting defendant's expressed desire to retaliate against the United States for its military operations in the Middle East); PSR ¶¶ 8, 31 (noting defendant's belief that his confederates, Youssef and Hussein, were Al Qaeda operatives).)

**Government's Sentencing Memorandum**                                    **Page 12**

## A.    Defendant's Failure to Accept Responsibility

Though he has intermittently "recit[ed] . . . the vocabulary of contrition," *United States v. Hall*, 952 F.2d 1170, 1172 (9th Cir. 1991) (quoting *United States v. Royer*, 895 F.2d 28, 30 (1st Cir. 1990)), defendant has failed to carry his burden of "clearly demonstrat[ing]" that he accepts personal responsibility for his crime in a manner that would justify a downward adjustment under the Guidelines.  USSG § 3E1.1(a).[2]  Indeed, defendant continues even now to lay primary

---

In addition, defendant's offense level must be increased by 12 levels—and his Criminal History Category increased to category VI—under USSG § 3A1.4 (the "terrorism enhancement"), because his conviction is for a felony that involved or was intended to promote a federal crime of terrorism.  *See* 18 U.S.C. § 2332b(g)(5) (defining "Federal crime of terrorism" to include violations of 18 U.S.C. § 2332a that are "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct").

In his objections to the draft PSR, defendant did not dispute that his offense level is properly calculated at 43, before departures, though he claimed that it should be adjusted downward by two levels to reflect his purported acceptance of responsibility under USSG § 3E1.1.  As discussed below, this contention is misplaced.

[2]  In practical terms, defendant's failure to accept personal responsibility merits discussion only insofar as it informs the Court's determination of a reasonable sentence.  *See* 18 U.S.C. § 3553(a)(2) (requiring sentence imposed "to promote respect for the rule of law" and "to protect the public from further crimes of the defendant").  Any such adjustment would have no effect on his Guideline sentencing range.  Defendant's total offense level would substantially exceed the maximum level of 43 for purposes of determining the sentencing range even if he had earned a full three-level reduction.  (PSR ¶ 156.)  Defendant disputes this conclusion, claiming that the adjustment for acceptance must be made from level 43 because that is the maximum offense level reflected on the sentencing table.  This contention is foreclosed by the Guidelines themselves.  As defendant notes, USSG § 1B1.1 controls the order in which this Court should make enhancements and adjustments under the various chapters of the Guidelines manual.  That provision establishes beyond peradventure that reference to Part A of Chapter 5 (the sentencing table) should occur only *after* application of any "adjustment . . . for defendant's acceptance of responsibility" under USSG § 3E1.1.  *See* USSG § 1B1.1(a) (directing sentencing courts to "apply[] the provisions of this manual *in the following order*" (emphasis added)); *id.* § 1B1.1(a)(5) (providing for adjustment for acceptance of responsibility); *id.* § 1B1.1(a)(7) (providing for "[d]etermin[ation of] the guideline range in Part A of Chapter Five").  Every circuit to address defendant's argument has, accordingly, rejected it.  *See United States v. Williams*, 380 F. App'x 527, 529 (7th Cir. 2010) (unpublished) ("Th[e] commentary merely explains how to use the sentencing table after an offense level is calculated—not how to

responsibility for his offense at the feet of government agents.  He further minimizes his own culpability by emphasizing—through a sheaf of expert reports—his purportedly heightened "vulnerabilit[y]" to the agents' influence as a result of: the dissolution of his parents' marriage, an adolescent identity crisis and desire for "heroism of some kind," and—most improbably—to his excessive enjoyment of alcohol and marijuana as a college freshman.[3]  Such claims cast grave doubt on the sufficiency and credibility of defendant's purported acceptance of responsibility in this case.

As a threshold matter, the "assertion of an entrapment defense is not *necessarily* incompatible with acceptance of responsibility."  *United States v. Ing*, 70 F.3d 553, 556 (9th Cir. 1995) (emphasis added).  At the same time, however, "a defendant whose only defense is entrapment is not automatically entitled to an acceptance of responsibility adjustment."  *Id.* Indeed, the Guidelines make clear that the adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial" and should be granted to such a

---

calculate the offense level in the first place.  Here, the court correctly started at 44 before making the 2-level reduction."); *United States v. Houser*, 70 F.3d 87, 92 (11th Cir. 1995); *United States v. Caceda*, 990 F.2d 707, 710 (2d Cir. 1993) ("[D]ownward adjustments must be made from the total of the base offense level plus upward adjustments even if that total exceeds 43.").

