**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
steve_sady@fd.org
**Steven T. Wax**
**Federal Public Defender**
steve_wax@fd.org
**Lisa Hay**
**Assistant Federal Public Defender**
lisa_hay@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon  97204
503-326-2123 Telephone
503-326-5524 Facsimile

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:10-cr-00475-KI |
| Plaintiff, | MEMORANDUM IN SUPPORT OF SECOND MOTION FOR A NEW TRIAL |
| v. | |
| **MOHAMED OSMAN MOHAMUD,** | |
| Defendant. | |

## Introduction

Government conduct, including surveillance activity, was central to the entrapment defense that was presented at trial. Evidence of additional surveillance would have been relevant and helpful

**PAGE 1    MEMORANDUM IN SUPPORT OF SECOND MOTION FOR A NEW TRIAL**

to the defense to support its arguments with respect to both the predisposition and inducement prongs, especially in the context of massive governmental activity focused on a confused and manipulable teenager. In addition, there was a sharp dispute about the nature and integrity of the investigation itself. Evidence of additional surveillance likely would have enabled the defense to impeach the government's narrative with respect to the propriety of the investigation. Therefore, a new trial is warranted to secure the fair trial rights guaranteed by cases such as *Crane v. Kentucky*, 476 U.S. 683 (1986), *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

**A.      A New Trial Should Be Granted Because The Government Withheld Evidence That Was Central To The Entrapment Defense.**

At trial, the defense presented a narrow theory of entrapment: Mohamed was not predisposed to, and was induced into, attempting to use a weapon of mass destruction *in the United States*. This argument was based on *Jacobson v. United States*, 503 U.S. 540, 549-51 & n.3 (1992) (the government must prove beyond reasonable doubt that a defendant was predisposed to commit the "crime charged"). The withheld evidence at issue – whether the fact of additional surveillance, the scope of that surveillance, or the evidence generated by that surveillance – was materially relevant and helpful to the defense on both the predisposition and the inducement prongs of the entrapment defense.

With respect to predisposition, the defense argued that an individual predisposed to use a weapon of mass destruction domestically would have taken certain steps that would be indicative of that mentality. For example, an individual predisposed to bomb Pioneer Square (or elsewhere in the United States) might research domestic target locations or visit web sites to learn bomb-making skills; he might take steps to finance such an attack, accumulate necessary material, or recruit like-

minded confederates; he might, at the least, express such a desire in private communications or even on social networking sites. In this age of technology and social media, the defense argued that, if such evidence existed, somebody who had total access to Mohamed's electronic communications and activities would have found it.

As a practical matter, the defense's use of government surveillance on the issue of predisposition faced two basic hurdles: first, the defense was trying to prove the negative, that Mohamed was not predisposed; and second, the defense was largely reliant on the government to supply the necessary evidence to prove that negative, given that Mohamed did not scrupulously preserve and document all his activities and communications during the relevant time frame. Ultimately, the crux of the dilemma in proving the negative was to establish that "absence of evidence was evidence of absence" – because the government surveillance did not generate evidence of such planning activities, the jury should conclude that such activities did not, in fact, occur. This inference would be substantially strengthened to the extent the defense could show that the government surveillance was so pervasive in scope that it likely would have located any such activity had it actually occurred. Thus, any additional surveillance that demonstrated absence of evidence would be very probative as evidence of absence of predisposition.

With respect to inducement, the defense argued that government surveillance activities allowed agents to gain an incredibly intimate understanding of Mohamed that was then used to tailor the sting operation in a way that would maximize the likelihood that he would carry through with the eventual plan. Whether this inducement was through exploiting known vulnerabilities, such as Mohamed's confusion about his religion and need for a father-figure, or whether it was by

mimicking language found in earlier communications, any evidence of additional government surveillance was necessary to allow the jury to fully assess the government's conduct.

The § 702 surveillance at issue was therefore relevant and helpful to the defense under *Brady* to the only issue at trial – whether or not Mohamed was entrapped into committing the crime charged. The defense consistently stressed the importance of government surveillance as evidence necessary to present a complete defense. Nonetheless, the government failed to provide the required pretrial notice of the additional § 702 surveillance. Moreover, the massive scope of government surveillance activities revealed by the Snowden leaks – both as to the § 702 activities and other programs – would have been fruitful for the defense because it would have strongly supported the predisposition argument (because the more surveillance the better when trying to prove a negative), and it would have cast further doubt on the propriety of the government's conduct, which is relevant to inducement.[1]

The new fact of the violation of the FISA notice statute also affects defense trial strategy. In a new trial, in light of the new information, the calculation regarding introducing evidence of government overreaching changes. The value of existing evidence of the illegal non-FISA computer search, and the Attorney General's violation of the regulations protecting against prejudicial pretrial publicity, would outweigh the downsides of introducing such evidence when used in conjunction with the further evidence of a clear statutory violation by the government.[2] Finally, as described

---

[1] Government conduct is also one of the enumerated factors to consider in the predisposition analysis, so the additional evidence would also be relevant and helpful to the predisposition argument in a second way.

