**Stephen R. Sady**
**Chief Deputy Federal Public Defender**
**steve_sady@fd.org**
**Steven T. Wax**
**Federal Public Defender**
**steve_wax@fd.org**
**Lisa Hay**
**Assistant Federal Public Defender**
**lisa_hay@fd.org**
**101 S.W. Main Street, Suite 1700**
**Portland, Oregon 97204**
**503-326-2123 Telephone**
**503-326-5524 Facsimile**

**Attorneys for Defendant**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No.: 3:10-CR-00475-KI** |
| **Plaintiff,** | **REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM** |
| **v.** | |
| **MOHAMED OSMAN MOHAMUD,** | |
| **Defendant.** | |

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... ii

Introduction .................................................................................................................. 1

    A.    The Trial Of This Case Did Not Dispute The Underlying Conduct. ..................... 2

    B.    Mohamed's Early Letter Of Remorse And Apology, Offers To Take Remedial Steps, Multiple Proffer Sessions, And Extensive Evidence Of Reform Contradict The Government's Sentencing Position. ............................... 4

    C.    The Government Relies On An Incomplete Definition Of Acceptance Of Responsibility And Cases That Are Distinguishable From The Present Case. ................................................................................................................ 6

    D.    The Government's Factual Account, Although Largely Undisputed, Skews Some Facts To Exaggerate What Mohamed Knew When.................................... 7

    E.    The Government's Reliance On Non-"Sting" Cases Should Be Rejected And, To The Extent Any Other Case Is Informative, The Relatively Reduced Sentences For Persons Involved In A Range Of Terror-Related Stings Are More Useful. ............................................................................... 9

    F.    Under The Supreme Court Authority On Individualized Sentencing, A Sentence To Ten Years Incarceration Is Sufficient But Not Greater Than Necessary To Accomplish The Purposes Of Federal Sentencing........................ 22

Conclusion ................................................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States,*
   552 U.S. 38 (2007) ............................................................................. 3

*United States v. McClelland,*
   72 F.3d 717 (9th Cir. 1995) ............................................................... 3

## FEDERAL STATUTORY AUTHORITIES

18 U.S.C. § 844(d) .................................................................................. 14

18 U.S.C. § 844(f) ................................................................................... 14

18 U.S.C. § 2155 ..................................................................................... 14

18 U.S.C. § 2339A .................................................................................. 15

18 U.S.C. § 2339B .................................................................................. 15

26 U.S.C. § 5861 ..................................................................................... 15

## ADDITIONAL AUTHORITIES

U.S. Sentencing Guidelines Manual § 3A1.4 ........................................ 21

U.S. Sentencing Guidelines Manual § 3E1.1 cmt. n.2 ............................. 6

**Introduction**

Over fifteen months ago, the defense submitted its sentencing memorandum setting out how, under the Guidelines and under the statutory sentencing factors, a sentence of ten years' incarceration is sufficient but not greater than necessary to accomplish the purposes of sentencing, which is the Supreme Court standard for federal sentences. Since that time, Mohamed has continued his post-offense mitigating conduct at the Federal Detention Center at Sheridan. He continues to recognize completely his terrible words and actions that led to his incarceration. He continues to do all he can to be a better person, reading the likes of Mahatma Gandhi and Nelson Mandela, relating his readings to his situation with his defense team, and staying in close contact with his family. Now that post-trial litigation is completed, this memorandum responds to the government's sentencing brief.

This case is more nuanced than the government's sentencing memorandum suggests. The trial of this case was based on a narrow and difficult question: whether the lawful but extremist views that Mohamed had on November 9, 2009, constituted predisposition to commit the crime charged in the United States when, as the presentence report finds, "there is no evidence that he planned or intended to personally carry out a terrorist attack within the United States prior to his contact" with the undercover agents. The defense fully recognizes the seriousness of the conduct involved, and the defense sentencing recommendations respect the jury's finding, but the government's extreme recommendation is based on a number of premises that this Court should reject:

- The government suggests the Court should not accept Mohamed's recognition of his horrendous words and acts, his apology to the community, and his efforts to atone through multiple complete and detailed debriefing sessions with the government and self-improvement while in jail;

**Page 1   REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

- The government mischaracterizes the imperfect entrapment ground for downward departure, which under Ninth Circuit law requires a trial and involved, in this case, full acknowledgment of the conduct underlying the offense;

- The government leaves out essential language from the standard for determining acceptance of responsibility and relies on distinguishable cases;

- The government asks the Court to use non-"sting" cases as a baseline rather than recognizing that, in virtually all other "sting" cases, the government's involvement led to substantially lower sentences.

The government's recommended sentence fails to adequately account for mitigating factors established by the defense, resulting in its unreasonably harsh sentence recommendation.

## A.    The Trial Of This Case Did Not Dispute The Underlying Conduct.

The government's sentencing memorandum appears to be premised on a misunderstanding of what the trial was about. CR 477 at 1 ("the jury, in convicting defendant, accepted the government's theory of the case: Defendant attempted to kill thousands of people in the name of his distorted and radical view of Islam."). The attempt was never in dispute; the trial was about whether the government's conduct in facilitating that attempt amounted to entrapment. From the outset of this case, the defense has not stepped back from Mohamed's admission that he knowingly and intentionally committed horrendous acts: "The fact that Mohamed pushed the cell phone buttons, believing that a huge explosion would occur, not disputed." RT at 284; *see* CR 245 (Defense Trial Memorandum) at 1 ("He deeply regrets his actions and is humiliated and ashamed for what he said and did. The trial of this case does not involve any dispute that Mr. Mohamud attempted to use a weapon of mass destruction on November 26, 2010 . . ."). The trial involved only the very narrow question of whether the FBI went "too far" in its interactions with Mohamed

Page 2    REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM

because, on November 9, 2009, Mohamed had not planned or prepared to commit the particular crime charged in the indictment in the United States.

