IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

                  Plaintiff,

     v.

MOHAMED OSMAN MOHAMUD,

                 Defendant.

No. 3:10-cr-00475-HZ
(3:20-cv-00883-HZ)

OPINION & ORDER

Natalie Wight
United States Attorney
Ethan D. Knight
Amy E. Potter
Assistant United States Attorneys
U.S. Attorney's Office, District of Oregon
1000 SW Third Ave., Suite 600
Portland, OR 97204

       Attorneys for Plaintiff

Per Olson
Hoevet Olson Howes, PC
1000 SW Broadway, Suite 1740
Portland, OR 97205

       Attorney for Defendant

HERNÁNDEZ, District Judge:

On January 31, 2013, Defendant was convicted of one count of Attempted Use of a Weapon of Mass Destruction, 18 U.S.C. § 2332a(a)(2)(A). On October 1, 2014, Defendant was sentenced to thirty years in custody. Now, Defendant moves to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. The Court denies Defendant's motion.

## BACKGROUND

In November 2010, Defendant was indicted of one count of Attempted Use of a Weapon of Mass Destruction, 18 U.S.C. § 2332a(a)(2)(A). The charges stem from a plot to detonate an explosive device at the annual Christmas tree lighting ceremony in Portland, Oregon. In August 2009, the FBI began surveilling Defendant after his father contacted the FBI for help trying to prevent Defendant from leaving the country. Based on that surveillance, the FBI used undercover agents to contact Defendant. After a series of meetings between Defendant and the agents, a plan was set in motion to detonate an explosive device at the tree-lighting ceremony. And on November 26, 2010, Defendant—in the presence of the agents—attempted to detonate the bomb and was arrested.

A fourteen-day jury trial began on January 10, 2013, resulting in a guilty verdict against Defendant. Defendant was represented by three senior attorneys from the Federal Public Defender's Office throughout the trial and appellate proceedings. On October 1, 2014, the District Court imposed a below-Guidelines sentence of thirty years and a lifetime of supervised release. J. & Commitment, ECF 524. At sentencing, the Court took into consideration Defendant's lack of a criminal history, acceptance of responsibility, low risk of recidivism, and the imperfect entrapment involved in the commitment of the crime. Sent. Tr., ECF 529.

Additional facts are included in the discussion below as relevant to the analysis.

**STANDARDS**

Section 2255 permits "[a] prisoner in custody under sentence of a court established by Act of Congress" to move the court that imposed the sentence to vacate, set aside, or correct the sentence on the ground that:

> [T]he sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]

28 U.S.C. § 2255(a). To warrant relief, a defendant must demonstrate that an error of constitutional magnitude had a substantial and injurious effect or influence on the guilty plea or the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also United States v. Montalvo*, 331 F.3d 1052, 1058 (9th Cir. 2003) ("We hold now that *Brecht's* harmless error standard applies to habeas cases under section 2255, just as it does to those under section 2254.").

Under § 2255, the defendant is entitled to a hearing in which the court determines the issues and makes findings of fact and conclusions of law, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. "The standard for granting an evidentiary hearing [under § 2255] entails assuming the truth of [the defendant's] factual allegations." *United States v. Leonti,* 326 F.3d 1111, 1121 (9th Cir. 2003). When faced with conflicting sworn accounts from a defendant and his trial attorney, a district court is required to hold an evidentiary hearing if the defendant's version of the facts would entitle him to relief. *United States v. Reyes-Bosque*, 624 F. App'x 529, 530 (9th Cir. 2015) (finding that district court erred in holding that the defendant's claim was self-serving because Section 2255(b) imposes no requirement of independent corroboration, and a declaration is not inherently unbelievable merely because it is self-serving). "Therefore, 'a hearing is mandatory

whenever the record does not affirmatively manifest the factual or legal invalidity of the petitioner's claims,' and failure to grant one in such a circumstance is an abuse of discretion." *Id.* (quoting *Baumann v. United States,* 692 F.2d 565, 571 (9th Cir. 1982)).

## DISCUSSION

Defendant asserts that he is entitled to relief under § 2255 for four reasons: (1) Judge King's failure to recuse himself from trying this case; (2) errors in jury selection; (3) issues surrounding evidence gathered pursuant to the Foreign Intelligence Surveillance Act (FISA); and (4) discovery and evidentiary errors. This Court disagrees.

## I.    Judicial Bias

The facts underlying Defendant's first claim are not in dispute. At the first court appearance before Judge King after Defendant's arraignment, Judge King informed the parties of potential conflicts, stating:

> The law clerk assigned to this case and her family and a member of my family were at the tree-lighting ceremony. I have three grandchildren who went to the same middle school as the defendant in this case. I have no indication that they knew or associated or had a social relationship with the defendant.
>
> I do not consider that any of these facts require recusal. I think they have no effect on the Court or on my law clerk, but I wanted to state that for the record in this case.

Def. § 2255 Ex. 4 at 4, ECF 563. There were no further court proceedings related to this issue. The referenced law clerk worked closely with Judge King on the case through sentencing. Judge King did not identify which of his family members attended the tree lighting ceremony.

After the first hearing, Defendant met with one of his trial attorneys—Steve Sady—who told Defendant they should "keep Judge King as the Judge." Def. § 2255 Ex. 14 ("Mohamud Decl.") ¶ 3. According to Defendant, Mr. Sady explained that Judge King's honesty about the event was a reason to "keep him," that Judge King was the best judge for sentencing, and that he

did not think that Judge King would be prejudiced against Defendant. *Id.* Defendant "went along with" his attorneys' decision regarding Judge King, but the potential risks of proceeding with Judge King and the risk of bias were never explained to Defendant. *Id.* ¶¶ 4–6.

Michael Levine—a local criminal defense attorney with forty years of experience—provided a declaration in support of Defendant's motion. Def. § 2255 Ex. 1 ("Levine Decl.") ¶ 1. Mr. Levine conferred with Defendant's attorneys regarding their decision not to move to recuse Judge King. *Id.* ¶ 14. They told Mr. Levine that they "understood the risk but believed, based on their collective experience, that Judge King was the most favorable judge in the district towards criminal defendants." *Id.* Though Mr. Levine generally agrees with that statement, he believes that the risk of bias in this case—given Defendant's intent to harm many people, including individuals close to the judge—outweighed his generally favorable attitude towards criminal defendants. *Id.* Because of the specific facts and circumstances of this case, Mr. Levine opines it was deficient performance not to move to recuse Judge King. *Id.* ¶¶ 12, 13, 15–17.