[3]  *E.g.*, Letter from J.D. Kinzie, Ph.D., Professor of Psychiatry, Or. Health & Science Univ., to Steven Wax & Stephen Sady, Def. Counsel, at 3-4 (June 6, 2013) (attached to PSR). Notably absent from any of these reports is justification for relying on defendant's own claim that "he has given up his extremist ideology," Letter from Marc Sageman, Sageman Consulting LLC, to Stephen R. Sady, Chief Deputy Fed. Pub. Defender, at 2 (June 4, 2013) (attached to PSR), despite his history of deliberately maintaining a double life, in which he fooled friends and family alike into believing he had no interest in waging violent jihad against non-Muslims. Defendant's reliance on his purported drug problem in mitigation not only is belied by the fact that he was able to desist from using alcohol and drugs when he chose to do so but is inconsistent with sincere contrition.  *See, eg.*, *United States v. Martinez-Martinez*, 369 F.3d 1076, 1090 (9th Cir. 2004) (affirming denial of adjustment for acceptance of responsibility, because defendant "laid the blame for his decisions on his drug addiction").

**Government's Sentencing Memorandum**                                                                 **Page 14**

defendant only in "rare situations."  USSG § 3E1.1 cmt. n.2; *see United States v. Weiland*, 420

F.3d 1062, 1080 (9th Cir. 2005) ("When a defendant chooses to put the government to its burden

of proof at trial, a downward adjustment for acceptance of responsibility should be rare."

(internal citations omitted)).  In determining whether the instant case constitutes one of those

"rare situations," this Court "must look at all the evidence bearing on the defendant's contrition,"

*Ing*, 70 F.3d at 556, while focusing "primarily upon *pre-trial* statements and conduct," USSG

§ 3E1.1 cmt. n.2 (emphasis added).[4]

      The evidence of defendant's contrition in this case is both modest and inconsistent.  The

day after his arrest, defendant suggested that this crime was little more than a series of

regrettable misunderstandings in which he had been unwittingly entangled.  He confided to a

psychiatric nurse that "he just couldn't figure out *how* he had gotten . . . to being *labeled* as a

terrorist in jail."  (Trial Tr. 2297:13-15, Jan. 28, 2013 (emphases added).)  He nonetheless

reported that he had been "depressed, . . . lost, [and] possibly . . . suicidal" before "he had gotten

connected with" the UCEs and that they "had given him a sense of direction and purpose" and

"made him feel cared about."  (*Id.* at 2296-97.)  Defendant has never abandoned this self-serving

claim of innocent bewilderment.  Indeed, he sought to convey it to the jury, calling the nurse to

testify about his disclosures at trial.  (*Id.*)

/ / /

---

    [4]  Defendant protests that the Court may not focus primarily on "pre-trial statements and conduct," because "acceptance of responsibility is measured at the time of imposition of sentence."  Defendant relies for this proposition on a Ninth Circuit decision from 1990, but, as the Ninth Circuit has repeatedly observed since then, the commentary relating to USSG § 3E1.1 was amended in 1992 specifically to preclude "a reduction . . . based on statements made 'during the sentencing phase.'"  *United States v. Gamboa-Cardenas*, 508 F.3d 491, 506 (9th Cir. 2007) (quoting *Martinez-Martinez*, 369 F.3d at 1090).

Approximately a month after his arrest, defendant drafted a written statement in which he acknowledged a degree of shame and remorse for his crime. (PSR ¶ 150.) Even that statement, however, fails to qualify as the sort of "clear demonstration" of acceptance of responsibility that is necessary for a reduction under USSG § 3E1.1. *United States v. Castaneda-Martinez*, 425 F. App'x 569, 570 (9th Cir. 2011) (unpublished). The substance of the statement fails to convey sincere contrition for a crime of such depravity and (intended) violence.[5] Defendant allows that "a lot of people" are rightly "upset, hurt, and angry" as a result of his plot to slaughter and maim thousands of innocent Oregonians during a civic celebration. Defendant's reference to "a lot of people," however, implies that some significant portion of the population is *not* "upset" or "hurt" or "angry." This suggestion plainly betrays a lack of true remorse for a murderous atrocity that

---

[5] The statement reads:

> On November 26, 2010, I, Mohamed Mohamud, did something that I will forever be ashamed of. I understand a lot of people must be upset, hurt, and angry. And they have every right to be so. Although the situation is a very horrific one, it entails me to clear up a few things:
>
> 1) That I renounce all acts of violence, especially killing innocent civilians, and acts of terrorism regardless of their justification.
> 2) That the decisions I made do not represent in any way the teachings of Islam and the Quran. But rather the teachings of misguided scholars and individuals.
> 3) And that they also do not reflect the beliefs and attitudes of the Somali and Muslim community, as they have made it clear that they want to integrate into American society, not destroy it.
> 4) They do not reflect the beliefs and attitudes of my family nor my upbringing and if I had followed what my family taught me then I would not have made such a terrible mistake.
>
> I apologize to the American public for my actions, and that they received from me anything but the utmost love and respect.