[2] Further, knowledge of that conduct was necessary to allow defense counsel to assess the validity of, and argue, a Motion to Dismiss for Outrageous Government Conduct. *See United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003).

**PAGE 4    MEMORANDUM IN SUPPORT OF SECOND MOTION FOR A NEW TRIAL**

below, the withheld evidence of surveillance potentially would have cast doubt on the veracity of government witnesses' trial testimony.

**B.     A New Trial Should Be Granted Because The Government Withheld Evidence That Could Have Impeached Critical Government Witnesses And Their Collective Narrative About The Course Of The Investigation.**

Through various FBI witnesses, the government presented a narrative of the case intended to put the investigation above reproach and to counter the defense claim that the FBI "went too far." CR 467 at 2598.  For example, the government painted a reasonable picture of the onset of the investigation of Mohamed by claiming that he was not investigated as a juvenile and not before his father called the FBI.  *See, e.g.*, CR 446 at 1434-39 (SA DeLong testimony); CR 456 at 407 (SA Trousas testimony).  Continuing with this reasonable and above-board theme, the government suggested that the electronic surveillance of Mohamed was properly supervised by a neutral judicial officer by referring to such activities as "court-authorized."  *See, e.g.*, CR 446 at 1442 (SA DeLong testimony); CR 446 at 1499 (SA Dodd testimony).

With respect to the onset of the sting operation itself, the defense argued that the timing raised questions about the propriety of the government's conduct – specifically, that the sting operation began immediately after the FBI had prevented Mohamed from flying to Alaska for gainful employment, an artificial construct created by the government that the undercover agents then exploited.  The government countered this argument with Special Agent Trousas, who justified the timing of events by stating the FBI had "grave concerns" and needed to "speed up . . . the undercover operation" due to the belief that Mohamed may have received some electronics from Amro Al-Ali. CR 456 at 351-52.

If the defense had had knowledge of the extent of the government's surveillance activities and capacities, it could have challenged this assertion by arguing that the government would have known of such events had they occurred, and that the purported justification offered by Agent Trousas was a post-hoc rationalization to defend against the entrapment claim because, of course, there were no electronics. Depending on the nature and circumstance of the undisclosed surveillance now at issue, it is highly likely that the defense would have been able to impeach government witnesses' characterization of the investigation, and thereby cast doubt on the credibility of those witnesses. Further, there were substantive issues – such as whether Amro Al-Ali was correctly characterized in the Interpol Red notice and what the government knew about the notice – that were fiercely contested and of utmost importance in the case. These issues would have been informed by revelations of ubiquitous government surveillance and would have allowed the defense to challenge the propriety of the government's sting operation.

**Conclusion**

While the defense has attempted to present some scenarios above to alert the Court to meritorious arguments about the effect that the withheld evidence had on the trial, the reality is that no such defense guess-work can accurately present the issues or arguments. In the lead-up to trial, defense counsel obviously made tactical decisions about how to proceed based on the known evidence. Similarly, which witnesses to call and what questions (or even what general areas of questioning) to ask of government witnesses depended on the defense's understanding of the evidence. It is, therefore, impossible for the defense to articulate exactly how the unknown evidence at issue and the unknown surveillance might have affected the trial. Indeed, there are a myriad of ways in which the unknown evidence now at issue, and the unknown surveillance that generated it

(or other surveillance), might have been relevant and helpful to the defense – whether to affirmatively support the entrapment defense or to impeach government witnesses' accounts of the integrity of the investigation and their own actions.  The withholding of such important evidence violated *Brady* and the due process right to present a complete defense in this very close case.  Therefore, in light of the arguments above and those made in the initial Motion for a New Trial, this Court should vacate the conviction in the case and grant a new trial.

Dated this 4th day of April, 2014.

/s/ Stephen R. Sady
Stephen R. Sady
Chief Deputy Federal Public Defender

/s/ Steven T. Wax
Steven T. Wax
Federal Public Defender

/s/ Lisa Hay
Lisa Hay
Assistant Federal Public Defender

Mark Ahlemeyer
Research & Writing Attorney

**PAGE 7    MEMORANDUM IN SUPPORT OF SECOND MOTION FOR A NEW TRIAL**