There was no question that Mohamed was involved in Islamic extremism before any government contact. The seriousness of the offense, notwithstanding the government involvement, warrants the substantial period of incarceration recommended by the defense.  At the same time, the imperfect entrapment defense – which is premised on the government acting lawfully – calls for substantial mitigation on the issues that the Ninth Circuit recognizes under controlling law as relevant: lack of preparation and planning prior to contact; lack of capability or wherewithal to commit the offense without the government; and the full range of Mohamed's vulnerabilities to government actions that encouraged the offense. CR 478 at 11-29.[1] In contrast, the government claims none of the vulnerabilities – not age, not the decision to keep the parents in the dark, not the protected nature of his writings, not the provocative Bill Smith emails, not Mohamed's struggle with identity – should make any difference. CR 477 at 23. On the contrary, the Court has complete authority, even encouraged authority, to consider these elements of imperfect entrapment as a ground for departure and variance.

The mitigation established by imperfect entrapment focuses only on the defendant. "It has been uniform and constant in the federal tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007). The mitigation supplied by entrapment factors that fall short of a

---

[1] In fact, under controlling Ninth Circuit law, the Court only has authority to mitigate the sentence with a downward departure for imperfect entrapment if the defendant goes to trial and loses. *United States v. McClelland*, 72 F.3d 717, 724-26 (9th Cir. 1995).

**Page 3   REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

complete defense provide information related to the individual defendant and involve no judgment – either congratulatory or critical – of the government agents. A longer sentence is not warranted because Mohamed exercised his Sixth Amendment rights, which, notwithstanding the lawfulness of the government's conduct, put the elements of imperfect entrapment at issue.

**B.      Mohamed's Early Letter Of Remorse And Apology, Offers To Take Remedial Steps, Multiple Proffer Sessions, And Extensive Evidence Of Reform Contradict The Government's Sentencing Position.**

The tone and claims of the government that minimize Mohamed's remorse for his bad conduct and his assistance to the government are inconsistent with the record before the Court. CR 477 at 15-17. Before the trial of this case, Mohamed took elaborate and unprecedented steps that fully and truthfully took responsibility for his conduct and detailed all of his activities. Most tellingly, he provided national security information over four sessions lasting 12 hours and resulting in 41 pages of reports.

Throughout the sessions and afterwards, in response to defense counsel inquiries, the prosecution expressed satisfaction that Mohamed was providing complete and truthful information. And the government tacitly admitted as much when, in a letter to the government of September 19, 2011, the defense asserted without contradiction that Mohamed provided "truthful and complete answers" to all the prosecution questions over the four meetings. As in any debrief, there are some questions generated for the purpose of determining whether the person is supplying full and truthful information: Mohamed consistently passed such tests.

Only now, after trial, does the government seek to minimize the assistance. Mohamed acted in good faith throughout the cooperation. Mohamed has described in truthful detail to the government and to the presentence writer his internet infatuation with Islamic extremism. He extensively and openly responded to all the government's questions. There is no question that he

had an internet identity that justified and supported this country's enemies. But sunlight is an effective disinfectant: after living in the virtual world of jihadi websites and sympathies, then being enamored of the surreptitious encouragement and validation of the government agents, reality burst the bubble. Upon arrest, Mohamed could no longer rationalize actions and objectify victims; in the cold light of day, he saw what he did was repugnant and indefensible.

Contrary to the government's claim, Mohamed's interview with the psychiatric nurse shortly after his arrest reflected his genuine confusion and distress. As the contemporaneous notes reflect, Mohamed was weeping when he expressed his anguish that he had gone from being a college student to being a terrorist. He also admitted to his abuse of mind altering substances and said that he felt suicidal that summer; that he "had no direction"; that the people he thought were al-Qaeda saved his life because "I finally felt like I belonged"; "I felt like they cared for me"; and "They gave me something to do." As anyone who sat through the trial could see, these statements are fully supported by the text messages and recorded meetings. Mohamed clearly admired and adapted to the personas of the undercover agents, the agents repeatedly expressed their love and admiration for Mohamed, and the agents kept him busy with tasks he could accomplish, to their approving reactions. The government's use of the psychiatric nurse's testimony as evidence that he is inadequately remorseful should be rejected. The testimony shows just the opposite.

To the same extent, the government's critique of Mohamed's renunciation statement of December 22, 2010 is misplaced. The statement is a clear and sorrowful admission that his actions were terrible and a public apology for his bad conduct. Further, Mohamed's penitence has been fully documented by psychiatric interviews with Dr. Sageman and Dr. Kinzie, as well as Mohamed's thoughtful and heartfelt letter to the Court. Mohamed has devoted his time in custody to thinking, reading, and making himself a better person, which has consistently reinforced his

rejection of his words and actions that bring him before the Court. The defense of entrapment does not posit that everything is the government's fault and that he is guiltless; on the contrary, he recognizes that the government had legitimate concerns regarding his writings and activities and that, ultimately, he is the one who committed the criminal acts. Notwithstanding that, however, Mohamed has done everything in his power to demonstrate his remorse and renounce his prior words and deeds. Mohamed's post-arrest conduct demonstrates the stark contrast between him and hard-core ideological terrorists the government claims are similar: Mohamed renounced his beliefs and deeds, he cooperated with FBI counter-terrorism agents, he offered to work with the government to steer other youth away from such activities, and he now stands remorseful and apologetic before this sentencing Court.

## C.    The Government Relies On An Incomplete Definition Of Acceptance Of Responsibility And Cases That Are Distinguishable From The Present Case.