Defendant makes essentially three arguments in his five grounds for relief related to Judge King's failure to recuse himself. First, Defendant argues that Judge King's failure to recuse himself violated Defendant's right to due process under the Fifth Amendment. Def. Mem. 18, ECF 562. Second, Defendant argues that trial counsel provided ineffective assistance of counsel in violation of the Sixth Amendment when they failed to move to disqualify Judge King; failed to permit Defendant to make a knowing, voluntary, and intelligent decision as to whether to move to disqualify the judge; and failed to move for a hearing in which Defendant would be fully advised of the risks associated with the assigned judge. *Id.* at 18–19. Third, Defendant argues that appellate counsel was ineffective under the Fifth and Sixth Amendments in failing to

assign error to Judge King's failure to disqualify himself from the case. *Id.* at 19. The Court addresses each set of arguments in turn.

A.    Judge King's Failure to Recuse Himself (Ground 1)

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"[1] *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). "Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. at 136. Thus, "[d]ue process may sometimes bar trial by judges who have no actual bias and would do their very best to weigh the scales of justice between contending parties." *Caperton*, 556 U.S. at 886 (internal quotations omitted).

"'[M]ost matters relating to judicial disqualification,'" however, "'[do] not rise to a constitutional level.'" *Id.* at 876 (quoting *FTC v. Cement Institute*, 333 U.S. 683, 702 (1948)); *see also United States v. Heffington*, 952 F.2d 275, 279 (9th Cir. 1991) ("[T]he cases

---

[1] Both parties rely on cases analyzing recusal under the federal statute in their briefs. Def. Mem 27–35; Gov't Resp. 9–11. Accordingly, the Court will consider the facts and circumstances of those cases as well in its analysis. The Court notes, however, that "the federal recusal statutes provide stricter grounds for recusal than the Due Process Clause." *Barroca v. United States*, No. CR-94-0470 EMC, 2014 WL 5513708, at *4 (N.D. Cal. Oct. 31, 2014) (citing cases from the Fifth, Eighth, and Eleventh Circuits); *see Davis v. Jones*, 506 F.3d 1325, 1336 (11th Cir. 2007) ("But a § 455 violation stemming from the appearance standard does not automatically mean the defendant was denied constitutional due process."); *United States v. Couch*, 896 F.2d 78, 82 (5th Cir. 1990) ("The Due Process Clause requires a judge to step aside when a reasonable judge would find it necessary to do so. Section 455 requires disqualification when others would have reasonable cause to question the judge's impartiality."); *United States v. Sypolt*, 346 F.3d 838, 840 (8th Cir. 2003) (holding the statute "reaches farther than the due process clause, which is concerned primarily with the individual rights of parties"). Indeed, the Supreme Court has recognized that the Due Process Clause "demarks only the outer boundaries of judicial disqualifications" such that "[a]pplication of the constitutional standard . . . will . . . be confined to rare instances." *Caperton*, 556 U.S. at 890 ("Because the codes of judicial conduct provide more protection than due process requires, most disputes will be resolved without resort to the Constitution.").

demonstrate a measure of caution on the part of courts before concluding that mere appearances of partiality have, in fact, risen to the level of constitutional error."). Rather, the Supreme Court has identified some circumstances that require recusal: where the judge has "'a direct, personal, substantial, pecuniary interest' in a case," *Caperton*, 556 U.S. at 876 (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)); where the same person serves as both accuser and adjudicator in a case, *In re Murchison*, 349 at 136–37; where "a man chooses the judge in his own case" through, for example, large campaign donations, *Caperton*, 556 U.S. at 886; and where the judge "becomes embroiled in a running, bitter controversy with one of the litigants, *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971); *see also Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (noting Supreme Court precedent has only identified limited circumstances where an appearance of bias necessitates recusal under the Due Process Clause). "These are circumstances 'in which experience teaches that the probability of actual biases on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" *Caperton*, 556 U.S. at 877 (*Withrow v. Larkin*, 421 U.S. 35, 47 (1975)); *see also Rippo v. Baker*, 580 U.S. 285, 287 (2017) (emphasizing that Supreme Court precedents require courts to ask "whether, considering all the circumstances alleged, the risk of bias was too high to be constitutionally tolerable").

 The "risk of unfairness has no mechanical or static definition" and "cannot be defined with precision because circumstances and relationships must be considered." *Hurles v. Ryan*, 752 F.3d 768, 789 (9th Cir. 2014) (internal citation and quotations omitted). This is an objective inquiry, asking "whether the average judge in her position was likely to be neutral or whether there existed an unconstitutional potential for bias." *Caperton*, 556 U.S. at 881.

Defendant argues that Judge King was required to disqualify himself from presiding over this case because one of his family members and the law clerk assigned to the case were present

at the tree-lighting ceremony. Def. Mem. 19. According to Defendant, these circumstances presented an unconstitutional potential for bias in violation of the Fifth Amendment. *Id.* at 21–48. The Government responds by arguing that Defendant has procedurally defaulted on his claim and that Defendant received a fair trial from Judge King, who was not biased. Gov't Resp. 7–11, ECF 573. The Court agrees with the Government.

     i.  Procedural Default

   Defendant has procedurally defaulted on his claim. Habeas review is not an alternative to direct appeal. *Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotation marks omitted). Absent a showing of cause and prejudice, a habeas petitioner procedurally defaults all claims that were not raised in his direct appeal other than claims asserting ineffective assistance of counsel. *Massaro v. United States*, 538 U.S. 500, 504 (2003). "[T]o obtain collateral relief based on trial errors to which no contemporaneous objection was made, a convicted defendant must show both (1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 167–68 (1982).

   To demonstrate "cause," the defendant must establish that "'some objective factor external to the defense' impeded his adherence to the procedural rule." *United States v. Skurdal*, 341 F.3d 921, 925 (9th Cir. 2003) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "External factors include obstacles such as 'a showing that the factual or legal basis for a claim was not reasonably available to counsel,' or that 'interference by officials . . . made compliance impracticable." *Bradford v. Davis*, 923 F.3d 599, 612 (9th Cir. 2019) (quoting *Murray*, 477 U.S. at 488). "Attorney ignorance or inadvertence is not cause," *id.*, nor is a tactical decision, absent a

showing that the attorney error constitutes ineffective assistance of counsel, *Reed v. Ross*, 468 U.S. 1, 13–14 (1984); *see also Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

For "prejudice," the defendant must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. The district court does not need to address both prongs if the defendant fails to satisfy one. *Id.* at 168.