**Government's Sentencing Memorandum**                                    **Page 16**

*any* society would harshly condemn.  Defendant simply fails to recognize that his crime demands

opprobrium not from "a lot of people" but from civilization itself.

Even more tellingly, defendant refers to his plot as "a terrible mistake."  Defendant had

eagerly anticipated and meticulously prepared for this attack over the course of four months.  He

had written glowingly about such attacks for years—in both prose and verse.  It was not a

"mistake."  It was a deliberate and heinous crime.  The only thing about which defendant had

been "mistake[n]" was the affiliation of the UCEs.  Fortunately for all involved, they worked for

the FBI rather than for Al Qaeda.  Defendant has many things for which he should apologize, but

his "mistake" is not among them.  *Cf. United States v. Lessner*, 498 F.3d 185, 199 (3d Cir. 2007)

(affirming denial of adjustment for acceptance because defendant "admitted, at most, to having

made a mistake and failed to demonstrate much if any acceptance of personal responsibility for

her actions"); *Martinez-Martinez*, 369 F.3d at 1090 (affirming denial of adjustment for

acceptance and noting that defendant's apology for "'mistakes' he had made . . . was at best

ambivalent").

In addition to his statements about the offense itself, defendant engaged in four pretrial

proffer sessions with the government.  (PSR ¶ 151.)  In those sessions, defendant elaborated on

the evolution of his own jihadist ideology as well as his contacts with and knowledge of other

suspected extremists.  These proffers were of limited value to the government in its ongoing

efforts to gather intelligence about potential terrorist threats.  Nonetheless, defendant persistently

minimized his support for attacks on the United States and his predisposition to commit the

crime with which he was charged.  Such partial and self-serving disclosures diminish the

proffers' value as "affirmative evidence," *United States v. Davis*, 36 F.3d 1424, 1436 (9th Cir.

1994), that defendant accepted personal responsibility for his crime. *Cf. United States v. Scrivener*, 189 F.3d 944, 948 (9th Cir. 1999) (holding that defendant's minimization of his conduct is inconsistent with acceptance).

Most importantly, defendant's ambivalent and inconsistent statements about his crime are insufficient to warrant a downward adjustment under USSG § 3E1.1 in light of his persistent position—both at trial and at sentencing—that his crime resulted primarily from inducements by government agents. Indeed, the courts of appeals have repeatedly affirmed denials of adjustments for acceptance in entrapment cases where defendants have been far more cooperative in accepting the consequences of their actions. In *United States v. Marquardt*, 949 F.2d 283 (9th Cir. 1991), for example, the Ninth Circuit upheld this Court's denial of an adjustment for acceptance of responsibility despite the defendant's timely plea of guilty to transporting child pornography *and* the government's support for the adjustment. *Id.* at 285. The court noted the defendant's undisputed assertion that he had "cooperated with the government and acknowledged transferring films," but affirmed this Court's implicit reliance on the defendant's insistence "that he had not intended to violate the law and that the authorities had 'steered' him towards child pornography." *Id.*[6]

As in *Marquardt*, defendant continues to insist that he was not predisposed to commit his offense and that government agents "'steered' him" toward it. Defendant put the government to its burden of proof, moreover, and waged an aggressive defense at trial. Such actions are flatly inconsistent with a sincere acceptance of responsibility under USSG § 3E1.1. *See, e.g.*, *United*

---

[6] The court also noted that the evidence "conflicted with his claim of entrapment." *Marquardt*, 949 F.2d at 286. The jury's verdict establishes that the evidence in this case "conflicted" with defendant's own claim of entrapment as well.

**Government's Sentencing Memorandum**                                    **Page 18**

*States v. Morhbacher*, 182 F.3d 1041, 1052 (9th Cir. 1999) (affirming denial of adjustment due to defendant's refusal to admit his criminal intent and despite his "immediate and extensive cooperation with the government, his willingness to enter a plea agreement, [and] his failure to present any defense or contest any facts at trial"); *see also United States v. Taylor*, 475 F.3d 65, 71 (2d Cir. 2007) (affirming denial of adjustment because "weakness" of entrapment defense cast doubt on defendant's credibility in purporting to accept responsibility).