Prior to trial, Mohamed took every measure at his disposal to accept responsibility for his bad conduct. The government's argument on acceptance of responsibility is based on a critical omission from the relevant legal standard: the government states that the adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial," while omitting the rest of the relevant sentence "*by denying the essential factual elements of guilt*." *Compare* CR 477 at 14-15 *with* U.S.S.G. § 3E1.1 cmt. n.2. The cases on acceptance of responsibility in entrapment cases recognize that, once the elements of the offense are admitted – "the conduct comprising the offense(s) of conviction" (application note 1(A)) – the defendant's litigation of the entrapment defense does not foreclose the adjustment. The pretrial conduct in the present case included:

- the renunciation and apology of December 22, 2010, which was provided to both the government and the Court before trial;

- the debriefing sessions with the government and its agents in four meetings over 12 hours during the summer of 2011;

- the rehabilitation efforts over the course of his incarceration in reading and thinking about how terrible what he did was and how to become a better person;

- his meetings with the two psychiatrists during which he expressed his remorse and tried to better understand his errors in thinking and to assure nothing like this could happen in the future;

- his offers to the government to make public statements designed to discourage persons with similar vulnerabilities and backgrounds from accepting the arguments of extremist propagandists.

Mohamed has done far more that the minimal recognition of bad conduct that warrants the adjustment, but the two levels should be viewed as a starting point in evaluating the other mitigating factors under § 3553(a). The cases upon which the government relies uniformly involve persons who failed to make the requisite showing of actual remorse and who took actions that contradicted acceptance of responsibility for the conduct involved, primarily by denying the factual elements of guilt.

**D.     The Government's Factual Account, Although Largely Undisputed, Skews Some Facts To Exaggerate What Mohamed Knew When.**

The government's claim that there was "testimony about defendant's relationship and fellowship with known Al Qaeda terrorists" (CR 477 at 3) goes too far in ignoring what was "known" when and by whom. This has been a troubling pattern with respect to the characterization of Mohamed's contacts with Samir Khan and Amro Al-Ali, even though the facts are straightforward and not in dispute.

With respect to Mr. Khan, the evidence established that Mohamed communicated with him by email and contributed to Khan's e-magazine *Jihad Recollections* from February to August of 2009, after Khan had solicited writers on his web site. During that six month period, Khan was

living openly in the United States and was transparent about his First Amendment advocacy of extremist ideology. There has been no evidence presented in this case that Khan was connected to al-Qaeda at that time, nor was *Jihad Recollections*, despite its sympathies, "Al-Qaeda's English language on-line magazine," as the government alleges. CR 477 at 3. Indeed, despite his open advocacy, Khan was apparently not even on the No-Fly list at that point.

Sometime after Mohamed ceased contact with Mr. Khan, Khan boarded an airplane and flew from the United States to Yemen. Around January of 2010, Khan contacted and joined an al-Qaeda offshoot in the Arabian Peninsula. RT 2497-98. Thereafter, he began publishing *Inspire*, which "was the official Al-Qaeda magazine of the Arabian Peninsula, and the first English-language magazine by an Al-Qaeda faction aimed at recruiting individuals directly from the West." PSR ¶ 28. Thus, the government's sentencing memo blurs the timeline. Mr. Khan was not a "known Al Qaeda terrorist" between February and August 2009, and, consequently, *Jihad Recollections* was not "Al-Qaeda's English language on-line magazine." CR 477 at 3. The presentence report correctly distinguishes between *Inspire* and *Jihad Recollections* in terms of content and sponsorship, and correctly notes that Mr. Khan was not a member of al-Qaeda until he left the United States.[2]

The government's discussion of Amro Al-Ali – presumably another "known al-Qaeda terrorist" (CR 477 at 3) – is similarly flawed in terms of the timing of events and what is "known" by whom. The government attempts to link Mohamed's "August 2009 . . . plans to travel to

---

[2] The government's discussion of Mr. Khan's role in an attempted terrorist attack over a year after the final email with Mohamed and his death from a drone strike well after Mohamed's arrest is irrelevant to Mohamed's case because Mohamed had no knowledge at the relevant time of those facts.

Yemen" with the Interpol Red Notice to suggest Mohamed's intentions were concrete and nefarious: "By August 2009, the FBI knew Al-Ali was wanted by the Saudi government, which had identified him as recruiting westerners to serve as foreign fighters for Al Qaeda." CR 477 at 4. There are two problems with this argument. First, the Interpol notice was not issued until October 18, 2009 (PSR ¶ 31), so could not provide the claimed knowledge about Mr. Al-Ali in August of 2009. Second, the government has not established that Saudi Arabia actually "identified" Mr. Al-Ali as an al-Qaeda recruiter in October of 2009. The Interpol notice refers to Mr. Al-Ali and an unnamed "fugitive" but does not clearly state which one was considered a terrorist recruiter. An FBI analyst responsible for processing Interpol Red Notices testified that he was "not sure" which person was being referenced. RT 1426. Dr. Sageman testified that, based on his review of open source material and about 150 intelligence reports, the al-Qaeda recruiter was definitively the unnamed "fugitive" and not Mr. Al-Ali. RT 2467-70. The government offered no contrary evidence that Mr. Al-Ali was the individual identified by Saudi Arabia as an al-Qaeda recruiter.

Mohamed has, from the outset of this case, acknowledged and taken responsibility for the enormity of his own actions. There is simply no need to skew the facts to attribute knowledge and behavior to him that is not borne out by the evidence.

**E.      The Government's Reliance On Non-"Sting" Cases Should Be Rejected And, To The Extent Any Other Case Is Informative, The Relatively Reduced Sentences For Persons Involved In A Range Of Terror-Related Stings Are More Useful.**

The defense relied on precedent discounting comparison of individual cases, which are of "little use in reaching the appropriate sentence." CR 478 at 45. In contrast, the government claims that the offense of conviction makes this case comparable to cases "where defendants have attempted to detonate weapons of mass destruction under similar circumstances." CR 477 at 28.