A defendant who fails to show cause and prejudice to excuse a procedural default, may still obtain review on a § 2255 collateral attack by demonstrating the likelihood of his actual innocence. *United States v. Braswell*, 501 F.3d 1147, 1150 (9th Cir. 2007). To establish actual innocence, the defendant must demonstrate that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him. *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011); *see also Bousley*, 523 U.S. at 623 ("'[A]ctual innocence' means factual innocence, not mere legal insufficiency.").

Defendant argues that cause is established in this case because (1) Judge King did not engage in a colloquy with Defendant to ensure he understood the risks associated with his presiding over the case and (2) the Government failed to speak up and ensure Defendant was advised of those risks. Def. Mem. 62. According to Defendant, these failures amount to interference with Defendant's rights, depriving him of an ability to question Judge King's impartiality or interject an objection. *Id.* In other words, the actions of Judge King and the Government made compliance with the procedural rule impracticable.[2] *Id.*

---

[2] Defendant does not argue actual innocence or that the factual or legal basis for his claim was not available to counsel.

Defendant has not demonstrated cause sufficient to excuse his procedural default. Judge King and the Government did not make compliance with the procedural rule impracticable. Indeed, Judge King was transparent about both his own and his law clerk's relationship to the underlying facts of the case from the beginning. Defendant's evidence demonstrates that he discussed this issue with his attorneys, who gave tactical reasons for their recommendation that Judge King continue to preside over the case. As discussed below, this tactical decision did not amount to ineffective assistance of counsel. The Court is unwilling to find, without more, that the manner in which Judge King presented his potential conflict at the hearing or the Government's failure to take any action in relation to that conflict amount to interference with Defendant's ability to raise this issue earlier. Accordingly, Defendant has procedurally defaulted on this claim.

ii.    Merits

Even assuming Defendant had not procedurally defaulted on his First Ground for Relief, Defendant's claim fails. This case is distinguishable from the cases cited by Defendant. Two of the cited cases involved threats that were directed at the judge or judges in the district. *See United States. v. Holland*, 519 F.3d 909 (9th Cir. 2008) (discussing whether a judge must recuse himself *sua sponte* under § 455 after receiving a threatening message from a criminal defendant before his sentencing); *Rodriguez v. Copenhaver*, 823 F.3d 1238 (9th Cir. 2016) (finding a judge—who had previously recused himself in criminal proceedings against a defendant for a robbery of a fellow judge's home—violated the due process clause when he presented a sentencing recommendation to the Bureau of Prisons recommending severe sanctions); *see also United States. v. Yousef*, 327 F.3d 56 (2d Cir. 2003) (holding recusal was not required under § 455 where there was some question as to the seriousness of a threat against the judge); *United*

*States v. Greenspan*, 26 F.3d 1001 (10th Cir. 1994) (finding recusal was required under § 455 where a credible threat was made against the judge and his family and there was no evidence the threat was a device to force recusal); *Clemens v. U.S. Dist. Ct. for the Cent. Dist. of Calif.*, 428 F.3d 1175 (9th Cir. 2005) (holding recusal of an entire district was not required due to a threat against three of the judges in that district). One involved a threat directed at a federal courthouse. *See In re Nettles*, 394 F.3d 1001 (7th Cir. 2005) (finding recusal was required where the defendant moved for recusal under § 455 and the underlying case involved an attempt to destroy a federal courthouse even though there was no actual threat to the courthouse because the defendant's accomplices were undercover federal agents). And still another involved massive damage to a United States federal courthouse and harm to court staff and their families. *See Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) (finding recusal was required even though the presiding judge had not lost any family in a nearby bombing because the explosion caused massive damage to the courthouse, injured a member of the judge's staff and other court personnel, and some employees had friends or relatives killed or injured in the explosion). Further, the Ninth Circuit has cautioned that questions involving recusal are necessarily fact-driven and require an independent analysis of the facts in each case. *See Holland*, 519 F.3d at 913 (discussing the analysis under § 455).

The facts in this case are particularly unique. It does not fall neatly into one of the categories of cases the Supreme Court has found requires recusal under the Due Process Clause, *see supra* Part I.A, nor does it closely track the exceptional facts of the cases cited by Defendant. In this case, the conflict Defendant argues requires recusal is the attendance of Judge King's family member and his law clerk at the tree-lighting ceremony. But Defendant's crime was not specifically targeted at Judge King, his family, his law clerk, the federal judiciary, or the

courthouse. Rather, the threat was to the holiday event itself, which took place in a public square in downtown Portland and had thousands of people in attendance. Moreover, Defendant's plot was never going to come to fruition, and no harm was suffered by anyone. Indeed, Defendant argued that he was entrapped by the FBI and would not have committed the crime but for the federal officers' involvement.

Taken together, the Court finds that Judge King did not violate Defendant's due process right to a fair trial in not recusing himself from the case. Subjectively, Judge King was not biased. From the outset, Judge King was open about his potential conflict and determination that he could be neutral in this case, Def. § 2255 Ex. 4 at 4, and Defendant has not pointed to anything that Judge King did or said to suggest that he was biased,[3] *cf. Rodriguez*, 823 F.3d at 1243 (emphasizing a letter that the judge wrote strongly recommending severe sanctions for a crime committed against his colleague and opining that an earlier release date would be an insult to the judge-victim); *Greenspan*, 26 F.3d at 1007 (noting that the judge chose to accelerate court procedures to protect himself and his family after he learned of a genuine death threat against them).  Indeed, at sentencing, Judge King acknowledged—among other things—the imperfect entrapment involved in the commission of this crime as well as Defendant's low risk of recidivism, ultimately sentencing Defendant well below the Guidelines recommendation of life in prison and 10 years below the sentence requested by the Government. Objectively, there is not an unconstitutional potential for bias. The average judge in his position would be likely to be neutral. *See Williams v. Ryan*, No. CV171834PHXDWLJFM, 2020 WL 7232628, at *36 (D. Ariz. Sept. 30, 2020), *report and recommendation adopted*, No. CV-17-01834-PHX-DWL, 2020

---

[3] Rather, it appears Defendant argues that the outcomes of Judge King's evidentiary and pretrial rulings demonstrate "uneven" treatment between the parties. Def. Reply 7. The Court disagrees.