### B.    Defendant's Criminal History Category

Defendant's criminal history properly falls into category VI as a result of the terrorism enhancement. *See* USSG § 3A1.4(b); (PSR ¶ 160). Defendant claims, however, that this Court should depart to a lower Criminal History Category, relying on the Court's general discretion to make such a departure when "*reliable* information indicates that the defendant's Criminal History Category substantially over-represents the seriousness of [his] criminal history or the likelihood that [he] will commit other crimes." USSG § 4A1.3(b)(1) (emphasis added). Any such departure would be unwarranted on the facts of this case.

As the Ninth Circuit recently emphasized, the automatic increase to Criminal History Category VI for terrorism offenses reflects the singular and enduring dangerousness of defendants who commit such offenses. "'Terrorists, *even those with no prior criminal behavior*, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" *United States v. Ressam*, 679 F.3d 1069, 1091 (9th Cir. 2012) (en banc) (quoting *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (internal quotation marks omitted)). In light of such concerns, the court reversed as substantively unreasonable a 22-year sentence of imprisonment for the man convicted of plotting to detonate a

massive bomb at Los Angeles International Airport on New Year's Eve 1999—a plot that, if it had succeeded, "would have resulted in the deaths and injuries of hundreds of innocent people." *Id.* at 1090.[7]

Although the defendant in *Ressam* and defendant in this case differ in numerous respects, the two men attempted to commit nearly identical crimes for effectively the same reason—to commit violent jihad against the United States under the banner of radical Islam and in retaliation for perceived crimes against Muslims. Similarly, both men pose an acute "likelihood of recidivism, . . . difficulty of rehabilitation, and . . . need for incapacitation." *Id.* at 1091. That defendant was relatively young at the time of his offense and had exhibited "no prior criminal behavior"—aside from his persistent disregard for the nation's drug laws—does little to diminish these concerns. *Id.*; *see also United States v. Abu Ali*, 528 F.3d 210, 261-69 (4th Cir. 2008) (reversing 30-year sentence imposed for terrorist conspiracy as substantively unreasonable despite defendant's having joined conspiracy at age 22 with no criminal history and despite "letters describing [his] 'general [*sic*] decent reputation as a young man' and his overall 'good character'").

There is simply no "reliable" evidence in this case that defendant will pose less of a danger following a lengthy term of incarceration than other aspiring jihadists who have been intercepted, convicted, and sentenced subject to the terrorism enhancement. A downward departure pursuant to USSG § 4A1.3(b)(1) would be entirely unfounded.

/ / /

/ / /

---

[7] Ressam was recently resentenced on remand to 37 years' imprisonment.

**Government's Sentencing Memorandum**                    **Page 20**

For the foregoing reasons, the government concludes that the proper application of the Sentencing Guidelines yields an offense level of 43, a Criminal History Category VI, and an advisory sentence of life in prison.

## III.    18 U.S.C. § 3553(a)

The sentencing guidelines are advisory and simply the first of the statutory factors this Court must consider when imposing a sentence. *See* 18 U.S.C. § 3553(a)(4); *United States v. Rita*, 551 U.S. 338, 347-48 (2007). They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 49 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita*, 551 U.S. at 350. The remaining factors this Court should consider include the defendant's history and characteristics, the nature and seriousness of the offense, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. 18 U.S.C. § 3553(a)(1)-(2). They also include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6); *see also Rita*, 551 U.S. at 347-48 (enumerating the statutory sentencing factors); *Gall*, 552 U.S. at 50 n.6 (same).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008), the Ninth Circuit, sitting en banc, summarized the procedures a sentencing court must follow. The court must first correctly determine the applicable guideline range. *Id*. at 991. The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the § 3553(a) factors to decide if they support the sentence suggested by the parties." *Id*. The court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other

factor.  *Id*.  The court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review."  *Id*. at 991-92.

The government has carefully reviewed each of the applicable factors in 18 U.S.C. § 3553(a) and has set forth its analysis of those factors in the context of defendant's case below.

### A.    The Nature and Characteristics of the Offense

The offense of conviction in this case is unique: Defendant methodically and resolutely plotted to murder thousands of innocent people in the name of Islamic extremism.  There is no suggestion that defendant's conduct resulted from a lack of impulse control, mental illness, or controlled substances.  In this context, the Court should consider the Guideline sentence of life as the starting point for assessing the appropriate sentence.

Defendant wanted to commit an act of terrorism.  Within minutes of meeting Youssef, he made his intention clear.  (PSR ¶¶ 85-86.)  Defendant's contact with Youssef and Hussein in the months leading up to the attack did nothing but reaffirm defendant's determination to commit an act of terrorism.  Similarly, defendant's actions before he met Youssef reaffirm this intention as well—defendant wrote for a well-known Al Qaeda publication, maintained personal contact with two known terrorists, and expressed an increasingly radical worldview in his writings. Defendant steadfastly moved toward the terrorist act of November 26, 2010, while leading a carefully constructed double life.  He lied to parents and friends and maintained the outward appearances of an average nineteen year-old college student, all the while calmly plotting to murder thousands of innocent strangers.