**Page 9   REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

But the government errs both in comparing individual cases and relying on cases where there was

absolutely no government involvement in the crime – *i.e.*, non-sting cases. In other contexts, the

government has frankly acknowledged that "sting" cases are different. For example, the Seattle

U.S. Attorney's office recently observed in a terrorism "sting" case that the range of sentences in

such cases was between 10 and 30 years:

> Over the last few years there have been numerous prosecutions throughout the
> United States involving attempted and/or disrupted terrorist attacks in the
> homeland. Many of these cases involved the use of undercover law enforcement
> agents and/or confidential informants, and are commonly referred to as "sting"
> cases. The facts of these cases are widely varied, and so are the sentences imposed
> by the courts. . . . As a general matter, the sentences imposed on the lead defendants
> in these other cases range from 30 years down towards 10 years, with the majority
> of the sentences falling somewhere between 20 and 30 years. *See United States v.*
> *El-Khalifi*, 1:12-CR-37 (EDVA) (30 years); *United States v. Finton* 09-CR-30098
> (SDIL) (28 years); *United States v. Martinez*, JFM-10-0798 (D. MD) (25 years);
> *United States v. Cromite* 09-558 (SDNY) (25 years); *United States v. Smadi* 3:09-
> CR-294 (NDTX) (24 years); *United States v. Farooque Ahmed* CR10-414 (EDVA)
> (23 years); *United States v. Amawi*, CR06-719 (20 years); *United States v. Ferdaus*
> CR11-10331 (D. MA) (17 years); *United States v. Douglas Wright* 1:12CR238
> (NDOH) (11.5 years). In a few instances, the lowest level defendants in these cases
> were sentenced to slightly less than 10 years.

Gov't's Sentencing Memorandum at 24-25, *United States v. Abdul-Latif*, No. 2:11-cr-00228 (W.D.

Wash. Mar. 19, 2013) (hereinafter "*Abdul-Latif* Memo"). Unlike here, where the government

claims comparison cases show a range of 23 years to life (CR 477 at 28), the Seattle U.S.

Attorney's office rightfully excluded non-sting cases and recognized that the general sentencing

range is actually between 10 and 30 years.

The two defendants in the Seattle case were charged under the same statute as Mohamed,

although they were charged with conspiracy to use a weapon of mass destruction rather than an

"attempt" because "public safety concerns dictated an earlier arrest" as the defendants "wanted to

obtain machine guns and grenades in advance of their attack for training purposes." *Abdul-Latif*

**Page 10 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

Memo at 25.[3] According to the government, the two defendants conceived of and planned an attack against a military processing station using "fully-automatic weapons, pistols, and fragmentation grenades." Complaint at 9, *United States v. Abdul-Latif*, No. 2:11-cr-00228 (W.D. Wash. June 23, 2011) (hereinafter "*Abdul-Latif* Complaint").

Mr. Abdul-Latif, who had served briefly in the Navy, was 33 years old and had at least two prior felony convictions. *Id*. at 11, 16. He was an admirer of Osama Bin Laden, an advocate of taking action in the cause of jihad rather than just talking, and said "he wanted to die as a martyr in the attack." *Id*. at 12, 14. Abdul-Latif also hoped that the attack would inspire other like-minded individuals to commit similar acts of violence. *Abdul-Latif* Memo at 24 & n.9. In addition to conceiving of the plot, picking and surveilling the target, and creating detailed attack plans, Abdul-Latif was able to finance much of the plot himself, including the purchase of weaponry and transportation costs associated with bringing his co-conspirator to Seattle. *Abdul-Latif* Complaint at 23, 27.

Even though the two defendants were charged under the same statute as Mohamed, acted with similar motivations, and had numerous aggravating factors not present here – including age, criminal background, lack of remorse, and continuing allegiance to a radical ideology – the government did not seek a draconian sentence of 40 years. As to Abdul-Latif, the government argued a 19-year sentence would be appropriate in light of the "extremely serious" charges, the need for deterrence and incapacitation, and the fact that the defendant continued to maintain his "radical ideology":

---

[3] Unlike the defendants in Seattle, Mohamed could not have been charged with a conspiracy because his confederates were both government agents. In *Abdul-Latif*, the government noted that the existence of such a conspiracy was an aggravating factor. *Abdul-Latif* Memo at 25.

**Page 11 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

A lengthy prison term is required in this case to reflect the extremely serious offenses of conviction, and to provide just punishment for these crimes. As far as inchoate crimes go, it is difficult to fathom more serious crimes than these.

The Court's sentence in this case should also be long enough to send a strong deterrent message to other individuals who share Abdul-Latif's radical views and who may consider acting on them. As will be discussed below, this case unfortunately does not stand alone. Over the past few years, there have been many similar cases across the United States in which similar plots have been carried out, attempted, and/or disrupted by the FBI and other law enforcement agencies. As was the case with Abdul-Latif, these other defendants often were inspired by the radical rhetoric of Osama Bin Laden, Anwar al-Awlaki, and other terrorist figures. It is foreseeable that there will be others who attempt similar plots in the future. Indeed, part of Abdul-Latif's goal was to inspire others to commit similar attacks, just as he claimed to be inspired by Nidal Hissan's deadly attack at Fort Hood. The Court should send a strong deterrent message – by imposing a 19-year prison term – in order to dissuade any future attack plots.

A 19-year term of imprisonment is also necessary to protect the public from future crimes by Abdul-Latif. There is every reason to believe that he is a future danger to the community. Abdul-Latif undertook his plot in furtherance of his long-standing and deeply felt radical beliefs. To this day, he has not disavowed the radical ideology that inspired his attack plot, nor has he expressed any meaningful remorse for his conduct, either to the Probation Office, the Court, or to the various mental health professionals who have examined and interviewed him. Based on the evidence in this case, the Court should expect Abdul-Latif to emerge from prison with the same radical and violent ideologies that led him to plan the mass killing at the [military processing station]. A 19-year sentence would best protect the public from Abdul-Latif's potential future crimes.