WL 7022233 (D. Ariz. Nov. 27, 2020) ("[T]he Due Process standard . . . focuses on the effect on the judge" not on the perceptions of laymen.). Judge King was not the intended target of the crime, and the harm was not specifically directed at the district court, his family, or his clerk. No harm was suffered by any individual attending the tree-lighting ceremony because Defendant was working with undercover FBI agents. This case does not present extreme circumstances where the risk of bias is too high to be constitutionally tolerable. Accordingly, Defendant is not entitled to relief on this claim.

As to Defendant's arguments regarding waiver, the Court declines to address those further as Defendant's judicial bias argument is both procedurally defaulted and fails on its merits. Further, as Defendant's memorandum demonstrates, no court has addressed waiver of the right to an impartial judge under the Due Process Clause or any associated requirements. *See, e.g.*, *Gonzalez v. United States*, 553 U.S. 242, 250–53 (2008) (holding that "express consent by counsel suffices to permit a magistrate judge to preside over jury selection in a felony trial" and noting that the structural nature of a violation of a right does not necessarily require personal waiver of that right). The Court declines to do so in the first instance.[4]

///

///

---

[4] In addition, the Court notes the relevant disqualification statute—28 U.S.C. § 455—"does not regulate the detailed manner in which waiver must be effected." *United States v. Nobel*, 696 F.2d 231, 236–37 (3d Cir. 1982) ("[I]t is sufficient under the statute if the judge provides full disclosure of his or her relationship at a time early enough to form the basis of a timely motion at or before trial and under circumstances which avoid any subtle coercion. The election to proceed after full disclosure of the relevant facts satisfies those requisites and constitutes an effective waiver under the statute."); *see also United States v. Rogers*, 119 F.3d 1377, 1381–82 (9th Cir. 1997) ("Rogers' election to proceed after this disclosure constitutes an effective waiver under § 455(e)."). Indeed, § 455(e) merely provides that a "waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification."

B.      Ineffective Assistance of Trial & Appellate Counsel (Grounds 2, 3, 4 & 5)

Defendant has also failed to demonstrate that he was not afforded effective counsel under the Sixth Amendment. The Sixth Amendment guarantees that "in all criminal prosecutions, the accused shall enjoy the right to . . . the Assistance of Counsel for his defence," U.S. Const. amend. VI. "[T]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled.'" *Strickland v. Washington*, 466 U.S. 668, 685 (1984) (internal citation omitted). Therefore, the right to counsel guaranteed in the Sixth Amendment is the right to *effective* assistance of counsel. *Id*. at 686. The right to effective counsel under the Sixth Amendment applies to all "critical stage[s] of the prosecution." *Kirby v. Illinois*, 406 U.S. 682, 690 (1972).

The defendant must prove two elements under *Strickland* to succeed on a claim for ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

*Strickland*, 466 U.S. at 687.

The Court must analyze counsel's performance considering the circumstances at the time: "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 659. First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Id*. at 688. Due to the difficulties in evaluating counsel's performance, courts must indulge a strong

presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id*. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

The appropriate test for prejudice is whether petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In proving prejudice with respect to the performance of appellate counsel, a petitioner must demonstrate a reasonable probability that but for appellate counsel's failure, "he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285–286 (2000).

i.    Expert Testimony of Michael Levine

As a preliminary matter, the Court addresses the utility of some of the evidence from Defendant's expert, Michael Levine. *See* Levine Decl. In his declaration, Mr. Levine concludes that various acts of defense counsel—including counsel's failure to move to recuse Judge King—constitute deficient performance. *Id.* ¶¶ 12, 17, 18, 20, 24, 28, 31. Mr. Levine also speculates as to the effect that these failures had on the trial and appeal, including on Judge King's mental state. *See, e.g., id.* ¶ 12 (speculating that evidence of Defendant's desire to kill attendees at the tree-lighting ceremony "was bound to provoke rage and anger in the judge's mind and in his clerk's during the course of the trial if not at the pre-trial stage").

"Expert testimony is not necessary to determine claims of ineffective assistance of counsel." *Earp v. Cullen*, 623 F.3d 1065, 1075 (9th Cir. 2010). Rather, "a district court is 'qualified to understand the legal analysis required by *Strickland*,' [and] it does not abuse its discretion in in excluding expert testimony relating to that analysis." *Id.* (quoting *Hovey v. Ayers*, 458 F.3d 892, 911 (9th Cir. 2006)).

Here, the Court finds that Mr. Levine's declaration is of limited value. Insofar as Mr. Levine offers legal determinations as to whether counsels' actions were deficient, the Court declines to consider that testimony. It does not aid the Court in resolution of the *Strickland* analysis. The Court also declines to consider counsel's statements speculating as to the mental state of the judge, law clerk, and jurors in this case. However, the Court will consider Mr. Levine's declaration to the extent that it offers his own interpretation of the record, insight into the actions of defense counsel, and why, in his experience as a criminal trial lawyer, alternatives may have been considered.

ii.    Ineffective Assistance of Trial Counsel

With regard to Judge King's alleged bias, Defendant argues that trial counsel was ineffective for two reasons. First, Defendant argues that counsel was ineffective for failing to move to disqualify Judge King. Def. Mem. 63. Specifically, Defendant asserts that counsel's decision to proceed with Judge King was unreasonable because: (1) despite their past prior experiences with Judge King, this case was unique in introducing a "new personal element" that would have an impact on Judge King's impartiality; and (2) counsel failed to consider Judge King's law clerk's role in their decision. *Id.* at 66–67. Second, Defendant argues that counsel was ineffective in failing to ensure that Defendant consented to Judge King's involvement in the case and that said consent was "unequivocal, knowing, and voluntary." *Id.* at 69.

Because Judge King was not biased, *see supra* Part I.A.ii, trial counsel could not have be ineffective for failing to move to recuse Judge King. *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.").