/ / /

**Government's Sentencing Memorandum**                                                    **Page 22**

**B.      Imperfect Entrapment Is Not an Appropriate Basis for Departure in This Case**

The Ninth Circuit has recognized that imperfect entrapment—defined as government conduct that amounts to the aggressive encouragement of wrongdoing that does not meet the criteria for the legal defense of entrapment—may be a ground for a downward departure after a defendant is convicted at trial.  *United States v. McClelland,* 72 F.3d 717, 724-725 (9th Cir. 1995) (citing *United States v. Garza-Juarez*, 992 F.2d 896, 912 (9th Cir. 1993)).  The use of imperfect entrapment should, however, be limited.  *United States v. Dickey*, 924 F.2d 836, 841 (9th Cir. 1991).

The facts in defendant's case do not support a downward departure based on imperfect entrapment.  To the contrary, defendant's case is a striking example of a case where a predisposed defendant was actively *discouraged* from engaging in the underlying criminal conduct.  The touchstone for determining whether a downward departure is warranted is whether there is "*aggressive* encouragement of wrongdoing."  *McClelland*, 72 F.3d at 725 (emphasis added).  Throughout the case, defendant has claimed, often incorrectly, that his case involves a number of unique factors that warrant special consideration by the Court: his age; the government's decision not to notify his parents after the investigation had begun; the protected nature of defendant's radical and violent writings; the Bill Smith emails; and defendant's many personal issues, including his purported struggle with his religious identity and issues with his parents.  None of these factors speak to any uniquely aggressive encouragement of wrongdoing by the undercover agents and thus are totally irrelevant to any question of imperfect entrapment.

The factual inquiry related to imperfect entrapment is confined to whether the undercover agents encouraged the criminal conduct.  They did not.  Within minutes of their initial contact,

**Government's Sentencing Memorandum**                                              **Page 23**

defendant said that he wanted to become "operational" and put an explosion together.  (PSR ¶¶ 85-86.)  This decision was not encouraged by Youssef and Hussein, but rather was a by-product of defendant's longstanding commitment to violent jihad.  (PSR ¶¶ 95-96.)  Defendant then selected the target.  (PSR ¶ 97.)  During the August 19 meeting, defendant was repeatedly discouraged from going through with his plan.  (PSR ¶¶ 99, 103.)

Defendant's commitment to the criminal plan and to martyrdom was so steadfast that agents had to aggressively discourage him from conducting a martyrdom operation.  (PSR ¶ 107.)  As November 26, 2010 drew near, defendant never displayed any reluctance to commit the criminal plan he devised.  Rather, he remained increasingly focused on the attack.  In fact, defendant took a number of steps in furtherance of the plan.  On November 4, 2010, he enthusiastically took part in a test detonation of a smaller bomb.  (PSR ¶¶ 121-124.)  Finally, on November 26, 2010, defendant required no encouragement, aggressive or otherwise, to commit the offense.  After driving past a person who defendant believed to be his own mother, defendant proceeded, undeterred, to Union Station where he excitedly—and repeatedly—attempted to detonate the bomb.  (PSR ¶¶ 139-140.)

### C.    History and Characteristics of the Defendant

#### i.    Defendant's Background

There are no salient characteristics or events in defendant's background that support a reduction in sentence under 18 U.S.C. § 3553(a).  In many respects, the defining characteristics of defendant's background—a supportive family, the absence of any criminal history, no evidence of profound mental illness or psychosis, above-average intelligence—are aggravating factors that this Court should consider in fashioning an appropriate sentence.  Simply put,

defendant possesses more ability and has been given more opportunities to succeed than many young men that come before this Court, yet he chose to embrace an ideology and a criminal scheme that led him to attempt to destroy thousands of innocent lives.

There are a number of factors in his background that defendant may rely upon in encouraging this Court to impose a sentence that is less than life.  The divorce of defendant's parents, while undoubtedly sad and upsetting, is not so remarkable that it warrants a downward departure.[8]  Similarly, defendant's age has frequently been cited by defendant as a factor that somehow mitigates the underlying conduct.  While defendant was 19 years old when he committed the crime, age alone is not a compelling mitigating factor.  *See* USSG § 5H1.1 (providing that age may be relevant only if it distinguishes the case from "typical cases").  As discussed further herein, many defendants who have sought to commit similar terrorism crimes are young.  More pointedly, according to a defense witness who interacted with defendant in the fall of 2009 and testified at trial, defendant had a very high level of self-motivation; a high level of intellect; and a high level of maturity, initiative and personal drive.  Defendant exhibited desire, ability, strength, and resiliency.  (Trial Testimony of Earlean Wilson Huey, Tr. 2402, Jan. 19, 2013.)