*Abdul-Latif* Memo at 24. Despite that the guidelines called for "life," the court ultimately sentenced Abdul-Latif to 18 years, and his co-defendant received 17 years. Judgment at 2, *United States v. Abdul-Latif*, 2:11-cr-00228 (W.D. Wash. Mar. 25, 2013); Judgment at 2, *United States v. Mujahidh*, 2:11-cr-00228 (W.D. Wash. Apr. 8, 2013).

In Mohamed's case, the government fails to even acknowledge this local "comparison case" when claiming that similar cases result in sentences from 23 years to life. Likewise, although the government in *Abdul-Latif* noted another similar "sting" case with a 17-year sentence, *United States v. Ferdaus*, the government here simply ignores that case despite the obvious similarities.

**Page 12 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

Mr. Ferdaus was a 26 year old graduate of Northeastern University with a degree in physics. Tr. of Plea Hr'g at 5-6, *United States v. Ferdaus*, 1:11-cr-10331 (D. Mass. Sept. 13, 2012) (hereinafter "*Ferdaus* Plea"). Beginning around 2010, Ferdaus "began planning to commit violent 'jihad' against the United States, which he consider[ed] an enemy of Allah." Complaint at 5, *United States v. Ferdaus*, 1:11-cr-10331 (D. Mass. Sept. 28, 2011) (hereinafter "*Ferdaus* Complaint"). Ferdaus had apparently become radicalized on the internet, and decided to engage in jihad by committing domestic terrorist attacks. *Id*. at 39-40. With the goal of "killing as many 'kafirs' . . . as possible," Ferdaus "extensively planned and attempted to attack the Pentagon and U.S. Capitol Building using large remote controlled aircraft filled with C-4 plastic explosives." *Id*. at 5-6. Ferdaus created "detailed attack plans with step-by-step instructions" and traveled to Washington, D.C. to surveil and photograph his targets. *Id*. at 8. Ferdaus created a false identity which he used to research and acquire necessary materials, and rented a storage unit "to use to build his attack planes and maintain all his equipment." *Id*. at 9. He also "ordered" and eventually received from FBI undercover agents "25 pounds of C-4 explosives, 6 fully-automatic AK-47 assault rifles (machine guns), and grenades." *Id*. at 8-9. He "envisioned causing a large 'psychological' impact by killing Americans, including women and children," and "expressed excitement at the prospect of gunning down politicians at the Capitol Building." *Id*. at 10.

Mr. Ferdaus' planning and research were underway prior to his contact with government agents, and he intended his explosives to "take out a target that's like three football fields, say a radius, of one or two blocks." *Id*. at 12. In the event that Ferdaus was unable to acquire "high powered explosives," he "was considering building his own improvised explosive device . . . and using such a device to attack a subway station." *Id*. at 13. Even though the undercover agents told Ferdaus "more than 25 times that he did not have to go through with . . . his plan to attack the

Page 13 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM

Pentagon and U.S. Capitol Building," that "there was no shame in backing out," and that he "could turn back at any time," Ferdaus continued forward with his plan. *Ferdaus* Plea at 31.

In addition, Ferdaus "designed, built, and supplied more than 7 mobile phones, each of which [he] had modified to act as an electrical switch for an improvised explosive device ('IED')." *Ferdaus* Complaint at 6. Ferdaus provided these "detonation devices" to undercover agents, who he believed were members of al-Qaeda, for the purpose of using the devices to kill American soldiers stationed overseas. *Id.* at 6-7. Ferdaus anxiously awaited word from the agents about the efficacy of his detonation devices, and "was visibly excited" when told that his work had resulted in the deaths of numerous Americans. *Id.* at 7, 34. Ferdaus also told the agents "he was interested in traveling to Afghanistan and assisting the 'overseas brothers' in a technical manner, whether by teaching physics or making something with technology." *Id.* at 17. In the meantime, Ferdaus offered to "'write instructions' or make a video on how to construct the cell phone detonation devices using different types of phones." *Id.* at 38. He ultimately did make such an instructional video to further the use of IEDs against Americans overseas. *Id.* at 40-41.

The government chose not to charge Mr. Ferdaus under § 2332a, although his plan to fly model airplanes with C-4 explosive into government buildings fit the elements of an attempt to use a weapon of mass destruction.[4] Instead, he was charged with attempting to damage and destroy a Federal building by means of an explosive (18 U.S.C. § 844(f)), attempting to damage and destroy national-defense premises (18 U.S.C. § 2155), receipt of explosive materials (18 U.S.C.

---

[4] During Mr. Ferdaus' plea hearing, the government stated it would have been able to prove beyond reasonable doubt that Mr. Ferdaus "extensively planned and took substantial steps to damage and destroy the Pentagon and U.S. Capitol Building using remote-controlled aircraft filled with C-4 plastic explosives." *Ferdaus* Plea at 22.

**Page 14 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

§ 844(d)), receipt and possession of non-registered firearms (26 U.S.C. § 5861), attempting to provide material support to terrorists (18 U.S.C. § 2339A), and attempting to provide material support to a designated foreign terrorist organization (18 U.S.C. § 2339B). Ferdaus pled guilty with an agreed sentence to 17 years in prison. Judgment at 2, *United States v. Ferdaus*, 1:11-cr-10331 (D. Mass. Nov. 1, 2012).

Ferdaus' case further highlights the inequity of the government's selected "comparison cases" and its overall sentencing request of 40 years. There were numerous aggravating factors present in that case that do not apply to Mohamed, including that Ferdaus was already planning the specific plot he was arrested for prior to government contact and that he had the technical wherewithal to implement his plan. That the U.S. Attorney's office in Massachusetts chose to charge Ferdaus under different statutes should not preclude this Court from recognizing that the government recommended that more culpable terrorism defendants than Mohamed receive sentences less than half of what the government recommends here.