Furthermore, counsel made a reasonable, tactical decision in not objecting to Judge King. Here, defense counsel explained that they "understood the risk but believed, based on their collective experience, that Judge King was the most favorable judge in the district towards criminal defendants." Levine Decl. ¶ 14.[5] Counsel explained this to Defendant. They told Defendant they did not think Judge King would be biased and emphasized Judge King's honesty in disclosing the possible conflict and the benefits to having Judge King at sentencing. Mohamud Decl. ¶¶ 3–6. Indeed, Judge King ultimately gave Defendant a sentence that was significantly below the Guidelines range. And Mr. Levine notes that defense counsel's perspective that Judge King was the most favorable towards criminal defendants was generally correct. Levine Decl. ¶ 14. His own perception that the risk of bias in this case outweighed his favorable disposition does not alter the Court's ultimate conclusion: that defense counsel's decision not to move to recuse Judge King falls within the wide range of reasonable professional assistance. Accordingly, the Court finds that Defendant's trial attorneys were not ineffective.[6]

The Court also declines to find that counsel was ineffective in failing to obtain a waiver from Defendant or failing to ensure that Defendant's consent to Judge King's involvement was unequivocal, knowing, and voluntary. As noted above, no court has addressed waiver of the right to an impartial judge under the Due Process clause and its associated requirements. Nor has any court required that such a waiver be a personal to the Defendant. *See Florida v. Nixon*, 543 U.S. 175, 187 (2004) (holding that "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate," including

---

[5] The Court notes that many of the statements of defense counsel submitted by Defendant through his own declaration and the declaration of Mr. Levine are hearsay. Both parties, however, appear to rely on these statements without objection.
[6] The Court declines to address the "prejudice" prong of the analysis because Defendant has failed to demonstrate that counsel's performance was deficient.

"whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal"); *see also Gonzalez*, 553 U.S. at 250 (holding that a tactical decision allowing a magistrate judge to oversee voir dire did not require the defendant's express consent); *United States v. Gamba*, 541 F.3d 895, 900–01 (9th Cir. 2008) (finding counsel's "decision to consent to [a magistrate judge] presiding over [the defendant's] closing argument . . . was also a strategic, tactical decision"). Indeed, "defense counsel may waive certain rights of the accused as part of the trial strategy without obtaining the accused's express, personal consent." *Gamba*, 541 F.3d at 900. In sum, Defendant's Second, Third, and Fourth Grounds for Relief fail.

        iii.    Ineffective Assistance of Appellate Counsel

Defendant argues that appellate counsel was ineffective for not appealing Judge King's failure to disqualify himself. Def. Mem. 71. He contends that "[a]ppellate counsel should have assigned on appeal the twin errors of Judge King failing to recuse himself and failing to obtain an unequivocal, knowing, and intelligent waiver from defendant personally of his right to an objectively impartial judge." *Id.*

Like trial counsel, appellate counsel could not have been ineffective for failing to appeal Judge King's failure to disqualify himself because Judge King was not biased. The "[f]ailure to raise a meritless argument does not constitute ineffective assistance." *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985); *see also Martinez v. Ryan*, 926 F.3d 1215, 1227 (9th Cir. 2019) ("[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal.") (internal citation and quotations omitted). Therefore, Defendant cannot succeed on his Fifth Ground for Relief.

///

///

## II.    Ineffective Assistance of Counsel in Jury Selection (Grounds 6, 7 & 8)

"The conduct of voir dire 'will in most instances involve the exercise of a judgment which should be left to competent defense counsel.'" *Hovey v. Ayers*, 458 F.3d 892, 910 (9th Cir. 2006) (quoting *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980)); *see also Clark v. Neven*, 707 F. App'x. 450, 452–53 (9th Cir. 2017) (finding counsel's decision not to use his last peremptory challenge was a reasonable tactical choice). "Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased." *Davis v. Woodford*, 384 F.3d 628, 642–43 (9th Cir. 2004).

"The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "It is not required, however, that the jurors be totally ignorant of the facts and issues involved." *Id.* Rather, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 723.

"The Supreme Court has suggested that the relevant test for determining whether a juror is biased is whether the juror had such fixed opinions that he could not judge impartially the guilt of the defendant." *Davis*, 384 F.3d at 643 (internal quotations, brackets, and ellipses omitted). This can be satisfied by a showing of either actual or implied bias. "[A]ctual bias is bias in fact— the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Gonzalez,* 214 F.3d 1109, 1112 (9th Cir. 2000) (internal quotations omitted). And "[i]n extraordinary cases, courts may presume bias based upon the circumstances." *Dyer v. Calderon*, 151 F.3d 970, 981 (9th Cir. 1998). In determining "implied

bias," the Court must ascertain "whether an average person in the position of the juror in controversy would be prejudiced." *Gonzalez*, 214 F.3d at 1112 (internal quotations omitted).

Defendant argues that trial and appellate counsel were ineffective in failing to exclude two different jurors. Def. Mem. 75. First, Defendant argues that trial counsel was ineffective in failing to use a peremptory challenge against Juror 7 or otherwise excuse her as opportunities arose throughout trial, and that appellate counsel was ineffective in failing to argue that the Court's denial of a for-cause challenge was an error. *Id.* at 76–77. Second, Defendant argues that trial counsel was ineffective in failing to use a peremptory challenge against Juror 5. *Id.* at 77. The Court addresses each in turn.

A.    Juror 7

i.    Background

Juror 7 was a 41-year-old teacher and mother of two children, ages 10 and 12, from the Portland metro area. Def. § 2255 Ex. 15 at 855. In her juror questionnaire, Juror 7 noted that she knew the attempted bombing had occurred because her children were at the tree-lighting ceremony. *Id.* at 858. She did not indicate whether she had formed any opinions about the case based on this knowledge but wrote that she was "[t]hankful [her] kids were safe." *Id.* at 858–59. Juror 7 also wrote that she could set aside her own prejudice or bias and decide the case solely based on whether Defendant was proved guilty of the crime charged. *Id.* at 858.

During voir dire, Juror 7 was questioned about her ability to remain neutral as a juror in light of her children's attendance at the tree-lighting ceremony. She said her reaction to learning about the situation after the ceremony was "disbelief," and she was "thankful . . . that [her] children were safe." Def. § 2255 Ex. 16 ("Voir Dire Tr.") 112:4–8. When asked by the Court

whether she might have some bias or prejudice against Defendant because of these

circumstances, she replied:

> You know, I'm a teacher, also, so I feel very protective of kids and, of course, that I have mine. Yes, I think that's -- nobody wants to have a feeling of possibly thinking that their children are going to be harmed. I don't know how else to answer that.

*Id.* at 112:9–23. The Court asked in follow-up whether she felt she could be an unbiased juror in

this case, and she said yes. *Id.* at 113:1–4.

Defense counsel also also asked Juror 7 questions about her ability to remain neutral.