Defendant may also claim that use of alcohol and controlled substances warrants a further downward departure.  Defendant's use of alcohol and drugs played no role in his attempt to detonate a weapon of mass destruction.  To the contrary, it appears that defendant was

---

[8]  The U.S. Census Bureau estimates that one-third of all children in the United States in 2011 did not live with both parents.  *See* U.S. Census Bureau, Dep't of Com., *Families and Living Arrangements, Living Arrangements of Children*, Table CH-1 (Nov. 13, 2012), http://www.census.gov/hhes/families/data/children.html.

**Government's Sentencing Memorandum**                                    **Page 25**

completely sober during his interactions with Youssef and Hussein, and there is no evidence that he suffers from any long-term cognitive deficiencies because of substance use.  In comparison to many defendants who appear before this Court, defendant's use of alcohol and controlled substances was relatively mild—indeed, entirely recreational—and does not warrant any departure.  (PSR ¶¶ 215-217.)

### ii.     Defendant's Proffer Statements

Defendant provided the government with information through a series of four proffer statements.  The Court was briefed on the substance of these proffers both pre-trial and during trial.  The issue before the Court at that time was whether defendant's legal defense at trial was inconsistent with specific statements that defendant made during the proffers.  The government has taken the defendant's proffers into account in its recommendation and respectfully suggests that the value of the information does not warrant a significant downward departure.

### D.     A Lengthy Sentence Is Necessary Based upon the Crime Committed.

### i.     The Seriousness of the Offense

The sentence imposed by this Court must fit the crime committed and reflect its seriousness.  In this case, defendant believed he was going to maim and kill thousands of people by detonating a bomb.  He did not know the bomb was inert.  He fully expected murder and mayhem when he dialed twice in attempting to detonate the bomb.  Remarkably, however, he was calm and completely at peace with the prospect of committing such a horrific act.  The seriousness of the offense in this case is unique.  Defendant wanted to carry out an act of terrorism that would maximize human carnage during a civic celebration.  Defendant's motivation to commit this remarkable act was well established prior to his first meeting with the

**Government's Sentencing Memorandum**                                    **Page 26**

UCEs.  The punishment should fit the crime, and should the Court find that a variance from the Guidelines is appropriate, a sentence of 40 years—and no less than 40 years—would be an appropriate sentence for this defendant and the crime he intended to and did commit.

### ii.    Protection of the Public and Deterrence

The only way to effectively protect the public from defendant is to impose a lengthy prison sentence.  Defendant's desire to kill was not impulsive or poorly planned.  It was chillingly conceived over a four-month period and has its roots in a mindset defendant embraced from the age of fifteen.  (PSR ¶¶ 95-96.)  The notion that defendant could, immediately after arrest, suddenly abdicate a violent ideology he so long embraced and recently acted upon defies common sense.  Indeed, a defendant motivated by radical Islamic ideology is less amenable to deterrence than an individual who is not.  (*See* Bruce Hoffman, *Inside Terrorism* 127-28 (2005), "Traditional counterterrorism approaches and policies may not be relevant, much less effective, in the face of religious terrorism. . . . given both the religious terrorists' fundamentally alienated worldviews and their often extreme, resolutely uncompromising demands.").

 Defendant has stated that he has renounced violence and his actions.  (PSR ¶¶ 150, 152.) Therefore, defendant contends, he no longer poses any future danger to society.  The government hopes that defendant's statement regarding his rehabilitation is true, but there is simply no credible evidence to support such a conclusion at this point in time.  The mindset on which defendant's decision to murder thousands of people rested was carefully thought out over a lengthy period.  It is not likely that it would change after a brief period in custody.  Defendant's well-documented deception of his family and friends further undermines any self-reported claim regarding his future dangerousness.  In the two years leading up to the attempted attack,

**Government's Sentencing Memorandum**                                    **Page 27**

defendant largely succeeded in concealing the truth from those who claimed to know him best. While the government hopes defendant has changed, there is little evidence to sustain such optimism. A lengthy sentence is justified because the Court cannot simply take defendant's word for it—especially given the nature of this defendant and his crime.