Ultimately, however, as the defense argued in its sentencing memorandum, fact-to-fact comparisons are largely inappropriate here because each individual defendant is unique and the government's involvement in the form of "sting" operations is also unique. Indeed, the government itself noted comparing cases was a "fool's errand" in requesting a 19-year sentence in *Abdul-Latif*, which it viewed as "well within the heartland of sentences" in similar terrorism cases:

> Although it is appropriate for the Court to consider the range of sentences that have been imposed in some of these past cases, any effort to compare the instant case to any one particular case is a fool's errand, given the vast differences in the facts and the backgrounds of each defendant. However, when viewing the sentences imposed in the other cases from a more global perspective, a sentence of 19 years in the instant case appears reasonable and appropriate, and is well within the heartland of sentences imposed in the other cases.

**Page 15 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

*Abdul-Latif* Memo at 25. This problem is especially acute when the supposed "comparison cases" are selectively chosen to support a desired outcome, as here where the government chooses non-"sting" cases to draw its comparisons.

In asking for a 19-year sentence in *Abdul-Latif*, the U.S. Attorney's office limited its "comparison cases" to only those where government agents interacted with a defendant in the form of a sting operation. This makes especially good sense in the present case where the scope of the activity post-dated contact with the agents and where, instead of grown men, the initial face-to-face contact was with an 18-year-old with no driver's license who was still wearing braces. In contrast, the government here injects non-sting cases into the analysis to reach the "life sentence" ceiling it argues is part of the range of sentences this Court should consider. The cases do not support the government's position on comparability.

The three cases highlighted by the government where a defendant received a life sentence actually support the defense's argument that such a sentence is inappropriate here.[5] None of the cases involved a sting operation and, thus, did not raise the question of what a defendant would have done absent the influence of government agents. Two of the defendants, Mr. Shahzad and Mr. Abdulmutallab, trained at foreign terrorist camps and worked closely with those organizations to carry out their attacks. The men were arrested after their respective bombs – one in a vehicle parked at Times Square in New York City, and the other on a commercial airliner en route to Detroit, Michigan – failed to detonate as planned. Both men showed no remorse for their actions

---

[5] The three cited cases are: *United States v. Shahzad*, 1:10-cr-00541 (S.D.N.Y. 2010); *United States v. Abdulmutallab*, 2:10-cr-20005 (E.D. Mich. 2010); *United States v. Aldawsari*, 5:11-cr-00015 (N.D. Tex. 2011).

**Page 16 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

or renunciation of their radical and violent beliefs, and both men reaffirmed their desires to attack the United States during their sentencing hearings.[6]

The third defendant, Mr. Aldawsari, was radicalized overseas as a youth and specifically sought to come to the United States as a student as a cover for his true intentions. Aldawsari had the wherewithal to construct and detonate a bomb that would target United States citizens and, at the time of his arrest, he "was one ingredient away from being able to build a powerful bomb."[7] He was arrested after a chemical supply company alerted law enforcement to Aldawsari's suspect purchase order. As with the other defendants, Aldawsari does not appear to have renounced his extremist ideology.

Even Mr. Ressam, the al-Qaeda operative and so-called millennium bomber, whose case involved nothing remotely like a sting, did not receive a life sentence after he was convicted at trial. As the government notes, Ressam received a 37-year sentence despite being "convicted of plotting to detonate a massive bomb at Los Angeles International Airport." CR 477 at 19-20 & n.7. Ressam had trained extensively at terrorist camps in Afghanistan and received instruction "in light weapons (handguns, machine guns, and rocket launchers), the making of explosive devices (including TNT, C4 plastic explosives, and black plastic explosives), sabotage, the selection of

---

[6] Scott Shifrel et al., *Remorseless Times Square car bomber Faisal Shahzad warns: 'We will be attacking the U.S.,'* N.Y. Times, June 22, 2010; Department of Justice Press Release, Faisal Shahzad Pleads Guilty in Manhattan Federal Court to 10 *Federal Crimes Arising from Attempted Car Bombing in Times Square* (June 21, 2010); Nick Bunkley, *Would-Be Plane Bomber Is Sentenced to Life in Prison*, N.Y. Times, Feb. 16, 2012; Department of Justice Press Release, Umar Farouk Abdulmutallab Sentenced to Life in Prison for Attempted Bombing of Flight 253 on Christmas Day 2009 (Feb. 16, 2012).

[7] Federal Bureau of Investigation News Release, Stopping a Would-Be Terrorist Who was *One Chemical Away from Building a Bomb* (Dec. 4, 2012).

**Page 17 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

targets, urban warfare, tactics (including assassinations), security, and the use of poisons and poisonous gas." *Ressam*, 679 F.3d at 1072. Ressam and five others in his terrorist "cell" were tasked with carrying out an attack against an American airport or consulate. *Id*. at 1073.

When the other cell members were held back due to immigration problems, Ressam continued on alone and was eventually arrested trying to enter the United States with explosive materials "capable of producing a blast forty times greater than that of a devastating car bomb." *Id*. After he was convicted at trial, Ressam cooperated with the government, but later withdrew that assistance. The government argued that Ressam "provided no indication that he has repudiated the goals of terrorists to inflict harm on the United States" and that his refusal to cooperate "affirmatively help[ed] identified terrorists escape responsibility for their actions." *Id*. at 1081.

The government now asks for Mohamed to receive a longer prison sentence than Mr. Ressam, an unrepentant, highly trained, self-motivated and dedicated terrorist who was part of an al-Qaeda cell and attempted to enter the U.S. with a carload of explosive materials. This is despite the fact that, in contrast to that case, the government has expressly acknowledged in pleadings that the would-be bombing in this case would never have occurred without the FBI's involvement. CR 241 at 8 ("Defendant was not the kind of lone-wolf extremist who could have purchased and built an 1800-pound truck bomb on his own, however."). When Mohamed's actual conduct is fairly compared to other terrorism cases, a 40-year sentence is far outside the heartland and is unreasonable.