Specifically, counsel asked Juror 7 whether hearing the evidence in this case, thinking about

what was going to happen, and seeing the device that was constructed could cause "emotional

carryover" and affect her. *Id.* at 172:12-19. She responded:

> Yeah, that's a tough question. I feel like, you know, there are -- I wasn't there with my children, and that was something -- so I didn't personally experience it with them. When we found out that it had happened, it was much later. So it wasn't in a situation where I was panicked for my children in that moment. Knowing that it had -- hearing about it afterward and knowing that they were there, as I said, I was thankful that it -- obviously, that it did not happen. And, as you say, you can't change what your life experience is or how you come to a certain situation, and life is not a pie with slices. It's a whole big mix. I also know that life happens -- things can happen at any moment, and you can't be everywhere to protect your children, whether you want to or not. And I'm not sure what else to say about that.

*Id.* at 172:20–173:11. In follow-up, Juror 7 clarified that she would have the same feelings

regardless of whether her children were there because "nobody wants these kinds of things to

happen to anyone." *Id.* at 174:6–12. Counsel then asked Juror 7 if she could commit to being a

fair and impartial juror to the best of her ability and that her emotions will not "enter into it." *Id.*

at 174:13–18. She answered affirmatively. *Id.*

Defendant challenged Juror 7 for cause, citing her children's attendance at the event. Def. § 2255 Ex. 17. The Court denied the challenge. Voir Dire Tr. 197:15–18. Defendant did not use one of his peremptory challenges against her. Def. § 2255 Ex. 18.

Defendant did not challenge Judge King's denial of Defendant's for-cause challenges on appeal. Def. § 2255 Ex. 30 ("Sady Decl.") ¶ 2, ECF 580-1. Appellate counsel "do[es] not remember having identified, researched, or made a tactical decision regarding potential appellate issues regarding denial of challenges for cause during jury selection." *Id.* ¶ 3. Specifically, he explains:

> Raising the potential jury selection issue would have been consistent with appellate strategy. The initial issue in the Opening Brief was raised to elaborate the perhaps counterintuitive theory for winning the appeal the difference between predisposition to extremism and predisposition to commit the crime charged. With the first issue raising insufficiency of evidence and establishing the lack of harmlessness, the issues following were aimed at demonstrating that pervasive legal errors rendered the trial unfair. Any error during jury selection would have been consistent with this narrative, and I remember no tactical decision to omit this issue on appeal.

*Id.* ¶ 4. Defendant's original opening brief on appeal was 230 pages. Def. § 2255 Ex. 20. A 179-page amended opening brief was filed when the Ninth Circuit limited the length of Defendant's brief to 180 pages. Def. § 2255 Ex. 21. The amended brief excluded at least one issue from the opening brief and condensed its discussion, largely focused on errors related to Defendant's entrapment defense, the handling of classified evidence, evidentiary rulings, and alleged violations of the FISA Amendments Act. *Compare* Def. § 2255 Ex. 20 *with* Def. § 2255 Ex. 21.

### iii.    Ineffective Assistance of Trial Counsel

Defendant argues that counsel's failure to use a peremptory challenge to strike Juror 7 as well as their failure to advocate for her removal as other opportunities arose during trial constitute ineffective assistance of counsel. Def. Mem. 91. Defendant contends that counsel's

actions fell below a "reasonable standard of care because, categorically and as a matter of law, her status as the victim of defendant's intended crime rendered her unsuitable as a fact-finder in this case." *Id.* at 92. In making this argument, Defendant emphasizes (1) statements made by Juror 7 during voir dire and (2) the attendance of Juror 7's children at the Christmas tree lighting ceremony. *Id.* at 92–95.

Defendant's claim fails because Juror 7 was neither actually nor impliedly biased. *See Davis*, 384 F.3d at 643 ("Establishing *Strickland* prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury contained at least one juror who was biased."). Turning first to actual bias, Defendant has not demonstrated that Juror 7 had a "state of mind that leads to an inference that the person will not act with entire impartiality." *Gonzalez*, 214 F.3d at 1112. Quite the contrary: Juror 7 indicated again and again in thoughtful and thorough answers that she would be able to remain neutral in this case despite her children's attendance at the tree-lightening ceremony. She unequivocally told the Court and counsel she could be unbiased. And when questioned by counsel, she indicated that her response to the tree-lighting ceremony was no different than it would have been if her children had not been in attendance. Though she also admitted that the case presented difficult circumstances and she was thankful the bombing had not happened, these statements merely reflect that she was confronting her feelings about the underlying incident. Taken together, the record demonstrates that Juror 7 harbored no actual bias against Defendant and that she intended to approach the case with a neutral, unbiased perspective. *See Davis*, 384 F.3d at 643 (noting that juror comments reflected that they were "grappling with their feelings about the death penalty, and that they intended to approach the evidence with an understanding of the proper allocation of burdens in a criminal case").

Further, this case does not present the extreme circumstances under which the Court can presume bias. The Ninth Circuit has warned that "courts answering this question should hesitate before formulating categories of relationships which bar jurors from serving in certain types of trials." *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir. 1990). Indeed, few cases have resulted in a finding of implied bias. For example, the Ninth Circuit found that a juror could not remain impartial in a heroin-conspiracy trial where his sons were currently imprisoned for heroin-related crimes. *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979). Similarly, the circuit court has presumed bias where jurors worked in a different branch of a bank that the defendant was accused of robbing. *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977). And in another, the court reversed a conviction for implied bias where a juror had concealed the murder of her brother during voir dire. *Dyer*, 151 F.3d at 981. As these cases illustrate, most findings of implied bias involve a looming threat of danger, special knowledge or understanding of the crime, a deep personal connection to a victim of the crime, or personal involvement in the criminal transaction. *But see United States v. Kechedzian*, 902 F.3d 1023, 1028 (9th Cir. 2018) (finding jurors' previous experience as a victim of identity theft was "not the type of 'extreme' situation where [the court] find[s] implied bias").