A significant sentence is also needed to deter others from committing similar acts of planned violence. *See United States v. Blixt*, 548 F.3d 882, 891 (9th Cir. 2008) (affirming sentence in which district court considered need to deter others from committing identity theft); *United States v. Zakhor*, 58 F.3d 464, 466 (9th Cir. 1996) (noting Sentencing Commission's mandate includes creating policies that consider the "deterrent effect a particular sentence may have on the commission of the offense by others."). There is no question that citizens have a right to express and hold unpopular views, or views that are contrary to those of their government. Our democratic system encourages just such dissent. What cannot be tolerated, however, is the individual who allows his personal views to consume him to such an extent that he believes that violence is an acceptable means of making his point. For the other people in this country who may disagree with the policies of the United States, the sentence imposed should be lengthy enough to deter others from using violent means to express their views.

**E.     The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants**

In cases where defendants have attempted to detonate weapons of mass destruction under similar circumstances, courts have imposed sentences ranging from 23 years to life imprisonment. As noted above, the defendant tried to detonate a massive bomb that he hoped would murder *en masse* hundreds of families who were simply celebrating the start of the holiday season. His horrific conduct places him in the same category as other terrorists who

**Government's Sentencing Memorandum**                                                    **Page 28**

sought to kill on a mass scale.  Three defendants were sentenced to life imprisonment: the "Times Square bomber" Faisal Shahzad,[9] the "Christmas Day bomber" Umar Farouk Abdulmutallab,[10] and Khalid Aldawsari.[11]  Although defendant did not construct the bomb that he sought to detonate, his intent was the same as Shahzad and Abdulmutallab—namely, to kill as many men, women, and children as he could.  Although he never trained at a terrorist training camp, he subscribed to the same violent ideology and maintained a similar commitment to murder.  Indeed, defendant remained steadfast in his desire to kill despite the undercover officers' attempts to discourage him from committing the attack.  While the FBI did assist in

---

[9]  *See United States v. Shahzad*, 1:10-CR-00541-MGC (S.D.N.Y. 2010), a case where a 30-year-old defendant was convicted of violating § 2332(a) and other terrorism-related statutes for attempting to detonate a car bomb at Times Square in New York City.  Shahzad was a naturalized United States citizen who had received explosives training from terrorists affiliated with the Tehrik-e-Taliban, a militant extremist group in Pakistan.  Upon his return to the United States, Shahzad acquired the necessary components to construct his bomb and researched his target.  At his first appearance after his indictment, Shahzad pled guilty to a ten-count indictment.

[10]  *See United States v. Abdulmutallab*, 2:10-CR-20005 (E.D. Mich. 2010), a case in which a 23-year-old defendant attempted to detonate a bomb hidden in his underwear while on board a flight bound for Detroit, Michigan, on December 25, 2009.  Had the bomb successfully detonated, all 289 passengers and crew aboard the airplane would have been killed.  At the time of his arrest, Abdulmutallab was a 23-year-old Nigerian national who had previously trained in Yemen at a terrorist training camp run by al Qaeda in the Arabian Peninsula, and had been tasked to commit the attack by Anwar al-Aulaqi.  On the second day of trial, Abdulmutallab pled guilty to an eight-count indictment.

[11]  *See United States v. Aldawsari*, 5:11-CR-00015 (N.D. Tex. 2011), a case where a defendant was convicted of violating § 2332(a).  At the time of his arrest, defendant Aldawsari was a 20-year-old Saudi national with a student visa living in the United States.  Law enforcement became aware of defendant after learning that he ordered chemicals from a North Carolina chemical company.  An investigation soon revealed that the defendant was trying to obtain other chemicals to use on an undetermined target for an attack in the name of violent jihad.  In addition, he possessed instructions, plans, and tools that could be used to combine the chemicals.  In June 2012, Aldawsari was convicted after a trial.

**Government's Sentencing Memorandum**                                        **Page 29**

providing him with the means to effectuate the attack that he planned, that fact alone does not substantially diminish defendant's culpability because it was ultimately his choice to detonate the bomb—which he eagerly attempted to do.