Even when guarding against overinclusiveness (*i.e.*, by excluding non-sting cases) and underinclusiveness (*i.e.*, by including sting cases with similar conduct regardless of charge), case-to-case comparisons to determine culpability are inappropriate in some terrorism sting cases because of the difficulty of discerning what, if anything, a particular defendant would have done

Page 18 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM

absent government intervention or with a different type of government intervention. In the present case, this factor is especially salient given the difference between Mohamed's actions prior to and after government contact.

As various FBI agents testified at trial, the government was concerned about Mohamed traveling overseas to join a terrorist organization. Indeed, the only evidence in the case on Mohamed's pre-contact intentions viz-a-viz terrorism were in regard to his traveling abroad. This is not a unique scenario in terms of the FBI's domestic counter-terrorism investigations. Indeed, there are numerous cases where the FBI's sting operation resulted in a defendant being arrested as he attempted to leave the United States to join a foreign terrorist organization. *See, e.g., United States v. Masri*, 1:10-cr-00655 (N.D. Ill. 2010); *United States v. Hasbajrami*, 1:11-cr-00623 (E.D.N.Y. 2011); *United States v. Tounisi*, 1:13-cr-00328 (N.D. Ill. 2013). Their attempts to join a terrorist organization were violations of the "material support of terrorism" statutes, which carry a maximum sentence of 15 years. 18 U.S.C. §§ 2339A, 2339B.[8]

Here, the FBI elected to begin the sting operation only after Mohamed had learned of his placement on the No-Fly list. Then, when Agent Youssef gave Mohamed five options that could be done "for the cause," Mohamed was not given the choice to travel abroad to join a terrorist organization. In fact, Youssef implicitly took that option off the table when he told Mohamed that it would be difficult for him to support the cause overseas since he was on the No-Fly list. Removing the option of traveling overseas cannot be justified by practical or operational concerns

---

[8] Less than two weeks ago, a 19-year-old from Colorado – who the FBI arrested at the airport while en route to join al-Qaeda and ISIS in Syria – pleaded guilty to conspiracy to provide material support and will receive a maximum prison term of 5 years.  Emma G. Fitzsimmons, *Guilty Plea by American on Attempt to Help ISIS*, N.Y. Times, Sept. 10, 2014.

**Page 19 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

– as noted above, the FBI has orchestrated exactly such sting operations and has arrested defendants at the airport as they attempted to travel. Furthermore, the undercover agents in this case ultimately did tell Mohamed that they would arrange for his travel overseas under an assumed name, an option that Youssef clearly could have presented to Mohamed in their initial meeting.[9]

Attempting to analyze Mohamed's culpability by comparing his case to others is therefore problematic because it is unclear which other cases serve as benchmarks. Defendants such as Ressam and Abdulmutallab were uninfluenced by any government agent and thus, their actions were entirely the product of their own intent and capabilities. The evidence in Mohamed's case is that he did not think up the charged crime until after he had been contacted by the undercover FBI operatives. Defendants such as Ferdaus and Abdul-Latif, while arrested as part of a sting operation, had concocted their specific plots prior to any contact with government agents. Thus, there is less concern about whether their intentions were influenced by government agents. Here, even assuming all inferences in favor of the government, Mohamed's intent prior to government contact was, at worst, to travel overseas to join a terrorist organization. This would suggest that the material support cases such as *Masri*, *Hasbajrami*, and *Tounisi* are the appropriate "comparison cases" in terms of measuring culpability and arriving at an appropriate sentence.

The defense agrees with the government's argument in *Abdul-Latif* that these case-to-case comparisons in terrorism sting operations are ultimately a "fool's errand." Nonetheless, a constant

---

[9] In another terrorism sting case where the defendant was focused on going abroad and subsequently learned that he was on the No-Fly list, the undercover agents apparently did not tell him it would be difficult to support the cause overseas. Instead, one of the agents arranged for the defendant to fly out of Canada instead. The defendant was arrested as he prepared to travel to Canada and was charged with providing material support to terrorists. Complaint at 14-18, *United States v. Abukhdair*, 1:12-cr-00293 (S.D. Ala. 2012).

**Page 20 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

in these cases is that the Sentencing Guidelines are significantly higher than the eventual sentence imposed. Largely due to the application of the "terrorism enhancement" in U.S.S.G. § 3A1.4 (12 point increase in offense level and automatic Category VI criminal history), the guidelines generally call for a life sentence. In past terrorism sting cases, including each one referenced in the government's sentencing memo, defendants uniformly receive far less prison time than called for by the guidelines. *See, e.g., United States v. Abdul-Latif*, No. 2:11-cr-00228 (W.D. 2011) (18-year sentence where Guidelines called for life); *United States v. Mujahidh*, 2:11-cr-00228 (W.D. Wash. 2011) (17-year sentence where Guidelines called for life); *United States v. Ferdaus*, 1:11-cr-10331 (D. Mass. 2011) (17-year sentence where Guidelines called for life); *United States v. Khalifi*, 1:12-cr-00037 (E.D. Va. 2012) (30-year sentence where Guidelines called for life); *United States v. Hassoun*, 1:10-cr-00773 (N.D. Ill. 2010) (23-year sentence where Guidelines called for life); *United States v. Hasbajrami*, 1:11-cr-00623 (E.D.N.Y. 2011) (15-year sentence where Guidelines called for 30 years to life).

Thus, while any specific case-to-case comparison is unhelpful due to the difficulties in assessing a defendant's original intent and the myriad of mitigating or aggravating facts specific to each defendant and each sting operation, this Court can still glean two important principles from these similar cases. First, as noted by the government in *Abdul-Latif*, the range of sentences generally fall between 10 and 30 years, making the government's recommendation of 40 years in this case well outside the heartland and the defense recommendation at the low end of the range. Second, the Sentencing Guidelines are uniformly rejected as producing too high a sentence. Applying those overarching threads, this Court will promote uniformity in sentencing by rejecting the Guidelines and the government's requested sentence. The defense recommendation of no more than 10 years is consistent with the outcome of other cases, when taking into consideration

**Page 21 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

Mohamed's original intent to travel overseas, the government's conduct in influencing that intent, Mohamed's lack of wherewithal and capability to have acted without FBI assistance, and Mohamed's complete renunciation of his actions and extremist views.