Here, Juror 7 was not impliedly biased. She was not personally involved in the underlying incident. Her children suffered no harm and were not the specific targets of the threat. Further, there was no future apprehension of this kind of crime to Juror 7's children. *Cf. Allsup*, 566 F.2d at 71–72 (emphasizing that the jurors—as bank employees—also had a "reasonable apprehension of violence by bank robbers"). And she had no special knowledge or understanding of the crime. Thus, Defendant has not demonstrated that counsel's failure to exercise a peremptory challenge against Juror 7 lead to a panel containing a biased juror. *Cf. Gonzalez*, 214

F.3d at 1114 (finding that the juror's equivocal responses to the court's questions "and the similarity between her traumatic familial experience and the defendant's alleged conduct" should have required the juror's excusal either for actual or implied bias). Defendant's Sixth Ground for Relief fails.

iii.    Ineffective Assistance of Appellate Counsel

Defendant separately argues that appellate counsel was ineffective for failing to appeal Judge King's denial of trial counsel's for-cause challenge of Juror 7. Def. Mem. 98. Defendant argues that appellate counsel "simply missed" this issue as he did not "consciously make a strategic choice not to pursue this issue on appeal in favor of other issues." *Id.* at 99. In support of this argument, Defendant emphasizes (1) the significant size and scope of the appellate brief and (2) that the for-cause issue was a strong appellate issue that "would have provided the clearest path to reversal." *Id.* at 100.

*Strickland*'s two-part test applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 284–86 (2000). However, the "two prongs partially overlap when evaluating the performance of appellate counsel." *Miller v. Keeney*, 882 F.2d 1428, 1434–35 (9th Cir. 1989). As the Ninth Circuit has observed:

> In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. Like other mortals, appellate judges have a finite supply of time and trust; every weak issue in an appellate brief or argument detracts from the attention a judge can devote to the stronger issues, and reduces appellate counsel's credibility before the court. For these reasons, a lawyer who throws in every arguable point—"just in case"—is likely to serve her client less effectively than one who concentrates solely on the strong arguments. Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue.

*Id.* (internal citations omitted); *see also Martinez v. Ryan*, 926 F.3d 1215, 1227 (9th Cir. 2019) ("'[A]ppellate counsel's failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal.'") (quoting *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001)).

Appellate counsel was not ineffective. Contrary to Defendant's argument, the size and scope of the appellate brief—and its history—illustrate that appellate counsel was faced with weeding out weaker issues on appeal. The scope of the proceedings in this case were significant. The pretrial period spanned over two years and involved robust motions practice. Defendant's trial was fourteen days long. And one-and-a-half years passed between the jury's verdict and sentencing, due in large part to additional, substantive motions practice. On appeal, counsel's brief was a whopping 230 pages and had to be edited significantly after the Ninth Circuit limited Defendant's brief to 180 pages. A review of the briefing shows that appellate counsel chose to focus on trial court rulings involving the entrapment defense, the handling of classified evidence, evidentiary rulings, and FISA evidence. Further, appellate counsel did not state that the jury selection issue was missed. Rather, counsel "do[es] not remember" having looked into or having made a tactical decision to omit the jury selection issue on appeal. Sady Decl. ¶ 3. In context of the record, Defendant has not demonstrated that this was not effective appellate advocacy.

Moreover, the for-cause issue was not a strong appellate issue that would have provided a path to reversal. As discussed above, Juror 7 was neither impliedly nor actually biased, and Judge King did not err in denying the for-cause challenge. Though the issue would not have been frivolous, Defendant would likely not have succeeded on this issue on appeal. *See Miller*, 882 F.2d at 1434 (finding counsel objectively competent in declining to raise a weak issue on appeal: "While raising [the incident] on direct appeal would not have been frivolous, neither would it

have led to a reasonable probability of reversal."); *Jones v. Barnes*, 463 U.S. 745, 754 (1983)

("For judges to second-guess reasonable professional judgments and impose on appointed

counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal

of vigorous and effective advocacy[.]"). Because appellate counsel did not err in declining to

include a weaker issue in the appellate brief, Defendant fails on Ground Seven.

> B.    Juror 5

>> i.    Background

Juror 5 was a 56-year-old retired operations director for the City of Tualatin, Oregon.

Def. § 2255 Ex. 15 at 123. Juror 5 was also a member of a nonprofit organization called the

"Patriot Guard Rider," which provides escort to and attends military funerals in response to

military-funeral protests in the mid-2000s. Voir Dire Tr. 164:2–18. He expressed that he is a very

patriotic person, but he stated that anti-American statements and evidence in the case would not

make it more difficult for him to follow the law and decide the case:

> I can have my personal views on whether I think somebody should say something
> or not say something or if I'm personally offended by it. But I think I would look
> at what the law is in this case – well, I know I would – and try to, based on the
> instructions I'm given, to say was a law broken or not.

> And regardless of whether I agree with what somebody said – I mean, that's, to me,
> part of living in America is that you can say things that I'll be very offended of, and
> I'll defend your right to say it. I may not like it, but I'll defend your right to say it.

*Id.* at 166:6–24.

Juror 5 also revealed that he had experience working with police officers through his

work in the Public Works Department of the City of Tualatin. *Id*. at 96:5–13. He was questioned

repeatedly about how he would evaluate the testimony of law enforcement officers. *Id.* at 96:14–

24. Though he expressed he would not generally give an edge to the police officer, in some of his

responses he indicated that he might find the law enforcement officer more credible under certain
circumstances:

> THE COURT: So could you evaluate [an officer's] testimony just as you would
> any other person's testimony? They don't have an edge because they've got a badge?
>
> JUROR NO. 5: Correct. I think there are times that they would, if it came down to
> -- if it involved the officer saying that a person ran a stop sign, and the person said
> they didn't run a stop sign, and there are no other witnesses, I think I would give
> the edge to the police officer because of their duty and their swearing to do their
> job. If it's just their evidence or their opinion, I think I would look at what the facts
> were.

*Id.* at 96:14–24. In response to a similar question from defense counsel, Juror 5 said that he gives

more weight to law enforcement testimony when the case boils down to the testimony of a

defendant versus a police officer and there is "no negative against the officer" because he

"hold[s] them to a higher standard." *Id.* at 162:2–14. He further clarified he did not believe the

police are "infallible" and would "listen to" other facts and witnesses in a case. *Id.* at 162:15–19.

Juror 5 also described his prior jury experience where a similar situation presented itself. There,

the attorneys spent a lot of time on the officer's credibility such that he "felt confident that the

officer was telling the truth," and "they put enough doubt on the defendant that [he] didn't

believe they were telling the truth." *Id.* at 163:7–23.