There are a series of other cases involving attempted § 2332(a) violations that were resolved through guilty pleas, or in at least one case pursuant to a cooperation plea agreement, and which resulted in sentences ranging from 23 to 35 years.[12]  The government submits that the defendants in these cases should not be considered to be similarly situated to defendant.  In those

---

[12]  *See United States v. Nafis*, 1:12-CR-00720 (E.D.N.Y. 2012) (sentencing a 21-year-old Bangladeshi national, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at the Federal Reserve Bank of New York for the express purpose of causing economic damage, to 30 years' imprisonment after pleading guilty pursuant to a plea agreement; *United States v. Khalifi*, 1:12-CR-00037-JCC (E.D. Va. 2012) (sentencing a 28-year-old Moroccan national, who attempted to conduct a suicide attack on the U.S. Capitol using a suicide bomb vest and automatic weapon (that unbeknownst to him were inert), to 30 years' imprisonment after waiving indictment and pleading guilty pursuant to a plea agreement); *United States v. Hassoun*, 1:10-CR-00773 (N.D. Ill. 2010) (sentencing a 22-year-old Lebanese legal permanent resident, who attempted to detonate a backpack bomb (that unbeknownst to him was inert) that he had deposited in a trash can outside of a sports bar located in the vicinity of Wrigley Field, to 23 years' imprisonment after pleading guilty pursuant to a cooperation agreement); *United States v. Martinez*, 1:10-CR-00798-JFM (D. Md. 2010) (sentencing a 21-year-old defendant, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at a military recruiting center and expressly stated that he did not want to kill civilians, to 25 years' imprisonment after pleading guilty pursuant to a plea agreement); *United States v. Finton*, 3:10-CR-30215-DRH (S.D. Ill. 2010) (sentencing a 29-year-old convicted felon with a history of bipolar personality disorder, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at a federal building and expressed concerns about targeting civilians, to 28 years' imprisonment after pleading guilty to a plea agreement); *United States v. Smadi*, 3:09-CR-00294-M (N.D. Tex. 2009) (sentencing a 19-year-old Jordanian national with a history of schizophrenia and abuse as a child, who attempted to detonate a truck bomb (that unbeknownst to him was inert) at an office building with the intent to inflict economic and commercial damage on the United States, to 24 years' imprisonment following his guilty plea to a plea agreement); *United States v. Shareef*, 1:06-CR-00919 (N.D. Ill. 2006) (sentencing a 22-year-old defendant, who attempted to purchase from a UCE a handgun and four grenades (that unbeknownst to him were inert) that he intended to detonate at a local shopping center, to 35 years' imprisonment following his guilty plea without a plea agreement to attempted use of a weapon of mass destruction).

cases, the defendants accepted responsibility and pled guilty.  Moreover, defendant's conduct was appreciably more egregious in several important respects given his zeal to attack a purely civilian, non-commercial target using a large-scale truck bomb.[13]

The government acknowledges that the Court could find that this defendant lies somewhere in between.  His conduct is arguably less culpable than those sentenced to life, especially in the cases involving Shahzad and Abdulmutallab.  However, the government's strong position is that defendant should not be given the credit afforded to those who took responsibility by pleading guilty or who entered into cooperation agreements with the government.

## IV.    Government's Recommendation

The government agrees with the PSR that the total offense level is 43, the defendant's Criminal History Category is VI, and the resulting guideline range is life.  However, there are factors present in this case based upon which the Court could find that a variance from the Guidelines range of life imprisonment is appropriate pursuant to 18 U.S.C. § 3553(a).  Should the Court determine a variance from the Guidelines is warranted, the United States asks that the

---

[13]  There are also a significant number of cases that involve arguably similar terrorism-related conduct but not charges of violating 18 U.S.C. § 2332a(a).  These cases are distinguishable and not instructive in informing the Court regarding appropriate, comparable sentences under 18 U.S.C. § 3553(a)(6).  To the extent defendant seeks to rely on such cases in its sentencing argument, the government will advise the Court of the distinguishing details of those cases at the sentencing hearing or in a separate supplemental filing prior to sentencing.  In addition, in *United States v. Cromitie, et al.*, 7:09-CR-00058-CM (S.D.N.Y. 2009), the defendants were convicted after a jury trial and received 25-year sentences.  The case involved the attempted bombing of a local synagogue and a plot to shoot stinger missiles at aircraft at Stewart Air Force Base.  That case is distinguishable from the instant case because of the nature of the Confidential Human Source's conduct in that matter.  The government will be prepared to address those distinguishing characteristics should the Court so desire.

**Government's Sentencing Memorandum**                                                    **Page 31**

Court sentence defendant to 40 years' imprisonment followed by a life term of supervised release.  The United States respectfully submits that a sentence of less than 40 years of imprisonment would vary inappropriately from the advisory Guidelines sentence in this case and is not warranted after taking into account all of the factors in Section 3553(a).

Dated this 23rd day of August 2013.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney


*s/ Ethan D. Knight*
ETHAN D. KNIGHT, OSB #99298
PAMALA R. HOLSINGER, OSB #89263
RYAN W. BOUNDS, OSB #00012
Assistant United States Attorneys
(503) 727-1000

**Government's Sentencing Memorandum**                                    **Page 32**