**F.    Under The Supreme Court Authority On Individualized Sentencing, A Sentence To Ten Years Incarceration Is Sufficient But Not Greater Than Necessary To Accomplish The Purposes Of Federal Sentencing.**

The government's sentencing recommendation does not fairly apply critical sentencing considerations in the context of a "sting" case. The courts have recognized that the calculus of culpability is different in "sting" cases, regardless of the legal accountability the defendant has for the offense. The government denigrates a number of the sentencing factors that, under § 3553(a), the Court should consider as mitigation, instead treating them as aggravating factors because the defense has the temerity to argue them: youth, substance abuse, and vulnerability.

Even though the government surveilled Mohamed for six months while he was a juvenile, and all the wrongful activity occurred while Mohamed was 19 and younger, the government claims his youth is not a mitigating factor. CR 477 at 25. As the defense has briefed, the government's position is contradicted by Supreme Court authority, developmental psychology, and common sense. CR 478 at 11-15. At sentencing, the defense asserts that age is a mitigating factor in a number of ways: he was more vulnerable to extremist propagandists and then the undercover agents; his evolving personality and beliefs make him open to reformation and rehabilitation; and the brain development of young men at that age made him susceptible to influences that, as he has matured, are less likely to lead to bad actions. The government's claim that his good conduct and relatively intact family are aggravating factors should also be rejected. The story of immigrant adaptation is a difficult one that should not be disregarded. The pro-social family environment bolsters rehabilitation, as established by the family's rallying and support for his renunciation and

future good behavior. At the same time, the pressures from high expectations and, from the age of 15, knowledge that his parents would divorce as soon as he graduated, created stresses directly relevant to his "identity crisis" that made Mohamed more vulnerable to extremist propaganda and surrogate authority figures.

The government's claim that the Court should regard Mohamed's substance abuse as irrelevant, "relatively mild," and "entirely recreational" should also be rejected. CR 477 at 25-26. The Court has an actual drug and alcohol evaluation before it, as well as the psychiatric opinion of Dr. Kinzie: the substance abuse easily meets the requirements of the Diagnostic and Statistical Manual for pathological dependence. The surveillance, especially the text messages collected in Defense Exhibit 1016, reflect binges where the excessive use of substances resulted in or contributed to blackouts, vomiting, and diminishing academic performance. The rampant abuse of drugs and alcohol is especially significant in the culture of Islam, where such activities are strictly forbidden. The binge activity demonstrates concretely the accuracy of the assessments that Mohamed was confused and conflicted during the relevant times, bouncing back and forth between strict and extreme forms of Islam and extreme forms of American college life. While the defense is not blaming substance abuse as the driving force behind the crime, the fact and extent of the substance abuse, which were well known to the government, are factors that support a mitigated sentence based on the confusion and adolescent conflict they reflect, the effect on judgment during the relevant time, and the prospect for full rehabilitation with treatment and abstention from drugs and alcohol.

A sentence of not more than 10 years would adequately account for the mitigating factors in this case and would be more than sufficient to accomplish any deterrence rationale. Despite the government's attempt to lump all terrorism defendants together as "unique among criminals" in

Page 23 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM

terms of their "enduring dangerousness" and "difficulty of rehabilitation" (CR 477 at 19), the reality is more complex. Some terrorists, as noted above, may be "unique among criminals" and have spewed their hateful ideology and reiterated their desire to harm Americans even while they were being sentenced to lengthy prison terms. Those individuals were so tied to their ideology that remorse or renunciation was unthinkable to them. Administering the harshest sentences – and full application of the terrorism enhancement – makes sense in those cases. This, however, is not such a case. Mohamed has taken every step in his power to show his rejection of the ideology and the path that has brought him before this Court. He has tremendous remorse for his actions and wants nothing more than an opportunity to become a productive member of our society. Two extremely experienced and professional psychiatrists, who have had extensive contact with Mohamed, have provided the Court with reports opining that he does not constitute a future danger. His life is worth saving, and the defense respectfully asks this Court to do so by sentencing Mohamed to no more than 10 years in prison.

**Conclusion**

Under the Guidelines and the statutory sentencing factors, the requested ten-year sentence is reasonable and appropriate. In anticipating the sentencing hearing, the defense would like to share several fears that, once expressed, we hope will be ameliorated.

- First, we fear that the terrorist epithet will become a substitute for the individual being sentenced. On Mohamed's own merits and deficits, rather than some stereotyped bad guy, the requested sentence is warranted.

- Second, we fear that our arguments for mitigation and mercy will be perceived as an attempt to minimize the seriousness of Mohamed's words and unlawful conduct. Nothing could be further from the truth. Mohamed and his counsel acknowledge the enormity of what he did, and he continues to feel shame and abhorrence for his conduct.

**Page 24 REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

- Third, we fear that publicity attendant upon sentencing may create pressure for a harsher sentence than necessary to achieve the legitimate goals of individualized sentencing of Mohamed. The sentence in this case is not about congratulating or criticizing the FBI and related agencies.

Based on the federal judicial tradition of treating every defendant as an individual, we respectfully request that the sentence imposed be not more than ten years' incarceration with a strong recommendation for continued custody in Sheridan, Oregon, or, in the alternative, a United States prison on the West Coast.

Respectfully submitted on September 19, 2014.

*/s/ Stephen R. Sady*
Stephen R. Sady
Chief Deputy Federal Public Defender

*/s/ Steven T. Wax*
Steven T. Wax
Federal Public Defender

*/s/ Lisa Hay*
Lisa Hay
Assistant Federal Public Defender

Mark Ahlemeyer
Research & Writing Attorney