Neither party made any challenges for cause or peremptory challenges against Juror 5.

ii.    Analysis

Defendant argues that trial counsel was ineffective for failing to use a peremptory

challenge against Juror 5. Def Mem. 105. Specifically, Defendant argues that "[d]espite [Juror

5's] assurances that he could be fair, he should have been struck with a peremptory challenge

because his affiliation with the Patriot Guard Riders and his strong sense of patriotism and

respect for military personnel made it extremely unlikely he would find that defendant was

entrapped." *Id.* at 105–06. Defendant further suggests that Juror 5 was the wrong juror to consider Defendant's entrapment defense because "he would have found defendant's support for violence against American service people completely unacceptable and so contrary to his own values." *Id.* at 106.

This Court disagrees. Defendant has not demonstrated that Juror 5 was biased. Juror 5 was absolute in his commitment to remaining neutral and unbiased in this case. While he did express that he holds very patriotic views and engages in pro-military volunteer work, he was unequivocal that the anti-American sentiments and evidence in the case would not make it more difficult for him to follow the law and decide the case. Juror 5 also gave thoughtful answers to questions about how he would weigh testimony, stating that he did not believe law enforcement were infallible and that he would listen to all the facts and witnesses in a case to weigh the credibility of witnesses and decide the issues. In other words, the record does not suggest that Juror 5 had a state of mind leading to an inference that he could not act impartially or appropriately consider Defendant's entrapment defense. *See Gonzalez*, 214 F.3d at 1112 (describing cases where courts found actual bias). Nor has Defendant demonstrated that an average person in Juror 5's position would be prejudiced. Accordingly, trial counsel was not ineffective in failing to use a peremptory strike to remove Juror 5.

## III.    FISA Motions (Grounds 9 & 10)

In his ninth and tenth grounds for relief, Defendant argues that his Fifth Amendment Due Process right was violated when he was denied FISA discovery and his Fourth Amendment right against unreasonable searches and seizures was violated with respect to surveillance conducted pursuant to FISA warrants. Def. Mem. 136. Citing recent reports revealing problems in the FBI's FISA process from the Office of Inspector General ("OIG"), Defendant essentially asks the

Court to reconsider FISA issues that were already presented to the trial and appellate courts in this case. The Court declines to do so.

As Defendant recognizes, many of the issues Defendant presents were already litigated in this Court and on direct appeal. *Id.* at 136–39, 179 (noting "the constitutional grounds for requiring the disclosure of FISA material and an adversary process . . . . were made and rejected in the first go-around in this case, but their persuasive strength has grown in the context of the abuses revealed by the ongoing OIG investigation"). Indeed, Defendant brought both Fifth and Fourth Amendment challenges to the FISA process, arguing many of the same points he argues here. *See* Def. FISA Disc. Mem., ECF 55; Def. Mot. Suppress Mem., ECF 503; May 7, 2012 Op. & Order, ECF 126; June 24, 2014 Op. & Order, ECF 517; Def. § 2255 Ex. 21 (Def. Appellate Br.); *United States v. Mohamud*, 666 F. App'x 591 (9th Cir. Dec. 5, 2016); *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016). These claims are therefore barred. *See United States v. Redd*, 759 F.2d 699, 701 (9th Cir. 1985) (finding a claim that was raised in a direct appeal and expressly rejected "cannot be the basis of a § 2255 motion").

The Court declines to find that the OIG reports can serve as a basis to relitigate these issues. Turning first to Defendant's Fifth Amendment claim, the Court finds that the OIG reports and related materials do not cast doubt on either the FISA materials or the ultimate conclusions of the district court and appellate court in this case. Defendant's argument is speculative. While the reports reflect significant issues in the FISA process from within the FBI, the cases discussed in the reports are unrelated to this case. *See* Def. § 2255 Exs. 23, 26 (2019 & 2020 OIG Reports). Nor is there temporal overlap between the reviewed cases and this case. *See id.* And of the 209 errors identified in the 2020 OIG report, only 4 were deemed material. Def. § 2255 Ex. 31 at 2. Finally, as the appellate court and this Court concluded, this case did not present complex or

novel questions in relation to the FISA surveillance. May 7, 2012 Op. & Order (agreeing with the Government that most of the factors identified by Defendant supporting disclosure of the FISA applications are "present in any court's review of FISA applications"); *Mohamud*, 843 F.3d at 438 ("Although § 702 potential raises complex statutory and constitutional issues, this case does not."). While the deficiencies in the FISA procedures identified by the OIG are undoubtedly troubling, the OIG reports are not a sufficient basis for Court to assume that "the same problems exist with the FISA applications in this case" such that it is appropriate to revisit Defendant's FISA motions. *See* Def. Mem. 183.

Defendant faces the same problems in his Fourth Amendment claims. As a general matter:

> A federal court may not grant . . . § 2255 habeas corpus relief on the basis that evidence obtained in an unconstitutional search or seizure was introduced [at trial] where the defendant was provided an opportunity to litigate fully and fairly his fourth amendment claim before petitioning the federal court for collateral relief.

*Tisnado v. United States*, 547 F.2d 452, 456 (9th Cir. 1976). Defendant argues that there are two reasons he was not given an opportunity to fully and fairly litigate this claim: (1) he was denied discovery of FISA-related materials before trial and (2) the OIG findings as to the accuracy of FISA applications undermines the justification for the ex parte, in camera FISA review processes that were relied on in this case. Def. Mem. 140–41. Neither argument serves as a basis for finding that Defendant was denied the opportunity fully and fairly litigate his Fourth Amendment claim. Rather, Defendant litigated these issues with the trial and appellate courts, and the OIG reports do not reasonably call into question these decisions. For the foregoing reasons, Defendant cannot succeed on his Ninth and Tenth Grounds for Relief.

///

///

**IV.    Discovery & Evidentiary Errors (Ground 11)**

In his Eleventh Ground for Relief, Defendant identifies nine categories of trial court rulings that he argues "must be considered anew despite the fact that they were rejected on direct appeal . . . because those appellate concepts presume an objectively impartial judge." Def. Reply 6, ECF 580. As Defendant appears to concede, the viability of these claims rests on whether the Court has found that Judge King was biased. *See id.* at 7 n.2. Because the Court has concluded that Judge King was not biased, it declines to revisit the identified trial court rulings. Defendant's Eleventh Ground for Relief fails.

**CONCLUSION**

Defendant's Motion to Vacate or Correct Sentence Under 28 U.S.C. § 2255 [557] is DENIED. The Court DENIES a certificate of appealability because Defendant has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED:   September 19, 2023   .


MARCO A. HERNÁNDEZ
United States District Judge